JUDGE BAER

# 13 CIV 5434

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SHARON HAWKINS, derivatively on behalf of MEDAPPROACH, L.P., and individually,

Plaintiff,

v.

MEDAPPROACH HOLDINGS, INC., and W. BRADLEY DANIEL,

Defendants,

-and-

MEDAPPROACH, L.P.,

Nominal Defendant.

Civil Action No



**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiff Sharon Hawkins ("Plaintiff" or "Mrs. Hawkins"), for her derivative complaint on behalf of Nominal Defendant MedApproach, L.P. ("MedApproach") and individually on her own behalf, alleging upon personal knowledge to herself and her own acts and upon information and belief as to all other matters, hereby complains against Defendants MedApproach Holdings, Inc. ("Holdings") and W. Bradley Daniel ("Mr. Daniel"), (together, "Defendants") as follows:

## NATURE OF THE ACTION

1.      This is an action brought on behalf of MedApproach against its general partner (Holdings) and the owner of its general partner (Mr. Daniel) because of their continuing breaches of fiduciary duties owed to MedApproach and its limited partners.  Through Holdings, Mr. Daniel has failed and refused to cause MedApproach to revoke an illegal proxy pursuant to

which Mr. Daniel has personally received fees of several million dollars. Those fees belong to MedApproach and its limited partners; the Defendants' refusal to cause MedApproach to revoke the proxy has cost MedApproach several million dollars, and continues to cost MedApproach more than $300,000 each year. In addition, Mr. Daniel has caused, and continues to cause, MedApproach to incur millions of dollars in tax liabilities by refusing to restructure MedApproach and an entity controlled by MedApproach unless he remains in control of the entity owned by MedApproach. Mr. Daniel has acted in his own self-interest at the expense of MedApproach and its limited partners; his conduct is in plain breach of his fiduciary duties to MedApproach and its limited partners.

2.    In addition, Mr. Daniel, through Holdings, caused MedApproach and affiliated entities to withhold in excess of $1 million of distributions owed to Mrs. Hawkins by virtue of her limited partnership interests in those entities. Mr. Daniel withheld these distributions beginning in 2011 in satisfaction of unadjudicated (and unsupported) claims made by Mr. Daniel against Mrs. Hawkins. On July 19, 2013, virtually all of claims were dismissed by court order, and thereafter Mr. Daniel caused checks totaling $1.3 million to be sent to Mrs. Hawkins. However, Mr. Daniel has failed and refused to reimburse Mrs. Hawkins for her lost earnings on the amounts that were withheld for almost two years. Mr. Daniel improperly used Holdings as a vehicle to execute upon unadjudicated claims that belonged to him personally and that have been held to be unfounded. Mr. Daniel's conduct was and is an illegal conversion of property belonging to Mrs. Hawkins, and was accomplished thorough Mr. Daniel's improper abuse of his control of limited partnerships in which Mrs. Hawkins is an investor. Mrs. Hawkins seeks full compensation for the harms she suffered as a result of Mr. Daniel's illegal conduct.

3.     Mrs. Hawkins seeks orders (1) directing the Defendants to cause MedApproach to withdraw the illegal proxy held by Mr. Daniel; (2) directing the Defendants to eliminate the unnecessary level of taxation in the MedApproach structure; (3) directing the Defendants to cause MedApproach and the affiliated entities to pay to Mrs. Hawkins all distributions withheld from her together with statutory interest for the period during which distributions were withheld from Mrs. Hakins; and (4) awarding damages to MedApproach and Mrs. Hawkins in amounts sufficient to compensate them for the Defendants' breaches of their fiduciary duties.

## THE PARTIES

4.     Plaintiff Sharon Hawkins is a resident of the State of New York.  Mrs. Hawkins owns approximately 88% of all limited partnership interests in MedApproach.

5.     Nominal Defendant MedApproach is a limited partnership organized and existing under the laws of Delaware.

6.     Defendant Holdings is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Nashville, Tennessee.  Holdings is the general partner of MedApproach, the entity on behalf of which Mrs. Hawkins derivatively files this Complaint.  As the general partner of MedApproach, Holdings owes fiduciary duties to MedApproach and its limited partners, and also owes them the highest obligations of loyalty and care.

7.     Defendant Mr. Daniel is a resident of the State of Tennessee.  Mr. Daniel is the 100% owner and sole director and/or officer of Holdings, the general partner of MedApproach.  Through his control of Holdings, Mr. Daniel controls MedApproach and two affiliated entities, DIG Equity, L.P. ("DIG Equity") and DIG Special Assets, L.P. ("DIG Special Assets").

