UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SHARON HAWKINS, derivatively on behalf of    :
MEDAPPROACH, L.P. and individually,    :
   :
        *Plaintiff,*    :
v.    :
   :       Case No.: 1:13-cv-5434-ALC-DCF
MEDAPPROACH HOLDINGS, INC., and W.    :
BRADLEY DANIEL,    :
   :
        *Defendants,*    :
   :
    -and-    :
   :
MEDAPPROACH, L.P.,    :
   :
        *Nominal Defendant.*    :
   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

GOODWIN PROCTER LLP
Jeffrey A. Simes
Michael Yiin
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. (212) 813-8800
Fax (212) 355-3333
jsimes@goodwinprocter.com

*Attorneys for Defendants
MedApproach Holdings, Inc. and
W. Bradley Daniel*

Dated: March 20, 2015

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................1

BACKGROUND FACTS ...........................................................................................3

    *The Parties and Their Business Arrangements*..................................................3

    *The Birth of the Proxy*.......................................................................................3

    *Mr. Hawkins Receives "Assurances" and Later Questions the Proxy*.............4

ARGUMENT ...........................................................................................................7

I.     PLAINTIFF'S PROXY-RELATED CLAIMS (COUNTS I, II, AND III) ARE TIME-BARRED AND SHOULD BE DISMISSED WITH PREJUDICE...................................7

    A.    Equitable Tolling is Unavailable Because SAC Shows That Plaintiff Was On Inquiry Notice Of Her Claims Over a Decade Ago. ........................... 8

        1.    Plaintiff Was On Inquiry Notice Concerning the Validity of the Proxy More Than A Decade Ago. ....................................................... 9

        2.    Mr. Daniel's Alleged Statements Regarding Revocability Of The Proxy Agreement Do Not Support Equitable Tolling Of A Claim Concerning Its Validity. ......................................................... 11

        3.    The SAC Undermines Any Notion Of Good Faith Reliance By Plaintiff. ...................................................................................... 13

    B.    Dismissal With Prejudice Is Warranted Here................................................. 15

CONCLUSION.......................................................................................................16

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ambase Corp. v. City Investing Co.*,
No. 18207, 2001 WL 167698 (Del. Ch. Feb. 7, 2001) ..............................................8

*Calabro v. D.E.A.*,
No. 88–CV–5082, 1990 WL 16103 (S.D.N.Y. Feb.14, 1990) ................................10

*Eni Holdings, LLC v. KBR Group Holdings, LLC*,
NO. CV 8075-VCG, 2013 WL 6186326 (Del. Ch. Nov. 27, 2013) ...................8, 12

*Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*,
NO. CIV.A. 1091-VCL, 2007 WL 2982247 (Del. Ch. Oct. 9, 2007)......................14

*Hill v. Curcione*,
657 F.3d 116 (2d Cir. 2011)...................................................................................15

*In re ML/EQ Real Estate P'ship Litig.*,
No. CIV.A. 15741, 1999 WL 1271885 (Del. Ch. Dec. 21, 1999) ............................9

*Johnson v. Geico Cas. Co.*,
673 F.Supp.2d 255 (D. Del. 2009)............................................................................8

*Keitt v. New York City*,
882 F.Supp.2d 412 (S.D.N.Y. 2011).......................................................................10

*Krahmer v. Christie's Inc.*,
NO. 606-N, 2006 WL 4782304 (Del. Ch. Oct. 17, 2006) ........................................8

*Miller v. HSBC Bank U.S.A., N.A.*,
NO. 13 CIV. 7500, 2015 WL 585589 (S.D.N.Y. Feb. 11, 2015) ...........................15

*Pomeranz v. Museum Partners, L.P.*,
No. Civ.A. 20211, 2005 WL 217039 (Del. Ch. Jan. 24, 2005) .........................8, 14

*Re IMO Restated Revocable Trust of Lawrence F. Conlin*,
NO. CIV.A. 8052-ML, 2014 WL 242655 (Del. Ch. Jan. 21, 2014) ..................11, 14

*United States v. All Funds Distributed to Weiss*,
345 F.3d 49 (2d Cir. 2003).......................................................................................7

*Weiss v. Swanson*,
948 A.2d 433 (Del. Ch. 2008)...................................................................................8

*Xin Wei Lin v. Chinese Staff & Workers' Ass'n*,
    NO. 11 CIV. 3944 RJS, 2012 WL 5457493 (S.D.N.Y. Nov. 8, 2012), *aff'd*,
    527 Fed.Appx. 83 (2d Cir. 2013) ............................................................................10

**STATUTES**

10 Del. Code § 8106(a) ...............................................................................................................7

## INTRODUCTION

There can be no dispute that the claims in the Second Amended Complaint ("SAC") attacking the validity of a 1997 voting proxy fall far outside of the three-year statute of limitations under governing Delaware law.  Indeed, the Court's August 11, 2014 Order as to the prior pleading dismissed those claims as untimely.  The sole question presented by this motion is whether the SAC pleads new facts that could toll the statute of limitations.  As shown below, it does not, and the proxy-based claims (Counts I-III) should therefore be dismissed as untimely.

