UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:   7/29/2020

SHARON HAWKINS, derivatively on behalf of
MEDAPPROACH, L.P., and individually,

                              Plaintiff,

            -against-

MEDAPPROACH HOLDINGS, INC., and W.
BRADLEY DANIEL

                              Defendants.

            -and-

MEDAPPROACH, L.P.,

                              Nominal
                              Defendant.

1:13-cv-05434 (ALC)(SDA)

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

## INTRODUCTION

This case involves a complex web of entities created to invest in the development, production and sale of the abortion drug mifepristone. In the Third Amended Complaint, Plaintiff, who has invested in this endeavor through a limited partnership, asserts derivative and individual claims against the limited partnership's corporate general partner and sole shareholder. *First*, Plaintiff asserts a claim of breach of fiduciary duty in connection with Defendants' alleged bad-faith refusals to alter a tax-inefficient corporate structure (Count IV). *Second*, Plaintiff asserts another claim of breach of fiduciary duty in connection with the distribution of a 10% interest in one of the venture's entities. (Count V.) *Third,* Plaintiff asserts individual claims of breaches of fiduciary duty and contract based on Defendants' withholding of distributions on Plaintiff's limited partnership investments. (Count VI and VII). Finally, Plaintiff asserts a breach of fiduciary duty in relation to certain payments made in 2016 and 2017. Upon careful consideration, Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 23.1 is GRANTED in part; Defendants' motion for summary judgment is GRANTED as to Counts

IV, V, VI and VII. As to Count VIII, Defendants motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff's motion for summary judgment is DENIED.

## BACKGROUND

Defendant MedApproach L.P. ("MedApproach") is a Delaware limited partnership, that is one of the web of entities involved in the mifepristone project ("the Project"). (Plaintiff's Response to Defendants' Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment ("RSUMF"), ECF No. 247 ¶¶ 1, 15.) Its General Partner is Med Approach Holdings ("Holdings"), which is owned and controlled by W. Bradley Daniel. (RSUMF ¶ 12-13.)

Plaintiff Sharon Hawkins is a limited partner of MedApproach, holding 88.18% of the shares therein. (RSUMF ¶ 3.) She is the successor in interest to her husband, Gregory D. Hawkins. (RSUMF ¶¶ 4-5.) Though Mr. Hawkins transferred his interest in MedApproach to Mrs. Hawkins, he has acted as an agent for Mrs. Hawkins and conducted discussions about the Project on her behalf. (RSUMF ¶ 7.)

Apart from the Parties, a few other entities involved in the Project are relevant here. Danco Laboratories, Inc. ("Danco Labs"), holds the license from Population Council ("Popco") to manufacture, market, and distribute mifepristone. (RSUMF ¶ 18.) Danco Labs is owned by Danco Investors Group, L.P. ("Danco"), the General Partner of which is N.D. Management, Inc. ("NDM"). (RSUMF ¶ 19, 21.) NDM is 75% owned by MedApproach. (RSUMF ¶ 22.)

Pursuant to a 1997 Irrevocable Proxy and Power of Attorney, Mr. Daniel and non-party Dr. Jeffrey Rush are Proxy Holders entitled to vote the shares of NDM. (RSUMF ¶ 29.) The Proxy Holders, by virtue of their control over the voting shares of NDM, effectively control the Project.

2

(RSUMF ¶ 30.) Absent this proxy, Mrs. Hawkins would control the Project by virtue of her 88.18%

ownership of MedApproach, which owns 75% of NDM. (RSUMF ¶ 86.)

Mrs. Hawkins previously challenged the validity of this proxy in this matter. In August

2014, the Court granted the Defendants' motion to dismiss three proxy-related claims contained in

a First Amended Complaint filed by Mrs. Hawkins as presumptively untimely, denied Defendants'

motion as to three other claims, but granted Mrs. Hawkins leave to replead as to the dismissed

claims. *Hawkins v. MedApproach Holdings, Inc.*, No. 1:13-cv-05434 (ALC) (DF), 2014 WL

3926811 (S.D.N.Y. Aug. 11, 2014). In November 2015, the Court again dismissed as untimely the

three proxy-related claims that Mrs. Hawkins had reasserted in her Second Amended

Complaint. *Hawkins*, 13 Civ. 5434, 2015 WL 8480076 (S.D.N.Y. Nov. 30, 2015).

Now, the Court turns to the claims remaining in the Third Amended Complaint.

1. Count IV: Tax Restructuring

NDM was, from its inception, a "C Corporaton". (RSUMF ¶ 52.) As a "C Corporation,"

NDM pays state and federal taxes on distributions made from Danco Investors before that money

is in turn distributed to MedApproach and eventually to MedApproach's limited partners, who

must then pay tax again on their respective shares. (Plaintiff's Response to Defendants'

Counterstatement of Undisputed Material Facts Pursuant to Local Rule 56.1(b) ("CoMF") ECF

No. 253 ¶ 36.)

Beginning in 2008, Mr. Daniel and Ms. Angelia Van Vranken began to consider the

possibility of reorganizing NDM in the future to secure tax benefits. (RSUMF ¶ 62.) Since 1997,

Ms. Van Vranken has been Chief Financial Officer, or served in a similar position, at

MedApproach and Danco. (ECF No. 235 ¶ 5.) Although she does not have a formal employment

relationship with NDM, she functions as the CFO there as well. (ECF No. 235 ¶ 5.) Along with

Roy Kamovsky, who is the Chief Executive Officer of Danco, she meets with Mr. Daniel and Dr. Rush on a regular basis to manage the affairs of the Project and the various entities involved. (ECF No. 235 ¶ 6.)

On or about January 9, 2009, Mr. Daniel provided Mr. Hawkins with a written proposal to change the corporate structure of NDM into a pass through "S Corporation" for federal income tax purposes (the "January 2009 Proposal"). (RSUMF ¶ 71.) Because the shares of an S Corporation could not be owned by passthrough entities such as MedApproach, a reorganization of NDM into an S Corporation would require that the shares of NDM stock be transferred to the individual limited partners of MedApproach, including Mrs. Hawkins. (RSUMF ¶ 67-68.) If done on a pro rata basis, Mrs. Hawkins, who owned 88.18% of MedApproach, which owned 75% of NDM, would become a majority and controlling owner of NDM, and thus would control the Project. (RSUMF ¶ 86.) Instead, the January 2009 Proposal anticipated that the shareholders would reaffirm the proxy.

