**Summary of Excerpts of the Deposition of Dr. Jeffrey Rush
Taken on August 7, 2019 Offered by Plaintiff**

Dr. Jeffrey Rush testified that he was one of two remaining holders of proxies to vote the shares of N. D. Management, Inc. (35:3-5) and is a Director of N.D. Management (see 45:25-46:11). He testified that he does not know who the members of the board of directors of N. D. Management are. (49:19-23)

Dr. Rush testified that he did not learn of the existence of this lawsuit until approximately 2018, and that he never read any version of the complaint in its entirety. (12:24-13:6)

Dr. Rush testified that he does not receive written information concerning N.D. Management on a regular basis. He testified that he does not receive financial reports concerning N.D. Management on a regular basis and was unaware of how much cash N. D. Management had on hand at any time during 2019. (46:19-47:22) He testified that he has never seen any minutes of any meeting of the Board of N. D. Management. (49:11-13) He testified that he does not remember ever receiving any written communication concerning the business of N.D. Management. (101:19-102:2)

Dr. Rush testified that he does not remember the Board of N.D. Management ever engaging an outside third party to advise it on a proposed course of action. (51:10-15)

Dr. Rush said that he has never been involved in discussions of the dividends to be paid to the shareholders of N.D. Management, and he testified that he has never been involved in any discussion concerning how much N.D. Management paid to anyone in compensation. (52:18-53:1) However, after consulting with Mr. Simes during a break, he changed his testimony and testified that he discussed with Mr. Daniel compensation to be received by Mr. Daniel from N.D. Management. (76:2-77:4)

Dr. Rush testified that he did not know of any documents he could review to determine what compensation Mr. Daniel receives from N.D. Management. (77:14-21) He did not remember that N.D. Management paid Mr. Daniel $75,000 in consulting fees and $152,000 in contract labor in 2016. (78:20-23) He testified that Mr. Daniel told him that he kept a log of hours he had worked and was entitled to be compensated at the rate of $600 per hour, but that he did not ask to see the log of hours. (80:21-81:25) He testified that Mr. Daniel told him that "as him operating the company at the ground level that they were entitled to that money based upon the documents . . ." (79:10-20)

Dr. Rush testified that he did not know why N.D. Management paid roughly $210,000 to Mr. Daniel in 2017, and that he never received any documents explaining why Mr. Daniel received that money. He testified that he never reviewed any documents to determine whether the payments were appropriate and he never consulted any outside party to help him determine if they were appropriate. (82:21-83:20)

Dr. Rush testified that Mr. Daniel never submitted a written request for indemnification to the N.D. Management Board or an undertaking to repay monies advanced for legal fees. (85:17-20) He testified that someone provided him with a memo dated November 9, 2018 for him to sign, and that Mr. Daniel told him that the documents supported indemnification. He testified that he did not write the memo and that he does not know who gave it to him to sign. (97:10-99:1)

CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT

2                          for the

3                SOUTHERN DISTRICT OF NEW YORK

4   SHARON HAWKINS,
    derivatively on behalf of
5   MEDAPPROACH, L.P., and
    individually,
6
             Plaintiffs,        Case No. 1:13-cv-5434-HB
7
             vs.
8
    MEDAPPROACH HOLDINGS, INC.,
9   and W. BRADLEY DANIEL,

10           Defendants.

11   _____

12

13                *** CONFIDENTIAL ***

14          DEPOSITION OF JEFFREY D. RUSH, M.D.

15                SAN DIEGO, CALIFORNIA

16                   AUGUST 7, 2019

17

18

19

20

21

22

23

24   Reported By: GRETA YANG, CSR No. 13978

25   Job No: 165905

CONFIDENTIAL

Page 2

```
 1        UNITED STATES DISTRICT COURT
 2                  for the
 3        SOUTHERN DISTRICT OF NEW YORK
 4    SHARON HAWKINS,
      derivatively on behalf of
 5    MEDAPPROACH, L.P., and
      individually,
 6
               Plaintiffs.    Case No. 1:13-cv-5434-HB
 7
               vs.
 8
      MEDAPPROACH HOLDINGS, INC.,
 9    and W. BRADLEY DANIEL,
10               Defendants.
11
12
13        Deposition of JEFFREY D. RUSH, M.D., taken on
14    behalf of the Plaintiffs at 333 West Harbor Drive,
15    San Diego, California 92101, beginning at 8:57 a.m.
16    and ending at 12:27 p.m., on August 7, 2019, before
17    GRETA YANG, Certified Shorthand Reporter No. 13978.
18
19
20
21
22
23
24
25
```

Page 3

```
 1    APPEARANCES:
 2    FOR PLAINTIFFS:
 3        WOLLMUTH MAHER & DEUTSCH
 4        BY: R. SCOTT THOMPSON, ESQ.
 5        500 Fifth Avenue
 6        New York, NY 10110
 7
 8
 9    FOR DEFENDANTS:
10        GOODWIN PROCTOR
11        BY: JEFFREY SIMES, ESQ.
12        620 Eighth Avenue
13        New York, NY 10018
14
15
16
17    Also Present:  BRADLEY DANIEL
18
19
20
21
22
23
24
25
```

Page 4

```
 1                I-N-D-E-X
 2    WITNESS: JEFFREY D. RUSH, M.D.
 3    EXAMINATION                    PAGE
 4    BY MR. THOMPSON                  6
 5    BY MR. SIMES                   106
 6    BY MR. THOMPSON                125
 7    BY MR. SIMES                   130
 8
 9
10              E-X-H-I-B-I-T-S
11    PLAINTIFFS'                    PAGE
12    Exhibit Rush 1  Subpoena to Testify at a    8
                      Deposition in a Civil Action,
13                    RUSH0000067 to RUSH0000120
14    Exhibit Rush 2  Danco Investment Group, LP  27
                      List of Partners, H00002835 to
15                    H00002841
16    Exhibit Rush 3  Neogen Investors, LP        29
                      Promissory Note, RUSH0000310
17                    to RUSH0000312
18    Exhibit Rush 4  Danco Laboratories, LTD     29
                      Secured Promissory Note,
19                    RUSH0000307 to RUSH0000309
20    Exhibit Rush 5  Danco Investors Group, LP   29
                      Promissory Note, RUSH0000178
21                    to RUSH0000179
22    Exhibit Rush 6  Danco Investors Group, LP   29
                      Promissory Note, RUSH0000180
23                    to RUSH0000181
24    Exhibit Rush 7  Letter, RUSH00002968 to     30
                      RUSH00002969
25
```

Page 5

```
 1          E-X-H-I-B-I-T-S (Continued)
 2    PLAINTIFFS'                    PAGE
 3    Exhibit Rush 8  Letter, MED00014055 to      35
                      MED00014056
 4
 5    Exhibit Rush 9  Letter, MED00014025         37
 6
 7    Exhibit Rush 10 Email with Attachment       54
 8
 9    Exhibit Rush 11 Letter, MED00014074 to      62
                      MED00014076
10    Exhibit Rush 12 Assignment of Percentage    66
                      Interest, MED00015215 to
11                    MED00015218
12    Exhibit Rush 13 Unanimous Written Consent in 87
                      Lieu of Meeting of Board of
13                    Directors, RUSH0000412 to
                      RUSH0000414
14    Exhibit Rush 14 Memo, RUSH0000415           89
15    Exhibit Rush 15 Indemnification Agreement,  92
                      H00002082 to H00002086
16    Exhibit Rush 16 N.D. Management, Inc. General 100
                      Ledger as of December 31,
17                    2017, MED00015196 to
                      MED00015214
18
19       WITNESS INSTRUCTED NOT TO ANSWER
20              PAGE    LINE
21               12      1
22
23
24
25
```

TSG Reporting - Worldwide - 877-702-9580

Page 6

1   SAN DIEGO, CALIFORNIA; WEDNESDAY, AUGUST 7, 2019
2              8:57 A.M.
3
4         JEFFREY D. RUSH, M.D.,
5   having been first duly sworn, testified as follows:
6
7         EXAMINATION
8   BY MR. THOMPSON:
9   Q.   Good morning, Dr. Rush.
10  A.   Good morning.
11  Q.   You're here for a deposition in the case of
12  Sharon Hawkins, et al. versus MedApproach Holdings,
13  right?
14  A.   Yes.
15  Q.   And you're represented today by Jeff Simes?
16  A.   Correct.
17  Q.   Have you considered the possibility that you
18  may have a conflict of interest that would require you
19  to have a separate attorney?
20       MR. SIMES:  Let me object to the extent you're
21  asking for a legal conclusion from this witness, that's
22  not a proper question.
23       To the extent that you can answer without
24  divulging any legal communications you may have had with
25  counsel, go ahead.  If you can't answer without doing

Page 7

1   so, you won't answer.
2        MR. THOMPSON:  And, Jeff, I just would really
3   appreciate it if you would keep the objections to
4   objection to form or, objection, calls for a legal
5   conclusion as required by the rules.  And that will make
6   this go a lot quicker.
7        MR. SIMES:  I totally understand, Scott.  This
8   is one where I'm trying to get around the privilege if
9   possible.
10       MR. THOMPSON:  It didn't call for any kind of
11  privileged communications.  So, you know, the rules
12  require you to limit your objections to objection to
13  form or to a very brief explanation.  And I will
14  appreciate it if you keep it to that.
15       MR. SIMES:  Scott, I'm not trying to argue.
16  The question contains a legal conclusion.  I'm trying to
17  parse it out.  But I hear you, and we'll move on.
18       THE WITNESS:  Can you repeat that one again?
19  I got confused there.
20  BY MR. THOMPSON:
21  Q.   Did you consider the possibility that you
22  might have a conflict of interest that would require you
23  to get separate counsel from counsel --
24  A.   No.
25  Q.   -- that's representing --

Page 8

1   A.   No.
2   Q.   -- Mr. Daniel?
3        MR. SIMES:  Same objection.
4        (Exhibit Rush 1 was marked for
5        identification.)
6   BY MR. THOMPSON:
7   Q.   I'm going to show you what we have marked for
8   today's purposes as Rush Exhibit 1, which is a copy of a
9   subpoena served on you sometime last year that bears
10  Bates Nos. Rush 67 through 120.
11       So my first question to you, Dr. Rush, is, do
12  you recognize this as something that you provided to
13  your attorneys to be produced in this case?
14  A.   Can I look it over?
15  Q.   Sure.
16       MR. SIMES:  My copy is unBates marked.  I
17  think it is a copied page on your back.
18       MR. THOMPSON:  It is a copied page.
19       MR. SIMES:  Do you want to pull that?
20       MR. THOMPSON:  Mine does not have that.
21       MR. SIMES:  Well, if the original has it,
22  we'll pull it.
23       MR. THOMPSON:  Yeah, that's a good idea.
24       THE WITNESS:  I think I do.  I think I do
25  recognize this.

Page 9

1   BY MR. THOMPSON:
2   Q.   Okay.  And what do you recognize it as?
3   A.   A subpoena for me to testify in the case of
4   Sharon Hawkins versus MedApproach.
5   Q.   Okay.  And you see that there are requests for
6   production of documents attached to the subpoena?
7   A.   Correct.  Documents to be produced.
8   Q.   And we can go through every one of them, but
9   did you do your best to produce all of the documents in
10  your possession that are responsive to the requests that
11  are set forth at pages 79 through 80?
12  A.   Oh, I'm on page 8.  Do you want me to go
13  through --
14  Q.   Well, page 8 and 9.
15  A.   Okay.  Okay.  I'm sorry.
16  Q.   I was using the document identification
17  numbers.  No need to apologize.
18  A.   Yes, I did.
19  Q.   Also attached to the subpoena as Exhibit A is
20  a copy of the second amended verified complaint for
21  damages and injunctive relief, right?
22  A.   Yes.  Next page, right.
23  Q.   And that goes from pages in the lower right
24  corner RUSH82 right through the end of the document,
25  right?

CONFIDENTIAL

Page 10

1 A. Correct.

2 Q. Did you read that document?

3 A. I don't remember.

4 Q. Do you know -- I'm sorry.

5 A. I don't remember if I read this or not a year

6 ago.

7 Q. Have you ever read it?

8 A. I don't remember.  I don't remember if I read

9 it or not.  But...