## JURISDICTION AND VENUE

8.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(a) and 1367, because there is diversity of citizenship between the parties and/or because this Court has supplemental jurisdiction over claims asserted herein.  Specifically, Plaintiff is a citizen of the State of New York, Defendant Holdings is a Delaware corporation with a principal place of business in Tennessee, and Defendant Mr. Daniel is a citizen of the State of Tennessee.  Nominal Defendant MedApproach is a Delaware limited partnership; upon information and belief, none of the limited partners of MedApproach other than Plaintiff is a citizen of the State of New York. The amount in controversy exceeds the sum of $75,000.

9.   This Court has personal jurisdiction over Defendants under the laws of the State of New York and Rule 4 of the Federal Rules of Civil Procedure because Defendants regularly conduct business within the State of New York and are committing the acts complained of within this judicial district.

10.   Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and a substantial part of the property that is the subject of the action is situated in this District.

## GENERAL ALLEGATIONS

### Background of the Project

11.   In the 1980s, Roussel-Uclaf, a French pharmaceutical company, invented and patented the controversial pharmaceutical drug mifepristone, also known as RU-486 (the "Drug").  RU 486 is used as an oral contraceptive with abortifacient properties that can induce abortions during the first weeks of pregnancy by blocking a hormone necessary to sustain a pregnancy.

12.     During the late 1980s and early 1990s, RU 486 was approved for distribution in France and other European countries but it was not approved for use in the United States.

13.     In 1994, Roussel-Uclaf assigned the rights to make and sell RU 486 in the United States to the Population Council, Inc. ("Popco"), an international not-for-profit family-planning research group based in New York.  As part of this arrangement, Popco agreed to arrange for the manufacture, marketing, and distribution of RU 486 in the United States (the "Project").

*Joseph D. Pike is Selected By Popco to Lead the Project*

14.     After obtaining a license to manufacture and sell RU 486, Popco solicited proposals from parties interested in sublicenses to carry out the Project.

15.     In or around December 1995, Popco selected Joseph D. Pike ("Mr. Pike") to hold the sublicense and carry out the Project.  Mr. Pike was a lawyer and businessman who had previously worked with Popco to develop another contraceptive in the United States.

16.     Due to the controversial nature of RU 486 and the volatility of abortion politics, and the resulting need to maintain confidentiality, Mr. Pike created a complex network of interlocking companies to finance and carry out the Project.

17.     As part of this arrangement, a sublicense was issued to Danco Laboratories, Inc. ("Danco Labs"), a Cayman Islands corporation formed by Mr. Pike to manufacture and distribute RU 486 as an abortifacient.  Danco Labs was later succeeded in interest by Danco Laboratories, LLC, a Delaware limited liability company.   (Both Danco Laboratories, Inc. and Danco Laboratories, LLC will be referred to as "Danco Labs.")

18.     Danco Labs was owned (through an intermediate company) by Neogen Investors, L.P. ("Neogen Investors"), a California limited partnership formed by Mr. Pike to sell limited partnership interests to investors in the Project.  Neogen Investors was succeeded in interest by

Danco Investors Group, L.P., a California limited partnership. (Both Neogen Investors, L.P. and Danco Investors Group, L.P. will be referred to as "Danco Investors Group.")

19.  The general partner of Danco Investors Group was and is N.D. Management, Inc. ("N.D. Management"), a corporation formed by Mr. Pike in or around 1995. N.D. Management was originally formed as a Cayman Islands corporation but was later reincorporated in Delaware.

20.  In 1995 and 1996, Mr. Pike raised money for the Project through the sale of limited partnership interests in Neogen Investors.

21.  At all times relevant to this Complaint, the headquarters of Danco Labs, the operational company established by Mr. Pike for the Project, was located in New York City.

***Plaintiff's Husband Invests in the Project through Old MedApproach***

22.  In 1995, Gregory D. Hawkins, the husband of Plaintiff Sharon Hawkins, learned about the Project through a childhood friend who introduced him to Mr. Pike. Mr. Hawkins met with Mr. Pike in New York to discuss the Project. Mr. Hawkins's childhood friend suggested that he invest in the Project through a fund operated by Defendant Mr. Daniel, the cousin of Mr. Hawkins's friend.

23.  In 1995, Mr. Daniel co-owned a small investment fund called Bio-Pharm Investments, Inc. ("Bio-Pharm"), a Tennessee corporation that primarily engaged in small-scale trading of the common stock of pharmaceutical companies.

24.  In or around 1995, Mr. Daniel met Mr. Pike and agreed to cause Bio-Pharm to purchase limited partnership interests in Neogen. Mr. Daniel raised funds from third parties through Bio-Pharm for the specific purpose of investing in the Project by acquiring limited partnership interests in Neogen.