The proxy-related claims assert that the proxy is "patently invalid" and thus Defendants' actions under the proxy were in breach of their fiduciary duties.  The SAC admits, however, that Greg Hawkins, the predecessor-in-interest of Plaintiff Sharon Hawkins, was not only involved in the creation of the proxy in 1997, but approved it.  The SAC also alleges that Mr. Daniel "agreed" and gave "assurances" in 1997 that the proxy would be relinquished as soon as certain payments were made to Joseph Pike, the original principal and general partner of the parties' venture.  Those payments were made no later than 2001, and Greg Hawkins at that time (and again in 2007) allegedly asked Mr. Daniel to relinquish the proxy as previously "agreed."  Mr. Daniel declined, however, and allegedly indicated each time that he was told that the proxy was "irrevocable."  The SAC thus concedes two critical facts: (1) Greg Hawkins knew of the proxy's contents in 1997, and (2) Mr. Hawkins knew no later than 2001 that Mr. Pike had been bought out and that Mr. Daniel supposedly refused to honor his "agreement" to relinquish the proxy.

These allegations affirmatively undermine any possible tolling.  As Plaintiff cannot allege fraudulent concealment—the relevant facts concerning the proxy were concededly always known by Greg and Sharon Hawkins—the only tolling doctrine that could arguably apply is equitable tolling.  This doctrine does not apply for three reasons.  <u>First</u>, the SAC itself shows that Plaintiff was on inquiry notice of any potential claim regarding the validity of the proxy nearly two

decades ago.  The sole "fact" of relevance here—the supposed invalidity of the proxy—is a legal conclusion the ignorance of which does not insulate Plaintiff from the statute of limitations.  Second, the alleged statements by Defendants on which Plaintiff purportedly relied—that the proxy was irrevocable—concerned the *revocability* of the proxy, not its *validity*.  As Plaintiff's claims relate solely to the validity of the proxy, and as the SAC does not assert that Mr. Daniel ever said anything on that topic, there is no basis for any tolling.  Third, and perhaps most crucial, the SAC asserts that Mr. Hawkins was assured, and the parties specifically "agreed," that the proxy was to be relinquished in 2001, at the latest.  In 2001, and again in 2007, Mr. Hawkins raised this agreement with Mr. Daniel, but Mr. Daniel refused to relinquish the proxy, asserting that it was irrevocable.  Because Mr. Daniel allegedly went back on his word to relinquish the proxy, Plaintiff cannot invoke equitable tolling.  As of 2001, at the latest, the SAC makes clear that Plaintiff was on notice that Defendants were allegedly not acting as fiduciaries vis-à-vis the proxy, but were allegedly dishonoring their prior promises to Mr. Hawkins about it.

The equitable tolling doctrine exists to ensure that fiduciaries cannot unfairly exploit their positions of trust into immunity for their own misconduct.  The SAC itself makes clear that no such concerns exist here.  The terms of the proxy were always known to Plaintiff, Mr. Daniel never said anything about its validity, and in asserting in 2001 that the proxy was irrevocable (as its very title indicated) Mr. Daniel openly contravened an alleged "agreement" that it would be relinquished, making clear that he was at odds with Mr. Hawkins on that point.  The SAC itself undermines any notion that equitable tolling could apply, and thus the proxy-related claims should be dismissed with prejudice as untimely.

<u>BACKGROUND FACTS</u>[1]

*The Parties and Their Business Arrangements*

Plaintiff is the successor-in-interest to her husband, Gregory Hawkins, who became a limited partner in Old MedApproach in 1995.  SAC ¶¶ 25-26. Mr. Hawkins assigned his interest and obligations in Old MedApproach to Ms. Hawkins on July 2, 1998.  *Id.* at ¶ 44.