Mr. Hawkins was consulted about the January 2009 Proposal. He agreed at the time that the January 2009 Proposal would have the desired effect of eliminating tax on NDM at the corporate level. (RSUMF ¶ 73.) However, Mr. Hawkins did not consent to the January 2009 Proposal because he did not want the proxy to remain in place. (RSUMF ¶ 78-81, 93.) The other MedApproach partners would not consent to the removal of the proxy. (RSUMF ¶ 87-88.)

In Count IV of her Third Amended Complaint, Mrs. Hawkins claims that Defendants breached their fiduciary duties when they failed to enact the tax restructuring. She argues that Mr. Daniel declined a proposal that would maximize the value of NDM, the sole asset of MedApproach, to entrench his control of MedApproach via the proxy. Mrs. Hawkins therefore

seeks injunctive relief compelling Defendants to take all appropriate actions necessary to eliminate the double taxation, as well as compensatory and punitive damages.

In 2014, during the pendency of this lawsuit, Mr. Daniel, proposed a reorganization of NDM into an S Corporation that would reserve the Hawkinses right to challenge the proxy. (RSUMF ¶¶ 94-95.) The Hawkinses did not accept this proposal. (RSUMF ¶¶ 96-97.) In 2016, when the Parties engaged in settlement talks in this and the Tennessee matter, the proxy remained a sticking point. (RSUMF ¶¶ 98-99.) This Court adjudicated a dispute between the Parties regarding the meaning of a writing made during the settlement conference which stated: "Pro rata distribution of non-voting shares of NDM to beneficial owners with voting shares distributed to Brad Daniel." Next to this item, the following appears: "(Subject to attorney review and discussion)." *Hawkins on behalf of MedApproach, L.P. v. MedApproach Holdings, Inc.*, No. 113CV05434ALCSDA, 2018 WL 1371404, at *1 (S.D.N.Y. Jan. 9, 2018), *report and recommendation adopted*, No. 13-CV-05434 (ALC), 2018 WL 1384502 (S.D.N.Y. Mar. 15, 2018). The Parties did not agree on a term related to voting rights. *Hawkins on behalf of MedApproach, L.P. v. MedApproach Holdings, Inc.*, No. 13-CV-05434 (ALC), 2018 WL 1384502, at *1 (S.D.N.Y. Mar. 15, 2018).

2. Count V: 10% Interest Distribution

In 1996, Popco learned of an earlier criminal conviction of a founder of the Project, and threatened to withdraw the sublicense for mifepristone unless the founder's control over the Project was eliminated. (RSUMF ¶ 28.) Popco also insisted that investors in the Project be given the opportunity to have their interests bought back if they elected to do so. (RSUMF ¶ 34.)

The aforementioned proxy agreement addressed Popco's concern about the criminal founder's control. To comply with Popco's demand that investors be able to have their interests bought back, Mr. Daniel, Mr. Hawkins and others initiated a Rescission Offer. (RSUMF ¶ 35.)

The Rescission Offer involved obtaining investments and maintaining investors in Danco, as well as obtaining financing from other sources. (RSUMF ¶ 36.) It also created a potential carried interest in Danco for NDM. (RSUMF ¶ 38.)

The Rescission Offer Memorandum, which was distributed to the original investors to describe the transaction (RSUMF ¶ 37), explained:

> Following completion of the Offering and assuming all of the Offered Interests are purchased, all Limited Partners will collectively possess a Percentage Interest of approximately 70% and the General Partner will possess a "carried" Percentage Interest of approximately 30%. . . .
> It is important to note that the General Partner's interest in the Partnership is a "carried" or "residual" interest. Until the Limited Partners receive cash distributions from the Partnership in the aggregate amount of their capital contributions, Limited Partners will receive 99% of the cash distributions from the Partnership with the General Partner receiving only 1 % of such distributions. Thereafter, cash distributions will be made in proportion to each Partner's Percentage Interest (*i.e.*, 70% to the Limited Partners and 30% to the General Partner assuming full subscription under the Offering). (RSUMF ¶ 38, ECF No. 230-14, at 36.)

The memorandum also indicated that the carried interest would "compensate the General Partner and the Proxy Holders". (CoMF ¶ 65.)

A few months earlier Mr. Hawkins had negotiated and approved an agreement signed by the proxy holders regarding the allocation of the carried interest. (RSUMF ¶ 40.) The "Certain Compensation Matters Agreement", date May 18, 1998 says:

> Assuming that the General Partner's interest in the Partnership is reset at a total of 30 percentage points, such total of 30 percentage points shall be allocated as follows as additional compensation for past and future services to the indicated individuals:
> To Freeman, 4 points in respect of the business of the Partnership relating to the abortifacient indications of mifepristone (the "Abortifacient Business") and 10 points in respect of the non-abortifacient indications of mifepristone, whether such other indications

6

are exploited through the existing Partnership, one of its existing subsidiaries or a new company ("Other Indication Business"); to Daniel, 4 points in respect of the Abortifacient Business and 10 points in respect of the Other Indications Business; and to MedApproach, 2 points in respect to the Abortifacient Business. (RSUMF ¶ 39; ECF No. 230-17 at 2.)

The Rescission Offer was successful, and left NDM with slightly more than 30% of the economic interests of Danco. (RSUMF ¶ 114.) By 2010, Danco's Limited Partners had received cash distributions from the Partnership in the aggregate amount of their capital contributions. (RSUMF ¶ 144.) Thereafter, on July 1, 2010, the disputed 10% interest in Danco—10.8601% to be precise—was transferred from NDM as follows: 4% to Mr. Daniel, 3.31% to Dr. Rush, 1.3781% to Dr. Hipp and 2.172% to MedApproach. (RSUMF ¶ 145.)

Mr. Daniel distributed portions of the 10% interest to people besides those named in the Certain Compensation Matters Agreement, himself and Mr. Freeman. At the time it was contemplated that Mr. Rush would leave the Proxy Holder position. However, he remains a Proxy Holder and Mr. Freeman retired before passing away. (RSUMF ¶ 33.) Dr. Hipp was not a proxy holder and was not referenced in any agreement. Defendants explain that the percentage interest that was transferred to Dr. Hipp represented a portion of equity that was due to the Proxy Holders that Mr. Daniel and Mr. Rush voluntarily reassigned to Dr. Hipp. (CoMF ¶ 65.)