10 Q. There's various versions of the complaint in

11 this case.  Have you ever read any version of the

12 complaint?  The original complaint, amended complaint,

13 second amended complaint, third amended complaint.

14 A. I think I read it in bits and pieces, but I

15 have not read it in its entirety.

16 Q. Do you know what Ms. Hawkins is alleging in

17 the complaint?

18 A. I think so.

19 Q. What is your understanding of what she's

20 alleging?

21 A. She's alleging that certain things -- I

22 understood with Brad that she's alleging that we didn't

23 change this company to a beneficial tax structure;

24 that -- should I say Sharon?  I don't know Sharon.  I've

25 never met her.  Can I use the word Greg?  Does it

Page 11

1 matter?

2 Q. Use whatever word you're comfortable with.

3 A. Okay.  That Greg basically wanted to change

4 the corporation; that Greg felt that Brad let him down

5 relative to changing from a C Corp. to an S Corp.

6 That's one.  Another complaint would be -- let me just

7 look at this a second.

8 That we were not entitled to 10 percent-ish of

9 the business.  That was another complaint.  That Greg

10 wanted to remove us as directors of the company or proxy

11 holders and take over the company himself.  That's

12 pretty much what I remember.

13 Q. Are you aware that there's an allegation that

14 Mr. Daniel improperly paid money to himself and Ms. Van

15 Vranken in 2016 and '17?

16 A. Yes.  Correct.

17 Q. And are you aware that there's an allegation

18 that Mr. Daniel improperly directed MedApproach Holdings

19 to withhold distributions from Ms. Hawkins in connection

20 with a lawsuit that Mr. Daniel had filed against the

21 Hawkinses?

22 A. I wasn't aware of that until Brad told me

23 about that in preparation for this deposition.

24 Q. When did that happen?

25 A. In the last two days.

Page 12

1 Q. And what did Mr. Daniel tell you in

2 preparation for this deposition?

3 MR. SIMES:  Hold on a second.

4 I just want to caution the witness that if

5 there was a communication that involved me and you and

6 Brad and nobody else in which legal advice was being

7 dispensed, that's a privileged communication and you

8 shouldn't divulge it.  If it involved just Brad or Brad

9 and other people, you can testify to it.

10 THE WITNESS:  Oh, no.  It involved the three

11 of us.

12 MR. SIMES:  Okay.  Then I'd have to ask you

13 not to answer that question.

14 THE WITNESS:  Okay.

15 MR. THOMPSON:  I actually disagree with that

16 instruction, but we'll have to take that up later, if at

17 all.  Because I assume you're not going to withdraw it,

18 you're going to stand by the instruction?

19 MR. SIMES:  Yes.

20 BY MR. THOMPSON:

21 Q. Now, when did you first learn of the

22 allegations that Mr. Daniel and MedApproach had been --

23 I'm sorry.  Withdrawn.

24 When did you first learn that Mr. Daniel and

25 MedApproach had been accused of violating fiduciary

Page 13

1 duties by failing to convert N.D. Management from a C

2 Corporation to an S Corporation?

3 A. Perhaps a year ago.

4 Q. And when you learned of it, how did you learn

5 of it?

6 A. Brad told me.

7 Q. What did he tell you?

8 A. He told me that the C Corp. was objected to by

9 Greg, Mr. Hawkins.  Can I use Greg?

10 Q. Sure.

11 A. -- Greg because he thought it was

12 disadvantageous to the investors and that in the early

13 days that -- in the early days of the company, when we

14 were struggling and getting started, that the company

15 wasn't making money and was building up operating

16 losses.  And then when it looked like we were going to

17 make it, so to speak, and the investors were going to

18 get their money back that at that point he considered

19 changing it to an S Corp.

20 Q. And did Mr. Daniel tell you anything else at

21 that time about the allegations that were made by

22 Ms. Hawkins in the lawsuit?

23 A. Yeah.  He told me that he would be willing to

24 do that but that that came along with a string of

25 Mr. Hawkins taking over control of the company; that the

CONFIDENTIAL

Page 14

1  S Corp was just part of -- changing to an S Corp. would
2  be okay with him but not on the basis of the fact that
3  we would have to step down as directors, and Mr. Hawkins
4  would take over, which was unacceptable to us.
5    Q.  So that was all discussed with Mr. Daniel?
6    A.  Yes.
7    Q.  When you first learned of the --
8    A.  Correct.
9    Q.  -- complaint?
10        And when you say that was unacceptable to us,
11 are you expressing your view that that --
12   A.  Well --
13   Q.  -- change and control --
14   A.  I was expressing Mr. Daniel's opinion affected
15 me.
16   Q.  Okay.  Now, did you do anything when you
17 learned of the existence of the complaint to investigate
18 the allegations in the complaint?
19   A.  Well, I studied with my accountant what the
20 advantages of the S Corp would be to a C Corp.  Is that
21 still dealing with the same complaint, right?
22   Q.  I'm dealing with the complaint as a whole.
23 That's one of the issues --
24   A.  No.  But this particular section you're
25 talking about.

Page 15

1    Q.  I'm actually talking more broadly --
2    A.  No.
3    Q.  -- but you can start with this section --
4    A.  Yeah, I spoke with my accountant.  And he said
5  that C Corp. represents the potential double taxation.
6  And I'm not an accountant.  And he said S Corp would be
7  more of a pass-through.
8    Q.  Okay.  So did you do anything else to
9  investigate any of the allegations in the complaint when
10 you first learned of it?
11   A.  Are you talking about this particular portion
12 of the complaint?
13   Q.  I'm talking about all of the allegations of
14 the complaint.  So there's a number of --
15   A.  Oh, a lot of them I didn't know about.
16       (Reporter interruption.)
17 BY MR. THOMPSON:
18   Q.  We have to slow down.  That's the New York
19 coming through both of us.
20   A.  At that time I wasn't really aware of the
21 other portions of the complaint, so I didn't do any
22 investigation because that was more between Mr. Daniel
23 and Hawkins.
24   Q.  So subsequent to that time, I take it, you
25 became aware of other portions of the complaint?

Page 16

1    A.  Correct.
2    Q.  When did that happen?
3    A.  Just in the last -- now, which -- can you just
4  describe which portions -- are you talking about the
5  Angelia and -- okay.  Let's go through one at a time.
6        The Angelia -- you mentioned Angelia and Brad
7  getting compensation.  I became aware of that probably a
8  few days ago.  The portion of withholding money from
9  Mr. Hawkins, I became aware of a few days ago.
10       MR. SIMES:  The allegation?
11       THE WITNESS:  The allegation.  Well, let's
12 not --
13 BY MR. THOMPSON:
14   Q.  Got it.
15   A.  You know, I mean, if I say something --
16 allegations, just chime in.
17       The S Corp Brad told me about a couple years
18 ago maybe, and I did investigate that with my
19 accountant, understanding what the differential was and
20 what it would mean.  And the other -- what's the other
21 one?
22   Q.  The transfer of the 10-ish percent?
23   A.  10-ish percent I became aware of probably a
24 couple years ago.  Three years ago.  I didn't know -- I
25 knew I got the percentage -- we got percentage

Page 17

1  transferred as the documents had stated we would, but I
2  didn't know there was a brouhaha about that.
3    Q.  And you --
4    A.  I didn't know there was a fight regarding the
5  transfer of the 10 percent.
6    Q.  When did you first find out that there was a
7  fight regarding the transfer of the 10 percent?
8    A.  I don't remember.  Recently.  Within the last
9  year or two.
10   Q.  When you learned that there was a fight --
11 when we say a "fight" --
12   A.  I understood.
13   Q.  -- meaning a claim --
14   A.  A claim, yes.
15   Q.  -- asserted --
16   A.  Yes.
17   Q.  -- in a legal proceeding?
18   A.  Correct.  Correct.
19   Q.  When you learned that, did you take any steps
20 to investigate that claim?
21       MR. SIMES:  Objection.
22       THE WITNESS:  Yeah.
23       MR. SIMES:  Objection.  To the word
24 "investigate."
25       Answer as best you can understand.

TSG Reporting - Worldwide - 877-702-9580

CONFIDENTIAL

Page 18

1      THE WITNESS: Well, I looked at the documents,
2  the compensation documents, and said were we entitled to
3  that, and I carefully studied that, asked Brad
4  questions, and that was the extent of my investigation.
5  BY MR. THOMPSON:
6      Q.  Okay.  We'll come back to that in a little
7  while.
8      When did you first meet Mr. Daniel?
9      A.  In the late 1990s.
10     Q.  How did you come to meet him?
11     A.  Through Mr. Pike.
12     Q.  In connection with what ultimately became the
13  Danco --
14     A.  Correct.
15     Q.  -- organization?
16     So I take it that you had met Mr. Pike prior
17  to having met Mr. Daniel?
18     A.  Yes.  We're both from San Diego, and he
19  approached me about this idea.
20     Q.  Did you know him, Mr. Pike, before he
21  approached you about the idea for what would become
22  Danco?
23     A.  A little bit.  Not too much.  Golfing, kind of
24  like -- played golf with him and belonged to the same
25  golf course.

Page 19

1      Q.  What was your first business dealing with
2  Mr. Daniel?
3      A.  Mr. Daniel?
4      Q.  Correct.
5      A.  That was -- the first was this -- he was
6  brought in.  That was the first time I had met him.
7      Q.  And what was his role when you met him in the
8  Danco enterprise?
9      A.  To help raise money to perpetuate the
10  business, to geminate the business, the Danco business.
11     Q.  Do you remember what year that was?
12     A.  Late 1990s.  I don't remember exactly.
13     Q.  Prior to the time that Mr. Pike was removed
14  from the operation, right?
15     A.  Yes.
16     Q.  Leaving aside relationships that you have with
17  Mr. Daniel in connection with Danco, do you have any
18  other business relationships with Mr. Daniel?
19     A.  Yes.
20     Q.  Can you describe those?
21     A.  Yes.  A piece of real estate in Nashville,
22  which I invested with him in, and we invested in a
23  hospital in Austin, Texas.
24     Q.  Anything else?
25     A.  A piece of land in Dublin, Ohio.

Page 20

1      Q.  What about a medical center in El Centro?
2      A.  Yes.  We -- well, I didn't -- he invested in
3  my company, along with many other people and took shares
4  in some of the medical buildings that we built over the
5  past 20 years.
6      Q.  What's the name of the organization or
7  organizations?
8      A.  Pacific Medical Buildings.
9      MR. SIMES:  Jeff, just make sure he
10  finishes --
11     THE WITNESS:  I'm sorry.
12     MR. SIMES:  -- so the court reporter --
13     THE WITNESS:  I'm sorry.
14     MR. SIMES:  That's okay.
15     THE WITNESS:  I'm sorry.
16     MR. SIMES:  -- so the court reporter can get
17  it all down.
18     THE WITNESS:  That's when you --
19     MR. SIMES:  Of course.  Of course.
20  BY MR. THOMPSON:
21     Q.  Are you familiar with an entity called RD
22  Development Partners?
23     A.  Yes.
24     Q.  What is that?
25     A.  That was just -- it had to do with our

Page 21

1  investment in Texas, in a hospital -- and R standing for
2  Rush, D for Daniel -- to collect any fees that we were
3  entitled to or profits or losses that would pass through
4  to Rush and Daniel, because he handled that portion
5  of -- through his office in Nashville.
6      Q.  And that's just the hospital in Austin?
7      A.  I think it might have to do also with the
8  development in Dublin, Ohio, as well.  I'm not sure
9  exactly.  You'd have to ask him where -- what that was.
10     Q.  Does Ms. Van Vranken work for any entity in
11  which you have a financial interest?
12     A.  Well, she helps Brad, Mr. Daniel, with keeping
13  track of these particular investments that we made.
14     Q.  When you say "these particular investments" --
15     A.  The ones that --
16     Q.  -- you're talking about the real estate --
17     A.  Correct, real estate.
18     Q.  Sorry.
19     A.  Sorry.
20     Q.  And, of course, she works for the Danco group
21  of entities --
22     A.  Correct.
23     Q.  -- in which you have a financial interest,
24  right?
25     A.  Correct.