25.    In 1995, Mr. Daniel formed MedApproach L.P. ("Old MedApproach"), a Tennessee limited partnership, as a limited partnership vehicle to hold funds for investment in the Project.  Bio-Pharm was the general partner of Old MedApproach.

26.    After meeting Mr. Daniel, Mr. Hawkins agreed to invest in the Project by purchasing limited partnership interests in Old MedApproach, which was controlled by Mr. Daniel at the time.

27.    Funds invested in Old MedApproach were used to purchase limited partnership interests in Neogen.  By 1996, Old MedApproach invested approximately $2.0 million in the Project, of which Mr. Hawkins provided approximately $1.5 million. Mr. Hawkins thus owned approximately 75% of the limited partnership interests in Old MedApproach.

28.    All funds invested in Old MedApproach were subject to a 1% annual management fee payable to Bio-Pharm (the general partner controlled by Mr. Daniel); in addition, Bio-Pharm would be entitled to 20% of all distributions of profits made to Old MedApproach by the Project through Neogen.

29.    Over the course of 1996 and 1997, Mr. Hawkins invested additional money in the Project, some of which was invested through Old MedApproach and some of which was invested directly in Danco Labs.

30.    By 1997, Mr. Pike had raised approximately $14 million for the Project, which was used to pay Popco licensing and royalty fees and to finance start-up costs of the operation, which was based in New York City.  Despite the funds raised by Mr. Pike, however, the Project was constantly in need of operating capital.  From 1996 through 1998, Mr. Hawkins loaned approximately $4 million to the operation.  During this period Mr. Hawkins attended meetings in New York City concerning the Project, its operations, and his investments.

31.     As of 1996, Mr. Pike owned 100% of the stock of N.D. Management, the general partner of Neogen. Neogen owned 100% of Danco Labs. Thus, as the person in control of the general partner of Neogen, Mr. Pike controlled the Project.

*Mr. Pike is Ousted from Control of the Project*

32.     In 1996, Popco learned of certain information concerning Mr. Pike's past, including a criminal conviction in North Carolina. This prompted Popco to threaten to withdraw the sublicense given to Danco Labs unless Mr. Pike's control over the Project was eliminated. Popco subsequently filed a lawsuit against Mr. Pike in 1996 in the United States District Court for the Southern District of New York, in which Popco sought to remove Mr. Pike from his position of control of the Project and to divest him of his ownership interest in the Project.

33.     Mr. Hawkins was by far the largest investor in the Project, and he stood to lose the most if Popco withdrew from its relationship with Danco Labs. Mr. Hawkins worked with Mr. Daniel and a small number of other investors to replace Mr. Pike and to satisfy other requirements set by Popco for the retention by Danco Labs of the rights to market and develop RU 486.

34.     Because of Mr. Pike's undisclosed criminal record, Popco demanded that Mr. Hawkins' group offer to refund investments made by any investor solicited by Mr. Pike. Popco required Mr. Hawkins' group to raise enough funds to (i) offer and then satisfy any requests for rescission from Mr. Pike's investors, and (ii) buy out Mr. Pike's interest.

35.     On February 12, 1997, Mr. Hawkins executed a Funding Commitment agreement in favor of Popco in which he agreed to provide up to approximately $14 million in financing necessary for Old MedApproach to meet Popco's demands. Neither Mr. Daniel nor any other existing investor in Old MedApproach agreed to be bound to raise any money to save the Project.

36.     In or around early 1997, Popco and Mr. Pike settled Popco's lawsuit when Mr. Pike agreed to relinquish decision-making control and management of the Project.  Pursuant to this settlement, Old MedApproach and three individual representatives of the limited partners of Danco Investors Group entered into an agreement with Mr. Pike dated as of January 21, 1997, as amended by an addendum, dated February 5, 1997, and an amendment, dated February 10, 1997 (the "Pike Agreement").

### The Proxy and Old MedApproach's Acquisition of a Controlling Interest

37.     Pursuant to the Pike Agreement and under the direction of Popco, Old MedApproach was to purchase from Mr. Pike 75% of the shares of N.D. Management.  Once that sale was completed, Mr. Pike would no longer control the general partner of the entity owning the Project; in his place, Old MedApproach would assume control.  Because the sale would not be complete until Mr. Pike was paid in full for the shares to be transferred, Popco required that Mr. Pike execute an irrevocable proxy giving people other than Mr. Pike the power to vote the shares until they were transferred to new owners.  Thus, Mr. Pike executed an Irrevocable Proxy and Power of Attorney, dated February 12, 1997 (the "Proxy"), giving to Defendant Mr. Daniel (the owner of Bio-Pharm, which in turn was the general partner of Old MedApproach), Brian M. Freeman (now deceased), and Jeffrey L. Rush, M.D. (together, the three "Proxy Holders") the right to vote the shares of N.D. Management being transferred.