The entities involved in this case manufacture, market and sell mifepristone, an abortifacient drug also known as RU 486.  *Id.* at ¶¶ 11-19.   The rights to make and sell mifepristone were held by Population Council, Inc. ("Popco"), which sublicensed those rights to Danco Laboratories, Inc.  *Id.* at ¶¶ 13, 17.  Because of the controversy surrounding the drug, the head of the project, Joseph Pike, established a complicated web of entities through which investors financing the project could maintain distance and anonymity.  *Id.* at ¶ 16.  Mr. Pike caused an entity now called Danco Investors Group, L.P. to own the sublicensor, Danco Laboratories, Inc.  *Id.* at ¶ 18.  Some investors were brought in through other partnerships that invested in Danco Investors Group, L.P., such as Old MedApproach.  *Id.* at 26.  Mr. Pike controlled all aspects of the project through his ownership of N.D. Management, Inc. ("NDM"), the general partner of Danco Investors Group, L.P.  *Id.* at ¶ 31.  A chart detailing the relevant corporate relationships is set forth in Appendix A.

*The Birth of the Proxy*

In 1996, Popco learned that Mr. Pike had been convicted of a crime in North Carolina, which Mr. Pike had not previously disclosed to investors in the project.  *Id.* at ¶ 32.  Popco, a non-profit in the business of promoting family-planning research, found it unacceptable that a

---

[1]  A full summary of the background facts is set forth in Defendants' prior motion to dismiss the Amended Complaint.  Set forth below are only those facts alleged in the SAC that are germane to this motion.  Defendants generally deny the allegations of the SAC, but treat them as true solely for purposes of this motion to dismiss.

convicted criminal would manage the project. *Id.* ¶¶ 13, 32.  Thus, Popco sued to remove Joseph Pike and threatened to pull the sublicense it had granted to Danco Laboratories, Inc.  *Id.* at ¶ 32.

Mr. Hawkins, the largest investor in the project at that time, intervened to prevent disaster for the project.  *Id.* at ¶ 33.  "Mr. Hawkins worked with Mr. Daniel and a small number of other investors to replace Mr. Pike and to satisfy other requirements set by Popco for the retention by Danco Labs of the rights to market and develop RU 486."  *Id.*  Popco settled its lawsuit under an agreement, brokered in significant part by Mr. Hawkins, that Mr. Pike would no longer be in a position to control the project.  *Id.* at ¶ 36.  Thus was born the proxy, under which 75% of NDM stock was to be bought from Mr. Pike by Old MedApproach, and all of the power to vote the shares of NDM stock was given to three proxy holders under an "irrevocable proxy."  *Id.* at ¶ 37. The proxy was to continue "while shares were still owned by Mr. Pike."  *Id.*

Mr. Hawkins was not only aware of the proxy, but was offered the chance to become a proxy holder.  However, "Mr. Hawkins did not want his name publicly associated with the Project, so he agreed (as the primary investor in the Project) to allow others to hold the proxy while shares were still owned by Mr. Pike."  *Id.*  Thus, it was agreed that Mr. Daniel, Jeffrey Rush, and Brian Freeman (now deceased) would be the proxy holders.  *Id.*

***Mr. Hawkins Receives "Assurances" and Later Questions the Proxy***

At the time he helped negotiate the proxy in 1997, Mr. Hawkins "sought and received assurances that the Proxy was an interim measure that would be replaced by ordinary corporate governance mechanisms after Old MedApproach  acquired control of N.D. Management."  *Id.* at ¶ 38.  The SAC further alleges that:

> Before the proxy was granted, Mr. Daniel agreed that it would only
> be in place until Mr. Pike transferred shares of N.D. Management
> to Old MedApproach, at which time a board of directors would be

elected to govern the affairs of N.D. Management and the proxy would be terminated.

*Id.* at ¶ 94 (emphasis added).    In other words, Mr. Daniel allegedly agreed that once MedApproach finished making the necessary payments to Mr. Pike to buy 75% of his interest in NDM, the proxy would then be terminated.

According to the SAC, the sale of 75% of NDM's stock to MedApproach "was finalized in 2001." *Id.* at ¶ 86; *see also id.* at ¶ 41. Thus, according to Plaintiff, "the Proxy was no longer necessary" and was to be terminated. *Id.* at ¶ 41.

Shortly after the 2001 payment to Joseph Pike, Mr. Hawkins "approached Mr. Daniel about relinquishing the proxy"—the subject matter as to which Mr. Hawkins "sought and received assurances" in 1997 and as to which Mr. Daniel had allegedly "agreed[.]" *Id.* at ¶¶ 38, 87, 94. Mr. Daniel allegedly stated "that he would look into these issues, but he did not get back to Mr. Hawkins." *Id.* at ¶ 87. After further inquiry from Mr. Hawkins, Mr. Daniel allegedly reported that "he had looked into terminating the Proxy and had been advised that the Proxy was irrevocable as a matter of law, and could not be terminated." *Id.* at ¶ 42; *see also id.* at ¶ 102 ("Mr. Daniel informed Mr. Hawkins that the proxy could not be terminated and that it was irrevocable as a matter of law.").