Mr. Daniel warned Mr. Hawkins of his intention to distribute the 10% interest before 2010. In 2008, Mr. Daniel told Mr. Hawkins via email that he intended to transfer part of the 10% interest to Mr. Rush as Proxy Holder. (RSUMF ¶¶ 127-129.) Mr. Hawkins opposed the transfer. (RSUMF ¶ 128-129.) In a January 2009 email to Mr. Hawkins, Mr. Daniel implied his intent to transfer to Mr. Rush and others, referring to the "10.8601 percent interest that is being allocated to proxy holders, et cetera . . . ." At that time, Mr. Hawkins again disputed the allocation. (RSUMF ¶ 130.)

From July 2010 onward, the Hawkinses received and retained their share of distributions from Danco in connection with the 2.172% interest transferred to MedApproach. (RSUMF ¶ 146.)

As early as March 28, 2011, Mrs. Hawkins received financial reporting indicating that she held an interest in Danco. (RSUMF ¶ 149.)

In Count V, Mrs. Hawkins claims, derivatively on behalf MedApproach, that Mr. Daniel breached his fiduciary duty by transferring the 10% interest in Danco. She seeks the return of the transferred interests, and an award of damages.

3. Count VI and VII: Withholding Distributions

On December 20, 2011, Holdings filed a lawsuit against Mr. and Mrs. Hawkins in the United States District Court for the Middle District of Tennessee (the "Tennessee lawsuit."). (RSUMF ¶ 151; *MedApproach Holdings, Inc. v. Hawkins*, No. 3:11-cv-01199, ECF No. 1 (M.D. Tenn.).)

The Tennessee lawsuit alleged, *inter alia*, that, to avoid paying management and other fees, the Hawkinses fraudulently induced Mr. Daniel and Holdings to permit the transfer of certain interests in the Project (their interests in MedApproach, DIG Equity and DIG Special Assets) to entities Mr. Daniel was told were third parties, but were in fact controlled by the Hawkinses. (RSUMF ¶ 152.)

In the lead up to filing the complaint, on December 3, 2010, Mr. Daniel advised Mr. Hawkins of the possibility he would pursue an offset of her profit distributions to satisfy the fees he believed were owed. (RSUMF ¶ 166.) The Complaint, filed several days later, indicated that Plaintiff had "set-off" and "set aside" and retained profit distributions due Mrs. Hawkins from interests in the Project for management and profit participation fees Mr. Daniel believed Holdings was owed. (*MedApproach Holdings, Inc. v. Hawkins*, No. 3:11-cv-01199, ECF No. 1 ¶¶ 23, 27 (M.D. Tenn.).) From the filing of the lawsuit to July 23, 2013, Mr. Daniel caused MedApproach to withhold $439,805.77 in Mrs. Hawkins's distributions. (RSUMF ¶ 168-69.) On the advice of

counsel, the withheld amounts were held in an interest-bearing partnership reserve account in MedApproach's name and taxpayer identification number. (RSUMF ¶¶ 160, 171.)

After twice being granted dismissal of Holdings' complaint in part or in whole, the Hawkinses answered an amended complaint on August 5, 2013. *MedApproach Holdings, Inc. v. Hawkins*, No. 3:11-cv-01199, ECF Nos. 46-48 (dismissing complaint); 64-65 (dismissing complaint besides fraud and civil conspiracy claims pertaining to the loss of management fees for a certain entity); 70 (answer to amended complaint) (M.D. Tenn.).) The Hawkinses did not assert any counterclaim challenging the withholding of the distributions in the Tennessee lawsuit. (RSUMF ¶ 177.)

In Count VI, Mrs. Hawkins sues individually for breach of contract. Mrs. Hawkins claims that the withholding of her distributions violated the limited partnership agreement, which provides in part that "The General Partner [i.e., Holdings] shall not have the authority without the written consent or ratification by all the Limited Partners to. . . [p]ossess Partnership property or assign rights to specific Partnership property for other than a Partnership purpose." (Third Amended Complaint ¶ 62.) As Mrs. Hawkins sees it, the withholding was not for a "Partnership purpose" because the Tennessee claims would have benefited only Holdings and Mr. Daniel personally.

In Count VII, she sues for breach of fiduciary duty in relation to the same act. In both counts, Mrs. Hawkins seeks damages to compensate for the full amount of distributions withheld, interest, and punitive damages. However, in the papers for the instant motion to dismiss, Mrs. Hawkins seems to concede that she received the money owed her, and is only seeking interest. (ECF No. 228 at 8 ("Shortly after the Tennessee Case was reduced to virtually nothing, Mrs. Hawkins received approximately 1.3 million of previously withheld distributions from the

MedApproach Entities, but she has never received adequate compensation for the loss of the use of her money for 18 months.").)

    4.  Count VIII: 2016 and 2017 Compensation

During 2016 and 2017, the general ledger of NDM shows that Ms. Van Vranken and Mr. Daniel were paid money classified therein as consulting and contract labor.

Mr. Daniel and Dr. Rush determined that Mr. Van Vranken should be paid $500 per month for regular services supplied to NDM. (RSUMF ¶ 199.) These payments began in 2013. (RSUMF ¶ 199.) In addition, the Proxy Holders determined that Ms. Van Vranken would be compensated for extra time spent in addressing the needs of the instant lawsuit, at a rate of $225 an hour. (RSUMF ¶ 201.)

For 2016, the ledger indicates that Ms. Van Vranken was paid $70,000 for consulting and paid $6,000 for contract labor. (ECF No. 230-31, at 10-11.) Invoices in the record purport to summarize 112 hours Ms. Van Vranken worked for NDM in 2016, for which she was due $25,200. (ECF Nos. 230-76 at MED00015774-75.) It also indicates that she was overdue $123,000 from prior years, and, having been paid $76,000, was still owed $73,000. (ECF Nos. 230-76 at MED00015775.)