Page 22

1    Q. So how did you first become involved in the
2  Neogen/Danco project?
3    A. Mr. Pike came up to me. I was a doctor.
4       And he said, This is something that might
5  interest you. This is something that would be great for
6  America. And I have this opportunity to start a company
7  that brings mifepristone to America.
8       (Reporter clarification.)
9       MR. SIMES: Mifepristone.
10      THE WITNESS: M-i-f-e-p-r-i-s-t-o-n-e.
11  BY MR. THOMPSON:
12    Q. And --
13    A. I should say RU-486 at that time.
14    Q. Okay. So what did you do once Mr. Pike
15  approached you with that suggestion?
16    A. This is -- we had several meetings and talked
17  about the details of what the hurdles would be and how
18  to go about it.
19    Q. Did he tell you that he had some connection
20  that would enable him to get the exclusive license to
21  manufacture and distribute RU-486 in the United States?
22    A. Yes.
23    Q. So how long after -- withdrawn.
24      Did he have money raised at the time that you
25  first began your discussions with him?

Page 23

1    A. I don't know.
2    Q. How soon after your first discussions with
3  Mr. Pike about RU-486 were you introduced to Mr. Daniel?
4    A. I can't remember. A year or two maybe.
5    Q. Did there come a point in time when Dan Hipp
6  became involved in the project?
7    A. Yes.
8    Q. When was that?
9    A. Within a couple years. I don't know exactly
10  when.
11    Q. Did you know Dr. Hipp before he became
12  involved in this project?
13    A. No.
14    Q. Who introduced you to Dr. Hipp?
15    A. I don't remember.
16    Q. What did Dr. Hipp do in connection with the
17  development of the project?
18    A. I believe he introduced Mr. Daniel to
19  Mr. Pike.
20    Q. Okay. How did you come to that belief?
21    A. Well, in looking back, I believe Mr. Hipp and
22  Mr. Daniel were partners in biotech- -- in this type of
23  thing, bio-related issues, and that's how I assumed that
24  Mr. Hipp was a doctor and became involved.
25    Q. Did anybody ever tell you how he became

Page 24

1  involved, or are you just making assumptions?
2    A. I can't remember.
3    Q. Other than making the introduction between
4  Mr. Daniel and Mr. Pike, what else did Dr. Hipp do in
5  connection with the development of the project?
6    A. Basically I think he was a guru in the FDA and
7  said he would be helpful in the process with the FDA.
8  And I think he was from Washington or nearby. I'm not
9  sure. But he spent a lot of time in Washington, and I
10  thought he would be -- he stated he would be very
11  helpful in moving along the process for approval.
12    Q. Was he, in fact, very helpful in moving along
13  the process for approval?
14    A. I don't know.
15    Q. At some point Mr. Pike raised money in order
16  to fund the project, right?
17    A. Right.
18    Q. And this is now -- we're talking now about the
19  time period before Mr. Pike was removed. So let's just
20  say prior to 1997. And, I mean, just as an aside, you
21  know, we're talking about something that happened 22
22  years ago. So it's -- not many cases involve --
23    A. So I was 57 years old at the time. I should
24  have known, yeah.
25    Q. Well, okay. So prior to Mr. Pike's removal,

Page 25

1  did you yourself invest personally in the project?
2    A. Yes.
3    Q. How much did you invest?
4    A. Well, I would say with my family or just me
5  alone, my brother, my mother, my kids -- not my kids.
6  They didn't have any money. My brother, my mother, and
7  myself, anywhere between -- I can't remember exactly --
8  between half a million and $1 million.
9    Q. And was that through R-M Neogen Investors?
10    A. Correct.
11    Q. So that was a vehicle that held the family
12  investment for the project; is that right?
13    A. It was not my family -- my family vehicle. I
14  invested in R-M Neogen. Is that what you're saying?
15    Q. It doesn't matter what I say. It matters what
16  you say.
17    A. Yeah, okay. You're right. I invested with
18  R-M Neogen, correct.
19    Q. Okay. So that wasn't your vehicle?
20    A. No.
21    Q. I see. So were you responsible for that
22  vehicle or was there somebody else who --
23    A. No.
24    Q. -- was responsible?
25      MR. SIMES: Objection to the word

CONFIDENTIAL

Page 30

1  subpoena.
2      A.  Okay.
3      Q.  Were there any other promissory notes
4  reflecting loans that you made to the enterprise that
5  you didn't produce?
6      A.  No, not that I know of.
7      Q.  Is it fair to say that these four notes
8  reflect all of the money that you loaned to the
9  enterprise?
10      A.  Yes, it's fair.
11      Q.  Okay.
12          (Exhibit Rush 7 was marked for
13          identification.)
14  BY MR. THOMPSON:
15      Q.  Let's mark this as Rush 7.
16          Rush 7, which you have in front of you now, is
17  a document that bears Bates numbers H2968 and 2969.  And
18  it appears to be a letter from Danco Investors Group to
19  you, dated June 3rd, 1999.
20          Do you recall this letter?
21      A.  No.
22          MR. SIMES:  Take your time and make sure
23      you've read it.
24          THE WITNESS:  No, I've looked at it.  I don't
25  recall it.

Page 31

1          MR. SIMES:  Okay.
2  BY MR. THOMPSON:
3      Q.  You see that it discusses an additional
4  $300,000 investment?
5      A.  Yes.
6      Q.  Do you see that?
7      A.  Uh-huh.
8      Q.  Do you recall making a $300,000 investment in
9  the Danco project on or after June 3rd, 1999?
10      A.  Well, I do now.  I do now.
11          MR. SIMES:  The question was whether you
12      independently recall.
13          THE WITNESS:  No.
14          MR. SIMES:  Okay.
15  BY MR. THOMPSON:
16      Q.  Do you know that you actually did it?
17      A.  I don't remember.
18      Q.  Okay.
19      A.  I would assume I did.  I don't know.
20      Q.  Do you see in item 3 it says, "Fees owed to
21  you from Danco as of December 31st, 1998, shall be
22  $250,000"?
23          Do you see that?
24      A.  Yes.
25      Q.  Do you recall agreeing in 1999 that fees owed

Page 32

1  to you from Danco through 1998 would be fixed at
2  $250,000?
3      A.  I don't recall that.
4      Q.  What were those fees for?
5      A.  Working with Mr. Pike, working to get this off
6  the ground, going to solicit investors, working very
7  hard to make this dream a reality.
8      Q.  Did you have any written agreement as of this
9  time that you would be entitled to fees for your work in
10  connection with trying to make the dream a reality?
11      A.  I don't remember.
12      Q.  That third paragraph goes on to say that, "It
13  is agreed that you will convert those fees to equity if
14  requested by the partnership."
15          Do you see that?
16      A.  Yes.
17      Q.  Did that happen?
18      A.  I don't remember.
19      Q.  Okay.  We can put that aside.
20      A.  Okay.  Put this down?
21      Q.  Sure.
22          MR. SIMES:  Are you doing good?  You let us
23      know when you need a break.
24          THE WITNESS:  No, I'm fine.  I'm fine.
25  ///

Page 33

1  BY MR. THOMPSON:
2      Q.  So there came a time when it was decided that
3  the shares of N.D. Management should be made subject to
4  control by proxy holders, right?
5      A.  Correct.
6      Q.  What do you recall about why that decision was
7  made?
8      A.  I think that was a decision made by the people
9  who were most involved, which was Mr. Freeman,
10  Mr. Daniel, and myself; that we needed directors.  And I
11  had never heard of the word "proxy holders," but that
12  was a terminology that was used, which I assumed were
13  directors.
14      Q.  And what reasons were discussed about why that
15  was necessary?
16      A.  Because someone had to be in charge of the
17  enterprise.
18      Q.  Okay.  So the first discussion that you recall
19  was about putting directors in place at the
20  N.D. Management corporation?
21      A.  Correct.
22      Q.  But at a certain point in time, it was decided
23  that the shares of NDM that were held by Mr. Pike and by
24  MedApproach should be subject to proxies, right?
25      A.  Yes.

CONFIDENTIAL

Page 34

1     Q.  And why was that decision made?
2       A.  I don't remember whether this was before or
3 after Mr. Pike's removal.  You've got to refresh my
4 memory relative to that.  I mean, I'm a little confused.
5 20 years ago, if this was -- I think this was done -- I
6 don't know if it was done before or after Mr. Pike's
7 removal.
8     Q.  Okay.  I mean, all you can do is give us your
9 best recollection.
10       A.  My best recollection is I don't remember.  It
11 must have been after Mr. Pike's removal because I would
12 assume Mr. Pike would have been a proxy holder prior to
13 his removal.  So you're saying to me after Mr. Pike's
14 removal?  Just refresh my memory.
15     Q.  I'm really -- honestly I'm just asking you for
16 your best recollection.
17       A.  My best recollection is after Mr. Pike's
18 removal.  We needed a leadership committee.
19     Q.  And why in particular were proxies decided
20 upon?
21       A.  As I had stated, I didn't know the word
22 "proxy," what that meant, but I just accepted that that
23 was a director.  I had never heard that terminology
24 before.  Probably something that Brian Freeman, who was
25 a lawyer, probably used that terminology.  But you would

Page 35

1 have to ask Mr. Daniel for, you know, why that
2 terminology was used.
3     Q.  And you yourself became what has now become
4 known as a proxy holder, right?
5       A.  Correct.
6     Q.  Why did you agree to become a proxy holder?
7       A.  A, I thought I could do a good job; B, I
8 had -- this is 1990s, so I was no longer a doctor, so I
9 had the time; C, I was responsible for my family's
10 money, my money, and my friends' money that I had
11 raised; and I had been asked to participate in the proxy
12 by Mr. Freeman and Mr. Daniel.
13     Q.  Do you recall when you were a proxy holder?
14       MR. SIMES:  Objection to the use of the word
15 "were."
16       Are you asking when he became or for what
17 period of time he was?
18       MR. THOMPSON:  We can go with became.
19       THE WITNESS:  Became one?  I don't remember
20 exactly.  Around the 2000 era, 1999.  I don't know
21 exactly the dates.
22       (Exhibit Rush 8 was marked for
23       identification.)
24 BY MR. THOMPSON:
25     Q.  Mark this as Rush 8.

Page 36

1       You have been handed Rush 8, which is a
2 document that bears Bates numbers MED14055 and -56.  And
3 it appears to be a letter to you, Mr. Hawkins, and
4 Mr. Freeman, dated February 4th, 1997.
5       Do you recognize this document?
6       A.  No.
7     Q.  Do you see it discusses something called the
8 "back-stop liability"?
9       A.  No. 2, yes, I do.
10     Q.  Do you remember what the back-stop liability
11 was?
12       A.  No.
13     Q.  Do you recall that you yourself were obligated
14 to be responsible for some portion of the back-stop
15 liability?
16       MR. SIMES:  Objection to legal conclusion.
17       You can answer to the best of your knowledge.
18       THE WITNESS:  I do now that I see this
19 document.
20       MR. SIMES:  Do you independently recall it?
21       THE WITNESS:  No.
22 BY MR. THOMPSON:
23     Q.  At the time of this document, February 4th,
24 1997, were you a proxy holder?
25       A.  I don't know.

Page 37

1     Q.  Did there come a point in time when you
2 withdrew as a proxy holder?
3       A.  I threatened to withdraw but never withdrew.
4       (Exhibit Rush 9 was marked for
5       identification.)
6 BY MR. THOMPSON:
7     Q.  Okay.  Mark this next document as Rush 9.
8       A.  Can I put this aside?
9     Q.  Rush 9 is a single-page document bearing Bates
10 number MED14025.
11       Do you recognize this document?
12       A.  No.
13     Q.  Do you see that it is a letter from Mr. Daniel
14 of Bio-Pharm Investments, Inc. to you, dated July 17th,
15 1997?
16       Do you see that?
17       A.  Yes.
18     Q.  And do you see in the second sentence, third
19 line of the only paragraph of this letter, it says in
20 part, "the three of us have been serving as proxy
21 holders under the proxy."
22       Do you see that?
23       A.  Yes.
24     Q.  Does that refresh your recollection that as of
25 1997 you were a proxy holder?