38.     The Proxy was mandated by Popco as an interim measure designed to ensure to Popco that Mr. Pike would no longer control the Project through his ownership of the stock of N.D. Management, regardless of whether or not he continued to own a majority interest in N.D. Management.  Pursuant to the Proxy, Mr. Pike appointed the Proxy Holders to vote all of the shares in N.D. Management in the place of Mr. Pike at any annual, special or other meeting of the stockholders of N.D. Management.

39.     In 1997, Mr. Pike transferred 75% of the shares in N.D. Management to Old MedApproach.  Mr. Pike retained passive, non-voting ownership of 25% of the shares in the company; the Proxy Holders were assigned the right to vote Mr. Pike's shares.  Old MedApproach's acquisition of the N.D. Management shares was funded by a loan from Mr. Hawkins to Old MedApproach.

40.     As a result of this transfer of shares in N.D. Management to Old MedApproach, Old MedApproach held a controlling interest in N.D. Management and, thus, the Project.  However, the shares held by Old MedApproach were still voted by the Proxy Holders pursuant to the Proxy.

41.     All financial obligations owed by Old MedApproach to Mr. Pike were fulfilled by 1999.  Thus, the proxy was no longer necessary and, indeed, it became invalid as it did not qualify as a valid proxy for any reason under California law.  However, the Proxy Holders did not surrender the Proxies.  Instead, Mr. Daniel executed a new proxy in the name of Old MedApproach (the purchaser of the shares) in his favor.  That new "proxy", however, was never valid because it never satisfied any of the criteria for a valid proxy under California law.  Nevertheless, Mr. Daniel executed documents that allowed him to begin receiving a "Proxy Holder's Fee" of several hundred thousand dollars a year, which he continues to receive to this day.

***Plaintiff Acquires Mr. Hawkins' Interests in the Project; Reorganization***

42.     By 1998, Mr. Hawkins had invested approximately $7.4 million in the Project. The investments were made generally in three ways: purchase of limited partnership interests in Old MedApproach, which used the money to acquire limited partnership interests in Danco Investors; a loan of $3.5 million to Old MedApproach for its purchase of the 75% interest in N.D. Management; and loans to Old MedApproach and to Danco Labs to help keep the Project

running.  Effective July 2, 1998, Mr. Hawkins assigned all of his interests in the Project to Mrs.

Hawkins.

43.     On January 1, 1999, Old MedApproach was reorganized.  The reorganization,

which was precipitated by Old MedApproach's acquisition of the N.D. Management stock,

resulted in the following changes:

(a)     Old MedApproach was dissolved as of January 1, 1999.  Its assets were
transferred to three new limited partnerships formed under Delaware law:
MedApproach, L.P. (Delaware) ("MedApproach") (which holds the 75%
interest in N.D. Management); DIG Equity (which holds all of the limited
partnership interests in Danco Investors previously held by Old
MedApproach); and DIG Special Assets (which held a portfolio of loans
made to fund Danco, primarily funded by Mr. Hawkins).

(b)     Mr. Daniel formed Defendant Holdings, a corporation wholly owned by
Mr. Daniel and under his complete domination and control, to assume the
rights and responsibilities of Bio-Pharm and for the specific purpose of
becoming the general partner in all three new limited partnerships.
Holdingshas no assets other than its interest in the new limited
partnerships.

44.     As a result of the reorganization of Old MedApproach, Plaintiff's investment was

split into three pieces, each of which was lodged in one of the three new limited partnerships in

which she owned the following limited partnership interests:

(a)     approximately 88% of the limited partnership interests in MedApproach;

(b)     approximately 100% of the limited partnership interests in DIG Special
Assets; and

(c)     approximately 60% of the limited partnership interests in DIG Equity.


***Distributions to the Limited Partners of MedApproach Are Subject to Double Taxation***

45.     As a limited partnership, MedApproach is a flow-through entity for tax purposes:

all profits and losses flow directly to the individual limited partners.  MedApproach itself does

not pay taxes on its income.  Instead, its income is distributed to the limited partners, who pay taxes on their respective shares.  DIG Equity and DIG Special Assets are also flow-through entities for tax purposes.  Over time, most of the loans held by DIG Special Assets were either repaid or converted to equity interests in Danco Investors Group.