For reasons the SAC does not explain, this did not end the inquiry; rather, Mr. Hawkins felt the need to ask about the revocability of the proxy again in 2007. *Id.* at ¶ 88. Mr. Daniel allegedly reiterated at that time that "he had consulted with accountants and attorneys, and he had been informed that the proxy was 'irrevocable' and could not be extinguished." *Id.* Mr. Daniel is alleged to have said that he "thoroughly explored the possibility of eliminating the proxy, and had been advised that the proxy could not be eliminated." *Id.*

Notably, the SAC does not assert that <u>any</u> of Mr. Daniel's alleged assertions were false. Nor does the SAC assert that the proxy is, in fact, revocable—to the contrary, the SAC describes the proxy as an "irrevocable proxy" and concedes that its title is "Irrevocable Proxy and Power of Attorney." *Id.* at ¶ 37. Instead, the SAC challenges the "validity of the proxy" and asks the Court to declare it "null and void and of no effect" as a result. *Id.* at ¶¶ 95 & 95A, 100, 106 (emphasis added).

The SAC further contends that although Mr. Hawkins questioned Mr. Daniel in 2001 and again in 2007 about relinquishing the proxy that Mr. Daniel allegedly had "agreed" would be relinquished when MedApproach bought out Mr. Pike (which happened in 2001), it was not until 2012 that Plaintiff and her husband "began to believe that Mr. Daniel was not acting in their interests as required by law." *Id.* at ¶ 42. This supposed revelation occurred shortly after Mr. Daniel filed a lawsuit against Plaintiff and Mr. Hawkins in Tennessee. *Id.* at ¶ 58. Only then did Plaintiff "learn[] that the Proxy was invalid and demanded that Mr. Daniel surrender it." *Id.* at ¶ 42. This assertion is elsewhere contradicted in the SAC, which describes the proxy as "patently invalid." *Id.* at ¶¶ 1, 79, 92, 93.

<u>**ARGUMENT**</u>

**I.    PLAINTIFF'S PROXY-RELATED CLAIMS (COUNTS I, II, AND III) ARE TIME-BARRED AND SHOULD BE DISMISSED WITH PREJUDICE.**

Counts I, II, and III of the SAC stem from the proxy Mr. Hawkins helped to create in 1997.[2]  SAC ¶ 37.  The SAC asserts the proxy was "patently invalid" (*id.* at ¶¶ 1, 79, 92, 93), and that it became invalid no later than 2001 when Mr. Pike was fully paid off.  *Id.* at ¶¶ 41, 86.  Yet this lawsuit was not filed until August 2, 2013, sixteen years after the creation of the proxy and twelve years after Mr. Hawkins is allegedly discussed with Mr. Daniel the fact that Mr. Pike had been fully bought out.  Thus, regardless of Plaintiff's current theory of the case,[3] the SAC shows that the claims fall outside the three year statute of limitations applicable under Delaware law.  *See* 10 Del. C. § 8106(a).  As this Court found in its August 11, 2014 Order granting in part Defendants' prior motion to dismiss, Plaintiff's claims are untimely.  (August 11, 2014 Order at 9, ECF No. 97.)

Because on its face, the SAC asserts claims that are untimely, the burden shifts to Plaintiff to prove that a tolling doctrine applies.  *See United States v. All Funds Distributed to Weiss*, 345 F.3d 49, 54-55 (2d Cir. 2003) ("A party seeking to benefit from [equitable tolling] bears the burden of proving that tolling is appropriate.").  As noted below, no such doctrine applies, and the SAC itself supplies the facts that undermine any possible tolling.

---

[2] Count I seeks a declaratory judgment that the proxy is invalid.  Count II asserts that the payment of proxy fees under the purportedly invalid proxy constitutes a breach of fiduciary duty.  Count III asserts that the payment of the proxy fees constituted unjust enrichment.

[3] The SAC differs from the Amended Complaint, which asserted that Mr. Pike was fully paid in <u>1999</u>, and that the proxy became invalid at that time.  *See* Am. Compl. ¶ 40.  Further confusing matters, and without explanation, the SAC asks for damages corresponding to proxy fees paid "since <u>2000</u> . . . ."  SAC ¶¶ 103B, 111A (emphasis added).