For 2017, the general ledger indicates that Ms. Van Vranken was paid $80,000 in consulting fees and $6,000 for contract labor. (ECF No. 230-32 at 10-11.) An invoice purporting to summarize the hours Ms. Van Vranken worked during 2017 indicates that she devoted 57 hours to NDM, for which she was due $12,835. (ECF No. 230-77 at MED00015776.) She was paid $86,000 that year, which covered the $73,000 balance from the prior year, and resulted in a credit of $175. (ECF No. 230-77 at MED00015777.)

Mr. Daniel's compensation is circumscribed by multiple agreements. The Certain Compensation Matters Agreement, which Mr. Hawkins approved, established a cost-of-living-adjusted $300,000 per annum rate of pay for Mr. Daniel for "routine management services" "to the General Partner and for services as a Director/Proxy Holder". (RSUMF ¶¶ 39, 188; ECF No. 230-17 at MED00014074.)

For the other proxy holders, it established a $50,000 annual retainer plus $2,500 per diem for Mr. Rush and $3,000 per diem for the late Freeman "not to exceed $250,000 per year per individual, unless otherwise agreed by the Proxy Holders." (ECF No. 230-17 at MED00014074.) It also provided that "[t]he undersigned [proxy holders] shall use commercially reasonable efforts to cause the Partnership to compensate Messrs. Freeman and Daniel, at customary market rates, for such additional special services as they may provide: to the Partnership from time to time in connection with such matters as public offerings, mergers, sale of assets, acquisition of products and/or assets, other business combinations and raising capital." (ECF No. 230-17 at MED00014074-75.)

On August 1, 1998, NDM and Danco entities also entered an Indemnification Agreement. This agreement provided in part:

> The Enterprise, and each of the entities comprising the Enterprise (collectively, the "Indemnitors"), jointly and severally, covenant and agree to indemnify, defend and hold harmless MedApproach (in its capacity as a stockholder of the General Partner), the Proxy Holders, the directors, officers, employees, agents of any of the Enterprise entities or their affiliates, and the respective heirs, personal representatives, successors, assigns, partners, employees and agents of each of the foregoing (individually, an "Indemnitee" and, collectively, the "Indemnitees"), to the fullest extent permitted by applicable law in effect on the date hereof and as such law may from time to time be amended, but, in the case of such amendment only to the extent that such amendment permits the Enterprise to provide broader indemnification rights and protection than the law permitted the Enterprise to provide before such amendment. Without in any way limiting the scope of the indemnification provided by this Agreement, the Indemnitors will indemnify the Indemnitees, and each of them, for any amount which an Indemnitee is or becomes legally

11

obligated to pay because of any claim or claims made against the Indemnitee as the result of any act or omission or neglect or breach of duty, including any actual or alleged error or misstatement or misleading statement, which the Indemnitee commits or suffers while acting to any degree in his, her or its capacity described above, and solely because of the Indemnitee serving in that capacity, the payments which the Indemnitors shall be obligated to make hereunder shall include, without limitation, damages, settlements, judgments, costs and expenses (including reasonable attorneys· fees), and **compensation for time spent by a Proxy Holder in attending to or dealing with such claim or claims at the per diem rates set forth in that certain letter agreement dated May_, 1998, by and among the General Partner, the Proxy Holders and MedApproach.**" (RSUMF ¶¶ 184-185) (emphasis added.)

Mr. Daniel contends that these agreements establish that he is entitled to his annual salary, plus payment for time spent on legal matters up to $3000 per day. (RSUMF ¶ 205.) It is not clear what text in particular leads Mr. Daniel to such conclusion, but the Court notes that $3,000 is the per diem for the late Mr. Freeman in the Certain Compensation Matters Agreement. Mr. Daniel backed out an hourly rate of $550 dollars by dividing $3000 by 8, and adjusting for inflation. (RSUMF ¶ 205.)

In 2016, the general ledger indicates Mr. Daniel was paid $70,000 in consulting fees and $152,250 for contract labor. (ECF No. 230-31, at 10-11.) In 2017, Mr. Daniel was paid $130,000 in consulting fees, and $79,567.52 for contract labor. (ECF No. 230-32 at 10-11.) In support of this pay, Mr. Daniel kept records of legal work performed from 2013-2017 for NDM. These indicate that he worked the following number of hours, and was due the following amount based on $550 hourly rate: 128.5 hours, $70,675 (2013, ECF No. 230-79 at MED00015682); 537.5 hours, $295,625 (2014, ECF No. 230-80 at MED00015702); 151.5 hours, $83,325 (2015, ECF No. 230-81 at MED00015721); 117 hours, $64,350 (2016, ECF No. 230-82 at MED00015736); 65 hours, $35,750 (2017, ECF No. 230-83 at MED00015749). These amounts exceed the 2016 and 2017 payments.

Mr. Rush, the other proxy holder, didn't specifically recall approving Mr. Daniel's 2016 payments or either 2017 payments. However, he recalled approving Mr. Van Vranken's 2016 payment. (ECF No. 230-7 at 78:20-79:9, 82:21-83:20.) Mr. Rush also testified that he spoke to Mr. Daniel and Ms. Van Vranken about the payments, and to Mr. Daniel about the agreements pursuant to which he believed he was being paid but did not review underlying time logs. (ECF No. 230-7 at 79:10-81:25.)

In Count VIII, Mrs. Hawkins claims that the 2016 and 2017 payments to Ms. Van Vranken and Mr. Daniel were unauthorized payments not in the interest of NDM. Derivately on behalf of MedApproach, and through MedApproach on behalf of NDM, Mrs. Hawkins seeks damages and disgorgement.

## DISCUSSION

1.  Motion to Dismiss

Before considering the Parties' cross motions for summary judgment, the Court considers whether Mrs. Hawkins is an adequate representative pursuant to Federal Rule of Civil Procedure 23.1. The Court is bound by Second Circuit law on this procedural issue. *JFURTI, LLC v. Singal*, No. 17 CIV. 7206 (CM), 2018 WL 6332907, at *10 (S.D.N.Y. Nov. 12, 2018).

Rule 23.1 provides that a derivative action "may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1(a). Because representative shareholders seek to protect the interests beyond their own personal stakes in a corporation, the representative stands in a fiduciary relationship with the corporation and the other shareholders. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949).