CONFIDENTIAL

Page 42

1    Q.  Are they scheduled on a regular basis?
2    A.  Yes.
3          MR. SIMES:  Objection.  Do you mean formal
4    meetings?
5          MR. THOMPSON:  The witness is answering the
6    questions.
7    BY MR. THOMPSON:
8    Q.  So are there scheduled meetings on a regular
9    basis?
10   A.  Yes.
11         MR. SIMES.  I reiterate the objection.
12   BY MR. THOMPSON:
13   Q.  And what is that schedule?
14   A.  We have quarterly meetings.
15   Q.  And who -- I'm sorry.  Go ahead.  I didn't
16   mean to interrupt you.
17         MR. SIMES:  Go ahead.  Finish the answer.
18         THE WITNESS:  We have quarterly meetings.  We
19   have an annual retreat.  We have two to three times a
20   week phone calls and extemporaneous, whatever's
21   necessary when things come up.
22   BY MR. THOMPSON:
23   Q.  And these are all meetings of the board of
24   directors of N.D. Management as distinct from any other
25   entity?

Page 43

1    A.  Yes.
2    Q.  The second duty that you identified was
3    something about every decision for the company of an
4    overview nature?
5    A.  Correct.
6    Q.  But you didn't articulate what your duty is
7    with respect to those decisions?
8    A.  Manufacturing, tabulating, going over the
9    financial statements.
10   Q.  And what is your duty with respect to --
11         MR. SIMES:  I don't think you finished.  It
12   looked like you were about to say something.
13         THE WITNESS:  I'm just trying to think of the
14   duties.  It's not easy.  Traveling to -- when there are
15   changes to be made, such as tabulating, associations
16   with other companies, things like that nature.
17   BY MR. THOMPSON:
18   Q.  What is your duty with respect to those kinds
19   of issues?
20   A.  My duty is to discuss these with Mr. Daniel
21   and make sure that we're on the right track.
22   Q.  Who are the shareholders of N.D. Management?
23   A.  Shareholders are MedApproach and Mr. Pike.
24   Q.  Is it your understanding that as a director of
25   N.D. Management you owe those individuals any kind of

Page 44

1    duty?
2    A.  Yes.
3    Q.  And what duties do you owe those people?
4          MR. SIMES:  Objection to the extent it calls
5    for a legal conclusion.
6          You can testify to your understanding.
7          THE WITNESS:  The same as my duties to the
8    investors at Danco.
9    BY MR. THOMPSON:
10   Q.  When was the last meeting of the board of
11   directors of N.D. Management?
12         MR. SIMES:  Objection to the use of the word
13   "meeting."  Ambiguous as to formal or informal.
14         Otherwise, you can answer if you understand.
15         THE WITNESS:  The last formal meeting was --
16   what month are we in now?
17   BY MR. THOMPSON:
18   Q.  August.
19   A.  August?
20   Q.  Believe it or not.
21   A.  December.  And I'm not sure if we met in June,
22   because I was ill.  The last year has been difficult for
23   me.
24   Q.  Do you attend meetings of the board of
25   directors of N.D. Management in person or

Page 45

1    telephonically?
2    A.  In person.
3    Q.  And where are those meetings held?
4    A.  The meetings are held either in Nashville or
5    in New York City.
6    Q.  Who attends those meetings?
7    A.  Brad Daniel, Jeffrey Rush, Roy Karnovsky,
8    Angelia Van Vranken, Angelo from manufacturing, Abbie
9    from marketing.
10         MR. SIMES:  Did you mean presently?
11         THE WITNESS:  You mean present at the meeting?
12   Is that what you mean?
13         MR. THOMPSON:  Uh-huh.
14         MR. SIMES:  Like in the current time frame?
15         MR. THOMPSON:  Uh-huh.
16         THE WITNESS:  In Nashville it would be
17   probably the same group and some of the ancillary staff
18   from Nashville, controller, et cetera.
19   BY MR. THOMPSON:
20   Q.  Does -- withdrawn.
21         It sounds to me like what you're describing
22   are meetings of people to discuss the business of Danco,
23   right?
24   A.  Correct.
25   Q.  Are there separate meetings of the board of

CONFIDENTIAL

Page 46

1   directors of N.D. Management during which only the
2   business of N.D. Management and none of the -- and not
3   the business of Danco is discussed?
4       A.   Yes.
5       Q.   How often do those meetings occur?
6       A.   At the same time as the other ones after the
7   business of Danco is concluded.
8       Q.   Who attends that part of the session that is
9   devoted solely to the business of N.D. Management?
10      A.   Mr. Daniel, myself, Angelia Van Vranken, and
11  Roy Karnovsky.
12          MR. THOMPSON:   We could take a --
13          THE WITNESS:   I'm good.  I'm good.
14          MR. SIMES:   You know what, I could use the
15  restroom, so let's take five.
16          MR. THOMPSON:   Okay.
17          (Recess taken.)
18  BY MR. THOMPSON:
19      Q.   Dr. Rush, do you receive regular written
20  information concerning NDM, N.D. Management?
21          MR. SIMES:   Objection to "regular."
22          (Reporter clarification.)
23          THE WITNESS:   I receive regular information on
24  Danco.
25          Can I ask you a question?  When you say "NDM,"

Page 47

1   are you meaning Danco?
2   BY MR. THOMPSON:
3       Q.   N.D. Management.
4       A.   Do you equate N.D. Management with Danco?
5       Q.   I do not.
6           So the question is, do you receive information
7   concerning N.D. Management on a regular basis?
8           MR. SIMES:   It was written information you're
9   asking about, right?
10          MR. THOMPSON:   I am, yeah.  Thank you.
11          THE WITNESS:   No.
12  BY MR. THOMPSON:
13      Q.   Do you receive financial reports concerning
14  the business of N.D. Management?  And as distinct from
15  business of Danco.
16      A.   No.
17      Q.   Do you review the tax returns for
18  N.D. Management before they're filed?
19      A.   No.
20      Q.   Do you know how much cash N.D. Management has
21  on hand now or at any point over the last year?
22      A.   No.
23      Q.   Okay.  So then with respect to Danco, do you
24  receive information about Danco on a regular basis?
25      A.   Yes.

Page 48

1       Q.   What information do you receive about Danco on
2   a regular basis?
3       A.   I receive written -- are you talking about
4   written or --
5       Q.   Yes, written.
6       A.   Written.  I receive regular reports quarterly
7   on everything from the science to the competition to the
8   FDA to the finances, et cetera.
9       Q.   Do you review the tax returns of Danco before
10  they're filed?
11      A.   Yes.
12      Q.   Do you know how much cash Danco has on hand
13  now?
14      A.   Yes.
15      Q.   How much cash does it have on hand now?
16      A.   More than 15 million.
17      Q.   Is there some reason why Danco has $15 million
18  of cash on hand?
19      A.   Yes.
20      Q.   What is that reason?
21      A.   We have competition coming with a generic in
22  the next year, which will be critical to the survival of
23  Danco.  And we need an ability to compete with a lower
24  price product that's coming on the market this year
25  which could potentially ruin Danco.  So it was my

Page 49

1   counsel with Brad to make sure we had a war chest, for
2   lack of a better term, to do what we need to do to
3   preserve our place in the market.  Otherwise, we'll be
4   out of business.
5       Q.   Going back to N.D. Management specifically
6   now, and these questions leave out Danco.  We're talking
7   now just about N.D. Management.
8           Are minutes kept of the meetings of the
9   directors of N.D. Management?
10      A.   I don't know.
11      Q.   Have you ever seen any minutes of any meeting
12  of the board of directors of N.D. Management?
13      A.   No.
14      Q.   Have you ever seen a written resolution
15  adopted by the board of directors of N.D. Management?
16      A.   Who's the board of directors at
17  N.D. Management that you're talking about?  I would have
18  to --
19      Q.   Do you know who the board of directors of
20  N.D. Management is?
21      A.   I'm asking you.  I don't know.
22      Q.   Yeah, but I'm not under oath.
23      A.   I don't know, no.
24          MR. SIMES:   He's asking for purposes of your
25  question.

CONFIDENTIAL

Page 50

1    THE WITNESS: Yeah, I'm asking -- I could
2  identify if I knew -- I wouldn't know N.D. Management,
3  but I'd know if I saw the signatories of -- my answer is
4  if I knew the signatories of who we're talking about.
5    MR. SIMES: Are you confusing MedApproach and
6  N.D. Management in your last answers? I just want to be
7  clear.
8    THE WITNESS: Maybe I am. I don't know.
9    MR. SIMES: Because I think he testified -- I
10  just want to make sure --
11    MR. THOMPSON: You're not testifying.
12    MR. SIMES: I want to make sure -- he said he
13  thinks he may be confused.
14    MR. THOMPSON: You have that opportunity -- he
15  didn't say that. And you're now interfering, Jeff.
16    MR. SIMES: He just said it.
17    MR. THOMPSON: So let's just stop.
18    MR. SIMES: Let's make a proper record, Scott.
19    MR. THOMPSON: You have an opportunity to ask
20  questions at the end which you avail yourself of. So
21  I'm making my record. You do not get to make my record.
22    MR. SIMES: Okay. Let's be clear. He said he
23  was confused. Carry on.
24  BY MR. THOMPSON:
25    Q. Has there ever been an issue that's raised in

Page 51

1  a meeting of the board of directors of N.D. Management
2  where one of the directors has recused himself?
3    MR. SIMES: Objection to "issue."
4    THE WITNESS: I don't know.
5  BY MR. THOMPSON:
6    Q. Do you remember any discussion of anything
7  where a member of the board of directors of
8  N.D. Management recused himself?
9    A. I don't remember.
10    Q. Has the board of directors of N.D. Management
11  ever engaged a third party to review and advise the
12  board on a proposed course of action?
13    MR. SIMES: Objection to "review" and
14  "advise."
15    THE WITNESS: I don't remember. I don't know.
16  BY MR. THOMPSON:
17    Q. Does the board of directors of N.D. Management
18  approve the amount of dividends that would be -- that
19  are to be paid to N.D. Management's shareholders each
20  year?
21    A. When you say "the board," can you be more
22  specific about the board of directors? You know, we're
23  talking about proxy holders, board -- can you be more
24  specific when you ask the question. I'm confused. I
25  really am confused. I'm not trying to dodge the

Page 52

1  question. Can you be more specific when you mean the
2  board of directors of N.D. Management.
3    Q. Does N.D. Management have a board of
4  directors?
5    A. I thought the proxy holders were the board of
6  directors, but I don't know if N.D. Management has its
7  own board of directors. Or MedApproach or -- that's...
8    Q. Okay.
9    A. In other words, it's tricky for me to answer
10  that question. And I'm not trying to dodge you. It's
11  tricky.
12    Q. Okay. Are you involved in discussions each
13  year concerning the amount of dividends that are to be
14  paid to the shareholders of N.D. Management?
15    A. I'm involved in the overall share of dividends
16  paid to Danco of which a portion of that goes to
17  N.D. Management.
18    Q. Okay. But my question has to do with payment
19  of dividends by N.D. Management to its shareholders.
20    A. I'm not involved in that.
21    Q. Are you involved in discussions concerning how
22  N.D. Management compensates anybody?
23    A. No.
24    Q. Have you ever been involved in such a
25  discussion?

Page 53

1    A. No.
2    Q. We talked earlier that in the versions of the
3  complaint there is a claim concerning level of taxation
4  paid by N.D. Management as a C Corp.
5    Do you recall generally that we talked about
6  that?
7    A. Yes.
8    Q. Were you involved in discussions concerning
9  elimination of the tax paid by N.D. Management as a C
10  Corporation? Were you ever involved in that as a
11  director of N.D. Management?
12    MR. SIMES: Let me hear the question again,
13  please.
14    I'm just asking for it to be reread.
15    (Record read.)
16    MR. SIMES: Objection to "director" based on
17  the witness's prior confusion.
18    THE WITNESS: I only discussed this with Brad
19  many years ago.
20  BY MR. THOMPSON:
21    Q. And what did you discuss with Brad many years
22  ago?
23    A. Well, I said I thought it would be -- if it
24  made sense that we should potentially consider changing
25  to an S Corp as a more tax advantageous strategy.