46.     MedApproach holds the stock of N.D. Management.  As the general partner of Danco Investors Group, N.D. Management receives a significant share (approximately 30%) of the profits flowing through Danco Investors from the Project.  As a "C Corporation," N.D. Management must first pay state and federal taxes on distributions made to it by Danco Investors Group before any of that money is distributed through MedApproach to MedApproach's limited partners, who must then pay tax again on their respective shares.

47.     Over the years, N.D. Management has paid millions of dollars in taxes.  These taxes are completely unnecessary and could be eliminated if, for example, N.D. Management was converted to an S Corp. and its shares were simply distributed to the limited partners of MedApproach on a *pro rata* basis.  Despite repeated requests, however, the Defendants have refused to take the steps appropriate to eliminate this waste.  Each time, Mr. Daniel has refused to act in the best interests of MedApproach and its limited partners unless he is allowed to remain in control of the N.D. Management stock.

*Defendants Wrongfully Withhold Distributions from Plaintiff*

48.     Danco Labs became profitable in the early 2000's.  By 2010, it had repaid all the principal invested by its investors, and began to make profit distributions.  Profits were distributed back to all of the investors in Danco Investors Group, including those whose investments were held by DIG Equity and DIG Special Assets.  MedApproach received millions of dollars through the distributions paid to Danco Investors Group's general partner, N.D. Management.  Most of that money should have been paid, in turn, to Mrs. Hawkins.

49.     In late 2011, Mr. Daniel caused Holdings to file a lawsuit captioned *MedApproach Holdings, Inc. v. Gregory D. Hawkins and Sharon Hawkins*, Case No. 3:11cv 01199, in the United States District Court for the Middle District of Tennessee (the "Tennessee Case"). In that case, Mr. Daniel alleged that he and Holdings are owed management fees by Mr. And Mrs. Hawkins in respect of direct investments in the Project that allegedly made by Mr. and Mrs. Hawkins.

50.     MedApproach, DIG Equity, and DIG Special Assets (the "MedApproach LPs") made no claim against Mrs. Hawkins in the Tennessee Case. Despite that fact, and despite the fact that the claims in the case have nothing to do with Mrs. Hawkins' investment in the MedApproach LPs, the Defendants used their position of control over the MedApproach LPs to instruct the MedApproach LPs not to pay to Mrs. Hawkins distributions to which she is legally entitled. Through early July 2013, the Defendants caused in excess of $1 million to be withheld from Mrs. Hawkins while other limited partners of the MedApproach LPs received the full distributions to which they were entitled. By order dated July 19, 2013, virtually all of the claims in the case were dismissed. Shortly thereafter, Mrs. Hawkins received approximately $1.3 million of previously withheld distributions. Mrs. Hawkins believes that this amount is less than the amount she is owed for distributions that should have been made during 2011, 2012, and 2013. In addition, although Mrs. Hawkins has demanded compensation for her loss of the use of the funds improperly withheld, the Defendants have refused to make any payment.

51.     The claims in the Tennessee Case were made only by Holdings, and sought money for the benefit of only Mr. Daniel; the MedApproach LPs had no interest in those claims. The Defendants thus abused their role as general partner of the MedApproach LPs to benefit themselves at the expense of a limited partner of the MedApproach LPs.

52.     The MedApproach LPs' limited partnership agreements delineate the scope of the general partner's rights and duties.  Section 6.14 of each limited partnership agreement is titled "Limitation on Authority of General Partner."  It states:

> The General Partner [*i.e.*, Holdings] shall not have the authority without the written consent or ratification by all the Limited Partners to:
>
> *               *               *
>
> (d) Possess Partnership property or assign rights to specific Partnership property for other than a Partnership purpose.

53.     By causing the MedApproach LPs to withhold distributions from Mrs. Hawkins for the benefit of Holdings, Holdings violated this portion of the limited partnership agreements. It took "Partnership property" — that amount of money that would be used to satisfy the MedApproach LPs' payment obligations to Plaintiff — and assigned that money to itself without the consent of all the limited partners.

54.     Holdings' claims against Plaintiff in the Tennessee Case were not a "Partnership purpose" of the MedApproach LPs because those claims would have benefited only Holdings and Mr. Daniel personally.  Mr. Daniel's use of the authority of the general partner of the MedApproach LPs to withhold money for his own benefit on claims in which the MedApproach LPs have no interest violates the clear terms of the limited partnership agreements.

### Holdings is the Alter Ego of Mr. Daniel

55.     Mr. Daniel exercises complete domination and control over the operations, finances, and business affairs or Holdings.  Mr. Daniel is the sole and principal shareholder.  He is entitled all the profits of Holdings.