**A.      Equitable Tolling is Unavailable Because SAC Shows That Plaintiff Was On Inquiry Notice Of Her Claims Over a Decade Ago.**

Applicable Delaware law recognizes a limited doctrine of equitable tolling to prevent fiduciaries from exploiting their positions of trust to cover their tracks.[4]   The doctrine of equitable tolling requires a plaintiff to establish: (1) wrongful self-dealing, (2) by a fiduciary, and (3) good faith reliance by the plaintiff on that fiduciary.  *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008).[5]  With respect to the third element of good faith reliance, a plaintiff must plead "specific facts" to show "that this reliance prevented the [plaintiff] from being on inquiry notice of the wrongs perpetuated . . . ."  *Eni Holdings, LLC v. KBR Group Holdings, LLC*, NO. CV 8075-VCG, 2013 WL 6186326, at *12 (Del. Ch. Nov. 27, 2013).   "Demonstrating that the [plaintiff] was not on inquiry notice requires pleading 'when the [plaintiff] learned of the [challenged transaction] . . . ; when he had notice of facts concerning possible unfairness of the terms; and the reasonable steps he took to oversee his investment.'"   *Id.* (quoting *Buerger v. Apfel*, C.A. No. 6539–VCL, 2012 WL 893163, at *4 (Del. Ch. Mar. 15, 2012)).  As the Delaware Court of Chancery has explained:

> [T]he equitable tolling doctrine does not afford a plaintiff the luxury of indolence at a defendant's expense.  Significantly, if the limitations period is tolled under this theory, it is tolled <u>only until</u> the plaintiff discovers (or by exercising reasonable diligence should have discovered) his injury.  Thus, the limitations period

---

[4] Delaware law also recognizes "that a statute of limitations may be tolled when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth."  *Johnson v. Geico Cas. Co.*, 673 F. Supp. 2d 255, 269 (D. Del. 2009).   Under this doctrine, "[m]ere silence is insufficient to establish fraudulent concealment" but rather affirmative artifice is required.  *Krahmer v. Christie's Inc.*, NO. 606-N, 2006 WL 4782304, at *5 (Del. Ch. Oct. 17, 2006).  Here, of course, there is no allegation of fraudulent concealment, much less one that would meet the pleading standards necessary for such allegations.

[5] Equitable tolling is an extreme measure to be reserved only for situations where it is necessary to prevent injustice.  *Pomeranz v. Museum Partners, L.P.*, No. Civ.A. 20211, 2005 WL 217039, at *13 (Del. Ch. Jan. 24, 2005) (holding that "[e]quitable exceptions to statutes of limitations are narrow and designed to prevent injustice"); *Ambase Corp. v. City Investing Co.*, No. 18207, 2001 WL 167698, at *6 (Del. Ch. Feb. 7, 2001) ("Equitable tolling doctrines are an exception to the normal rule, and should not be lightly invoked.").

>begins to run when the plaintiff is <u>objectively</u> aware of the facts
>giving rise to the wrong, *i.e.*, on inquiry notice.

*In re ML/EQ Real Estate P'ship Litig.*, No. CIV.A. 15741, 1999 WL 1271885, at *2 (Del. Ch. Dec. 21, 1999) (emphases in original) (internal quotations omitted) (quoting *In re Dean Witter P'ship Litig.*, No. CIV.A. 14816, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998)).

As set forth below, equitable tolling cannot apply here because Plaintiff was on inquiry notice of the facts underlying her claim more than a decade prior to the filing of this lawsuit and because the SAC undermines any notion of good faith reliance on Mr. Daniel's purported statement about the proxy's irrevocability.

### 1. Plaintiff Was On Inquiry Notice Concerning the Validity of the Proxy More Than A Decade Ago.

Counts I, II and III of the SAC hinge on the alleged invalidity of the proxy.  But the proxy's validity is a legal conclusion which was plainly available to Plaintiff from the time of its creation in 1997, and from 2001 when Plaintiff contends the proxy's purpose was fulfilled.

The SAC alleges that Mr. Hawkins was personally and directly involved in the creation of the proxy in 1997.  Mr. Hawkins "agreed . . . to allow others to hold the proxy while shares were still owned by Mr. Pike."  SAC ¶ 37.  Moreover, the SAC concedes that Plaintiff and/or her husband were aware in 2001 that Mr. Pike had been fully paid off.  *Id.* at ¶ 41.  The SAC alleges that "[b]eginning in approximately 2001," when the obligations to Mr. Pike were fulfilled, "Mr. Hawkins discussed with Mr. Daniel on numerous occasions the need to replace the Proxy with a board of directors that would govern the affairs of N.D. Management."  *Id.* at ¶¶ 42, 87.  Mr. Hawkins did this because he had "sought and received assurances that the Proxy was an interim measure that would be replaced by ordinary corporate governance mechanisms after Old MedApproach acquired control of N.D. Management."  *Id.* at ¶ 38.  That is, Mr. Hawkins

purportedly understood in 1997 that the proxy would go away upon full payment to Mr. Pike; when Mr. Pike was fully paid in 2001, Mr. Hawkins raised this fact with Mr. Daniel.