An adequate representative must have the capacity to prosecute a derivative suit vigorously and needs to be free from interests that are antagonistic to the interests of the class. *See*, *e.g.*, *Sweet v. Bermingham*, 65 F.R.D. 551, 554 (S.D.N.Y. 1975). Courts consider a number of factors bearing on the adequacy of representation, including:

1. Economic antagonisms between the representative and class;
2. Other litigation pending between the plaintiff and the defendants;
3. The relative magnitude of the plaintiff's personal interest in matters beyond the scope of the derivative action, as compared to his or her interest in the derivative action;
4. The plaintiff's vindictiveness towards the defendants; and
5. The degree of support the plaintiff receives from the other shareholders that he or she purports to represent. J. Moore et al., Moore's Federal Practice – Civil § 23.1.09 (2018) (citing cases); *see also Priestley v. Comrie*, No. 07 CV 1361 (HB), 2007 WL 4208592, at *6 (S.D.N.Y. Nov. 27, 2007) (citing same factors).

Courts generally have found that the defendant bears the burden of showing that the plaintiff is an inadequate representative. *In re JPMorgan Chase & Co. S'holder Derivative Litig.*, No. 08 CIV. 974 (DLC), 2008 WL 4298588, at *8 (S.D.N.Y. Sept. 19, 2008).

Defendants argue that Mrs. Hawkins is an inadequate representative because her engagement in this lawsuit is motivated by antagonism and animus; she lacks knowledge regarding her claims; and her interests are inimical to those of other partners. The Court concludes that Mrs. Hawkins's limited involvement in the day to day of the company does not render her an inadequate representative. However, with respect to the tax structure claim, Count IV, the Court does find a disqualifying conflict. For the reasons that follow, the Court dismisses Count IV. However, the Court concludes the remaining derivatives claims may proceed.

To be an adequate representative, a plaintiff must "be the one to authorize the suit, and must be sufficiently well informed, diligent, and independent (with the support where necessary of appropriate advisors) to protect the interests of the shareholders and corporation from the potentially competing interests of the attorneys". *See e.g.*, *in re JPMorgan Chase & Co. S'holder*

*Derivative Litig.*, No. 08 CIV. 974 (DLC), 2008 WL 4298588, at *12 (S.D.N.Y. Sept. 19, 2008). A plaintiff is not rendered inadequate because they "rely on relatives and close friends to assist them in bringing and maintaining derivative litigation". *Id.* at *11.

It is clear from the record that while Mrs. Hawkins is the owner of the interest in MedApproach, she relies on Mr. Hawkins to manage the investment. However, Defendants have not demonstrated that Mrs. Hawkins level of knowledge has allowed the litigation to be run by lawyers, as in the cases on which the Defendants sought to rely, or been otherwise detrimental. As such, Defendants have not shown Mrs. Hawkins inadequate based on this ground.

The Court also concludes that the fact that Mrs. Hawkins has brought derivative actions as well as individual ones is not disqualifying. Though courts in this district have found lack of standing on these grounds, there is no per se rule that such claims must always be dismissed. *See Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d 778, 793-94 (S.D.N.Y. 2011), *aff'd*, 479 F. App'x 375 (2d Cir. 2012) (collecting cases). Any potential conflict from Mrs. Hawkins's direct and derivative claims here is not comparable to those that other courts found merit dismissal. For example, in *JFURTI, LLC v. Singal*, the court found an inherent conflict of interest where the plaintiff improperly recast its individual claims, which had been settled and released against most defendants, as derivative claims. No. 17 CIV. 7206 (CM), 2018 WL 6332907, at *13-14 (S.D.N.Y. Nov. 12, 2018). The court in *Ryan v. Aetna Life Ins Co.,* found a disqualifying conflict in plaintiff's attempt to simultaneously seek damages from the company on behalf of a class and on behalf of shareholders. 765 F. Supp. 133, 135-36 (S.D.N.Y. 1991).

No comparable conflict exists between the direct and derivative claims by Plaintiff here. Unlike in *Ryan*, the individual claims arise out of different transactions from the derivative ones. Unlike in *JFURTI*, the individual claims properly seek a personal recovery related to a contract

dispute. Therefore, the Court concludes Mrs. Hawkins has not been shown to be inadequate on this ground either.

However, Defendants have shown a conflict of interest as to the tax structure claim, Count IV, that renders Mrs. Hawkins an inadequate representative.

"[I]f an ulterior motive of plaintiff manifests itself and renders plaintiff's interests inimical to those of the shareholders she seeks to represent, the court should consider this ulterior motive in the determination of plaintiff's adequacy." *Renz by Renz v. Carota,* No. 87-CV-487, 1991 WL 165677, at *3 (N.D.N.Y. Aug. 26, 1991) *aff'd sub nom. Renz v. Beeman*, 963 F.2d 1521 (2d Cir. 1992). For example, in *Renz*, the court held that a plaintiff was an inadequate representative under 23.1 because the "plaintiff's foremost concern [was] the perceived loss of family control rather than with the Company's best interests". *Id.* This lead the court "to conclude that plaintiff's true interest in this suit beyond the removal of Bruno from a 'family trustee' position is incidental at best, and that plaintiff's purpose in pursuing the derivative claims was to gain leverage in her fight against Bruno's retention of his position as 'family trustee.'" *Id.* The First Circuit affirmed a trial court's dismissal of a putative derivate representation based on the trial court's conclusion that from the vantage of the plaintiff, who had other disputes with the defendants, "the 'highest and best' use of the derivative suit would be as a weapon in the total Kattar arsenal, to be either pursued, de-emphasized, or settled as the future course of the larger claims might dictate." *G. A. Enters., Inc. v. Leisure Living Cmtys., Inc.*, 517 F.2d 24, 26 (1st Cir. 1975). In *Smollar v. Potarazu*, the court concluded that a plaintiff was an inadequate 23.1 representative because he sought "approval of a settlement in which he would receive a substantial personal benefit not available to other stockholders". No. CV 10287-VCS, 2016 WL 3635304, at *3 (Del. Ch. June 29, 2016).

It is undisputed that the Hawkinses have long sought the removal of the proxy. Such removal would confer a significant personal benefit on them: control of the Project commensurate with majority stake in MedApproach.