14  (Pages 50 to 53)

CONFIDENTIAL

Page 54

1    Q. Do you recall when that discussion took place?
2    A. Many years ago.
3    Q. What did Mr. Daniel say when you suggested
4  that to him?
5    A. He was positive in his response.
6    Q. Was any written proposal ever prepared in
7  order to accomplish the objective of changing
8  N.D. Management from a C Corp. to an S Corp.?
9    A. I can't remember.
10   MR. SIMES: Make sure he finishes the
11 question.
12   THE WITNESS: I'm sorry.
13   (Exhibit Rush 10 was marked for
14   identification.)
15 BY MR. THOMPSON:
16   Q. Let's mark this as -- I think it's 10, right?
17   You have in front of you, Dr. Rush, Rush 10,
18 which has Bates numbers on it. And the first page of
19 this is an email from Brad Daniel to Greg Hawkins,
20 January 14th, 2009.
21   Do you see that part of it?
22   A. Yes.
23   Q. Okay. And then following that there are a
24 number of pages, and I want to direct your attention to
25 the pages that bear the Bates numbers which are the

Page 55

1  numbers in the lower right-hand corner H2208 through
2  2215.
3    MR. SIMES: So just to be clear, we're
4  ignoring the first two pages since they're not
5  consecutive anyway?
6    MR. THOMPSON: We are ignoring them, not
7  because they are nonconsecutive, but they are
8  nonconsecutive.
9    MR. SIMES: Okay. That's fine. I was going
10 to have you read the numbers if we were going to get
11 into the documents.
12 BY MR. THOMPSON:
13   Q. Do you recall ever having seen this document
14 before, Dr. Rush?
15   A. No.
16   MR. THOMPSON: Jeff, I think you may have my
17 copy. Can I have my copy?
18   MR. SIMES: Yeah, sure.
19   MR. THOMPSON: Thank you. I think you have my
20 copy.
21   MR. SIMES: This one has highlighting on it.
22 So shall we give that back to you?
23   MR. THOMPSON: Give that back to me --
24   MR. SIMES: And let's swap out --
25   MR. THOMPSON: You know what, it's okay. He

Page 56

1  can have that. He can have that. It might actually
2  serve the purpose --
3    MR. SIMES: Okay. Should we just note for the
4  record that the highlighting was added?
5    MR. THOMPSON: Yeah. So I think we actually
6  have to resolve that.
7    MR. SIMES: Do you want to just give him --
8    MR. THOMPSON: Let's mark yours. Yours is the
9  only clean one left.
10   MR. SIMES: Can we do a substitute tag on
11 that?
12   MR. THOMPSON: Yeah. This will be -- so we're
13 going to mark this one as Rush 10.
14   MR. SIMES: Do you want that back? Do you
15 have another clean or should I --
16   MR. THOMPSON: It's cleanish.
17   MR. SIMES: Cleaner?
18   MR. THOMPSON: On the first page, it just says
19 Rush 10.
20   (Discussion off the record.)
21 BY MR. THOMPSON:
22   Q. So, Dr. Rush, do you remember discussing a
23 copy of this document that is the document at H2208
24 through 2215 at any time with anybody?
25   A. I didn't discuss this document. I discussed

Page 57

1  the concept. I've never seen this document before.
2    Q. Okay. Then I will not ask you any further
3  questions about it.
4    Switching gears a little bit, do you receive
5  compensation for your service as a proxy holder?
6    A. I do.
7    Q. How much compensation do you receive for that?
8    A. Approximately $7,000 a month.
9    Q. Do you receive any other compensation from any
10 Danco-related entity?
11   A. What do you mean by "Danco-related entity"?
12   Q. Any of the entities in the Danco family. So
13 Danco Labs, Danco Investors Group, MedApproach,
14 N.D. Management.
15   A. No.
16   Q. Do you receive any income from any of those
17 entities at all?
18   MR. SIMES: Income -- I just want to make sure
19 you said income, not compensation?
20   MR. THOMPSON: Income, yeah.
21   THE WITNESS: No.
22 BY MR. THOMPSON:
23   Q. You do receive any dividends or distributions --
24   A. Yes.
25   Q. -- as an owner --

15 (Pages 54 to 57)

CONFIDENTIAL

Page 58

1    A.  Correct.
2    Q.  -- of certain entities?
3    A.  I'm sorry.
4        Yes.
5        (Reporter clarification.)
6    BY MR. THOMPSON:
7    Q.  How much income do you receive in the form of
8  dividends or distributions from -- on a yearly basis
9  from any of the Danco entities?
10   A.  Approximately $400,000 a year.
11   Q.  Does Mr. Daniel receive compensation from any
12  Danco-related entity of which you are aware?
13   A.  Yes.
14   Q.  What compensation are you aware of that
15  Mr. Daniel receives?
16   A.  He receives a salary, he receives a
17  distribution based on his ownership.  Same as me.
18   Q.  How much does he receive in the form of
19  salary?
20   A.  I think it's about $150,000 to $200,000 a
21  year.
22   Q.  What entity pays him that?
23   A.  Danco.
24   Q.  Does he also receive a proxy holder's fee?
25   A.  That's what I'm talking about.

Page 59

1    Q.  Does he receive -- withdrawn.
2        Are you involved -- withdrawn.
3        Have you been involved at any time in the past
4  in any discussion concerning the appropriate amount of
5  compensation to be paid to Mr. Daniel?
6    A.  Yes.
7    Q.  In what capacity have you been involved in
8  such discussions?
9        MR. SIMES:  Objection to the question as
10  ambiguous and vague.
11       If you understand what he's getting at, go
12  ahead.
13       THE WITNESS:  Yes.  Just the cost of living
14  each year to the base salary that we receive for being
15  proxy holders.
16  BY MR. THOMPSON:
17   Q.  So is there a discussion of that topic every
18  year among the Danco management group?
19   A.  Yes.
20   Q.  Does Mr. Daniel also receive profit sharing
21  from Danco?
22   A.  Yes.
23   Q.  How much profit sharing does he receive?
24   A.  I'm not sure.
25   Q.  Does he receive any other benefits from Danco?

Page 60

1        MR. SIMES:  Objection to "benefits."
2        If understand, go ahead.
3        THE WITNESS:  Yeah, I believe he receives his
4  portion of the profits from MedApproach, the promoted
5  interest basically.
6  BY MR. THOMPSON:
7    Q.  As an indirect owner of Danco?
8    A.  What does that mean?  I don't know what you
9  mean by "indirect owner."
10   Q.  The promoted interest of MedApproach -- oh,
11  you mean as the manager of the MedApproach entity
12  management fee?
13   A.  No.  No.  Basically the portion that goes to
14  MedApproach that -- after everybody had received their
15  initial investment back.
16   Q.  Does he receive any other form of benefit from
17  Danco?  Does he have health benefits?
18   A.  I don't know.
19   Q.  Does he have any kind of life insurance policy
20  that's paid for by Danco?
21   A.  I can't remember.
22   Q.  Any kind of deferred compensation plan with
23  Danco?
24   A.  I can't remember.
25   Q.  Who sets Mr. Daniel's compensation?

Page 61

1        MR. SIMES:  Objection.  I think that has a
2  supposition in the question that's improper.
3        You can answer if you understand it.
4        THE WITNESS:  The proxy holders.
5  BY MR. THOMPSON:
6    Q.  Who are the proxy holders?
7    A.  Myself and Mr. Daniel.
8    Q.  Who sets Ms. Van Vranken's compensation?
9    A.  Mr. Daniel and myself.
10   Q.  How about Roy Karnovsky's compensation?
11   A.  Mr. Daniel and myself.
12   Q.  How much is Ms. Van Vranken paid on an annual
13  basis?
14   A.  I can't remember right now.
15   Q.  Okay.  We're going to go to a new topic, which
16  is the 10 percent issue.
17   A.  Okay.
18   Q.  I adopted your "ish" because it's easier than
19  10.8601.
20   A.  Okay.
21   Q.  What was the first discussion that you can
22  remember where it was suggested that you, Dr. Rush,
23  should receive a portion of that 10 percent interest
24  transfer --
25   A.  When?

Page 74

1  A.  He says you're getting confused between
2  N.D. Management and MedApproach.
3  Q.  And what else did he say?
4  A.  That's it.
5  Q.  And what did you say to him?
6  A.  You're right.
7  Q.  Okay.  And did he -- he told you that you were
8  confused, right?
9  A.  No.  I asked him -- no, he said, Are you -- he
10  asked me the question, Are you confusing N.D. Management
11  with MedApproach?
12  And I kept thinking N.D. Management and Danco
13  are what we're responsible for, and I was -- the answer
14  is I was confused.
15  Q.  Okay.  So you say that you receive financial
16  information regarding N.D. Management?
17  A.  Correct.
18  Q.  What do you receive -- withdrawn?
19  What financial information do you receive
20  concerning N.D. Management?
21  A.  I receive the statements of the cash -- not
22  the cash, basically what portion of N.D. Management and
23  Danco, how we're doing.
24  Q.  Okay.  But what I'm asking you is, in
25  particular focusing on N.D. Management, what documents

Page 75

1  do you receive concerning the finances of
2  N.D. Management?
3  A.  I don't know.  I can't remember.  I mean, I
4  just --
5  Q.  When was the last time --
6  MR. SIMES:  Let him finish the answer, please.
7  Go ahead.  You were saying?
8  THE WITNESS:  I just can't remember the
9  differentiation from the Danco versus the
10  N.D. Management statements.
11  BY MR. THOMPSON:
12  Q.  Okay.  So identify a single N.D. Management
13  specific document that you receive on a regular basis.
14  MR. SIMES:  Asked and answered.
15  THE WITNESS:  Huh?
16  MR. SIMES:  I'm objecting, but you can answer
17  the question.  You've been asked the same question.  But
18  go ahead if you want to answer again.
19  THE WITNESS:  I can't differentiate right now
20  what I receive.
21  BY MR. THOMPSON:
22  Q.  Can you identify any N.D. Management specific
23  document that you've received in the last six months?
24  MR. SIMES:  Objection.  Asked and answered.
25  THE WITNESS:  No.

Page 76

1  BY MR. THOMPSON:
2  Q.  You said also when we came back in after you
3  had spoken with Mr. Simes that you also review the
4  N.D. Management compensation, right?
5  A.  Correct.
6  Q.  What does that mean?  What do you do with
7  respect to the N.D. Management compensation?
8  A.  Well, Brad calls me and talks to me about his
9  compensation from N.D. Management, and I review it to
10  see if it's reasonable.
11  Q.  Okay.  So it has to do with Mr. Daniel's
12  compensation from N.D. Management?
13  A.  Correct.
14  Q.  Does anybody else receive compensation from
15  N.D. Management that you review?
16  A.  No.
17  Q.  What compensation does Mr. Daniel receive from
18  N.D. Management?
19  A.  I can't recall.
20  Q.  When was the last time you discussed with
21  Mr. Daniel his compensation from N.D. Management?
22  A.  I can't recall.
23  Q.  Well, when was the last time that you can
24  recall?  Because you've testified that you do discuss it
25  with Mr. Daniel, and I'm asking you --

Page 77

1  A.  Perhaps a year ago.
2  Q.  What did you discuss with Mr. Daniel on that
3  subject a year ago?
4  A.  I don't remember.
5  Q.  Forgive me if I've already asked this, but how
6  much compensation does Mr. Daniel receive from
7  N.D. Management?
8  A.  I can't differentiate how much he receives
9  from N.D. Management right now from Danco.  I don't know
10  how it's divided up.
11  Q.  Do you know of any compensation that
12  Mr. Daniel receives from N.D. Management?
13  A.  I can't remember.
14  Q.  Is there a document that you would go to look
15  at in order to determine what compensation Mr. Daniel
16  receives from N.D. Management?
17  A.  I don't know.
18  Q.  Have you ever seen any document that reflected
19  some compensation paid to Mr. Daniel from
20  N.D. Management?
21  A.  I can't recall.
22  Q.  Other than running the business of Danco, what
23  does N.D. Management do?
24  A.  N.D. Management oversees the operation of
25  Danco as a general partner.  To me, in my positions,

Page 78

1   basically one. It basically is one.
2       Q.  You understand that the owners of Danco Labs
3   are different from the owners of N.D. Management, right?
4       A.  Yes.
5       Q.  Do you distinguish in the role that you play
6   as a proxy holder between your duties to the owners of
7   N.D. Management and the owners of Danco Labs?
8       A.  Yes.
9       Q.  How do you make that distinction?
10      A.  I'm responsible for both. It's just one as
11  far as my responsibilities.
12      Q.  What do you do specifically to fulfill your
13  responsibilities to the shareholders of N.D. Management?
14      MR. SIMES:  Objection. Asked and answered.
15      THE WITNESS:  Nothing specifically. Just all
16  one responsibility. I don't differentiate in my
17  responsibility, nor do I focus on the responsibility of
18  Danco and N.D. Management.
19  BY MR. THOMPSON:
20      Q.  Are you aware that in 2016 N.D. Management
21  made payments to Mr. Daniel of $75,000 for consulting
22  fees and approximately $152,000 for contract labor?
23      A.  No, I can't remember.
24      Q.  Are you aware that in 2016 N.D. Management
25  paid Ms. Van Vranken $70,000 as -- I believe it's

Page 79

1   consulting fees?
2       A.  I thought that was for -- I was aware of that.
3   And I think that it was basically for work performed
4   and, you know, things that have happened up until that
5   time. I think that was due to years of work that she
6   billed the company for.
7       Q.  Did you approve the payments to
8   Ms. Van Vranken?
9       A.  I did.
10      Q.  What information did you review in order to
11  conclude that that payment was appropriate?
12      A.  That I had spoken to Mr. Daniel and that they
13  were entitled to that money for time spent and according
14  to what was in the documents that they were entitled to
15  that money. Mr. Daniel told me as him operating the
16  company at the ground level that they were entitled to
17  that money based upon the documents of the time spent
18  in -- either it was legal activities or other issues
19  that -- per diems, that type of thing, hourly fees,
20  things like that over the period of time.
21      Q.  Other than speaking to Mr. Daniel, did you
22  take any steps to investigate whether those payments
23  were appropriate?
24      MR. SIMES:  Objection. "Any steps" and
25  "investigate."