56.     Other than Mr. Daniel, there are no other officers or directors of Holdings. The interests of Holdings are indistinguishable from Mr. Daniel and his personal interests such that Holdings is the mere instrumentality and business conduit of Mr. Daniel's personal interests.

57.     Mr. Daniel owns and operates Holdings in a manner indistinguishable from his personal affairs and in a manner calculated to mislead those dealing with him to their detriment. Holdings is inadequately capitalized and Mr. Daniel conducts the business affairs of Holdings without observing corporate formalities and legal requirements.    Upon Information and belief, Holdings does not regularly hold meetings of the board of directors.

58.     Mr. Daniel caused Holdings to wrongfully withhold limited partnership distributions from Plaintiff, for his own personal benefit. The acts of Holdings must be treated as the acts of Mr. Daniel because the corporate form of Holdings has been exploited by Mr. Daniel to accomplish a wrongful purpose.

59.     The actions that Mr. Daniel caused Holdings to take in its capacity as general partner of MedApproach were done solely to further Mr. Daniel's personal interests and not those of the limited partnership of which Holdings is the general partner.

60.     Mr. Daniel must be held responsible for the acts knowingly and intentionally done in the name of Holdings or inequity to Plaintiff will result. If Mr. Daniel were not held personally liable for the actions of Holdings, he would be permitted to shield himself from liability for the conversion of funds belonging to Plaintiff.

## DERIVATIVE ALLEGATIONS

61.     Plaintiff brings Counts II, III, and IV of this Complaint derivatively to redress injuries suffered by MedApproach as a direct result of breaches of fiduciary duties by Defendants.

62.    Plaintiff has owned limited partnership units of MedApproach during the wrongful course of conduct by Defendants, and continues to hold limited partnership units in MedApproach.

63.    Plaintiff will adequately and fairly represent the interests of MedApproach and its limited partners in enforcing and prosecuting the rights of MedApproach.

64.    This Complaint is not brought by Plaintiff as a collusive action to confer jurisdiction that the Court would otherwise lack.

## DEMAND FUTILITY ALLEGATIONS

65.    The general partner of MedApproach is Defendant Holdings, which is controlled by Defendant Mr. Daniel.

66.    A pre-filing demand on Defendants would be futile; Defendants are interested parties because they face a likelihood of liability for their conduct.

67.    The maintenance of the Proxy and the Proxy Holder's Fee paid to Mr. Daniel is an interested transaction and is on terms that are patently unfair to MedApproach.

68.    Because the Proxy is an interested transaction, Defendants will bear the burden of proving the entire fairness of the transaction.   Mr. Daniel is the sole owner, officer and/or director of Holdings, the general partner of MedApproach.  Mr. Daniel is the direct beneficiary of the Proxy and the Proxy Fee.

69.    The Proxy and the Proxy Fee provide a substantial benefit to Mr. Daniel. However, the Proxy has been illegal and invalid for years; what is more, the payment of the Proxy Fee provides no benefit to MedApproach. The payment of a fee to Mr. Daniel because he holds an invalid proxy cannot be deemed the product of the valid exercise of business judgment and demand is therefore excused as a matter of law.

70.   Mr. Daniel has repeatedly refused to take steps to eliminate the tax burden paid by N.D. Management unless he is allowed to maintain control over N.D. Management.  This refusal and the maintenance of N.D. Management as a taxable corporation is an interested transaction on terms that are patently unfair to MedApproach.

71.   Mr. Daniel's control over N.D. Management and the continued taxable status of N.D. Management provide no benefit to MedApproach.  On the contrary, they result in losses of millions of dollars each year.

72.   Mr. Daniel's control over N.D. Management and his refusal to take steps to eliminate the unnecessary taxes paid by N.D. Management unless he maintains control cannot be deemed the product of the valid exercise of business judgment and demand is therefore excused as a matter of law.

73.   Mr. Daniel suffers from conflicts of interest and divided loyalties which preclude him from exercising independent business judgment on behalf of MedApproach.

74.   It is unreasonable to expect Holdings, because it is completely controlled by Mr. Daniel, to take any action against the wishes of Mr. Daniel.  Holdings, therefore, cannot exercise independent judgment to consider a demand against it as the general partner of MedApproach.

## CAUSES OF ACTION

### COUNT I

**Conversion**
**(Plaintiff Individually Against Holdings and Mr. Daniel)**

75.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76.    Defendants wrongfully and without authority exercised dominion and control over property belonging to and owned by Plaintiff in the form of distributions owed to her as a limited partner of the MedApproach LPs in an amount in excess of $1.0 million.