The SAC therefore makes perfectly clear that no facts have ever been unavailable to Plaintiff or her husband concerning the validity of the proxy or whether its supposed purpose had been fulfilled or not. Thus, Plaintiff cannot contend that the Defendants prevented Plaintiff from discovering the proxy's invalidity in 1997, or in 2001 after Mr. Pike was bought out.

Plaintiff's theory of the case appears to be that even though all relevant facts were always known to her and/or her husband, Defendants' assertions concerning the legal import of the proxy (*i.e.,* its irrevocability) caused her delay in filing this lawsuit. But in the context of tolling, the courts sharply distinguish between facts and issues of law. As this Court has held, "accrual of the statute of limitations does not depend on plaintiff[']s knowledge of the law, but rather on a plaintiff's knowledge of the injury." *Keitt v. New York City,* 882 F.Supp.2d 412, 437 (S.D.N.Y. 2011); *see also Calabro v. D.E.A.*, No. 88–CV–5082 (RWS), 1990 WL 16103, at *2 (S.D.N.Y. Feb. 14, 1990) (plaintiff's claim that he was not "cognizant of the legal extent of his claim until he consulted with a lawyer" did not warrant equitable tolling).[6] Plaintiff's contention that she failed to appreciate the legal import of the proxy because of statements Defendants allegedly made to her about its legal effect does not constitute a toll under settled Delaware law.

---

[6] This Court explained the principle in *Xin Wei Lin v. Chinese Staff & Workers' Ass'n*, NO. 11 CIV. 3944 RJS, 2012 WL 5457493 (S.D.N.Y. Nov. 8, 2012), *aff'd*, 527 Fed. Appx. 83 (2d Cir. 2013), a case that did not involve Delaware law but federal equitable tolling. In *Xin Wei Lin*, employees challenged agreements they entered into with an employer concerning an earlier wage lawsuit and sought to evade the statute of limitations which would have precluded that challenge by arguing that the employer falsely represented to the plaintiffs that the agreements were "legal," "customary" and "approved by courts." 2012 WL 5457493 at *6. This Court rejected that purported ground for equitable tolling, finding that fraudulent concealment for purposes of tolling the limitations period "applies where the alleged fraud concerns a factual predicate of a plaintiff's cause of action but not where it concerns the state of the law." *Id.* at *7. The Court observed: "[t]he Court is not blind to the difficulties Plaintiffs may have faced in ascertaining their legal rights, but the precedent is clear that even if what Plaintiffs allege is true—that the Remittance Agreements are illegal, that Lam knew they were illegal, and that Lam falsely told Plaintiffs otherwise—it does not, as a matter of law, make out a fraudulent concealment grounds for tolling the statute of limitations." *Id.*

Under Delaware law, "even when a plaintiff is entitled to rely on the good faith of a fiduciary, the statute of limitations is tolled only until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, if pursued, would lead to the discovery of the injury." *Re IMO Restated Revocable Trust of Lawrence F. Conlin*, NO. CIV.A. 8052-ML, 2014 WL 242655, at *5 (Del. Ch. Jan. 21, 2014) (emphasis added) (internal quotations omitted).   In the *Conlin* case, the plaintiff, a trust beneficiary, received certain monthly statements which induced her to ask questions about certain assets disclosed in the statements.   The court found that the plaintiff's "receipt of the monthly statements and her own conduct in raising questions about assets she believed were missing from the Trust demonstrates she was aware or should have been aware of the conduct she alleges constituted a breach of [the trustee's] fiduciary duties." *Id.*   Although the plaintiff argued that the wrongful acts could not have been known until after she hired a forensic accountant, the court observed that "nothing precluded [the plaintiff] from hiring an accountant sooner" and thus she could not claim equitable tolling. *Id.*

The SAC makes clear that Plaintiff and her husband always had access to the proxy and fully understood the fact on which they apparently contend the validity of the proxy hinges—that MedApproach fully bought out Joseph Pike no later than 2001.   Indeed, Mr. Hawkins questioned Mr. Daniel on the point no later than 2001 and once again in 2007.   There is no basis for equitable tolling to apply here.

### 2.   Mr. Daniel's Alleged Statements Regarding Revocability Of The Proxy Agreement Do Not Support Equitable Tolling Of A Claim Concerning Its Validity.