Since before 2009, well before the initiation of this suit, the question of tax restructuring and the proxy have been, in the words of Mr. Hawkins, "tied topics". (RSUMF ¶ 79.) In depositions, Mr. and Mrs. Hawkins have candidly stated an unwillingness to accept a change in the tax structure without removal of the proxy. When asked "[w]hy not agree to change N.D. Management to an S corporation, leave the proxy in place, fight about the proxy later?", Mr. Hawkins answered "Because if we'd waited to do the proxy change, then it would have been more difficult to. . . if we'd assented to just the taxes and left the proxy in place, then there was actually no leverage to change the proxy from our point of view." (RSUMF ¶ 79.) Mrs. Hawkins, when asked "You understand Mr. Daniel has proposed during the lawsuit to make the conversion happen and argue about the proxy later. You understand that happened right?", she responded "But if I don't feel like that's beneficial to me because the proxy is—the proxy is not beneficial to me." (RSUMF ¶ 80.)

When Mrs. Hawkins originally initiated the instant suit, it included three counts seeking that the proxy be invalidated, which have been dismissed. But in 2014, during the pendency of this lawsuit, Mr. Daniel, proposed a reorganization of NDM into an S Corporation that would reserve the Hawkinses right to challenge the proxy. (RSUMF ¶¶ 94-95.) This proposal was rejected. (RSUMF ¶¶ 96-97.) In 2016, when the Parties engaged in settlement talks, the proxy remained an issue. (RSUMF ¶¶ 98-99.) The sticking point with respect to the tax structuring deal was whether the Parties could agree to "Pro rata distribution of non-voting shares of NDM to beneficial owners with voting shares distributed to Brad Daniel." *Hawkins on behalf of MedApproach, L.P. v.*

17

*MedApproach Holdings, Inc.*, No. 113CV05434ALCSDA, 2018 WL 1371404, at *1 (S.D.N.Y. Jan. 9, 2018), *report and recommendation adopted*, No. 13-CV-05434 (ALC), 2018 WL 1384502 (S.D.N.Y. Mar. 15, 2018).

Though Mrs. Hawkins objects to the Court relying on facts related to the settlement discussion, this objection is misplaced. First, the Court's use is not for the purposes circumscribed by Federal Rule of Evidence 408, "to prove or disprove the validity of amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Second, Plaintiff herself seeks to rely on the settlement talks. For example, in her summary judgment memorandum, Plaintiff discusses the settlement talks to support her arguments related to Mr. Daniel's alleged overcompensation of himself and Ms. Van Vranken. (ECF No. at 228, 26-27.)

The Court's concern that Mrs. Hawkins cannot advance the shareholder interest as to the tax structure in light of the proxy issue is exacerbated by the fact that Defendants have put forward unrebutted evidence that the shareholders in Danco and MedApproach do not support removal of the proxy. (ECF No. 237). Mrs. Hawkins is correct that disagreement of other shareholders is not sufficient for a finding of inadequacy and that a shareholder can be a class of one. (P's Opp. to MTD, ECF No. 271, at 17-18.) However, here, together with Mr. and Mrs. Hawkins's statements and actions, it suggests that the tax structure cannot be disentangled from the Hawkinses longstanding dissatisfaction with the proxy. Mrs. Hawkins is an inadequate representative not because she advances her claims alone, but because she purports to advance a claim on behalf of the corporation for tax restructuring, but in deed and word has sought to advance her interest as to the proxy.

For these reasons, the Court concludes Mrs. Hawkins is an inadequate representative under Rule 23.1 with respect to the tax structure claim. Count IV is therefore dismissed. The remaining

derivative claims, Count V, regarding the 10% interest distribution, and Count VIII, regarding the 2016 and 2017 compensation, are not intertwined with the proxy issue and do not represent the same conflict. Therefore, the Court concludes Mrs. Hawkins has standing as to those claims.

1. Cross-Motions for Summary Judgment

The Court now turns to the Parties' cross motions for summary judgment. The Parties agree Delaware law governs.

a. Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the moving party to establish the lack of any factual issues. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). When the moving party has carried its burden, the party opposing summary judgment must do more than simply show that "there is some metaphysical doubt as to the material facts." *Id*. at 586. Under Rule 56(e), the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A party's personal belief that the true facts are different from the facts established by the record cannot create a genuine dispute." *Berbick v. Precinct 42*, 977 F. Supp. 2d 268, 274 (S.D.N.Y. 2013).

b. Count V: 10% Interest Distribution

The Court need not engage with the merits of Parties' motions, because it concludes the claim is time-barred.

The statute of limitations for a claim of a breach of fiduciary duty or contract in Delaware is three years from the date on which the cause of action accrued. *See* 10 Del. C. § 8106(a); *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004). As the Plaintiff filed this claim in the Second Amended Complaint on February 20, 2015, the claim must have accrued before February 20, 2012 in order for the claim to be eligible for a statute of limitations dismissal. A cause of action is deemed to have "accrued" at the time of the wrongful act, irrespective of whether a plaintiff is on notice. *Wal–Mart Stores*, 860 A.2d at 319. If tolling is available, the statute of limitations begins to run when a plaintiff receives inquiry notice of a cause of action. *Norman v. Elkin*, 338 F. Supp. 3d 361, 376 (D. Del. 2018) *aff'd in part, rev'd in part and remanded*, 961 F.3d 275 (3d Cir. 2020). Inquiry notice does not require "actual knowledge of the wrong, but merely an objective awareness of the facts giving rise to the wrong." *Id.* "Delaware law expects some initiative from plaintiffs, even those who rely on fiduciaries." *Pomeranz v. Museum Partners L.P.*, No. Civ.A. 20211, 2005 WL 217039, at *12 (Del. Ch. Jan. 24, 2005).

Assuming no tolling is applicable, the claim related to Mr. Daniel's distribution of the 10% interest accrued on July 1, 2010, when the transfer was made. This is well before February 20, 2012; the claim is time-barred unless Plaintiff shows she is entitled to tolling.

Plaintiff attempts to invoke the doctrine of fraudulent concealment and equitable tolling to argue that the claim accrued in 2014. Fraudulent concealment exists where a defendant "knowingly acted to prevent a plaintiff from learning facts or otherwise made misrepresentations intended to 'put the plaintiff off the trail of inquiry." *Forsythe v. ESC Fund Mgmt. Co.*, 2007 WL 2982247, at *14 (Del. Ch. Oct. 9, 2007) (quoting *Delaware ex rel. Brady v. Pettinaro Enter.*, 870 A.2d 513, 531 (Del. Ch. 2005)). "Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a

plaintiff reasonably relies on the competence and good faith of a fiduciary." *Weiss v. Swanson*, 948 A.2d 433, 451 (Del Ch. 2008).