Page 80

1       THE WITNESS:  No.
2   BY MR. THOMPSON:
3       Q.  So you just --
4       A.  Besides talking to Ms. Van Vranken, who had
5   been trusted since the beginning, I believe that on the
6   level that they weren't cheating the company.
7       Q.  How many hours did Ms. Van Vranken spend that
8   were compensated for by the $70,000 payment in 2016?
9       A.  I don't know.
10      Q.  What hourly rate was she compensated at?
11      A.  I don't know.
12      Q.  Did you receive any documentation that
13  reflected the number of hours that she had spent?
14      A.  No.
15      Q.  Did you review any documentation to which
16  Mr. Daniel referred when he said that they were entitled
17  to the money under the documents?
18      A.  The only thing was a verbal with Mr. Daniel
19  saying that he had accumulated and accrued these over a
20  period of years.
21      Q.  So the payment of $227,000, plus or minus, to
22  Mr. Daniel in 2016 was, according to Mr. Daniel,
23  supposed to compensate him for time that he had spent on
24  N.D. Management affairs over the years?
25      A.  Correct.

Page 81

1       Q.  Did he tell you what it was that he had done
2   to deserve that money?
3       A.  Yes. He told me that he had spent countless
4   hours working on legal issues.
5       Q.  Did he tell you how many hours?
6       A.  Well, he told me that he kept a log and that
7   this could be produced and the math was what the math
8   was.
9       Q.  Well, when you say "the math" --
10      A.  In other words, the amount of hours divided by
11  the hourly rate over a period of three or four or five
12  years -- I can't remember how many years -- that he had
13  not billed the company for.
14      Q.  What was the hourly rate?
15      A.  I think it was $600 an hour.
16      Q.  And did you do anything to test whether that
17  hourly rate was an appropriate rate for Mr. Daniel to be
18  compensated at?
19      MR. SIMES:  Objection to "appropriate."
20      THE WITNESS:  No.
21  BY MR. THOMPSON:
22      Q.  You said he told you that he had logs of hours
23  that he can produce, right? Did you ask to look at
24  them?
25      A.  No.

CONFIDENTIAL

Page 82

1    Q.  So in 2016 the amounts paid to Mr. Daniel and
2    Ms. Van Vranken were paid in a number of installments.
3         Did you approve each individual payment as it
4    was made, or did you simply approve the payment in total
5    for the year?
6    A.  I approved -- after he had told me about it, I
7    approved the total, not the methodology.
8    Q.  Did you approve a maximum amount of payment to
9    Mr. Daniel for 2016?
10   A.  No.
11   Q.  Did you approve a maximum amount of payment to
12   Mr. Daniel from N.D. Management in total for any year?
13   A.  No.
14   Q.  Did you approve a minimum amount of payment to
15   Mr. Daniel?
16   A.  No.
17   Q.  Is there any written record of
18   N.D. Management's board of directors' consideration of
19   Mr. Daniel's request for payment?
20   A.  No.
21   Q.  Now, in 2017 N.D. Management made additional
22   payments to Mr. Daniel and Ms. Van Vranken, roughly
23   $210,000 to Mr. Daniel and $80,000 to Ms. Van Vranken.
24        Did you approve those payments in 2017?
25   A.  I can't remember.

Page 83

1    Q.  Do you know what those payments are for?
2    A.  For time spent in the legal matters of the
3    problems he was having with Mr. Hawkins.
4    Q.  Did Mr. Daniel tell you that?
5    A.  I can't remember.
6    Q.  Is there any document anywhere that would help
7    you remember why those monies were paid to Mr. Daniel
8    and Ms. Van Vranken in 2017?
9    A.  I never received one.
10   Q.  Did you propose that these payments be made in
11   2017?
12   A.  No.
13   Q.  Who proposed that they be made?
14   A.  Mr. Daniel and Ms. Van Vranken.
15   Q.  In 2017 did you review any documents to help
16   you understand whether the payments were appropriate?
17   A.  No.
18   Q.  Did you seek any outside input into whether
19   those payments should be approved?
20   A.  No.
21   Q.  You know that the legal fees incurred in
22   connection with the defense by Mr. Daniel and
23   MedApproach in this case are being paid by
24   N.D. Management, right?
25   A.  Specifically, yes, I did know that,

Page 84

1    N.D. Management being owned by Mr. Pike and -- excuse
2    me -- MedApproach and Mr. Pike being the principals of
3    N.D. Management, correct?  Yeah.
4    Q.  They're the shareholders.
5    A.  I get confused sometimes between MedApproach
6    and N.D. Management.  Because, remember, all these years
7    I've been working with Danco.  So I just want to explain
8    that when you say that, you mean N.D. Management as
9    Mr. Pike -- owned by Mr. Pike and MedApproach.
10   Q.  N.D. Management is owned by Mr. Pike --
11   A.  Correct.
12   Q.  -- and MedApproach.
13   A.  I am aware of that.
14   Q.  Do you know what the total amount of those
15   fees has been over time?
16   A.  It's been, I guess, $1 million, approaching $1
17   million.  I mean, that's kind of the feeling that I had.
18   Q.  Do you --
19   A.  I don't know exactly is the answer.  I don't
20   know exactly.
21   Q.  Do you approve the payment of those fees every
22   year?
23   A.  No.
24   Q.  Have you ever approved the payment of those
25   fees?

Page 85

1    A.  In the sense that I've talked to Mr. Daniel
2    where he's told me that they're indemnified and if the
3    paperwork -- he assures me that the paperwork, the
4    documents, and I trust him that he's doing the right
5    thing.
6    Q.  Did you ever review any documents or paperwork
7    that provide for indemnification of Mr. Daniel --
8    Mr. Daniel's legal fees in this case?
9    A.  I've not reviewed them, but he's read them to
10   me and told me about them; that we were doing the -- he
11   was doing the right thing.
12   Q.  What documents did he read to you from?
13   A.  I can't remember.
14   Q.  You never yourself went out and looked at the
15   documents?
16   A.  No.
17   Q.  Did Mr. Daniel submit to the board of
18   directors of N.D. Management a written request for
19   indemnification?
20   A.  No.
21   Q.  So you didn't review N.D. Management's bylaws
22   to see if Mr. Daniel was, in fact, entitled to
23   indemnification for the legal fees under the bylaws?
24   A.  He assured me, but I don't recall -- I don't
25   recall us ever going over the documents of

CONFIDENTIAL

Page 86

1   indemnification.
2       Q.  Did you ever sit down with Mr. Daniel and
3   Ms. Van Vranken and review the documents -- review any
4   corporate documents to see if the payments to them were
5   justified under those documents?
6       A.  No.
7       Q.  Do you have an understanding as to whether
8   Mr. Daniel will be responsible for repayment of the
9   legal fees in the event that he is found liable for
10  intentional misconduct in this case?
11      A.  No, I don't have that understanding.
12      Q.  So you don't understand it one way or another,
13  or you disagree that that is the case?
14      A.  No, I don't understand it one way or the
15  other.
16      Q.  Did N.D. Management take any steps to require
17  Mr. Daniel to execute a document in which he agreed to
18  repay the money that was advanced him for his legal fees
19  in the event that he is found liable for willful
20  misconduct?
21      A.  I don't know.
22      Q.  To your knowledge, N.D. Management never took
23  such steps?
24      A.  I don't know a thing about it, no.
25      Q.  If there's a judgment entered against

Page 87

1   Mr. Daniel that involves willful misconduct, will
2   N.D. Management seek to recover the legal fees that had
3   been advanced to him?
4       MR. SIMES:  Objection.  Calls for a
5   hypothetical.
6       THE WITNESS:  I don't know.  I don't know the
7   answer to that.
8   BY MR. THOMPSON:
9       Q.  What would you need to know in order to know
10  the answer to that?
11      A.  I would have to --
12      MR. SIMES:  Same objection.
13      Go ahead.
14      THE WITNESS:  Sorry.
15      I'd have to sit down and review it and make my
16  judgment based upon what you just said.
17      (Exhibit Rush 13 was marked for
18      identification.)
19  BY MR. THOMPSON:
20      Q.  Let's mark this as the next exhibit, please.
21      You have in front of you Rush 13, which is a
22  document that has Bates numbers RUSH412 to 414.
23      And if you look at the last page, Dr. Rush, is
24  that your signature?
25      A.  Correct.

Page 88

1       Q.  Do you see that this -- withdrawn.
2       And your signature is dated April 17th, 2014,
3   right?
4       A.  Yes.
5       Q.  And you see that this is titled "Unanimous
6   Written Consent in Lieu of Meeting of Board of
7   Directors."
8       Do you see that?
9       A.  Yes.
10      Q.  And this document concerns the advancement of
11  expenses and filing of an insurance claim in connection
12  with this lawsuit, right?
13      A.  "That the corporation shall file" --
14      MR. SIMES:  Take a moment to --
15      THE WITNESS:  Yeah, let me read it.  Okay?
16  BY MR. THOMPSON:
17      Q.  Sure.
18      A.  Okay.
19      Q.  Do you recall ever having seen this before?
20      A.  No.
21      Q.  Do you recall any discussions concerning it?
22      A.  I don't recall the discussions, no.
23      Q.  Do you know who prepared it?
24      A.  No.
25      Q.  The numbers in the lower right-hand corner are

Page 89

1   RUSH numbers, and that indicates that they -- that this
2   document supposedly came from your files.
3       Do you recall maintaining a copy of this
4   document in your files?
5       A.  No, I don't recall.
6       Q.  Was there a board meeting of the board of
7   directors of N.D. Management at which this document was
8   discussed?
9       A.  I can't recall.
10      Q.  Were any payments made to lawyers representing
11  Mr. Daniel prior to the execution of this document?
12      A.  I don't know.
13      Q.  You see that in the first "Resolved" on the
14  first page, it says, "Now therefore, be it resolved."
15  It says, "That after careful consideration, the board
16  has determined that the indemnities have the right to
17  have the corporation advance funds."
18      What careful consideration did the board
19  undertake in order to determine that the indemnities had
20  the right to advancement of funds?
21      A.  I can't remember.
22      (Exhibit Rush 14 was marked for
23      identification.)
24  BY MR. THOMPSON:
25      Q.  Okay.  Let's mark this as the next exhibit,

TSG Reporting - Worldwide - 877-702-9580

CONFIDENTIAL

Page 90

1    please, Rush 14.
2        You have in front of you Rush 14, which is a
3    single-page document bearing document identification
4    No. RUSH415. And it is a single page memo from
5    N.D. Management from you, Dr. Rush, to Mr. Daniel.
6        Have you ever seen this document before?
7    A.  I can't recall.
8    Q.  You see that in this document -- withdrawn.
9        That is your signature at the bottom there?
10   A.  Yes.
11   Q.  You see that in this document that you say
12   that -- you confirm that you approved N.D. Management's
13   indemnity of Mr. Daniel and MedApproach Holdings and
14   Mr. Daniel's related entities, right?
15   A.  Correct.
16   Q.  Under, among other things, the August 1st,
17   1998, indemnification agreement?
18   A.  Correct.
19   Q.  Have you ever reviewed the August 1st, 1998,
20   indemnification agreement?
21   A.  Yes.
22   Q.  When did you last review it?
23   A.  Many years ago. I don't remember exactly
24   when.
25   Q.  What in the indemnification agreement were you

Page 91

1    referring to when you said that?
2    A.  Is that the question? I'm sorry. Could you
3    repeat it.
4    Q.  I'll repeat it.
5    A.  Yeah, please.
6    Q.  What were you referring to when you said that
7    you approved N.D. Management's indemnity under the
8    August 1st, 1998, identification agreement? What in
9    particular under the indemnification agreement?
10   A.  Well, that the proxy holders are indemnified
11   against any actions brought against them legally as
12   directors.
13   Q.  And you see it also says that -- in this
14   document it says, "I have also approved and approve
15   payments to you (and to Ms. Van Vranken) by
16   N.D. Management for your time spent in addressing, among
17   other things, the Hawkins v. MedApproach lawsuit, which
18   falls within the scope of the indemnification
19   agreement."
20       Did you review the indemnification agreement
21   in order to come to the conclusion that payments to
22   Mr. Daniel for his time in connection with the lawsuit
23   should be paid for?
24   A.  Yes.
25   Q.  You did review the indemnification agreement?