77.    Defendants wrongfully interfered with Plaintiff's right to possess Plaintiff's property in a manner inconsistent with Plaintiff's rights as a limited partner of the MedApproach LPs and in contravention of the express terms of the limited partnership agreements that govern the MedApproach LPs.

78.    Defendants refused Plaintiff's demand to issue the limited partnership distributions that they have withheld from her, and, although payment of much of the formerly withheld distributions was made in July 2013, the Defendants have refused to make Plaintiff whole in respect of distributions and monies that were withheld for almost two years.

79.    Defendants' conduct directly and proximately caused injury and pecuniary loss to Plaintiff, for which she is entitled to an award of actual and consequential damages to be proven at trial.

80.    Defendants' conduct was willful, wanton, and consciously disregarded Plaintiff's rights as a limited partner of MedApproach. As a result, Plaintiff is entitled to an award of punitive damages.

81.    As set forth in the allegations above (including but not limited to ¶¶ 55-60), the facts and circumstances warrant piercing the corporate veil of Defendant Holdings, thereby rendering Defendant Mr. Daniel jointly and severally liable for the actions, debts, and obligations of Defendant Holdings.

**WHEREFORE,** Plaintiff Sharon Hawkins prays for judgment as follows:

-18-

A.    Granting all direct, compensatory and consequential damages resulting from Defendants' conversion of property belonging to Plaintiff, including statutory interest for the period during which Plaintiff's property was wrongfully withheld, in an amount to be determined at trial;

B.    Directing the Defendants to make all payments owed to her by MedApproach in the future;

C.    Granting an award of attorneys' fees, costs and interest; and

D.    Granting such other and further relief as the Court may deem just and proper.

## COUNT II

### Breach of Fiduciary Duty
### (Derivatively Against Holdings and Mr. Daniel)

82.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.    As the general partner of MedApproach, Defendant Holdings owes fiduciary duties to both MedApproach and its limited partners.  These fiduciary duties include the duties of loyalty, care, and entire fairness.

84.    With respect to MedApproach, Defendant Holdings must always act in a good faith to advance the interests of MedApproach and its limited partners.

85.    Defendants' control over MedApproach has resulted in MedApproach being operated for the benefit of Defendants and not the limited partners of MedApproach.  Defendants have intentionally put their own interests before those of MedApproach and its limited partners.

86.    Defendants have caused MedApproach to incur substantial expenditures associated with the Proxy Fee paid to Defendant Mr. Daniel.  The Proxy has been invalid as a matter of law for at least 13 years.  Moreover, it is not necessary because MedApproach owns a

controlling 75% interest in N.D. Management and the limited partners of MedApproach can exercise voting control over those shares without the need for a proxy.

87.     The maintenance of the invalid proxy is a one-sided transaction that has provided no benefit to MedApproach.  Over the last 13 years, Mr. Daniel has caused N.D. Management to pay to him several million dollars pursuant to the invalid and illegal proxy.  Mr. Daniel continues to treat the proxy as valid solely to benefit himself at the expense of the limited partners of MedApproach.  Mr. Daniel has placed his own self-interest above those of MedApproach.

88.     The Proxy Fee has resulted in diminished income to MedApproach, diminished distributions to the limited partners, and a diminished value of the limited partnership units. Over the years, Mr. Daniel has diverted to himself millions of dollars of funds that should have been paid to the limited partners of MedApproach, which he has justified by the existence of the illegal proxy.

89.     Plaintiff and MedApproach have no adequate remedy at law.

90.     As set forth in the allegations above (including but not limited to ¶¶ 55-60), the facts and circumstances warrant piercing the corporate veil of Defendant Holdings, thereby rendering Defendant Mr. Daniel jointly and severally liable for the actions, debts, and obligations of Defendant Holdings.

**WHEREFORE**, Plaintiff Sharon Hawkins, derivatively on behalf of MedApproach, prays for judgment as follows in favor of MedApproach and against Defendants:

A.     Permanent injunctive relief compelling Holdings to direct MedApproach, as the entity that owns the stock to which the Proxy relates, to revoke the Proxy and declare it invalid with respect to its shares in N.D. Management;

B.      Permanent injunctive relief prohibiting Holdings from directing the payment by MedApproach of any fees to any Proxy Holder;

C.      Permanent injunctive relief compelling Defendant Daniel to disgorge any and all fees received from N.D. Management or MedApproach since 2000 in connection with his self-declared role as a Proxy Holder;

D.      Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts; and

E.      Granting such other and further relief as the Court may deem just and proper.

## COUNT III

### Breach of Fiduciary Duty
### (Derivatively Against Holdings and Mr. Daniel)

91.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

92.     As the general partner of MedApproach, Defendant Holdings owes fiduciary duties to both MedApproach and its limited partners. These fiduciary duties include the duties of loyalty, care, and entire fairness.