Even if the SAC did not on its face prove that Plaintiff was always on inquiry notice of her proxy-related claims, Plaintiff's allegations further undermine equitable tolling in an additional, distinct way.   Plaintiff relies on two conversations (in 2001 and 2007) in which Mr.

Hawkins questioned the need for the proxy and suggested that it be terminated, and Mr. Daniel allegedly countered that he had consulted with accountants and attorneys and was advised that the proxy was "irrevocable."  *See* SAC ¶¶ 85-90.  Yet the SAC makes clear that Mr. Daniel never commented on the proxy's <u>validity</u>, which is what the claims challenge.  Even assuming that Mr. Hawkins could rely on Mr. Daniel, who is not an attorney, concerning a legal evaluation of the proxy, Mr. Daniel's assertion that he lacked the legal power to personally terminate the proxy is not the same thing as the proxy simply having no effect as a matter of law.  The supposed comments of Mr. Daniel do not connect to Plaintiff's claims of invalidity and thus do not constitute a toll.  *See Eni Holdings, LLC*, 2013 WL 6186326, at *13 (finding insufficient facts to support equitable tolling where a plaintiff "failed to plead with specificity *what reliance* on [a fiduciary] led to suppression of *which specific claims*.") (emphasis added).

Moreover, even if Mr. Daniel's comments regarding irrevocability were somehow on point, the SAC lacks allegations to suggest that Mr. Daniel's statements were inaccurate or indicative of inequitable conduct.  Nowhere does the SAC assert that the proxy is not, in fact, irrevocable, or that Mr. Daniel was not advised that the proxy is irrevocable, as he allegedly reported to Mr. Hawkins.  To the contrary, the SAC concedes that the proxy is entitled "Irrevocable Proxy and Power of Attorney," (*id.* at ¶ 37) and no allegation is offered to suggest that the title is a misnomer.  Nor, critically, does Plaintiff allege that Mr. Daniel spoke inaccurately when he allegedly asserted that he had spoken to lawyers and they confirmed what the proxy's title asserts—that it is irrevocable.  The SAC does not negate the notion that Mr. Daniel spoke entirely truthfully and accurately, and thus there is no basis for equitable tolling to apply.

> **3.  The SAC Undermines Any Notion Of Good Faith Reliance By Plaintiff.**

Even putting aside all of the foregoing arguments, the SAC shows that Mr. Hawkins did not rely and could not have relied in good faith on anything Mr. Daniel said concerning the proxy because Mr. Daniel supposedly refused to honor an agreement and his "assurances" that the proxy would be relinquished after Mr. Pike was paid off, and Mr. Daniel is alleged to have twice shrugged off Mr. Hawkins's questions as to why the proxy remained in place.

The SAC concedes the key facts here:

1.  "Before the proxy was granted, Mr. Daniel <u>agreed</u> that it would only be in place until Mr. Pike transferred shares of N.D. Management to Old MedApproach, at which time a board of directors would be elected to govern the affairs of N.D. Management and the proxy would be terminated." *Id.* at ¶ 102 (emphasis added).

2.  At the time the proxy was being contemplated, "Mr. Hawkins sought and received assurances that the Proxy was an interim measure that would be replaced by ordinary corporate governance mechanisms after Old MedApproach acquired control of N.D. Management." *Id.* at ¶ 38.

3.  When the NDM shares were transferred from Pike to MedApproach in 2001, Mr. Hawkins asked Mr. Daniel about eliminating the proxy and implementing a board of directors for NDM as had allegedly been previously agreed. *Id.* at ¶ 42.

4.  The SAC alleges that Mr. Daniel "stalled." *Id.*  "[H]e did not get back to Mr. Hawkins." *Id.* at ¶ 87.  As a result, Mr. Hawkins was compelled to "raise[] the issue with Mr. Daniel several times." *Id.*

5.  Mr. Daniel eventually informed Mr. Hawkins that Mr. Daniel had "looked into terminating the Proxy and had been advised that the Proxy was irrevocable as a matter of law, and could not be terminated." *Id.* at ¶ 42.

6.  Evidently, this did not satisfy Mr. Hawkins, as he raised the matter again in 2007, when Mr. Hawkins once more asked for the proxy to be relinquished. *Id.* at ¶ 88.