These tolling doctrines are not applicable here. Plaintiff does not point to facts before or after July 1, 2010 that indicate fraudulent concealment by Defendants. It is undisputed that Mr. Hawkins was aware of and approved the 1998 agreements that established the carried interest: the Rescission Offer Memorandum and the Certain Compensations Matters Agreement. It is likewise undisputed that in 2008 and 2009, Mr. Daniel told Mr. Hawkins that he planned to distribute the 10% interest to the proxy holders and possibly others. Mr. Hawkins disagreed with the distribution in 2008 and 2009 when Mr. Daniel informed him of them. Mr. Hawkins admitted he was aware the 10% interest transfer had not been effectuated in 2009, and expected that it would happen in 2009-2010. After the July 1, 2010 transfer, Mrs. Hawkins received distributions from the portion of Danco that MedApproach received from the 10% carried interest. Mrs. Hawkins also received a financial report showing a new interest in Danco as early as March 2011. Further, Mrs. Hawkins claimed she realized that Mr. Daniel was not a good faith actor as of his filing a December 2011 lawsuit against the Hawkins family. (RSUMF ¶ 213.) Taken together, these facts indicate that Mrs. Hawkins was on inquiry notice starting in March 2011, and at the very latest, in December 2011 with the filing of the Tennessee complaint. Plaintiff cannot now say she reasonably relied on Mr. Daniel and therefore did not inquire into the issue until 2014.

For these reasons, Defendants' motion for summary judgment as to Count V is GRANTED.

c.  Counts VI & VII Withholding Distributions

Plaintiff has brought both a contract and breach of fiduciary duty claim related to Defendants' withholding profit distributions from Mrs. Hawkins to offset amounts Mr. Daniel alleged Mrs. Hawkins owed in the Tennessee lawsuit. As a preliminary matter, the Court concludes

that Plaintiff's fiduciary duty claim is duplicative of her breach of contract claim, and therefore must be dismissed.

Under Delaware law, if a contract claim addresses the alleged wrongdoing by a director, "any fiduciary duty claim arising out of the same conduct is superfluous." *Grayson v. Imagination Station, Inc.*, No. CIV.A. 5051-CC, 2010 WL 3221951, at *7 (Del. Ch. Aug. 16, 2010). The rationale for this is that "[t]o allow a fiduciary duty claim to coexist in parallel with [a contractual] claim, would undermine the primacy of contract law over fiduciary law in matters involving . . . contractual rights and obligations." *Id.* "Nevertheless, Delaware law does recognize a narrow exception under which breach of contract and breach of fiduciary duty claims can both arise from the same nucleus of operative facts. Where there is an 'independent basis for the fiduciary duty claims apart from the contractual claims, even if both are related to the same or similar conduct . . . the fiduciary duty claims will survive.' . . . . The relevant inquiry then is whether the obligation sought to be enforced arises from the parties' contractual relationship or from a fiduciary duty owed to the shareholders. If the obligation to be enforced arises from a fiduciary duty owed to the shareholders, then the count is not duplicative and will not be dismissed." *Id.*

The Court concludes Mrs. Hawkins's fiduciary duty claim does not fit in that narrow exception. The gravamen of Mrs. Hawkins claim is that Mr. Daniel withheld funds from her in contravention of the Limited Partnership Agreement. Under the Limited Partnership Agreement, Mrs. Hawkins argues, Mr. Daniel could only withhold her distributions for partnership purposes or with the permission of the limited partners. Mrs. Hawkins has alleged no facts that indicate that, assuming *arguendo* that the withholdings were a breach of the Limited Partnership Agreement, that there is any further application for fiduciary duty. Rather, the two claims depend on the same

facts, have the same scope, and seek the same remedies. In light of this, summary judgment is granted in favor of Defendants as to Count VIII.

The next question is whether Count VII must be dismissed because it was a compulsory counterclaim in the Tennessee action. The Court concludes the answer is yes.

Federal Rule of Civil Procedure 13(a) provides in relevant part: "A pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim . . . ." Fed. R. Civ. P. 13(a). "The test for determining whether a counterclaim is compulsory is whether a logical relationship exists between the claim and the counterclaim and whether the essential facts of the claims are " 'so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" *Adam v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991) (citing *United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir.1980)). If a party has a compulsory counterclaim and fails to plead it, the claim cannot be raised in a subsequent lawsuit. *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n.1 (1974).

There is a logical relationship between the Tennessee claims and the withholding claim here. Mrs. Hawkins seeks an award of interest on the money that was withheld as an offset to the claims brought by Holdings in the Tennessee lawsuit. The withholding was done in direct response to the alleged breach of contract and fraud. Evidence of the transfers made by Mr. Daniel at the behest of Mr. Hawkins, the communications between Mr. Hawkins and Mr. Daniel with respect the entities to which interests were transferred, and any agreements related to fees due Holdings are relevant to both matters. Given the evidentiary overlap between the claims, judicial economy and fairness would have been served by disposing of all claims in the Tennessee action.

Plaintiff does not deny that there is a logical connection between the instant action and the Tennessee one. Instead, Plaintiff argues that the claim could not have been brought until the Hawkinses knew that the money was withheld, the reason for the withholding, and that they were damaged. First, the withholding and reason for it were disclosed in the complaint itself. Any argument that the Hawkinses could not file a counterclaim because they lacked that information is disingenuous. So too is the suggestion that the claim did not accrue until there was a judgment that Mr. Daniel's claims in the Tennessee suit were meritless. It is the very nature of the counterclaim that it is adjudicated alongside the claim. Besides, Mrs. Hawkins did not even wait until the Tennessee case was fully adjudicated to file here in the Southern District of New York. The instant claim was filed on August 2, 2013, three days before the Hawkinses answered the amended complaint in the Tennessee matter without asserting a counterclaim. (*MedApproach Holdings, Inc. v. Hawkins et al*., No. 3:11cv01199, ECF No. 70 (M.D. Tenn.).)