Page 92

1    A.  Yes.
2        (Exhibit Rush 15 was marked for
3        identification.)
4    BY MR. THOMPSON:
5    Q.  So let's mark this as the next exhibit,
6    please, 15. Rush 15 is a document bearing Bates numbers
7    H2082 through 2086.
8        Have you ever seen this document before?
9    A.  I can't recall. I have seen this, yes. This
10   is the indemnification agreement.
11   Q.  This is the indemnification agreement that is
12   referred to in Rush 14?
13   A.  Correct.
14   Q.  So what in Rush 15 caused you to approve
15   payments to Mr. Daniel for time spent addressing the
16   Hawkins lawsuit?
17   A.  Indemnification.
18   Q.  Where? Point it out to me.
19   A.  No. 2 --
20       MR. SIMES:  Take your time and read the whole
21   agreement.
22       THE WITNESS:  Okay. Okay.
23   BY MR. THOMPSON:
24   Q.  So what in this document in particular did you
25   rely on in approving payment to Mr. Daniel for time

Page 93

1    spent addressing the Hawkins versus MedApproach lawsuit?
2    A.  Indemnification.
3    Q.  Where in the indemnification --
4    A.  No. 2, page 2.
5    Q.  Yeah. Okay. And what in the indemnification
6    provision in particular do you believe -- did you rely
7    on?
8    A.  Hold harmless MedApproach, the proxy holders,
9    the directors, officers, employees, agents of any
10   enterprise or their affiliates, heirs, et cetera.
11   Q.  And that concerns the indemnification for
12   legal fees?
13   A.  I assume so.
14   Q.  Okay. So what I'm talking about now is -- you
15   say in Rush 14, "I have approved and approve payments to
16   you (and Angelia Van Vranken) by N.D. Management for
17   your time spent in addressing, among other things, the
18   Hawkins v. MedApproach lawsuit, which falls within the
19   scope of the indemnification agreement."
20       What in the indemnification agreement were you
21   relying on when you said you approved payments to
22   Mr. Daniel and Ms. Van Vranken for their time spent?
23       MR. SIMES:  Take your time and read it.
24       THE WITNESS:  "Without in any way limiting the
25   scope of indemnification provided by this agreement,"

CONFIDENTIAL

Page 94

1    "compensation for time spent by a proxy holder in
2    attending or dealing with such claims" on page 3.
3    BY MR. THOMPSON:
4        Q.  So say that again.
5        A.  "The payments which the indemnities shall be
6    obligated to make hereunder shall include, without
7    limitation, damages, settlements, judgments, cost and
8    expenses (attorneys' fees), and compensation for time
9    spent by a proxy holder in attending or dealing with
10   such claim or claims at the per diem rates set forth in
11   that certain letters agreement dated May 1998, by and
12   among the general partner and proxy holders of
13   MedApproach."
14       Q.  So that's the specific provision that you were
15   relying on when you said in Rush 14 that you approved
16   payments to Mr. Daniel and Ms. Van Vranken, right?
17       A.  Correct.
18       Q.  Now, is Ms. Van Vranken a proxy holder?
19       A.  No.  But going back, she was an employee, an
20   agent.
21       Q.  Right.  But you --
22       A.  And, well, that's -- you know, that is -- does
23   not say -- it really doesn't say Ms. Van Vranken.
24   But...
25       Q.  The provision you just read from says that it

Page 95

1    includes compensation for time spent by a proxy holder,
2    right?
3        A.  Correct.
4        Q.  It doesn't say time spent by an employee.  It
5    says time spent by a proxy holder.
6        A.  Correct.
7        Q.  And Ms. Van Vranken is not a proxy holder,
8    right?
9        A.  No.
10       Q.  So her time spent is not covered by this, is
11   it?
12           MR. SIMES:  Objection.  Calls for a legal
13   conclusion.  And objection to "this."
14           But you can answer if you have an
15   understanding, if you know what he's talking about.
16   BY MR. THOMPSON:
17       Q.  It's not covered by that particular phrase, is
18   it?
19       A.  No.  But it is covered by the fact that -- not
20   specifically time spent, but she's indemnified as an
21   employee.  So perhaps this paragraph No. 2 can be
22   interpreted as indemnification.
23       Q.  Did you -- when you approved the payments to
24   Ms. Van Vranken that Mr. Daniel proposed to you in 2016
25   and 2017, did you consider that to be indemnification?

Page 96

1            MR. SIMES:  Objection.  The question's
2    confusing.
3            If you have an understanding, go ahead.
4            THE WITNESS:  I had no -- I assumed that she
5    should be indemnified by her time by paragraph 2; that
6    she's an officer or employee -- she's an officer or
7    employee of the company.
8    BY MR. THOMPSON:
9        Q.  Did you seek any advice from anybody other
10   than Mr. Daniel in your interpretation of this document?
11       A.  No.
12       Q.  Now, it says that the compensation for time
13   spent by a proxy holder would be at the per diem rates
14   set forth in the certain letter agreement dated
15   May 1998, right?
16       A.  Correct.
17       Q.  So let's go back to that agreement, which is
18   Rush 11.  Do you have Rush 11 there?  You do have it in
19   the pile.  It's just --
20       A.  I have it somewhere.
21           MR. SIMES:  Do you want me to find it for you?
22           THE WITNESS:  Yes, please.
23           MR. SIMES:  I'll find it for you.  I think we
24   kept it in order, I hope.
25           THE WITNESS:  Okay.

Page 97

1    BY MR. THOMPSON:
2        Q.  All right.  Now, identify for me in Rush 11
3    what the per diem rate for Mr. Daniel's time was.
4        A.  I see a per diem rate for me.  I don't see it
5    for Mr. Daniel here.  But direct me to where it would.
6        Q.  Well, I can't find it.  So I don't believe
7    it's in there, but if you can find it, find it for us.
8        A.  I don't see it.  I just see it for Mr. Freeman
9    and myself.
10       Q.  Now let's go back to Rush 14.
11       A.  Okay.
12       Q.  That document is dated November 9th, 2018,
13   right?
14       A.  Uh-huh.
15       Q.  What caused you to sign this document?
16       A.  Again, that I looked at the indemnification
17   agreement which said attorneys' fees, time spent for
18   Mr. Daniel.
19       Q.  Did you write this?
20       A.  No.
21       Q.  Who wrote this?
22       A.  I don't know.
23       Q.  How did it come into your possession?
24       A.  I can't remember.
25       Q.  Who sent it to you?

Page 98

1    MR. SIMES: Same question.
2    Go ahead.
3    THE WITNESS: I don't know. I don't remember.
4    BY MR. THOMPSON:
5    Q. Did you discuss it with Mr. Daniel before you
6    signed it?
7    A. Yes.
8    Q. What did Mr. Daniel say to you about it?
9    A. That the documents support indemnification and
10   reimbursement of time for myself and Ms. Van Vranken.
11   Q. Did you say anything back to him?
12   A. Well, he read me the -- we discussed it and I
13   believe that he was telling me the truth about the
14   indemnification.
15   Q. Did you actually pull out the indemnification
16   agreement and look at it?
17   MR. SIMES: Objection. Asked and answered.
18   THE WITNESS: I can't remember.
19   BY MR. THOMPSON:
20   Q. Did Mr. Daniel send this to you?
21   MR. SIMES: Objection. Asked and answered.
22   THE WITNESS: I can't remember.
23   BY MR. THOMPSON:
24   Q. But you didn't write it, right?
25   MR. SIMES: Asked and answered.

Page 99

1    THE WITNESS: No.
2    MR. SIMES: Let us know when there's a pause
3    in the action. We could take a break.
4    MR. THOMPSON: We can take a break, but I
5    would just caution you and the witness not to discuss
6    the substance of the witness's testimony during the
7    break.
8    MR. SIMES: So to be clear, we'll comply with
9    the rules of SDNY. There's no pending question. We're
10   going to take a break.
11   (Recess taken.)
12   BY MR. THOMPSON:
13   Q. I think you testified when we started,
14   Dr. Rush, that you first learned of the claim that
15   Mr. Daniel had improperly withheld distributions owed to
16   Ms. Hawkins within the recent past?
17   A. Correct.
18   Q. Were you consulted at all in 2011 when the
19   decision was made to withhold those distributions?
20   A. No.
21   Q. So you never had any discussions with anybody
22   about the subject of whether distributions should be
23   withheld from Ms. Hawkins because of a dispute between
24   Mr. Daniel and the Hawkinses?
25   A. The only thing I knew about -- I didn't know

Page 100

1    that he withheld, is that Brad told me that Mr. Hawkins
2    had done an end run around him by putting in false
3    investments so that Mr. Daniel wouldn't share in the
4    proceeds of anything that came that way. And I don't
5    know the particulars, but that's the only thing I know.
6    Q. Did Mr. Daniel tell you that he had filed a
7    lawsuit against Mr. and Mrs. Hawkins in which he made
8    that allegation?
9    A. I can't remember.
10   Q. But whether he did or didn't tell you that he
11   filed a lawsuit, you did not discuss with him
12   withholding distributions from --
13   A. No.
14   Q. -- Ms. Hawkins?
15   A. No.
16   (Exhibit Rush 16 was marked for
17   identification.)
18   BY MR. THOMPSON:
19   Q. Let's mark this as the next document, 16.
20   Dr. Rush, you've been handed Rush 16, which
21   has Bates numbers MED15196 through 15214, and it bears a
22   caption "N.D. Management, Inc. General Ledger as of
23   December 31, 2017."
24   Have you ever seen this document before?
25   A. I probably have. I can't remember. This is a

Page 101

1    possibility, but I don't remember.
2    Q. Have you seen general ledgers for
3    N.D. Management before?
4    A. Yes.
5    Q. How often do you see them?
6    A. I don't know. I really don't remember.
7    Q. Are they sent to you on a regular basis?
8    A. I don't know.
9    Q. In the documents that you produced, there were
10   no copies of any general ledgers.
11   Is there some reason why that was the case?
12   A. I can't say. I don't know.
13   Q. Do you discuss the business of N.D. Management
14   with anybody via email?
15   A. No.
16   Q. Do you discuss the business of N.D. Management
17   with anybody via text message?
18   A. No.
19   Q. Do you communicate about the business of
20   N.D. Management with anybody by way of any written
21   communication?
22   A. I can't remember that I have.
23   Q. Does anybody communicate with you concerning
24   the business of N.D. Management by way of written
25   communication?