93.     With respect to MedApproach, Defendant Holdings must always act in a good faith to advance the interests of MedApproach and its limited partners.

94.     Defendants' control over MedApproach has resulted in MedApproach being operated for the benefit of Defendants and not the limited partners of MedApproach. Defendants have intentionally put their own interests before those of MedApproach and its limited partners.

95.     The continued taxable status of N.D. Management and the resulting tax imposed on income received by N.D. Management results in diminished income to MedApproach,

diminished distributions to the limited partners, and a diminished value of the limited partnership units.

96.     Defendants have refused to take steps that would have eliminated the unnecessary level of taxation imposed on distributions made to N.D. Management, which has, in turn, reduced the amount of dividends paid to MedApproach and distributions made to the limited partners.   It has always been, and continues to be, in the best interests of MedApproach to reduce or eliminate unnecessary taxes paid by N.D. Management.

97.     Holdings as general partner, acting through its principal Mr. Daniel, has refused to take steps to eliminate the N.D. Management taxes only because such steps would result in a loss of Mr. Daniel's control over N.D. Management, and, in turn, the Project in general.

98.     The refusal to take steps to eliminate the N.D. Management tax has resulted in pecuniary benefits to Mr. Daniel personally and at the expense of MedApproach and its limited partners.

99.     Plaintiff and MedApproach have no adequate remedy at law.

100.     As set forth in the allegations above (including but not limited to ¶¶ 55 - 60), the facts and circumstances warrant piercing the corporate veil of Defendant Holdings, thereby rendering Defendant Mr. Daniel jointly and severally liable for the actions, debts, and obligations of Defendant Holdings.

**WHEREFORE**, Plaintiff Sharon Hawkins, derivatively on behalf of MedApproach, prays for judgment as follows in favor of MedApproach and against Defendants:

A.     Permanent injunctive relief compelling Defendants to take whatever action is necessary to eliminate the taxable status of N.D. Management that results in an unnecessary level of taxation on distributions to the limited partners of MedApproach;

B.     Permanent injunctive relief compelling Defendants to pay to MedApproach an amount equal to all income taxes paid by N.D. Management since 2000;

C.     Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plainitff's attorneys and experts; and

D.     Granting such other and further relief as the Court may deem just and proper.

## COUNT IV

### Waste of Limited Partnership Assets
### (Derivatively Against Holdings and Mr. Daniel)

101.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

102.    The Proxy Fee is a transfer of an asset of the limited partnership from MedApproach to Mr. Daniel.

103.    Payment of the Proxy Fee and maintenance of N.D. Management as a taxable entity represent waste of limited partnership assets by Holdings and Mr. Daniel.

104.    By failing to consider the interests of MedApproach by continuing (1) to allow the payment of the Proxy Fee and (2) to refuse to eliminate the N.D. Management tax, Defendants have caused MedApproach to waste valuable limited partnership assets.

105.    As set forth in the allegations above (including but not limited to ¶¶ 55 - 60), the facts and circumstances warrant piercing the corporate veil of Defendant Holdings, thereby rendering Defendant Mr. Daniel jointly and severally liable for the actions, debts, and obligations of Defendant Holdings.

**WHEREFORE**, Plaintiff Sharon Hawkins, derivatively on behalf of MedApproach, prays for judgment as follows in favor of MedApproach and against Defendants:

-23-

A.    Ordering the immediate disgorgement of all profits, benefits, and other compensation received by Mr. Daniel as a result of the Proxy and the Proxy Fee, and any other benefits Mr. Daniel has received by virtue of his control over the Project;

B.    Permanent injunctive relief compelling Defendants to take whatever action is necessary (1) to eliminate the Proxy Fee and (2) to eliminate the taxable status of N.D. Management that results in an unnecessary level of taxation on distributions to the limited partners of MedApproach;

C.    Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts; and

D.    Granting such other and further relief as the Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury of all claims that are so triable.


Respectfully submitted,

LOWENSTEIN SANDLER LLP
*Attorneys for Plaintiff Sharon Hawkins*

By: _____

Dated:  August 2, 2013

R. Scott Thompson
Matthew M. Oliver
1251 Avenue of the Americas
New York, New York 10029
Tel.: (973) 597-2532
Fax: (973) 597-2533
sthompson@lowenstein.com

## VERIFICATION

I have reviewed the within Verified Complaint and hereby verify that the facts as set

forth therein are true to the best of my knowledge.

By: *Sharon Hawkins*
    Sharon Hawkins

Dated: 8/1/13

-25-