7.  Mr. Daniel reiterated in 2007 that he had been advised by consultants "that the proxy was "'irrevocable' and could not be extinguished." *Id.*

Given these allegations, Mr. Hawkins could not have relied in good faith on Mr. Daniel concerning the proxy.  If one credits the SAC's allegations, Mr. Daniel failed to honor his

agreement and assurances to Mr. Hawkins.  Mr. Hawkins supposedly authorized the proxy premised on the assurance and agreement that Mr. Daniel would surrender it when Joseph Pike was bought out, which occurred in 2001.  But in 2001, when that happened, Mr. Hawkins asked Mr. Daniel to relinquish the proxy and Mr. Daniel refused, on the premise that it was "irrevocable."  At that point, plainly Mr. Hawkins could not have imagined that Mr. Daniel was acting as a fiduciary concerning the proxy since Mr. Daniel "stalled" and then did the exact opposite of what Mr. Hawkins claims was promised.  "Delaware law expects some initiative from plaintiffs, even those who rely on fiduciaries." *Pomeranz*, 2005 WL 217039, at *12. "Reasonable reliance on the competence of fiduciaries can toll the running of the statute of limitations, but the trusting plaintiff must still be *reasonably attentive* to his interests.." *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, NO. CIV.A. 1091-VCL, 2007 WL 2982247, at *14 (Del. Ch. Oct. 9, 2007) (emphasis in original) (internal quotations omitted).

The proof that Mr. Hawkins did not, in fact, rely on Mr. Daniel is supplied by the SAC itself.  Mr. Hawkins obviously did not rely on what Mr. Daniel said in 2001, because Mr. Hawkins felt compelled to ask again in 2007 that the proxy be relinquished, and received the same answer from Mr. Daniel.  Why would Mr. Hawkins again question Mr. Daniel about relinquishing the proxy?  The only reasonable inference is that Mr. Hawkins did not rely on Mr. Daniel's 2001 comments, but doubted what he had been told. *See Conlin*, 2014 WL 242655, at *5 (finding that plaintiff's "own conduct in raising questions about assets she believed were missing from the Trust demonstrates she was aware or should have been aware of the conduct she alleges constituted a breach of [the trustee's] fiduciary duties").  But if Mr. Hawkins doubted what Mr. Daniel allegedly said in 2001, when Mr. Pike was paid off, why would he then rely on the exact same assertion six years later, in 2007, long after Mr. Pike had been bought out?  Mr.

-14-

and Mrs. Hawkins, having twice been told what the SAC claims is the opposite of what Mr. Daniel supposedly promised, could not reasonably have continued to wait another six years in reliance on Mr. Daniel before investigating the proxy further and filing suit.

The allegations of the SAC, if accepted as true, compel the conclusion that Mr. Hawkins could not have believed Mr. Daniel was acting in his best interests.  Indeed, the SAC shows that Mr. Hawkins did not believe Mr. Daniel, but instead repeated his inquiry years later, long after the supposed justification for the proxy had been resolved.  The SAC contradicts the notion that any good faith reliance occurred here which might warrant equitable tolling.

### B.   Dismissal With Prejudice Is Warranted Here.

The SAC represents Plaintiff's third attempt to plead proxy-related claims.  Her failure to assert timely claims is not due to lack of effort, but due to a lack of underlying merit to her efforts to evade the statute of limitations.  "Where a proposed amendment would be futile, leave to amend need not be given."  *Hill v. Curcione*, 657 F.3d 116, 123–24 (2d Cir. 2011).  Here, Plaintiff "has had ample opportunity to correct the deficiencies in her pleadings and has been unable to do so."  *Miller v. HSBC Bank U.S.A., N.A*., NO. 13 CIV. 7500, 2015 WL 585589, at *12 (S.D.N.Y. Feb. 11, 2015) (rejecting third attempt to plead a claim).  The proxy-related claims have been asserted many years too late, and should therefore be dismissed with prejudice.

<u>**CONCLUSION**</u>

For the foregoing reasons, Counts I, II, and III of Plaintiff's Second Amended Complaint should be dismissed with prejudice.

Dated: March 20, 2015

By:  /s/ Jeffrey A. Simes
Jeffrey Alan Simes
Michael Yiin
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. (212) 813-8800
Fax (212) 355-3333
jsimes@goodwinprocter.com

*Attorneys for Defendants*
*MedApproach Holdings, Inc. and*
*W. Bradley Daniel*

**Appendix A**

Organizational Chart of the Project in 1995:



Organizational Chart of the Project Following the Buyout
of 75% of Mr. Pike's Interest in NDM:



-17-

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2015, I caused to be served by electronic means via the Court's CM/ECF System a copy of the Memorandum in Support of Defendants' Partial Motion to Dismiss the Second Amended Complaint on all counsel registered to receive electronic notices.

/s/  Jeffrey Alan Simes