Because this counterclaim was compulsory in the Tennessee action, summary judgment is granted as to Count VII in favor of Defendants.

d. Count VIII: 2016 and 2017 Compensation

Both parties have also sought summary judgment as to the compensation received by Ms. Van Vranken and Mr. Daniel in 2016 and 2017. However, the appropriate review for Ms. Van Vranken's compensation differs from that for Mr. Daniel's compensation.

"Delaware courts examine the merits of a claim for breach of fiduciary duty through one of (primarily) three doctrinal standards of review: business judgment, enhanced scrutiny, and entire fairness." *Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 577 (Del. Ch. 2015). The business judgment presumption "applies when there is no evidence of 'fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment' on the part of the directors. In

the absence of this evidence, the board's decision will be upheld unless it cannot be 'attributed to any rational business purpose.'" *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 747 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). "When a plaintiff fails to rebut the presumption of the business judgment rule, she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste." *Id.* "This presumption can be rebutted by a showing that the board violated one of its fiduciary duties in connection with the challenged transaction." *Id.* "In that event, the burden shifts to the director defendants to demonstrate that the challenged transaction was 'entirely fair' to the corporation and its shareholders." *Id.*

As to the compensation of Ms. Van Vranken, the Court concludes that Plaintiff has not rebutted the business judgment presumption by showing a breach of the duty of care or loyalty.

A breach of loyalty occurs when "a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders". *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 191 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006). Plaintiff has not made any showing that Ms. Van Vranken's compensation was self-dealing on the part of Mr. Daniel. To the degree the Plaintiff intimates that the long-running work relationship between Mr. Van Vranken and Mr. Daniel suggests such a finding, she is mistaken. If a lengthy working relationship without more implicated the duty of loyalty, every decision made by the Project would come under scrutiny. And Mrs. Hawkins points to nothing more. The record shows that Ms. Van Vranken's invoices summarizing her hours spent on NDM's legal matters match NDM's ledger. Plaintiff presents no facts suggesting that the invoices are inaccurate or fraudulent, or that Ms. Van Vranken's hourly rates, which were set by Mr. Daniel and Mr. Rush are unreasonable. While Mr. Rush admits that he did not review Ms. Van Vranken's timesheets, even if he had, the timesheets do not raise a specter of conflict or self-dealing. For these reasons, the Court concludes that the

business judgment rule has not been rebutted on the basis of a breach of a duty to loyalty in relation to Ms. Van Vranken's compensation.

To evaluate whether the duty of care is implicated, we must consider the Agreement of Limited Partnership. Delaware law permits the members of a limited liability company to adopt provisions in its operating agreement that limit "any and all liabilities for breach of contract and breach of duties (including fiduciary duties)" with the exception of "any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing." 6 Del. C. § 18-1101(e). Such "exculpatory clauses" immunize managers from claims for breach of the duty of care, but not claims for an act of bad faith or breach of loyalty. *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006).

The MedApproach LLP Agreement of Limited Partnership, entered on January 1, 1999, includes an exculpatory clause. (ECF No. 230-1.) This clause provides, in part:

> "The General Partner shall not be liable to any other Partner for any claims, costs, expenses, damages or losses arising out of the performance of his duties as General Partner other than those directly attributable to the General Partner's own fraud, gross negligence or willful disregard of his duties." (Agreement of Limited Partnership, ECF No. 230-1, at 17.)

In light of this clause, the duty of care analysis asks whether based on the undisputed facts Plaintiff has shown "fraud, gross negligence or willful disregard of his duties" by Mr. Daniel with respect to the 2016 and 2017 compensation of Ms. Van Vranken. For the same reasons Plaintiff cannot show a breach of loyalty, Plaintiff cannot show fraud, gross negligence or willful disregard by Mr. Daniel in approving Ms. Van Vranken's compensation.

Since Plaintiff has not rebutted the presumption of the business judgment rule, she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste. She has not even attempted to make such a showing. For these reason, summary judgment is GRANTED

in favor of Defendants on the breach of fiduciary duty claim related to Ms. Van Vranken's compensation in 2016 and 2017.

As previously indicated, Mr. Daniel's compensation is a different matter. "Although authorized to do so by statute, when the board fixes its compensation, it is self-interested in the decision because the directors are deciding how much they should reward themselves for board service." *In re Inv'rs Bancorp, Inc. Stockholder Litig.*, 177 A.3d 1208, 1217 (Del. 2017), as revised (Dec. 19, 2017)." If no other factors are involved, the board's decision will 'lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation.' In other words, the entire fairness standard of review will apply." *Id.*

Defendants' argument that the approval of the Indemnification Agreement and Certain Compensation Matters Agreement by Mr. Hawkins precludes the applicability of fiduciary duties here is premature. Defendants have not shown that the plain language of the contracts unambiguously entitle Mr. Daniel to the 2016 and 2017 fees, such that summary judgment is proper. *See GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012) ("This Court has long upheld awards of summary judgment in contract disputes where the language at issue is clear and unambiguous. In such cases, the parol evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict that unambiguous language. But, where reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence. In those cases, summary judgment is improper.") Nor have Defendants shown that the terms of the agreement are irreconcilable with the fiduciary duty analysis, and therefore displace them. *See*,

27

*e.g.*, *R.S.M. Inc. v. All. Capital Mgmt. Holdings L.P.*, 790 A.2d 478, 497 (Del. Ch. 2001). While the Court does not rule out the possibility of such a showing, Defendants have not made it yet.

Nor has Plaintiff made a showing that her interpretation of these agreements unambiguously precludes any compensation besides Mr. Daniel's annual pay. For these reasons, the Court DENIES both Parties' motions for summary judgment as to Mr. Daniel's compensation in 2016 and 2017.

## CONCLUSION

For the foregoing reasons, Count IV (Tax Structure) is DISMISSED. Defendants' motion for summary judgment as to Counts V (10% Interest Distribution), VI (Withholding Distributions - Contract), VII (Withholding Distributions – Fiduciary Duty), and Count VIII (2016-17 Compensation, as to Ms. Van Vranken) is GRANTED. Plaintiff's motion for summary judgment as to those claims is DENIED. Finally, both Parties' motions for summary judgment as to Count VIII (2016-17 Compensation, as to Mr. Daniel) are DENIED.

**So Ordered.**

Dated: New York, New York
      July 29, 2020

                                         _____
                                         Hon. Andrew L. Carter, Jr.
                                         United States District Judge