26 (Pages 98 to 101)

CONFIDENTIAL

Page 102

1    A. I can't remember. Maybe. I just can't
2    remember.
3    Q. If you look on the first page of this
4    document, Rush 16, halfway down the page, there's an
5    account that's identified as Regions Checking Account.
6         Do you see that?
7    A. On the first page?
8    Q. First page.
9    A. Legions or Regions?
10   Q. Regions.
11   A. Where is that?
12   Q. About halfway down there's Morgan Keegan, and
13   then after that there's Regions Check Account.
14   A. I don't have it.
15   Q. Right here.
16   A. Show me where.
17   Q. (Indicating.)
18   A. Halfway down the page.
19        MR. SIMES: On the left-hand side in bold.
20        THE WITNESS: Are you talking about this page
21   right here?
22   BY MR. THOMPSON:
23   Q. I am.
24   A. Just point it to me, please.
25        MR. SIMES: If you'll allow me, I'll point --

Page 103

1    BY MR. THOMPSON:
2    Q. Right there.
3    A. Oh, in bold.
4    Q. Yeah.
5    A. Regions Checking Account. Okay. I see it.
6    Q. And do you see the --
7    A. That's off to the side. That's why. Okay.
8    Go ahead.
9    Q. Do you see the first entry there is a payment
10   to Market Street Emporium?
11        Do you see that?
12   A. Correct. Yes.
13   Q. What is Market Street Emporium?
14   A. That is the company that owns Brad's building.
15   Q. Who owns Market Street Emporium?
16   A. Brad.
17   Q. And then further down, there's an entry for
18   MedApproach Management. It's actually MedApproach Mana,
19   but it's MedApproach Management.
20   A. Right.
21   Q. What does MedApproach Management do for
22   N.D. Management?
23   A. MedApproach -- I don't know.
24   Q. Do you see the very last entry on this page is
25   a wire to Wayne Bradley Daniel?

Page 104

1         Do you see that?
2    A. I do.
3    Q. What was that payment for?
4    A. I don't know.
5    Q. If you flip it over to the next page,
6    there's -- about eight lines down, there's another wire
7    to Mr. Daniel for $30,000. What was that payment for?
8    A. I don't know.
9    Q. If you go to page 14 of this document and you
10   see under Legal Fees. About halfway down, there's an
11   account called Legal Fees.
12        Do you see that?
13   A. I see it, yeah.
14   Q. It says Hawkins Lawsuit.
15   A. Yes.
16   Q. And there's a payment to Waller Lansden
17   D-o-r-t. Small payment. But who is Waller Lansden
18   Dort?
19   A. Where do you see that? Kraft, Goodwin,
20   Goodwin, Goodwin, Delaware Corp., Vaco Nashville.
21   Q. Just under -- so halfway down the page, it
22   says -- in the bold on the left it says Legal Fees, and
23   then under that indented, it says Hawkins Lawsuit.
24   A. Yeah.
25   Q. And there are seven payments.

Page 105

1    A. Correct.
2    Q. Six of which are to Goodwin Proctor, and one
3    of which is to Waller Lansden Dort.
4    A. $422?
5    Q. Yeah.
6    A. I don't know who they are.
7    Q. And you see that in 2017 there was a total of
8    $77,000 paid to Goodwin Proctor, right?
9    A. Uh-huh, yes.
10   Q. For the Hawkins lawsuit?
11   A. Yes.
12   Q. And, yet, in that year Mr. Daniel was paid
13   $220,000 for his work in connection with the lawsuit?
14   A. Yes.
15   Q. And Ms. Van Vranken was paid $80,000 for her
16   work in connection with the lawsuit?
17   A. Yes.
18   Q. So it's your understanding that they put in
19   more time than the lawyers did on the lawsuit in 2017?
20        MR. SIMES: Objection. That assumes that the
21   billing was for that period of time.
22        THE WITNESS: Yes.
23   BY MR. THOMPSON:
24   Q. So it's your understanding that they did put
25   in more time on the lawsuit?

CONFIDENTIAL

Page 106

1    A.  I don't know what they put the -- I don't know
2    what that's for.  I don't know what that amount is for.
3         Q.  The amounts paid to Mr. Daniel and
4    Ms. Van Vranken?
5         A.  Correct.
6         MR. THOMPSON:  I should have done this before.
7    Give me a second.  And we may be done or close to done
8    or close to done anyway.  Let me check my stuff.
9         MR. SIMES:  Sure.
10        (Pause in the proceedings.)
11        MR. THOMPSON:  We can go back on the record.
12   I don't have any further questions right now.
13        MR. SIMES:  I'm going to have some questions.
14
15             EXAMINATION
16   BY MR. SIMES:
17        Q.  So, Dr. Rush, I want to follow up on a few
18   things that you testified about earlier today.  One
19   thing that we talked about earlier today was the idea of
20   converting N.D. Management from a C Corp. to an S
21   Corporation.
22        Do you remember the testimony about that?
23        A.  Sure.  Yes, I do.
24        Q.  Now, I think, if I understood you correctly,
25   you said that at one point Brad -- you understood that

Page 107

1    Brad made a proposal to convert NDM from a C Corp. to an
2    S Corp.
3         Did I understand that correctly?
4         A.  Yes.
5         MR. THOMPSON:  Object to form.
6    BY MR. SIMES:
7         Q.  Do you remember when that topic first arose?
8         A.  No.  It was back ten years ago maybe.
9         Q.  Do you know whether Mr. Daniel was working
10   with accountants or other outside professionals to come
11   up with that plan?
12        MR. THOMPSON:  Object to the form.
13        THE WITNESS:  I'm not certain.
14   BY MR. SIMES:
15        Q.  You supported the idea?  You thought it was a
16   good idea?
17        A.  Yes.
18        MR. THOMPSON:  Object to the form.
19   BY MR. SIMES:
20        Q.  Okay.  And was it your understanding that that
21   was Brad's idea?  He came up with that idea?
22        MR. THOMPSON:  Object.  Leading.
23        THE WITNESS:  I don't know whose idea it was.
24   BY MR. SIMES:
25        Q.  Why wasn't the proposal accepted?  What's your

Page 108

1    understanding of that?
2         A.  Well, the proposal was accepted, as I had
3    testified, that the strings were attached.  Brad told me
4    that they had an agreement, Hawkins and he had an
5    agreement.
6         Q.  You're referring to Greg Hawkins?
7         A.  Yeah.  Greg Hawkins had an agreement.  It was
8    good for everybody.
9         And then Greg came back and said, Well, we'll
10   do it only if you two resign as proxy holders.
11        Q.  And why not resign as proxy holders?  What was
12   your objection to that?
13        A.  Well, I had my own money in the steel, and I
14   didn't think Greg Hawkins was the one to lead this group
15   because we had, you know, we had offered Greg a
16   leadership position and he had refused up until -- for
17   many, many years.  For ten years he refused because he
18   did not want to be associated with the stigma of being
19   part of the abortion group.
20        Q.  Do you know -- oh, I'm sorry.
21        A.  I'm sorry.  That's it.
22        Q.  Do you know whether any of the other
23   MedApproach partners or Mr. Pike supported the idea of
24   Mr. Hawkins taking control of the whole project?
25        MR. THOMPSON:  Object to the form.

Page 109

1         THE WITNESS:  Nobody.
2    BY MR. SIMES:
3         Q.  Nobody supported that?
4         A.  Nobody supported that.  Well, we didn't --
5    nobody -- there was nobody who came out and supported
6    that that I know of.
7         Q.  Now, I want to ask you some questions about
8    some of the -- oh, withdrawn.
9         Do you know whether Mr. Daniel -- after that
10   proposal in the 2009 time frame, were any other efforts
11   made to revisit that question with Mr. Hawkins?
12        A.  I don't know.
13        Q.  Okay.  You were asked a lot of questions about
14   reimbursements to Mr. Daniel and Ms. Van Vranken.
15        Is it accurate that -- did I understand your
16   testimony correctly that they presented to you the
17   amounts that they thought they should be reimbursed?
18        They came to you and said, Dr. Rush, we think
19   we should be reimbursed.
20        MR. THOMPSON:  Object to the form.
21        THE WITNESS:  Say that question again.
22   BY MR. SIMES:
23        Q.  Did I understand your prior testimony
24   correctly that with respect to the reimbursements we're
25   talking about in this case, Mr. Daniel and

TSG Reporting - Worldwide - 877-702-9580

CONFIDENTIAL

Page 126

1 can't -- I have -- I can't say offhand.
2      Q.  And how much square footage does
3 N.D. Management occupy?
4      A.  I can't remember.  Back when I thought it was
5 1,500 square feet for -- I don't know exactly, but it
6 was --
7      Q.  When was the market study that you said you
8 did?  When was that done?
9      A.  It was done perhaps ten years ago.
10      Q.  Was that before or after the move to the
11 current office space?
12      A.  After the move to the current office space.
13      Q.  Do you know whether N.D. Management paid for
14 leasehold improvements to the current office space?
15      A.  I don't know.
16      Q.  Do you know what the total amount of rent is
17 that is paid by all of the Danco entities for all of the
18 office space that it occupies?
19      A.  Not offhand.
20      Q.  You say that you review audited financial
21 statements.
22      Have you ever reviewed an audited financial
23 statement for N.D. Management?
24      MR. SIMES:  Objection.  Asked and answered.
25      THE WITNESS:  I can't remember.

Page 127

1 BY MR. THOMPSON:
2      Q.  As you sit here today, can you remember a
3 single time that you've ever seen an audited financial
4 statement for N.D. Management?
5      MR. SIMES:  Objection.  Asked and answered.
6 He testified to that.
7      THE WITNESS:  I can't remember.
8 BY MR. THOMPSON:
9      Q.  If we go back to Rush 15, which is the
10 indemnification agreement.  You've got that in front of
11 you?
12      A.  Uh-huh.
13      Q.  And you read from paragraph 4, so we'll stay
14 on paragraph 4.
15      A.  Uh-huh.
16      Q.  And you read the last sentence there, right,
17 which starts by saying, "If the claim is not paid by the
18 enterprise within 90 days after receipt by the
19 enterprise of the written claim."
20      Do you see that?
21      A.  Yes.
22      Q.  Did Mr. Daniel ever submit a written claim for
23 indemnification?
24      A.  No, not that I remember.  I don't remember.
25      Q.  You testified that as far as you -- as far as

Page 128

1 you know, nobody supported Mr. Hawkins taking control of
2 the enterprise back several years ago.
3      Did you ever have a conversation with
4 Mr. Hawkins in which he said to you that he was trying
5 to take control of the enterprise?
6      A.  I haven't had a conversation with Mr. Hawkins
7 at all since 2013.
8      Q.  Where did you come up with the idea that
9 Mr. Hawkins was trying to take control of the
10 enterprise?
11      A.  Through Mr. Daniel.
12      Q.  So Mr. Daniel told you that?
13      A.  Correct.
14      Q.  And did you have any conversations with any
15 other stakeholders in the enterprise about the concept
16 of Mr. Hawkins taking control?
17      A.  Yes.
18      Q.  Who did you discuss that with?
19      A.  Jerry Kaminsky, Steven Roth, a few other of my
20 investors who were large investors.
21      And I said, There's a dispute brewing.
22      And they said, We like -- we like the future
23 of this company, and we're happy with where we are.
24      Q.  You testified that -- earlier today you
25 testified that the hourly rate at which Mr. Daniel was

Page 129

1 compensated for his time was approximately $600?  That's
2 the best of your recollection?
3      A.  That's what he told me, yes.
4      Q.  That's what he told you.
5      Let's go back and look at -- I think it's 11.
6 It's the Certain Compensation Matters agreement.
7      A.  Yes.
8      Q.  If you could just pull that out.
9      A.  Okay.
10      Q.  In paragraph 2, there is a $2,500 per diem for
11 you, right?
12      A.  Correct.
13      Q.  And in an eight-hour day, what does that
14 equate to?
15      A.  $300.
16      Q.  So how close is that to $600 per hour?
17      A.  Well, this is ten -- this is 22 years ago.
18 And I don't know how to equate $300 an hour 22 years ago
19 to -- it's half, but I don't know 20 years later what
20 that equates to in the present value of money.
21      Q.  Is there an escalator clause in this paragraph
22 2?
23      A.  No.
24      Q.  And similarly, the per diem for Freeman is
25 $3,000?

TSG Reporting - Worldwide - 877-702-9580