# DX 29

# *Confidential Memorandum*

THIS MEMORANDUM IS NOT TO BE SHOWN OR GIVEN TO ANY PERSON OTHER THAN THE PERSON WHOSE NAME APPEARS BELOW AND SUCH PERSON'S PROFESSIONAL ADVISORS, AND IS NOT TO BE REPRINTED OR REPRODUCED IN ANY MANNER. AS A CONDITION TO RECEIVING THIS MEMORANDUM, CURRENT PARTNERS WHO ACCEPT THE RESCISSION OFFER AND POTENTIAL INVESTORS WHO DECIDE NOT TO INVEST IN THE PARTNERSHIP SHALL BE REQUIRED TO RETURN THIS MEMORANDUM TO THE GENERAL PARTNER AND AGREE TO KEEP ALL INFORMATION ABOUT THE CONTENTS OF THIS MEMORANDUM CONFIDENTIAL FOR ALL PURPOSES.

RECIPIENT:_____  _____  ___  Copy No.: ___
           Name

If the above number does not appear in red, there is a presumption that this Memorandum has been improperly reproduced and circulated, in which case Danco Investors Group, L.P. and its affiliates and related persons disclaim any responsibility whatsoever for its contents and use.

---

## DANCO INVESTORS GROUP, L.P.

**A California Limited Partnership**
(formerly known as NeoGen Investors, L.P.)

**RESCISSION OFFER**

███████

### OFFERING OF CLASS B LIMITED PARTNERSHIP INTERESTS

████████ Percentage Interest

### CONSENT SOLICITATION

*FOR PROFESSIONAL USE ONLY*

     This Confidential Memorandum and the exhibits and attachments hereto (collectively, the "Memorandum") is being distributed in connection with, and contains information relating to, the Rescission Offer, the Offering and the Consent Solicitation (each as defined herein and collectively referred to as the "Transactions") of Danco Investors Group, L.P., a California limited partnership formerly known as NeoGen Investors, L.P. (the "Partnership"). The Partnership is the investment vehicle used to fund the manufacture, marketing and distribution of the drug mifepristone (the "Drug") in the United States. Each of the Transactions is generally contingent on the consummation of the others. Current limited partners who accept the Rescission Offer will not be eligible to participate in the Offering or the Consent Solicitation.

     See "Risk Factors" starting on page 10 of this Memorandum for a discussion of certain matters that should be carefully considered by investors before deciding whether to accept the Rescission Offer, participate in the Offering or consent to the matters which are the subject of the Consent Solicitation.

     THE LIMITED PARTNERSHIP INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAS THE COMMISSION OR OTHER REGULATORY AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THE RESCISSION OFFER OR THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

The date of this Memorandum is August 5, 1998.

CONFIDENTIAL



EXHIBIT
PENGAD 800-631-6989
G. Hawkins 7
6/2/14

H00000914

## TABLE OF CONTENTS

PAGE

MEMORANDUM SUMMARY ................................................ 1
    The Partnership .................................................. 1
    The Enterprise .................................................. 1
    Enterprise Organizational Chart .................................... 2
    The Business .................................................... 3
    History of the Enterprise .......................................... 4
    The Rescission Offer .............................................. 6
    The Offering .................................................... 6
    The Consent Solicitation .......................................... 9

RISK FACTORS ...................................................... 10
    Risks Relating to the Business ...................................... 10
    Risks Relating to the Enterprise .................................... 18
    Risks Relating to the Rescission Offer ............................... 20
    Risks Relating to the Offering ...................................... 22
    Risks Relating to the Consent Solicitation ............................ 23
    Certain Tax Related Risks .......................................... 23

THE RESCISSION OFFER .............................................. 24
    Background ...................................................... 24
    Reasons for the Rescission Offer .................................... 25
    Effect of the Rescission Offer ...................................... 27
    Rescission Offer Terms ............................................ 28
    Determination of the Rescission Price ................................ 30
    Method of Acceptance ............................................ 31
    Indications of Intent to Reject the Rescission Offer ..................... 31
    Funding of the Rescission Offer .................................... 31
    Certain Federal Income Tax Consequences of the Rescission Offer .............. 32

THE OFFERING ...................................................... 33
    Terms of the Offering ............................................ 33
    Dilution ........................................................ 36
    Plan of Distribution .............................................. 37
    Investor Suitability Standards ...................................... 37
    How to Invest .................................................. 40
    Use of Proceeds ................................................ 41
    Standby Funding Commitments ...................................... 43

THE CONSENT SOLICITATION .......................................... 44
    Summary of the Consent Solicitation ................................ 44
    The Rescission Offer ............................................ 45
    The Offering .................................................... 45
    The Amendment ................................................ 45
    Required Vote .................................................. 46
    Indications of Intent to Consent .................................... 46

i

CONFIDENTIAL

H00000915

LEGAL PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
    Proceedings Commenced Against the Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    Proceedings Commenced by the Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    Certain Threatened or Anticipated Litigation and Arbitration . . . . . . . . . . . . . . . . . . 48

MANAGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    The Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
    The General Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
    The Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
    Executive Officers, Key Personnel and Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
    Executive Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    Advisory Board . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT . . 54

BUSINESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    General Description of the Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    History of the Enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
    The Drug . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
    Patents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
    Governmental Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
    Manufacturing and Tabletting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
    Marketing and Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69
    Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
    Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
    Properties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

CERTAIN RELATIONSHIPS AND TRANSACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
    Pike Removal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
    Financial Advisory Services Agreements Between Mr. Pike and Certain Parties . . . . . 79
    Prior Offering Commissions to Related Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
    Payments to Certain Related Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
    Payments Relating to Legal Proceedings and Other Disputes . . . . . . . . . . . . . . . . . . 81
    Bridge Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
    Use of Office Space from Certain Related Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

CERTAIN AGREEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
    Partnership Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
    Holdings Limited Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
    Revised Consent Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
    Revised License Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
    Positive Aspects of Revised Consent Agreement and Revised License Agreement . . . . . 98
    Agreement Regarding Directorship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

CONFIDENTIAL

H00000916

FINANCIAL MATTERS .............................................. 101
    Basis of Presentation ......................................... 101
    Selected Financial Data ....................................... 101
    Selected Pro Forma Financial Data ............................. 102

CERTAIN FEDERAL INCOME TAX CONSIDERATIONS ...................... 104

LEGAL MATTERS ................................................. 107

ADDITIONAL INFORMATION ........................................ 108

<u>EXHIBITS</u>

EXHIBIT A - LIMITED PARTNERSHIP AGREEMENT
EXHIBIT B - FINANCIAL STATEMENTS
EXHIBIT C - PROJECTIONS
EXHIBIT D - RESCISSION ACCEPTANCE AGREEMENT FORM
EXHIBIT E - INVESTOR QUESTIONNAIRE FORMS
EXHIBIT F - SUBSCRIPTION AGREEMENT FORM
EXHIBIT G - CONSENT FORM

iii

CONFIDENTIAL

H00000917

# MEMORANDUM SUMMARY

*The following summary is meant merely to be a brief overview of certain information in this Memorandum and is not intended to be complete or definitive, and is qualified in its entirety by and should be read in conjunction with the more detailed information appearing elsewhere in this Memorandum.*

## The Partnership

The Partnership is a California limited partnership. It was organized to finance the activities of the Enterprise (as hereinafter defined), including the commercialization of the Drug. The general partner of the Partnership is N. D. Management, Inc., a Cayman Islands corporation (the "General Partner"). The principal offices of the Partnership are located at 640 Fifth Avenue, 13th Floor, New York, New York 10019.

Capitalized terms used in this Memorandum that are not otherwise defined herein have the meanings attributed to them in the Limited Partnership Agreement of the Partnership, dated as of December 28, 1995 (the "Partnership Agreement"), a copy of which is attached hereto as Exhibit A. A summary of the Partnership Agreement can be found at "Certain Agreements - Partnership Agreement."

## The Enterprise

The Danco Group (the "Enterprise") is a group of companies organized to commercialize the Drug, consisting of the General Partner, the Partnership and the other entities identified in the following paragraph. The Partnership is the investment vehicle for the Enterprise.

The Partnership holds a 99% limited partnership interest in Danco Holdings, L.P., a Cayman Islands limited partnership formerly known as NeoGen Holdings, L.P. ("Holdings"). The General Partner also serves as the general partner of Holdings. Holdings, in turn, owns all of the outstanding capital stock of Danco Laboratories, Inc., a Cayman Islands corporation ("Danco"), which currently holds the exclusive license to develop, manufacture, market and distribute the Drug in the United States for the medical termination of pregnancies (the "AF Indication"). In addition, the Partnership holds all of the outstanding capital stock of Danco Pharmaceuticals, Inc., a Delaware corporation formerly known as NeoGen Pharmaceuticals, Inc. ("Pharmaceuticals"), which was organized to develop, manufacture, market and distribute the Drug in the United States for certain other medical applications, such as emergency contraception, cervical ripening, breast cancer, Cushings' disease, endometriosis and meningioma (the "Other Indications").

Set forth on the next page is a current organizational chart for the Enterprise.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000918



Enterprise Organizational Chart

N.D.
Management, Inc.
(a Cayman Islands corporation)

Investors

General
Partner

Limited
Partners

Danco Investors Group, L.P.
(a California limited partnership)

General
Partner

Limited
Partner

Danco Holdings, L.P.
(a Cayman Islands limited partnership)

100%
Stockholder

100%
Stockholder

Danco Laboratories, Inc.
(a Cayman Islands corporation)

Danco Pharmaceuticals, Inc.
(a Delaware corporation)

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

2

H00000919

## The Business

The business of the Enterprise is the manufacture, marketing and distribution of the Drug (the "Business"). The Drug is a synthetic steroid developed by a group of scientists for a French corporation (the "Donor") in order to effect non-surgical termination of pregnancies. Since its development, the Drug has been used for the AF Indication in China, France, the United Kingdom ("U.K.") and Sweden. According to clinical tests, the Drug is approximately 92% up to 97% effective in the termination of pregnancies less than seven weeks after the beginning of the woman's last menstrual period ("LMP") when used in conjunction with a prostaglandin (such as misoprostol). The Drug is also considered to be potentially effective for Other Indications, such as emergency contraception, cervical ripening, breast cancer, Cushings' disease, endometriosis and meningioma.

At the request of President Bill Clinton, for the benefit of American women, the Donor assigned to The Population Council, Inc., a New York not-for-profit corporation (the "Council"), all of its rights to the patents to manufacture, market and distribute the Drug in the United States. The Council then solicited indications of interest from a select group of people and companies to commercialize the Drug. However, concerns about possible boycotts of their other drug products by certain religious or advocacy groups appear to have convinced large pharmaceutical companies not to become involved with the Drug. In return for a series of fixed royalty payments totaling approximately ▮▮▮▮▮ and fluctuating royalty payments based on a percentage of net sales, the Enterprise received exclusive licenses and rights to manufacture, market and distribute the Drug in the United States for a period of 50 years, as well as potential rights in certain countries outside of the United States. See "Business - Patents," "Certain Agreements - Revised License Agreement" and "Risk Factors - Risks Relating to the Business."

Each year on a worldwide basis, up to 50 million women voluntarily terminate their pregnancies. Only a small fraction of this number are able to access the relatively safe environment of a modern medical facility for this purpose. As a result of the conditions under which many pregnancies are terminated, approximately 70,000 women die each year, and many more suffer from infection, hemorrhaging and permanent sterilization. Even in countries where pregnancy termination is safe and legal such as the United States, women have essentially only one option: an invasive surgical procedure that carries with it the potential for emotional distress and surgical complications, such as infection and perforation.

Women in the United States experience approximately 6.6 million pregnancies each year, involving approximately 11% of women of reproductive age. Over half of these pregnancies are unintended, contributing to a reported rate of 1.5 million surgical pregnancy terminations per year. In fact, induced termination is the most frequently performed gynecological procedure in the United States. While the currently available technology is safe and effective, the introduction of the Drug as a medical alternative is expected by many to have a dramatic and immediate impact. An acceptability study conducted of clinical trial participants in the United States shows that the overwhelming majority of women who chose the Drug would choose it again (91%) and would recommend it to others (96%).

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

3

In addition to the market potential in the United States, opportunities for commercialization of the Drug may exist in certain developing countries of the world. In many of these countries, unsafe surgical termination procedures are part of everyday life, and it is believed that the provision of the Drug could have a substantial impact on the health of women in those countries. For example, in the former Soviet Union, the official reported statistics indicate that between 7 and 8 million pregnancy terminations were performed each year, with the average woman having over 10 terminations during her child bearing years. Management of the Enterprise believes that, even for just the AP Indication, the Drug has market potential in such countries and that there are opportunities to market and sell the Drug in certain other countries. However, the Donor has since assigned (subject to certain opportunities reserved for the Council) all of its patent rights for countries outside the United States to a company controlled by its former President. The plans and intentions of such company with respect to those other countries is uncertain at this time. There can be no assurance that such opportunities will not be challenged by such company or other third parties if ever pursued by the Enterprise. See "Risk Factors - Risks Relating to the Business."

The manufacture, marketing and distribution of the Drug in the United States is regulated by the United States Food and Drug Administration (the "FDA"). In connection therewith, the Council submitted a New Drug Application ("NDA") to the FDA for use of the Drug for the AP Indication and has supplemented the NDA with the results of a large scale clinical trial conducted in the United States. On September 18, 1996, the Council received a letter from the FDA indicating that the use of the Drug for the AP Indication was approvable subject to satisfaction of certain special conditions (the "Approvable Letter"). The Council and the Enterprise are working together to satisfy those conditions as rapidly as possible.

### History of the Enterprise

In the context of carrying out the commercialization of the Drug, the Council was approached by several people who expressed interest in such a project, including ▓▓▓▓, who was affiliated with a company with which the Council had worked from time to time on other previous projects. The Council selected ▓▓▓▓ to commercialize the Drug. The Enterprise was originally organized by ▓▓▓▓ in order to operate the Business and commercialize the Drug. A Delaware not-for-profit corporation, ▓▓▓▓ ▓▓▓▓, was established to be the licensee of an exclusive license to manufacture, market and distribute the Drug in the United States granted by the Council pursuant to a License and Distribution Agreement dated December 29, 1995 (the "License Agreement"). ▓▓▓▓, in turn, entered into sublicensing agreements with various entities within the Enterprise (each a "Sublicense").

The Partnership was established by Mr. ▓▓ as the investment vehicle for the Enterprise. From about November 1995 to February 1997, the Partnership (under the control of Mr. ▓▓ raised ▓▓▓▓ to fund the Business by selling Limited Partnership Interests. The majority of such funds were invested in Danco (through Holdings) and used to pay license and royalty fees to the Council and Advances and for operating expenses and a variety of other purposes. See "The Rescission Offer - Reasons for the Rescission Offer."

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

In 1996, the Council learned certain unfavorable information about █████, including that he had pled guilty to misdemeanor forgery charges as a result of ████████████████████████████████

None of these events were previously disclosed in materials distributed to prospective investors in the Enterprise or to the Council. The failure to disclose such information may have caused the Partnership to violate certain federal and/or state securities laws. Other violations may have also been caused by Mr. ███, including, among other things, the potential misuse of Partnership funds, the inappropriate payment of fees and commissions, and the offering of Limited Partnership Interests to non-accredited investors. See "The Rescission Offer - Reasons for the Rescission Offer."

As a result of these events, Mr. ███ was removed from control of the Enterprise effective on February 12, 1997, and replaced by the Proxy Holders (as hereinafter defined), comprising three representatives of the Limited Partners (W. Bradley Daniel, ████████████ and ████████████ As part of the transactions evidencing the removal of ███, the Council, ████ and certain of the Enterprise entities entered into a Consent and Agreement dated February 12, 1997 (the "Consent and Agreement"), setting forth certain terms to govern the future relationship of the parties, including an obligation of the Partnership to undertake the Rescission Offer and the Offering (subject to certain conditions such as the absence of a material adverse change). The Rescission Offer and the Offering were not undertaken at that time as a result of a material adverse change in the Enterprise and its Business and affairs. See "Certain Relationships and Transactions - Pike Removal" and "Business - History of the Enterprise."

The removal of ███ and the other events and circumstances described above and later in this Memorandum have caused significant delays in the introduction of the Drug into the United States market and have had an adverse effect on the Business. As a result, the Proxy Holders and management of the Enterprise were successful in renegotiating the Consent and Agreement and License Agreement with the Council. The Revised Consent Agreement (as hereinafter defined) and the Revised License Agreement (as hereinafter defined) that were recently entered into by the Council and certain of the Enterprise entities contain considerably more favorable terms than their predecessors. See "Certain Agreements - Revised Consent Agreement" and "Certain Agreements - Revised License Agreement." For instance, the cash flow situation of the Enterprise has been improved significantly as a result of extended royalty payments, credits for certain other payments made to the Council, less restrictive escrow requirements and payment terms, and less restrictive liquidity requirements. In addition, certain claims that the Council may have against third parties relating to the Drug and/or the Business have been assigned to the Enterprise and various "controls" that the Council had previously placed on the Enterprise have been substantially removed or reduced. See "Certain Agreements - Positive Aspects of Revised Consent Agreement and Revised License Agreement."

In light of the progress made by the Proxy Holders and key personnel of the Enterprise in regards to Enterprise infrastructure and renegotiation of the various agreements with the Council, the Proxy Holders and the General Partner believe that the Partnership is now in a position to undertake the Transactions, including the Rescission Offer, the Offering and the Consent Solicitation.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and it not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000922

### The Rescission Offer

The Partnership is hereby offering to holders of Limited Partnership Interests of the Partnership (the "Current Partners") which were purchased for aggregate capital contributions of �a in a prior offering thereof (the "Rescission Interests") occurring between about November 1995 and February 1997 (the "Prior Offering"), the right to rescind their purchases of the Rescission Interests in accordance with the terms set forth in this Memorandum (the "Rescission Offer"). Current Partners who accept the Rescission Offer (the "Rescinding Partners") shall have elected to exchange their Rescission Interests for cash equal to the amount of consideration paid by them for the Rescission Interests together with interest thereon (the "Rescission Price") from the date of purchase at the applicable statutory rate of the State in which such Current Partner resides or has his, her or its principal place of business (the "Statutory Rate"). The Rescission Offer will commence on the date of this Memorandum and expire at 5:00 p.m., Central daylight time, on September 9, 1998 (the "Rescission Expiration Date"). It is expected that the Rescission Price will be paid within 30 days after the Offering Expiration Date (as hereinafter defined), provided that certain conditions are satisfied including the raising of sufficient funds under the Offering. See "The Rescission Offer" and "Risk Factors - Risks Relating to the Rescission Offer."

### The Offering



| | |
|---|---|
| Limited Partnership Interests Offered . . . . . | The Partnership is hereby offering up to a maximum ▆ aggregate amount of Limited Partnership Interests of the Partnership (the "Offering"), consisting of: |

    (i)    ▆ of additional Limited Partnership Interests (the "Additional Interests"); and

    (ii)   up to ▆ of Limited Partnership Interests to replace Rescission Interests which will be repurchased to consummate the Rescission Offer (the "Replacing Interests").

The Additional Interests and Replacing Interests are sometimes referred to herein collectively as the "Offered Interests" or "Class B Interests." The Offering will occur in three rounds as described in this Memorandum. See "The Offering" and "Risk Factors - Risks Relating to the Offering."

| | |
|---|---|
| Purchase Price . . . . . . | Purchasers of the Offered Interests will receive a Percentage Interest (as defined in the Partnership Agreement) equal to ▆ |

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Donco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Donco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

6

| First Round . . . . . . . . | During the first round of the Offering (the "First Round"), Current Partners who do not accept the Rescission Offer (the "Continuing Partners") may subscribe to purchase as many of the Additional Interests as they desire, subject to each Continuing Partner being entitled to purchase at a minimum his, her or its pro rata share of the Additional Interests based on the Percentage Interests held by the Continuing Partners immediately before commencement of the First Round. Subscriptions in excess of a Continuing Partner's pro rata share are subject to acceptance or rejection, in whole or in part, by the Partnership, in the sole and absolute discretion of the General Partner. The First Round will commence on the date of this Memorandum and expire at 5:00 p.m., Central daylight time, on September 9, 1998 (the "First Round Expiration Date"). |
|---|---|
| Second Round . . . . . . | During the second round of the Offering (the "Second Round"), Continuing Partners may subscribe to purchase as many of the Replacing Interests and available Additional Interests as he, she or it desires, subject to each Continuing Partner being entitled to purchase at a minimum his, her or its pro rata share of the Replacing Interests and any such available Additional Interests based on the Percentage Interests held by the Continuing Partners immediately before commencement of the Second Round (taking into consideration subscriptions received and accepted in the First Round). The Second Round will commence on September 16, 1998 and will expire at 5:00 p.m., Central daylight time, on October 21, 1998 (the "Second Round Expiration Date"). |
| Third Round . . . . . . . | During the third round of the Offering (the "Third Round"), Continuing Partners and, in the sole and absolute discretion of the General Partner, possibly other new accredited investors who are not presently Limited Partners of the Partnership may subscribe to purchase any Offered Interests not subscribed for in the First and Second Rounds. All subscriptions in the Third Round are subject to acceptance or rejection, in whole or in part, by the Partnership, in the sole and absolute discretion of the General Partner. The Third Round will commence on October 28, 1998 and expire at 5:00 p.m., Central Standard Time, on November 27, 1998, unless extended in the sole discretion of the General Partner (the "Offering Expiration Date"). |

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000924

| | |
|---|---|
| **Limited Partnership Interests to be Outstanding Immediately After the Offering . . . .** | The Offered Interests will dilute the currently outstanding Limited Partnership Interests (the "Class A Interests") held by Continuing Partners such that, after completion of the Offering and assuming that it is fully subscribed, the holders of the Class A Interests will have a Percentage Interest equal to ▮▮▮ ▮▮▮ ▮▮▮ contributed by them for the Class A Interests (in contrast to their current ▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮). Thus, after the Offering and assuming that it is fully subscribed, the Limited Partners will collectively possess a Percentage Interest of approximately 70% and the General Partner will possess a "carried" or "residual" Percentage Interest of approximately 30%. To the extent that the Offering is not fully subscribed, the Percentage Interests collectively held by the Limited Partners will be smaller and the "residual" Percentage Interest of the General Partner will be larger. See "The Offering - Dilution." |
| **Investor Suitability Standards . . . . . . . .** | Only Continuing Partners and, in the sole and absolute discretion of the General Partner, certain other new investors who are not currently Limited Partners are eligible to participate in the Offering. In addition, prospective investors must generally meet certain suitability criteria to qualify to purchase Offered Interests in the Partnership. These suitability criteria include, among others, that the investor must be an "accredited investor" within the meaning of Regulation D under the Securities Act. The General Partner may, in its sole discretion and after consultation with legal counsel, waive such criteria in any particular instance. See "The Offering - Investor Suitability Standards." |
| **Use of Proceeds . . . . .** | The Partnership is initiating the Offering to raise additional capital for the Enterprise to finance royalty and expense reimbursement payments to the Council, to fund the repurchase of the Rescission Interests under the Rescission Offer; to fund manufacturing and tabletting scale-up for the Drug, to pay the premiums on certain insurance coverage, to repay certain Bridge Loans (as hereinafter defined), to pay certain professional fees, to pay fees to certain related parties, to pay expenses incurred in connection with the Transactions, to pay certain operating expenses and to provide working capital. See "The Offering - Use of Proceeds." |

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000925

## The Consent Solicitation

The Partnership is hereby soliciting the consent (the "Consent Solicitation") of Continuing Partners for approval and/or ratification of each of the following actions: (i) the Rescission Offer; (ii) the Offering; and (iii) the Amendment (as hereinafter defined). The Amendment changes the name of the Partnership from NeoGen Investors, L.P. to Danco Investors Group, L.P. and the name of NeoGen Holdings, L.P. to Danco Holdings, L.P., and changes the voting requirement for amendments to the Partnership Agreement from unanimous consent of the Partners to the consent of the General Partner and Limited Partners owning or holding at least two-thirds of the outstanding Limited Partnership Interests. The Rescission Offer, the Offering and the transactions contemplated by each of them are conditioned upon receipt of the requisite consent from the Continuing Partners for the actions which are the subject of the Consent Solicitation (provided that the General Partner may waive such condition with respect to the Amendment). The Consent Solicitation shall commence on the date of this Memorandum and shall expire on September 9, 1998, unless extended in the sole and absolute discretion of the General Partner (the "Consent Solicitation Expiration Date"). Consents received pursuant to the Consent Solicitation shall be binding and effective one day after the Consent Solicitation Expiration Date (the "Consent Effective Date"). See "The Consent Solicitation" and "Risk Factors - Risks Relating to the Consent Solicitation."

Investors are advised to read this Memorandum carefully before deciding whether to accept the Rescission Offer, participate in the Offering or consent to the matters which are the subject of the Consent Solicitation. See "Risk Factors."

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000926

## RISK FACTORS

*The Partnership is a speculative investment. It is designed for sophisticated persons who are able to bear the risk of an investment in the Partnership. There can be no assurances that the Partnership will achieve its investment objectives. Current Partners (and, as to the Offering, prospective investors) should carefully consider the following risk factors in determining whether to accept the Rescission Offer, participate in the Offering or approve matters which are the subject of the Consent Solicitation. The risk factors summarized below should not be deemed to be a complete enumeration or explanation of the risks involved in an investment in the Partnership. Current Partners and potential investors should read this entire Memorandum and the Partnership Agreement and consult with their own advisors before deciding whether to participate in any of the matters or transactions which are the subject of this Memorandum.*

### Risks Relating to the Business

*Development Stage Enterprise; Lack of Product Revenues; Uncertainty of Future Profitability.* The Enterprise, as a business still in its developmental stages, has dedicated most of its financial resources to (a) securing rights to manufacture and sell the Drug in the United States, (b) identifying and securing bulk substance manufacturers, tabletters, and distributors for the Drug, (c) building the Enterprise's infrastructure, (d) renegotiating and finalizing the Enterprise's rights granted by the Council to manufacture and sell the Drug in the United States (see "Certain Agreements - Revised License Agreement," "Certain Agreements - Revised Consent Agreement," and "Certain Agreements - Positive Aspects of Revised License Agreement and Revised Consent Agreement"), (e) maintaining and responding to certain developments and legal proceedings (see "Certain Relationships and Transactions" and "Legal Proceedings"), (f) structuring and undertaking the Transactions, and (g) general and administrative expenses. The Enterprise has experienced substantial losses every year since its inception. The Enterprise anticipates incurring substantial additional losses over at least the next year and possibly longer due primarily to, among other factors, the need to expend substantial amounts to implement the infrastructure, manufacturing, and distribution channels necessary to commercialize the Drug, to address certain legal proceedings, and to fund the business development and general and administrative expenses associated with the introduction of the Drug to the United States market. The Enterprise's ability to become profitable will depend, among other things, on the commercial success of the Drug and on the Enterprise's ability to successfully obtain the necessary regulatory approvals, establish manufacturing and sales and marketing capabilities, achieve market acceptance for the Drug, educate physicians and patients alike on the Drug and its potential uses, and maintain sufficient funds to finance its activities. There can be no assurance that the Enterprise (and, consequently, the Partnership) will be able to achieve profitability or that profitability, if achieved, can be sustained.

*Government Regulation.* The manufacture, marketing and distribution of the Drug in the United States is subject to extensive regulation by the FDA and by other federal, state and local authorities. The FDA regulates the research, development, clinical studies, manufacturing, processing, packaging, labeling, distribution, promotion and post-market surveillance of drugs and medical devices in the United States. Under the Federal Food, Drug and Cosmetic Act, data relating to drugs such as the Drug is

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

10

CONFIDENTIAL

H00000927

subject to stringent FDA review to ensure that the drug is safe and effective before commencement of marketing, sales and distribution for patient use in the United States. A company producing such a drug must subject its product to clinical trials, and thereafter submit to the FDA an application supported by extensive data, including clinical trial data, to prove the safety and effectiveness of the product.

On September 18, 1996, the FDA issued an Approvable Letter indicating that the Drug was approvable for use for the AF Indication in the United States, subject to certain conditions, such as approval of the Enterprise's manufacturer and tabletter, the establishment of chemistry and manufacturing controls, and the establishment of the bioequivalency and stability of the Drug manufactured and tabletted by the Enterprise's manufacturers and tabletters. There can be no assurance that these conditions will be satisfied in the near future or at all. The failure of the Enterprise to obtain final approval from the FDA for the Drug would preclude the Enterprise from marketing and selling the Drug in the United States and, as a result, would have a material adverse effect on the Business, financial condition and results of operations of the Enterprise. Even if approval of the FDA is received, the approval will be limited to sale and distribution of the Drug for use for the AF Indication and not for the Other Indications, which would require separate approval from the FDA following clinical trials and submission of the appropriate data. There can be no assurance that the Enterprise will be successful in obtaining FDA approval for sale and distribution of the Drug for use for the Other Indications.

Even if FDA approval of the Drug for the AF Indication and/or Other Indications is eventually obtained, there can be no assurance that such approval will be received in a timely manner. Delays may be encountered for any number of reasons, including matters outside of the Enterprise's control such as delays resulting from changes in or additions to FDA regulations concerning the drug approval process. Any delay in obtaining FDA or other necessary regulatory approvals, would adversely affect the marketing of the Drug by the Enterprise and the ability of the Enterprise to generate product revenue.

In addition, a marketed drug, its bulk chemical supplier, its tabletter and the manufacturing facilities are subject to continual regulatory review and periodic inspections, and later discovery of previously unknown problems with a product, supplier, manufacturer or facility may result in restrictions on such products and manufacturers, which may require a withdrawal of the product from the market. Failure to comply with the applicable regulatory requirements can, among other things, result in fines.

In the event that the Enterprise decides to market and/or sell the Drug for the AF Indication or Other Indications in countries outside of the United States, agencies comparable to the FDA in such other countries will likely impose similar approval requirements and restrictions. The obtaining of any such international regulatory approvals and/or complying with such restrictions are subject to the same risks and uncertainties as FDA and other regulatory approvals in the United States.

Government regulation of the Drug may increase at any time, creating additional costs and delays for the Enterprise. The extent of potential adverse government regulation of the Drug which might arise from future legislation or administrative action cannot be predicted. It is possible that, before or after FDA approval, legislation may be proposed or enacted that would limit, restrict or prohibit the use of the Drug for the AF Indication or other potential applications. In this regard, the House of

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

11

Representatives recently approved an amendment to an agriculture appropriations bill that would prohibit the FDA from using federal funds for testing, development or approval of production, manufacturing or distribution of any drug for the chemical inducement of abortion. Enactment of such amendment would have a significant adverse effect on the Business of the Enterprise. The Senate has approved the agriculture appropriations bill without the amendment. The amendment in question is currently being debated in the Senate's conference committee. Historically, the Senate has been more reluctant to approve legislation of that nature. Moreover, in press releases, a spokesman for President Clinton said the Clinton Administration opposed the bill. Given his strong support for the Drug, management of the Enterprise is hopeful that, if such amendment were to survive a conference committee vote, it would be vetoed by President Clinton. However, there can be no assurance that the amendment will not survive approval by the conference committee or, if approved, that it would be vetoed by President Clinton, nor can there be any assurance that similar legislation will not be enacted in the future.

*Uncertainties Related to Market Acceptance; Controversial Nature of the Drug.* The Enterprise's ability to successfully commercialize the Drug will depend significantly on the acceptance of the Drug by physicians and their patients. The development of the Drug, particularly its use for the AF Indication, has been very controversial. Certain religious and advocacy groups protest and may continue to protest the use of the Drug for perceived religious, moral and/or human rights reasons. While similar protests in the past have usually been peaceful in nature, a few have resulted in property damage and/or physical harm. It is possible that the commercialization of the Drug and profitability of the Enterprise may be adversely affected by protests, demonstrations or boycotts of and against the sale and/or use of the Drug. In particular, some physicians may be reluctant to prescribe or recommend the Drug out of fear that by doing so such protests, demonstrations and/or boycotts could be targeted at their businesses or practices. In response, the Enterprise intends to utilize extensive provider training with extensive public education programs. However, there can be no assurance that the Enterprise's efforts in this regard will be successful.

Numerous health care facilities and hospitals throughout the United States are owned and/or operated by organizations with religious affiliations. It is expected that these organizations will not likely promote or recommend use of the Drug for the AF Indication and, therefore, they are not included in the Enterprise's sales forecasts. However, given the trend toward consolidation in the health care industry, it is possible that these organizations could acquire other facilities that might otherwise promote or recommend use of the Drug, thereby having a potential adverse effect on the actual sales of the Enterprise.

Given the controversial nature of the Drug, the media cover widely all matters relating to the Drug. Unfavorable publicity concerning the Drug or the Enterprise could have an adverse effect on the Enterprise's ability to obtain regulatory approvals, achieve acceptance of the Drug by prescribing physicians, managed care providers or patients, and commercialize the Drug, any of which could have a material adverse effect on the Enterprise and its Business.

*Dependence on Single Product.* The Enterprise's Business will, at least initially, be entirely dependent upon future commercial sales of the Drug for the AF Indication in the United States. Although

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000929

the Drug may in the future be sold to treat the Other Indications or be sold in other countries, neither the Council nor the Enterprise has made definitive efforts toward such pursuits, nor are such pursuits expected to be undertaken in the near future. Accordingly, the profitability and success of the Enterprise may be eliminated or severely restricted if the Drug does not receive final FDA approval for use for the AF Indication or if commercial sales do not meet the levels currently anticipated. While the Enterprise may also pursue other women's health products in the future that do not involve use of the Drug, such as other products for emergency contraception, the Enterprise has no definitive plans to do so and there can be no assurance that it would be successful in any such pursuits.

*Product Liability Exposure.* Manufacturing, marketing and selling the Drug entails a risk of product liability. Even though the Drug has been used extensively in France, Sweden, the U.K. and China and tested extensively in the United States, it is possible that unknown adverse reactions or unexpected "side effects" may occur or be discovered in the future with respect to the use of the Drug. The Enterprise could, under those circumstances, be subject to costly product recalls, product liability claims (including possible class actions) and/or loss of acceptance of the Drug in the marketplace. Even unsuccessful product liability claims could result in the expenditure of significant funds in litigation and the diversion of management time and resources. The Enterprise is required under agreements with the Council to obtain and maintain substantial product liability insurance, which is extremely costly. However, there can be no assurance that the amount of such insurance will be sufficient to cover the costs of defending against or paying such a claim or that damages payable by the Enterprise would not have a material adverse effect on the Enterprise's Business, financial condition or results of operations.

*Uncertainties Regarding Patents and Proprietary Rights.* The patent rights to manufacture, market and sell the Drug in the United States were obtained by the Council from the Donor. The terms of the patent transfer are subject to strict confidentiality. In addition, the Council and its licensees are required to cease all further activities relating to the Drug (and the Council must relinquish its rights to such patents) upon the occurrence of certain events. These events include, among others, the breach by the Council or its designees of their confidentiality requirements relating to the patent rights for the Drug. See "Business - Patents." Some of these events are not necessarily under the control of the Enterprise or the Council. If the Council and its licensees (namely, the Enterprise) are required to cease all further activities relating to the Drug, it is highly unlikely that the Business would be able to continue to operate, in which case the Partnership would likely lose its investment capital.

The rights of the Enterprise to manufacture, market and sell the Drug for various applications are subject to the terms and provisions set forth in the Revised License Agreement. The Revised License Agreement is essential to the ability of the Enterprise to operate the Business. Current Partners and prospective investors should review the Revised License Agreement carefully. In particular, the Revised License Agreement is subject to non-exclusivity and/or early termination upon the occurrence of certain events. See "Certain Agreements - Revised License Agreement." The loss of exclusivity or the termination of the Revised License Agreement would have a significant adverse effect on the Business.

███████, a foreign pharmaceutical company, pursuant to the ███ ███████, agreed not to institute or join in any legal proceedings against the Council, the Enterprise or certain affiliates for

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

infringement by any of them of the ████████ patents to the extent that such infringement consists solely of the use and/or sale of the Drug for use in conjunction with misoprostol for pregnancy termination in the United States. However, the ████████ is subject to certain conditions and may be revoked by ████████ under certain circumstances. See "Business - Patents." If the ████████ were revoked, ████████ may claim that the Enterprise would not be entitled to use the Drug, or sell the Drug for use, in combination with misoprostol. Under those circumstances, the Business of the Enterprise may be adversely affected. See "Business - The Drug."

It is possible that other third parties may challenge the rights of the Council or the Enterprise relating to the Drug. For example, without limitation, third parties may challenge the validity of the patents for the Drug, the status of the Council as the assignee and owner of the United States patents for the Drug, or the rights of the Council to use or license the patented product. Third parties may also challenge the validity or the exclusivity of the transfer of the patents to the Council. If any of the rights of the Council relating to the Drug or the patents are lost or determined not to be exclusive, the Business of the Enterprise will be adversely affected. In addition, upon expiration of the patents for the Drug (which may occur as early as January 2002 or as late as January 2007), the Enterprise may be subject to unlimited competition in connection with the manufacture, marketing and sale of the Drug. See "Business - Patents."

The confidential nature of the patent transfer and the ████████ is a significant risk factor faced by Current Partners and prospective investors. If more specific information is sought regarding such matters, Current Partners and prospective investors should contact the General Partner to obtain such information on a confidential basis.

*Technological Change and Competition.* The pharmaceutical industry is subject to rapid and substantial technological change. Competition from pharmaceutical companies, biotechnology companies and universities is intense and is expected to increase. Many of the Enterprise's current and future competitors have significantly greater marketing, manufacturing, financial and managerial resources than the Enterprise. There can be no assurance that developments by others will not make the Drug an inferior product or otherwise have a negative impact on the Enterprise's revenues or profitability. For the AF Indication, the Enterprise and its Business face competition from providers of surgical techniques used for early pregnancy terminations and from marketers and distributors of certain other drugs (including methotrexate and possibly tamoxifen and misoprostol) being used off-label (i.e., without FDA approval) to perform early medical pregnancy terminations. See "Business - Competition."

Pursuant to the Revised License Agreement and the Revised Consent Agreement, the Council has agreed to use commercially reasonable efforts to obtain for the Enterprise the right to use, market and sell the Drug outside the United States. See "Certain Agreements - Revised License Agreement" and "Certain Agreements - Revised Consent Agreement." If the Council or the Enterprise is successful in doing so, the Enterprise will likely face similar competition in such other countries. In addition, under the Revised Consent Agreement, the Enterprise has a right of first refusal for a limited time to discuss and negotiate a possible arrangement with the Council relating to any proprietary rights or products which the Council may own or control now or in the future, and which are used for medical pregnancy

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

14

H00000931

termination, as long as the Revised License Agreement is in full force and effect and the Enterprise is in compliance in all material respects with the terms thereof. See "Certain Agreements - Revised Consent Agreement." There can be no assurance that the Enterprise will be successful in obtaining any such proprietary rights or products from the Council. Moreover, even if the Enterprise is successful in securing such proprietary rights or products, there is no assurance that such products would receive approval by the FDA and, if approved, it is likely that the Enterprise would face similar competition as that faced in connection with the marketing and sale of the Drug.

*Dependence on Certain Suppliers and Distributors.* The Enterprise has not invested in the development of manufacturing capabilities. The Enterprise's strategy has been, and is expected to continue to be for the foreseeable future, to contract with outside sources for the manufacture and tabletting of the Drug. In November, 1997, the Enterprise entered into a manufacturing agreement with Factory A (as hereinafter defined), a foreign manufacturer, to manufacture the Drug for the Enterprise in bulk substance form and in July 1998, the Enterprise entered into a manufacturing agreement with Factory B (as hereinafter defined), another foreign manufacturer. Each of Factory A and Factory B are working toward compliance with FDA cGMP requirements (as hereinafter defined). Given its experience with the Previous Manufacturer (as hereinafter defined), the Enterprise is also in discussions with other possible manufacturers as additional source suppliers of the Drug in bulk substance form. While the Enterprise has had discussions with several tabletters, the Enterprise does not have a contractual agreement yet with any tabletting company. There can be no assurance that the Enterprise will be able to negotiate an acceptable arrangement with these manufacturing and tabletting companies nor can there be any assurance that, even if the Enterprise is able to secure their services on acceptable terms, such manufacturing and tabletting companies will be able to comply with FDA cGMP or similar requirements. Manufacturing and tabletting companies outside the United States may also be subject to the political climate and instability within their countries. An interruption in the supply of the Drug for any reason could have a material adverse effect on the Enterprise's ability to manufacture the Drug or to obtain regulatory approval.

Similarly, the Enterprise intends to distribute the Drug through one or more outside distributors. To date, the Enterprise has not engaged a distributor and has not even received any quotations regarding commissions charged and other terms required by a possible distributor, although it has received indications of interest from at least two potential distributors. There can be no assurance that the Enterprise will be able to engage one or more outside distributors on terms that are acceptable to the Enterprise, if at all, or that the distributors so selected will be able to comply with the very tight controls to be placed on the distribution of the Drug. If the Enterprise is unable to engage one or more qualified distributors on a timely basis, the timeline for introduction of the Drug and/or the Business may be adversely affected.

*Dependence on Key Personnel.* The success of the Enterprise is dependent on its ability to attract and retain highly-qualified scientific and management personnel. In this regard, the Enterprise will depend to a large extent, at least initially, on the efforts of its President and Chief Executive Officer, ██████ , and other key personnel. See "Management - Executive Officers, Key Personnel and Directors." The Enterprise faces intense competition for personnel from other companies, academic

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000932

institutions, government entities and other organizations. There can be no assurance that the Enterprise will be successful in attracting and retaining key personnel. The loss of key personnel, or the inability to attract and retain the additional, highly-skilled employees required, could adversely affect the Enterprise's results of operations and its Business.

*Uncertainties as to Other Indications.* The Drug is considered to be effective for the AF Indication and also potentially effective for each of the Other Indications, such as emergency contraception, cervical ripening, breast cancer, Cushings' disease, endometriosis and meningioma. At some future time, the Enterprise may attempt to commercialize the Drug for use in Other Indications. However, in order to do so, the Enterprise would need additional financial resources, clinical tests to prove the safety and effectiveness of using the Drug for the Other Indications, FDA approval to market and sell the Drug and possibly additional manufacturers and/or tabletters. There can be no assurance that the Enterprise will be successful in obtaining the additional financial resources (through equity offerings or otherwise), trials, FDA and other regulatory approvals or additional qualified suppliers of the Drug necessary to successfully market and/or sell the Drug for any of the Other Indications.

*Adverse Impact of Certain Legal Proceedings.* The Enterprise is currently involved in a number of important legal proceedings, some of which have been commenced against the Enterprise and some of which have been initiated by the Enterprise against various parties. See "Legal Proceedings." Moreover, it is possible that additional claims or legal proceedings may be threatened and/or commenced by or against the Enterprise as a result of circumstances surrounding the activities of Joseph D. Pike and possibly others or relating to the Transactions. There can be no assurance that the Enterprise will be successful in defending or maintaining any such legal proceedings, as the case may be. A decision against the Enterprise on one or more of such legal proceedings could have a material adverse impact on the Enterprise and its financial resources. Even if the Enterprise is successful in defending or maintaining such legal proceedings, as the case may be, the proceedings could be costly and result in significant diversions of time and talent by the Proxy Holders (as hereinafter defined) and possibly other members of the Enterprise's management. It is the Enterprise's intent that proceedings involving the Enterprise shall be handled in such a way so as to minimize management involvement and distraction.

*Future Capital Requirements; Uncertainties as to Additional Funding.* Since inception, the Enterprise has funded its efforts primarily through the private placement offering of Limited Partnership Interests in the Partnership and advances made by the Proxy Holders and certain of their affiliates. See "Certain Relationships and Transactions - Bridge Loans." In the Prior Offering, the Partnership raised ▮▮▮▮ from the sale of Limited Partnership Interests. Of that amount, approximately ▮▮▮▮ was paid to the Council as the first two fixed royalty payments. When the Proxy Holders took control over the Enterprise in February 1997, there was virtually nothing remaining of the original ▮▮▮▮ Since that time, the Proxy Holders and their affiliates have funded the Enterprise directly from their own resources by provision of the Bridge Loans, with the exception of a small amount which has been loaned to the Enterprise by certain other investors.

The Partnership is by this Memorandum attempting to raise an additional ▮▮▮▮ expected to be needed in order to complete the commercial introduction of the Drug to the United States market

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000933

for the AF Indication. It is possible, however, that the Enterprise may require more than this amount in order to successfully introduce the Drug. See "Financial Matters - Capital Requirements." In addition, it is not expected that any of the proceeds from the Offering will be used to commercialize the Drug for the AF Indication in countries outside the United States or to develop the Drug for the Other Indications and substantial additional debt and/or equity financing will likely be required for such purposes. In the event that the Enterprise decides to pursue other women's health products, it is likely that substantial additional funding would be required for those pursuits as well. Neither the Partnership nor the Enterprise generally has any commitments or arrangements for such additional financing. There can be no assurance that the Enterprise will be successful in obtaining any such financing or, if available, that such funding will be on terms acceptable to the Enterprise. Any such financing could result in dilution to the then outstanding Limited Partnership Interests. See "Risk Factors - Risks Relating to the Offering." If adequate funds are not available, the Enterprise's growth will be significantly impaired and the Business may fail, in which case all invested funds may be lost.

The Partnership Agreement provides that holders of the Class A Interests have certain rights with respect to future financing activities of the Enterprise. For instance, holders of the Class A Interests have a limited right of first refusal to purchase additional Limited Partnership Interests offered for sale by the Partnership. See "Certain Agreements - Partnership Agreement." However, with respect to commercialization of the Drug for Other Indications, the Partnership Agreement provides that the Partnership shall fund the business of Pharmaceuticals (which was set up to commercialize the Drug for Other Indications) at such time, and by such means, as the General Partner, in its sole and absolute discretion, deems appropriate and in the best interests of the Partnership. Therefore, it is possible that funding to commercialize the Drug for Other Indications, which funding is expected to be substantial, may be sought and/or accomplished through other means or entities. Under those circumstances, holders of the Class A Interests and/or other Limited Partners of the Partnership may not necessarily participate in the funding of the business of Pharmaceuticals according to their Percentage Interest in the Partnership or at all.

*Uncertainties as to Financial Information.* None of the Enterprise's financial statements have been audited or reviewed by an independent certified public accountant. To date, the Enterprise has been unsuccessful in obtaining an audit opinion with respect to its financial statements by an independent certified public accountant. The problem appears to derive from concerns about the accuracy and reliability of financial information compiled by ▮▮▮▮ and his employees prior to February 1997, when control of the Enterprise was transferred from ▮▮▮▮ to the Proxy Holders. See "Certain Relationships and Transactions - Pike Removal." Accordingly, Current Partners and prospective investors should place limited reliance upon the financial information involving the Enterprise and its Business prior to February 1997. Moreover, due to the uncertainties of actions or omissions by ▮▮▮▮ or his employees, there may be other issues or matters of concern to the Enterprise which have not yet been discovered by the Proxy Holders and other current Enterprise management.

*Projections.* The Projections contained in the pro forma financial statements attached to this Memorandum as Exhibit C represent only estimates of revenues and expenses, based upon knowledge currently available to the Enterprise. Management of the Enterprise has prepared and reviewed such

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000934

estimates and has no reason to doubt their validity in light of the assumptions and caveats relied upon in deriving such estimates. The projections have not been compiled or reviewed by any independent accountants and no independent verification of the projections or the assumptions underlying them has been made. No representations or warranties whatsoever with respect to the projections or their attainability are being made. The projections do not incorporate the proceeds, if any, that may be received by the Enterprise in the future from certain litigation or arbitration proceedings, from the sale of the Drug for any Other Indication or in any country other than the United States, or from loans or grants. As indicated above, the projections are predicated on a number of critical assumptions. There can be no assurance that any of those assumptions will prove correct. If any or all of them prove incorrect, actual results will vary from those projected, or may be realized at a different time than projected.

### Risks Relating to the Enterprise

*Lack of Control.* Limited Partners are subject to a number of restrictions contained in the Partnership Agreement, including prohibitions against taking part in the management of the Partnership. Therefore, except for certain extraordinary matters (such as admitting new or additional general partners, changing the nature of the Partnership's business, acting in contravention of the Partnership Agreement, obtaining financing from affiliates of the Partnership, or amending the Partnership Agreement), the Limited Partners have no voice in the day-to-day management of the Partnership or its business or affairs and have no voting rights. The General Partner has the exclusive right to manage, control and operate the Partnership and its business and affairs and to make all decisions relating thereto. The General Partner is owned 75% by MedApproach, L.P. and 25% by [         ], and is controlled by the Proxy Holders. Importantly, Limited Partners do not have the right to remove the General Partner. See "Certain Agreements - Partnership Agreement."

Moreover, the Business of the Enterprise, which shall be operated by Danco, will be managed by a Board of Directors, consisting of seven members (including the Proxy Holders who are the only members of the Board with voting or approval rights). The day-to-day management of the Business shall be delegated to certain executive officers and key personnel of the Enterprise. See "Management - The Enterprise." As a result, no person should remain an investor in the Partnership or purchase any of the Offered Interests unless such investor is willing to entrust all aspects of the management of the Partnership and the enterprise to the General Partner and Board of Directors, as the case may be.

*Limitations on General Partner's and Proxy Holders' Liability.* Under the Partnership Agreement, subject to applicable restrictions imposed by federal and state securities laws, the liability of the General Partner to the Partnership and any Partner is limited and the General Partner is to be indemnified by the Partnership generally for any act or omission not amounting to fraud or gross negligence and performed in good faith by the General Partner. See "Certain Agreements - Partnership Agreement." Therefore, Limited Partners may have a more limited right of action against the General Partner than they would have absent such provisions. Similarly, under the [    ] Agreement (as hereinafter

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

18

defined) and a separate indemnification agreement recently entered into, the Enterprise has agreed to indemnify and hold harmless the Proxy Holders, to the fullest extent permitted by law, for monetary damages incurred by them in such capacities, except for acts or omissions not in good faith or which involve intentional misconduct, violation of law or improper personal benefit.

*Loss of Limited Liability.* The Partnership Agreement was drafted to generally prohibit a Limited Partner's participation in the management of the Partnership so as to qualify for the limited liability protection safe harbor under applicable law. However, there can be no assurance that limited liability protection will not be lost by a Limited Partner if the Limited Partner takes part in the management of the Partnership.

*No Independent Counsel.* No independent legal counsel or other representative has been retained to represent the interests of Limited Partners, prospective investors or Rescinding Partners. Moreover, the terms of the Transactions have been determined solely by the General Partner and have not been the product of any arms-length negotiations. Therefore, each Current Partner and prospective investor is encouraged to consult with independent financial and legal advisors as to the terms of the Transactions and other matters relevant to the Business and affairs of the Enterprise.

*Conflict of Interest.* There are inherent and potential conflicts of interest between the General Partner and its affiliates, on the one hand, and the Partnership and unaffiliated Limited Partners, on the other hand. The following are summaries of certain transactions or situations that may result in such conflicts.

<u>Compensation and Fees</u>. The General Partner will receive no fees or other compensation directly in connection with the Transactions, other than its "carried" interest in the Partnership. However, the General Partner and its affiliates will receive other compensation and fees. The General Partner and certain of the Proxy Holders will receive annual compensation for their efforts related to the Enterprise. In addition, certain affiliates of the General Partner and/or Proxy Holders have provided Bridge Loans (as hereinafter defined) to the Partnership and will receive compensation for having done so. See "Certain Relationships and Transactions - Bridge Loans." Such compensation and fees were generally determined by the Proxy Holders without arms-length negotiations or independent review (though the Bridge Loans were approved and/or ratified by a majority-in-interest of the Current Partners and each of the Current Partners were afforded an opportunity to provide some or all of the Bridge Loans).

<u>Reimbursement</u>. The General Partner and the Proxy Holders are entitled to be reimbursed for the costs and expenses incurred by them in connection with the Enterprise and its Business and affairs. The determination of amounts owed to the General Partner and the Proxy Holders may require the allocation of certain expenses and items of overhead which will likely be determined by the Proxy Holders without arms-length negotiations or independent review.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

Terms of the Transactions. The terms of the Transaction have been determined solely by the General Partner and the Proxy Holders and have not been the product of any arms-length negotiations.

Competition for Time and Talents. The time and talent of the Proxy Holders will be divided among the General Partner, the Enterprise and other business ventures in which they are or become involved. In that sense, the Partnership and the Enterprise may be competing for the time and talents of the Proxy Holders. There is no agreement requiring them to devote their full time and efforts to the Partnership or to the Enterprise.

Other Conflicts. The contemplated activities of the Partnership and the Enterprise may involve a number of other transactions between the Partnership and/or Enterprise and the General Partner and/or its affiliates (including the Proxy Holders). In each of those transactions and situations, these interests of the General Partner and its affiliates (including the Proxy Holders) may differ from the interests of the Enterprise, the Partnership and/or the Limited Partners.

### Risks Relating to the Rescission Offer

Potential Rescission Liability. The Rescission Offer is being made to all Current Partners of the Partnership. If all of the Current Partners accept the Rescission Offer, the Partnership would be required to make payments in the amount of ▮▮▮▮ plus interest at the Statutory Rate in the approximate amount of ▮▮▮▮ for an aggregate Rescission Price of ▮▮▮▮ (assuming payment of the Rescission Price is made within 30 days after the Offering Expiration Date). The Partnership currently has insufficient funds with which to meet this potential obligation. Certain Current Partners affiliated with or related to the General Partner representing approximately 33% of the outstanding Limited Partnership Interests have informally indicated that they intend to reject the Rescission Offer. However, such indication is not enforceable and cannot be relied upon by the Partnership. Notwithstanding the Funding Commitments (see "The Offering - Funding Commitments"), absent a letter of credit, escrow of funds, or other guarantee of payment, the Partnership has no guarantee that such funds will actually be available to fulfill its offer to repurchase Rescission Interests under the Rescission Offer.

Risk of Securities Violations in Connection with the Rescission Offer and the Offering. Neither the Rescission Offer nor the Offering have been registered with the SEC or any state securities administrator. The General Partner believes that the Rescission Offer and the Offering may qualify for exemption from registration under Section 4(2) of the Securities Act and various state registration exemptions. However, there is no "safe harbor" whereby an issuer can be assured of qualification for these exemptions. Further, the disclosure provided in this Memorandum may not include all material facts, such as matters that may have transpired while the General Partner was being managed by Mr. ▮▮▮▮ See "Certain Relationships and Transactions - ▮▮▮▮ Removal." In particular, because of the General Partner's inability to make certain representations to the Partnership's auditors in connection with the Partnership's operations during such period, the Partnership is unable to obtain audited financial statements. As a result of these factors, the Partnership's liability for rescission or other damages to

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000937

sellers and purchasers of the Limited Partnership Interests may continue until the expiration of any applicable statute of limitations.

*Extinguishing of Certain Investor Claims; Possible Continuing Legal Liabilities of the Partnership and Affiliates.* During the Prior Offering, the Partnership sold the Rescission Interests to the Current Partners. The Prior Offering may not have complied with the registration requirements under the federal securities laws and certain of the state securities laws. In addition, the Prior Offering Memorandum may have omitted and misstated certain facts that may have been deemed to be material by a prospective investor. See "The Rescission Offer—Reasons for the Rescission Offer."

The federal securities laws and certain of the state securities laws provide that, in certain circumstances, purchasers of securities either 1) sold without registration or qualifying for an exemption from registration; or 2) sold by means of an offering document containing material omissions or misstatements, may have, subject to certain legal and equitable defenses, a right of rescission whereby the seller of such a security is required to repurchase the security from the purchaser. Accordingly, the Partnership is offering the Current Partners the right to rescind their purchases of the Rescission Interests, for a return of the purchase price paid for such Rescission Interests, plus interest thereon at the Statutory Rate in accordance with the terms set forth in this Memorandum. The Rescission Offer will not cure any violations in the Partnership's prior sale of securities but, under certain state securities laws, the Rescission Offer will have the effect of extinguishing the contingent civil claims or rights of rescission that both Rescinding Partners and Continuing Partners might have against the Partnership relating to the offer and sale of the Rescission Interests. However, it is the position of the SEC that Current Partners who do not accept the Rescission Offer will retain their right to pursue civil remedies against the Partnership and its controlling persons under the federal securities laws until expiration of the applicable statute of limitations. See "The Rescission Offer - Effect of the Rescission Offer."

If a material misrepresentation or omission of fact occurred in connection with the sale of the Rescission Interests, causes of action for fraud under federal and state securities laws and/or common law may also exist. Other claims may also exist against the Partnership, the General Partner, or certain individuals. However, despite the SEC's position, Current Partners who do not accept the Rescission Offer by the Rescission Expiration Date may lose their rights under certain state securities laws or may be limited in their recovery due to the fact that they rejected the return of their investment plus interest under the Rescission Offer. Moreover, notwithstanding the Rescission Offer, the Partnership may be subject to enforcement actions by the SEC and/or state securities authorities. See "The Rescission Offer - Effect of the Rescission Offer."

*Securities Litigation.* Although the Partnership believes that its potential liability under federal and state securities laws for the sale of the Limited Partnership Interests with possibly inadequate disclosure will be effectively eliminated by the Rescission Offer and the running of applicable statutes of limitations, there can be no assurance that claims asserting violations of federal and/or state securities laws based on the reasons underlying the Rescission Offer will not be asserted. A successful claim brought against the Partnership could have a material adverse effect on the Business and the Enterprise's

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

financial condition. Even unsuccessful claims could result in costly litigation and significant diversions of effort by the Enterprise's management.

## Risks Relating to the Offering

*Limitations on Transfer.* The Limited Partnership Interests are subject to certain restrictions under federal and state securities laws. The Limited Partnership Interests have not been registered under the Securities Act or under any state securities laws. Consequently, the Limited Partnership Interests may not be transferred unless they are subsequently registered or exemptions from the registration requirements under the Securities Act and applicable state securities laws are available. The Limited Partnership Interests are also subject to restrictions on transfer under the Partnership Agreement. Generally, the Limited Partnership Interests may not be sold, assigned, pledged, gifted, mortgaged, hypothecated or subject to any encumbrances without the prior written consent of the General Partner, which consent may be withheld in the General Partner's sole discretion. See "Certain Agreements - Partnership Agreement."

*No Market for Limited Partnership Interests.* There is currently no trading market for the Limited Partnership Interests and there can be no assurance that a trading market will develop or be maintained at any time. It is not presently anticipated that the Enterprise will undertake a public offering of any securities in the near future or that any public market will develop for the sale and purchase of the Limited Partnership Interests. The Partnership is under no obligation to register the Limited Partnership Interests and, as indicated above, the Limited Partnership Interests are subject to significant restrictions on transfer.

*Arbitrary Offering Price.* The offering price of the Offered Interests was determined by the General Partner without arms-length negotiations or independent review. The determination of the offering price was not based on the Enterprise's net worth, historical earnings or other financial statement indicia of value.

*Lack of Distributions.* Neither the Enterprise nor the Partnership has made any operating distributions on the Limited Partnership Interests to date. The making of distributions is, to a large extent, within the discretion of the General Partner and will depend upon the Enterprise's earnings, capital requirements, financial condition and other relevant factors. It is extremely unlikely that operating distributions will be made on the Limited Partnership Interests in the near future. Moreover, any distributions that are made will be lesser in amount than if the Partnership was carrying on the Business directly as a partnership rather than through taxable corporate entities indirectly owned by the Partnership.

*Dilution.* The issuance of the Offered Interests will dilute the Class A Interests such that, after giving effect to the transactions contemplated by the Offering, holders of the Class A Interests will possess a ▮▮▮ Percentage Interest in the Partnership for each ▮▮▮ contributed for their Class A Interests (in contrast to the ▮▮▮ Percentage Interest they originally received for each ▮▮▮ invested

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000939

by them in the Prior Offering). Thus, assuming that no Current Partners accept the Rescission Offer and full subscription under the Offering, Current Partners holding the Class A Interests will collectively possess a Percentage Interest of 33.91% following completion of the Offering, resulting in direct and immediate dilution of about 12%. See "The Offering - Dilution." In addition, the Offered Interests will be classified as Class B Interests under the Partnership Agreement. Holders of the Class B Interests do not benefit from the preemptive rights provided in the Partnership Agreement. Preemptive rights are granted to holders of the Class A Interests only. See "Certain Agreements - Partnership Agreement." Moreover, the issuance of additional Limited Partnership Interests may also dilute the interests of Limited Partners in the Partnership, as may the benefit and incentive plans adopted for the Enterprise's management, consultants and/or others.

*Use of Proceeds.* The "Offering - Use of Proceeds" section of this Memorandum sets forth the Partnership's best estimate of the anticipated expenditure of the proceeds from the Offering based upon current information, estimates and plans regarding anticipated expenditures, revenue and/or cash flow. Actual expenditures, revenue and/or cash flow may vary substantially from these estimates and the Partnership and General Partner may find it necessary or advisable to use portions thereof for other Partnership purposes. As a result, there can be no assurance that the proceeds from the Offering will be used consistent with the breakdown set forth herein. It should also be noted that a significant portion of the proceeds from the Offering are expected to be used to pay pre-existing obligations of the Enterprise, including approximately      to satisfy the Bridge Loans (as hereinafter defined). Therefore, only a limited portion of such proceeds are expected to be used to complete the commercialization of the Drug in the United States.

### Risks Relating to the Consent Solicitation

*Unsuccessful Consent Solicitation.* Each of the actions which are the subject of the Consent Solicitation other than the Amendment (including, without limitation, the Rescission Offer and the Offering) requires the consent of a majority-in-interest of the Continuing Partners. The Amendment requires the consent of all Continuing Partners. Even though certain Limited Partners affiliated with or otherwise related to the General Partner representing approximately 33% of the outstanding Limited Partnership Interest (before giving effect to the Rescission Offer) have indicated their intention not to accept the Rescission Offer and to consent to each of the matters which are the subject of the Consent Solicitation, there can be no assurance that the requisite consent of Continuing Partners will be obtained under the Consent Solicitation. Both the Rescission Offer and the Offering are contingent upon a successful Consent Solicitation, provided that the General Partner may, in its discretion, proceed with the Rescission Offer and Offering without having obtained the requisite consent for the Amendment.

### Certain Tax Related Risks

*Partnership Tax Status.* The Partnership will be characterized as a partnership for federal income tax purposes. However, future legislation or U.S. Treasury regulations could possibly result in a loss

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

of "partnership" status for federal income tax purposes, possibly with retroactive effect. Characterization as an "association taxable as a corporation", rather than as a "partnership", would result in adverse federal income tax consequences to the Limited Partners, the General Partner, and the Partnership.

*Investment Partnership.* The Partnership will not directly carry on the Business. If it did so, any profits or losses of the Business would be reported directly by the Partners. Instead, the Business will be conducted by Danco and Pharmaceuticals, which are taxable as corporations. Consequently, the income of the Partnership, if any, will be substantially in the form of distributions of income from Holdings, which, in turn, must be derived from dividends distributed by Danco, and from Pharmaceuticals from after-tax income. Thus, Partners will not achieve the tax benefits often associated with tax partnerships, that is, a single-level of tax on income at the Partner level and the possibility of using losses to reduce other income. The Proxy-Holders and Enterprise management are presently considering alternative structures that may be more favorable to investors from a tax perspective.

*Tax Adjustments.* The lack of audited financial statements and the inability to fully account for the use of the proceeds of the Prior Offering could result in adjustments by the Internal Revenue Service ("IRS") to the tax returns filed by the Partnership and the investors. The IRS may also question the tax or disallow the deduction claimed. For example, expenditures classified as amortizable organization or start-up expenses may be reclassified as non-deductible, non-amortizable syndication fees or as capital contributions to Holdings, Danco or Pharmaceuticals. Similar adjustments are possible with respect to expenditures intended to be made from the proceeds of the Offering.

*Tax-Exempt Entities (Including Qualified Plans).* The Partnership may generate Unrelated Business Taxable Income ("UBTI") which would be taxable to otherwise tax-exempt Limited Partners. Therefore, an investment in the Partnership may not be suitable for tax-exempt investors, who should consult their own tax advisors regarding an investment in the Partnership. Due to the level of risks, illiquidity, and the possibility of UBTI, the Partnership may not be suitable for investors that are qualified pension, profit-sharing and stock bonus plans, and individual retirement accounts (the "Qualified Plans"). Fiduciaries of Qualified Plans should take into account the following: whether the relevant plan instruments allow investment in a limited partnership; whether UBTI might result from the investment; the application of the "plan assets" regulation of the Department of Labor; whether the investment is prudent, considering the nature of the investments of the Partnership, its compensation, structure and relative illiquidity; whether the investment satisfies the diversification requirement of Section 404(a)(I)(C) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"); and, whether the Partnership or the General Partner or any of their affiliates is a fiduciary or a party in interest to the Qualified Plans.

### THE RESCISSION OFFER

**Background**

In the Prior Offering, the Partnership raised       from the sale of Limited Partnership Interests possessing a 38.72% Percentage Interest in the Partnership. It is believed that the Prior Offering

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

24

CONFIDENTIAL

H00000941

commenced in November 1995. As of December 29, 1995, the Partnership had raised [█████]. At that time, the General Partner (which was then controlled by Joseph D. Pike) determined that it was necessary to modify the terms of the Prior Offering. Due to the modification, the General Partner offered each of the initial investors that contributed the [████] an opportunity to rescind their purchase of Limited Partnership Interests. It appears that two investors whose contributions totaled [████] may have elected to rescind their investments at that time. The Prior Offering continued under the modified terms until it was terminated in February 1997, when [████] was removed from his management role in the Enterprise. See "Certain Relationships and Transactions - [███] Removal."

### Reasons for the Rescission Offer

The Partnership and the General Partner are undertaking the Rescission Offer because the sale of the Limited Partnership Interests in the Prior Offering may have violated certain federal and/or state securities laws. The Rescission Offer and the statements set forth below do not constitute an admission of a violation of any such securities laws, nor a waiver of any statute of limitations or other defense against such violation.

*Possible Federal Securities Law Violations.* The following is a summary of the violations of federal securities laws that may have occurred in the Prior Offering.

Omission of Material Information. [████████] prosecution and conviction for misdemeanor forgery and his disbarment from the practice of law in North Carolina during the Prior Offering (see "Certain Relationships and Transactions - [███] Removal") were apparently not disclosed to prospective investors in the Prior Offering. These and other matters omitted from or misstated in the Prior Offering documents may have constituted material facts required to be disclosed to prospective investors under federal securities laws. As a result of such nondisclosure, the Partnership may be subject to civil liabilities, including liability for rescission.

Registration Exemption. The Rescission Interests were sold without registration under the Securities Act in reliance upon the safe harbor exemption contained in Rule 506 of Regulation D promulgated thereunder. Regulation D provides that if any purchaser in the subject offering is not an "accredited investor" as defined in Rule 501(a), that purchaser must be provided with specified, very detailed information. It appears that the Partnership may not have received all of the documentation from the investors in the Prior Offering necessary to confirm their accredited investor status. Since the information provided in the disclosure documents distributed to potential investors in the Prior Offering (the "Prior Offering Memorandum") may not satisfy the requirements of Regulation D for offers and sales to one or more non-accredited investors, all of the conditions of Regulation D may not have been satisfied if there were non-accredited investors who purchased Limited Partnership Interests. However, even if that were the case, the General Partner believes that exemptions from registration under the Securities Act would still have been available pursuant to Section 4(2) of the Securities Act.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000942

· Misuse of Partnership Funds. The Prior Offering Memorandum stated that proceeds from the Prior Offering were estimated to be used as follows:

Royalty Fees to the Council and Advances
Advance Payment to Bulk Supplier
Organizational Expenses and Reimbursements
Insurance
Inventory
Capital Expenditures
Media/Public Relations
Training/Education
Marketing/Promotions
General and Administration
Operations and Distribution
Additional Operating Capital

Based on information available to the Enterprise, it appears that funds of the Partnership raised from the Prior Offering were used in large part to pay license and royalty fees to the Council and Advances (approximately ████████) and for the cost of insurance required by the Donor (approximately █████). However, material amounts may have been used for potentially improper purposes. Accordingly, even though the Prior Offering Memorandum contains a qualification that the actual use of proceeds may be different from that shown in the Prior Offering Memorandum, the Proxy Holders believe that use of Partnership funds for such purposes may have been inappropriate.

*Possible State Securities Law Violations.* The following is a summary of the violations of certain state securities laws that may have occurred in the Prior Offering.

Payment of Commissions. Under certain state securities laws, the exemption from registration relied on to offer the Rescission Interests during the Prior Offering may have been conditioned upon the absence of payment of commissions to any person soliciting any prospective purchaser unless such person was appropriately licensed in the relevant state as a broker-dealer or agent. In the Prior Offering Memorandum, the General Partner disclosed that it would reserve the right to compensate third parties who would introduce prospective limited partners to the Partnership. Some commissions were paid to third parties or prospective limited partners, which may have resulted in violations of the registration requirements under these state securities laws. See "Certain Relationships and Transactions - Prior Offering Commissions to Related Parties."

Omission of Material Information. Mr. ████ prosecution and conviction for misdemeanor forgery and disbarment from the practice of law in North Carolina during the Prior Offering may have constituted a material fact required to be disclosed to prospective investors pursuant to applicable state securities laws. As a result of the failure to disclose such facts, and the possible failure

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000943

to disclose or misstatement of other material facts, the Partnership may be subject to civil liabilities, including liabilities for rescission under certain of such laws.

Idaho Securities Laws. The Partnership accepted payment for Limited Partnership Interests from an investor residing in Idaho before completing the required exemption filing with the State of Idaho, resulting in a technical violation of the requirement that a filing be made 10 days before the sale to an Idaho investor. As a result, the Partnership may be liable for rescission to such investor.

Registration Exemptions. As described above, to the extent that one or more Current Partners may not have been accredited investors, the safe harbor exemption from federal securities registration requirements provided by Rule 506 of Regulation D may not have been available, although exemption may have been available pursuant to Section 4(2) of the Securities Act. If the Prior Offering failed to comply with Regulation D, then reliance upon certain state registration exemptions which are also predicated upon compliance with Regulation D may have been misplaced, resulting in violations of the registration requirements of such state securities laws.

## Effect of the Rescission Offer

Federal Securities Laws. It is unclear whether the Rescission Offer will terminate the Partnership's liability, if any, for failure to register the issuance of the Rescission Interests with the SEC under the Securities Act, and/or general failure to comply with the antifraud requirements under federal securities laws. The SEC has taken the position that liability under federal law is not avoided because a potentially liable person makes a rescission offer. SEC enforcement actions or criminal claims are also possible. Current Partners should be aware, however, that because the Partnership, pursuant to the Rescission Offer, is unconditionally offering to pay Rescinding Partners the same amount that they might receive in an action for rescission, under relevant case law there is authority that suggests that Rescinding Partners may be estopped from bringing any future claim for rescission.

State Securities Laws. Under certain state securities laws, the civil liability of an issuer of securities and its affiliates arising out of a violation of the antifraud or registration requirements of such laws may be eliminated with respect to each investor who receives (and, in some states, does not reject) an unconditional rescission offer meeting the requirements of the applicable state securities law.

Under California and Washington state securities laws, the Rescission Offer will not extinguish civil liability for rescission for the reason that the present Rescission Offer will not be carried out in full compliance with the statutory provisions governing rescission offers in such states. However, because the Partnership is unconditionally offering to pay Rescinding Partners exactly what they could receive under the California or Washington statutory provisions, there is authority that suggests that Rescinding Partners may be estopped from bringing future claims for rescission or that they released the Partnership from such claims.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

Under New York securities laws, there is no private right of action, but New York law grants the Attorney General broad investigative and prosecutorial powers for violations of the New York state securities laws, and there can be no assurance that the Attorney General will not take enforcement action against the Partnership. However, the fact that the Partnership is making the Rescission Offer could mitigate against this result.

Continuing Partners should also be aware that if someone were to successfully allege that a material misrepresentation or omission occurred in connection with the Rescission Offer, or that the Rescission Offer was not properly qualified for exemptions from applicable registration requirements, there may be additional causes of action under the antifraud provisions of applicable federal and state securities laws or common law. See "Risk Factors - Risks Associated with the Rescission Offer."

*Release and Assignment of Certain Claims.* By accepting the Rescission Offer and executing the Rescission Acceptance Agreement, Rescinding Partners will be releasing the Enterprise and its agents, employees, representatives, partners, shareholders, directors, officers, affiliates, successors and assigns of any and all claims which the Rescinding Partner may have against them relating to the Enterprise or its Business, except for Pike Claims (as hereinafter defined), which will be assigned by the Rescinding Partner to the Enterprise which may pursue such claims against ▮▮▮▮▮. See "Rescission Offer - Rescission Offer Terms."

## Rescission Offer Terms

The Partnership is hereby offering to Current Partners the right to rescind their purchases of the Rescission Interests in accordance with the terms set forth in this Memorandum. Current Partners who accept the Rescission Offer shall have elected to exchange all (but not less than all) of their Rescission Interests for cash equal to the Rescission Price. For a description of how the Rescission Price is determined, see "The Rescission Offer - Determination of Rescission Price."

The Rescission Offer will commence on the date of this Memorandum and expire at 5:00 p.m., Central daylight time, on September 9, 1998, the Rescission Expiration Date. In order to validly accept the Rescission Offer, Rescinding Partners must properly complete, sign and date the YELLOW Rescission Acceptance Agreement, the form of which is attached hereto as Exhibit D, and deliver it in the manner required by this Memorandum on or prior to the Rescission Expiration Date. See "The Rescission Offer - Method of Acceptance."

Each Rescinding Partner will be deemed to have approved the Rescission Offer in his, her or its capacity as a Limited Partner. In addition, effective on the Rescission Expiration Date, the Rescission Interests of Rescinding Partners will be deemed to have been redeemed by the Partnership and cancelled. Each Rescinding Partner will cease to be a Limited Partner as of that date and will be considered a creditor of the Partnership up to the amount of the Rescission Price, subject to the conditions to

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and it not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000945

consummation of the Rescission Offer identified below. As a result, Rescinding Partners will be ineligible to purchase Offered Interests under the Offering or to vote in the Consent Solicitation.

Moreover, by execution of the Rescission Acceptance Agreement, each Rescinding Partner shall be releasing any and all claims which the Rescinding Partner may now or hereafter have against the Enterprise and/or its agents, employees, representatives, partners, shareholders, directors, officers, affiliates, successors and assigns, except for any claims (the ▮▮▮▮▮▮ ") the Rescinding Partner has, had or may have against ▮▮▮▮▮▮ and/or his family members or affiliates (other than the Enterprise) by reason of any matter, cause, event, transaction or thing relating to the Enterprise or the Business. ▮▮ Claims of a Rescinding Partner will be assigned to the Partnership as part of the Rescission Acceptance Agreement, which claims may be pursued by the Enterprise. It is important to note that the SEC has taken the position that securities law claims against an issuer may not be released as a matter of public policy. Accordingly, the enforceability of the release is uncertain.

Consummation of the Rescission Offer and payment of the Rescission Price is subject to satisfaction of each of the following conditions:

(1) the Partnership has accepted subscriptions and received proceeds for the sale of Offered Interests aggregating the amount necessary (a) to pay certain amounts to the Council under the Revised Consent Agreement in the approximate amount of ▮▮▮▮▮▮ and (b) to pay the Rescission Price to the Rescinding Partners;

(2) the Partnership has accepted subscriptions or otherwise received irrevocable commitments or guarantees acceptable to the Partnership and the Council to purchase Offered Interests aggregating ▮▮▮▮▮▮ (less the aggregate amount necessary under subparagraph 1 above); and

(3) the receipt by the Partnership of the requisite consent for each of the matters which are the subject of the Consent Solicitation on or prior to the Consent Solicitation Expiration Date;

(4) the absence of a material adverse change in the business, condition (financial, regulatory or otherwise) or prospects with respect to the Business or the Enterprise; and

(5) the absence of a material misrepresentation by the Council under the Revised Consent Agreement and the absence of a breach by the Council of its material obligations under the Revised Consent Agreement and Revised License Agreement.

Provided that each of such conditions are satisfied, the Rescission Price will be paid by the Partnership within 30 days after the Offering Expiration Date to all Rescinding Partners who have validly accepted the Rescission Offer and have not withdrawn such acceptance prior to the Rescission Expiration

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

Date. See "The Rescission Offer - Method of Acceptance." In the event that any or all of the above conditions are not satisfied, the Rescission Offer shall be terminated and Rescinding Partners will be considered Limited Partners once again having a Percentage Interest identical to that possessed by such Limited Partners immediately prior to the Rescission Offer, unless the General Partner in its sole discretion determines to waive one or all of such conditions and not to terminate the Rescission Offer, which the General Partner may only do if the Partnership has raised sufficient funds under the Offering or otherwise to pay the aggregate Rescission Price to Rescinding Partners in accordance with the requirements of the Rescission Offer.

## Determination of the Rescission Price

The Partnership is hereby offering to Current Partners the right to rescind their purchases of Rescission Interests in accordance with the terms set forth in this Memorandum. Current Partners who accept the Rescission Offer shall have elected to receive the Rescission Price in exchange for their Rescission Interests. The Rescission Price will be (i) the consideration paid by the Current Partner for the Rescission Interests, plus (ii) interest from the date of purchase at the Statutory Rate. The Statutory Rate applicable to each Current Partner will be determined by the state in which the Current Partner currently resides or, if the Current Partner is not an individual, its current principal place of business.

The following is a list of the Statutory Rates applicable to the Rescission Offer:

| State | Statutory Rate (interest per annum) |
|---|---|
| Alabama | 6% |
| California | 10% |
| Connecticut | 6% |
| Idaho | 6% |
| Massachusetts | 6% |
| Nevada | 10.25% |
| New Jersey | 12% |
| New York* | 6% |
| Tennessee | 10% |
| Washington | 8% |

*New York state securities laws do not contain statutory procedures for rescission offers. For the residents of the State of New York, the Partnership will fix the interest rate at 6%, corresponding to the statutory interest rate proposed in the Uniform Securities Act.

Assuming that the Rescission Offer is consummated within 30 days after the Offering Expiration Date, the aggregate Rescission Price payable to repurchase all Rescission Interests would be ███████, assuming that sufficient funds have been raised under the Offering. But see "The Rescission Offer - Indications of Intent to Reject the Rescission Offer."

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and it is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

## Method of Acceptance

For a Rescinding Partner to validly accept the Rescission Offer, a properly completed, signed and dated YELLOW Rescission Acceptance Agreement, the form of which is attached hereto as Exhibit D, must be received by the Enterprise's legal counsel, Foley & Lardner, Attention: Joseph P. Hildebrandt, 150 East Gilman Street, Madison, Wisconsin 53703, prior to 5:00 p.m., Central daylight time, on September 9, 1998, the Rescission Expiration Date. A Rescinding Partner may only participate in the Rescission Offer with respect to all (but not less than all) of his, her or its Rescission Interests. Documentation received other than at the address specified above or after the time or date specified above, incomplete or invalid documentation, or documentation purporting to accept the Rescission Offer in a manner not permitted by the terms of the Rescission Offer, will not be deemed to constitute acceptance of the Rescission Offer.

The Rescission Acceptance Agreement may be delivered by hand or courier service, or by mail. The method of delivery of all documents is at the election and risk of the Rescinding Partner. If delivery is by mail, certified mail, return receipt requested, is recommended.

Acceptance of the Rescission Offer by any Rescinding Partner may be withdrawn by written notice to Foley & Lardner at any time prior to 5:00 p.m., Central daylight time, on the Rescission Expiration Date.

## Indications of Intent to Reject the Rescission Offer

The General Partner was informed that certain Limited Partners affiliated with or otherwise related to the General Partner representing approximately 33% of the outstanding Limited Partnership Interests presently intend to reject the Rescission Offer. In addition, within the past year, the Proxy Holders have had discussions with a number of Current Partners, most of which have indicated that they are not inclined to accept the Rescission Offer. It is important to note, however, that such indications were made prior to having an opportunity to review this Memorandum and the information contained herein. Therefore, such indications are not binding and should not be relied upon as to how many Rescission Interests will be tendered in the Rescission Offer or whether any particular Limited Partner will, or will not, accept the Rescission Offer.

## Funding of the Rescission Offer

At the closing for the Rescission Offer, which is expected to occur within 30 days after the Offering Expiration Date provided that certain conditions are satisfied (see "Rescission Offer - Rescission Offer Terms"), Rescinding Partners will surrender their Rescission Interests for cancellation by the Partnership in consideration of the Rescission Price. The Partnership will attempt to obtain the funds necessary to purchase such Rescission Interests for the Rescission Price from the net proceeds of the Offering. See "The Offering - Use of Proceeds." However, there can be no assurance that the

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000948

Partnership will be successful in raising the necessary funds under the Offering to repurchase the Rescission Interests of Rescinding Partners or that the other conditions to the consummation of the Rescission Offer will be satisfied. See "Risk Factors - Risks Relating to the Rescission Offer" and "Risk Factors - Risks Relating to the Offering."

## Certain Federal Income Tax Consequences of the Rescission Offer

The following summary describes certain significant federal income tax consequences to Rescinding Partners. The summary does not consider and is not addressed to nonresident aliens or foreign corporations. The summary is based on the Internal Revenue Code of 1986, as amended, as in effect on the date of this Memorandum (the "Code"), the U.S. Treasury regulations promulgated thereunder, rulings of the United States Internal Revenue Service (the "IRS"), and court decisions.

THIS SUMMARY IS NECESSARILY GENERAL, AND CURRENT PARTNERS ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX CONSEQUENCES OF ACCEPTING OR DECLINING THIS RESCISSION OFFER.

*Federal Income Tax Consequences to Rescinding Partners.* Generally, the exchange of Rescission Interests for cash pursuant to this Rescission Offer will be treated as a taxable sale or disposition of a capital asset by the Rescinding Partners to the Partnership; the interest will be ordinary income. The amount of gain recognized by a Rescinding Partner generally will be the excess of the Rescission Price (net of the interest components) over the Rescinding Partner's adjusted basis in such Rescission Interests. Conversely, the amount of loss recognized by a Rescinding Partner generally will be the excess of the Rescinding Partner's adjusted basis over the Rescission Price.

Generally, the sale by a Rescinding Partner of Rescission Interests held for more than 18 months will result in long-term capital gain or loss, subject to a maximum federal income tax rate of 20%, in the case of an individual, and may implicate the Alternative Minimum Tax for certain individuals. Higher rates apply to shorter holding periods. The deduction of capital losses is limited.

Continuing Partners who decline this Rescission Offer will not incur federal tax liability as a result of the acceptance of this Rescission Offer by the Rescinding Partners, although there may be adjustments to their adjusted basis in their Partnership Interests by reason of the Rescission and the issuance of Additional Interests.

Regardless of whether a Current Partner accepts or declines this Rescission Offer, a Current Partner will still be considered a Partner for purposes of (a) the Partnership's 1998 tax returns on Form 1065, and (b) the Partnership's 1998 Schedule K-1s indicating the Partner's distributive share of tax items for the portion of 1998 that the person was a Partner. A Rescinding Partner will be subject to any income tax adjustments made by the IRS with respect to years during which the person was a Partner.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000949

*Federal Income Tax Consequences to the Partnership.* A Rescinding Partner's acceptance of this Rescission Offer will result in the Partnership distributing the Rescission Price to the Rescinding Partner and liquidating the Rescinding Partner's Rescission Interests. Such distributions of cash will not cause the Partnership to recognize gain or loss.

## THE OFFERING

### Terms of the Offering

-- The Partnership is hereby offering up to a maximum ▮▮▮▮ aggregate amount of Limited Partnership Interests of the Partnership, consisting of (i) ▮▮▮▮ of Additional Interests and (ii) up to ▮▮▮▮ of Replacing Interests. The Offered Interests will be sold at an effective price of ▮▮ % of Percentage Interest for each ▮▮▮▮ contribution. Purchasers of Offered Interests will be designated as Class B Limited Partners under the Partnership Agreement with respect to such Offered Interests. Only Continuing Partners (and, in the sole and absolute discretion of the General Partner, certain other new investors who are not currently Limited Partners) will be eligible to participate in the Offering. Rescinding Partners will not be eligible to participate in the Offering. In addition, unless waived by the General Partner, only investors who meet certain suitability standards may participate in the Offering. See "The Offering - Investor Suitability Standards." The Offering will occur in three rounds as described below.

*First Round.* The First Round of the Offering will involve the initial offering of the Additional Interests. The First Round will commence on the date of this Memorandum and expire at 5:00 p.m., Central daylight time, on September 9, 1998, the First Round Expiration Date. During the First Round, each Continuing Partner may "top up" and subscribe to purchase as many of the Additional Interests as he, she or it desires, subject to each Continuing Partner being entitled to purchase at a minimum, his, her or its pro rata share of the Additional Interests based on the Percentage Interest owned or held by him, her or it relative to the total Percentage Interests held by all Current Partners, each determined immediately prior to the commencement of the First Round. This in effect permits the Continuing Partners to purchase Additional Interests in a minimum dollar amount equal to ▮▮▮▮ of their current dollar investment in the Partnership (e.g., a Limited Partner that had previously invested ▮▮▮▮ in the Partnership could purchase up to ▮▮▮▮ in Additional Interests out of the ▮▮▮▮ available under the First Round). Continuing Partners who desire to purchase the Additional Interests must deliver a completed ORANGE Investor Questionnaire and GOLD Subscription Agreement, duly executed by or on behalf of each such Continuing Partner, on or before the time and date specified above. Full payment of the purchase price for the Additional Interests subscribed for shall be due at that time as well. See "The Offering - How to Invest." Subscriptions in excess of a Continuing Partner's pro rata share are subject to acceptance or rejection, in whole or in part, by the Partnership in the sole and absolute discretion of the General Partner.

*Second Round.* Within seven days after the First Round Expiration Date, the General Partner will send to each of the Continuing Partners a Supplement to this Memorandum setting forth (i) the dollar

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

33

amount of Rescission Interests that Rescinding Partners have elected to rescind, (ii) the amount of the Replacing Interests offered by the Partnership as a result of the Rescission Offer, (iii) the amount of Additional Interests subscribed for in the First Round, and (iv) the amount of unsubscribed Additional Interests available. The Second Round of the Offering will involve the offering of the Replacing Interests and the offering of any Additional Interests not subscribed for by Continuing Partners in the First Round. The Second Round will commence on September 16, 1998, and will expire at 5:00 p.m., Central daylight time, on October 21, 1998, the Second Round Expiration Date. During the Second Round, each Continuing Partner may subscribe to purchase as many of the Replacing Interests and Additional Interests not purchased in the First Round as he, she or it desires, subject to each Continuing Partner being entitled to purchase his, her or its pro rata share of the Replacing Interests and remaining Additional Interests based on the Percentage Interest owned or held by him, her or it relative to the total Percentage Interests held by all Continuing Partners, each determined immediately prior to the commencement of the Second Round. Continuing Partners who desire to purchase such Offered Interests must deliver (i) a completed ORANGE Investor Questionnaire if one was not previously delivered by the Continuing Partner in the First Round and (ii) a GOLD Subscription Agreement, duly executed by or on behalf of such Continuing Partner, on or before the time and date specified above. Full payment of the purchase price for the Offered Interests subscribed for in the Second Round shall be due at that time as well. See "The Offering -. How to Invest." Subscriptions in excess of a Continuing Partner's pro rata share are subject to acceptance or rejection, in whole or in part, by the Partnership, in the sole and absolute discretion of the General Partner. Subscriptions for a Continuing Partner's pro rata share of the Offered Interests must comply with the requirements of this Memorandum and are subject to rejection if the General Partner believes or determines that the Continuing Partner does not meet the suitability criteria.

*Third Round.* The Third Round of the Offering will involve the offering of any Offered Interests not subscribed for by Continuing Partners in the First and Second Rounds. The Third Round will commence on October 28, 1998, and will expire at 5:00 p.m., Central Standard Time, on November 27, 1998 (unless extended by the General Partner), the Offering Expiration Date. During the Third Round, Continuing Partners and, in the sole and absolute discretion of the General Partner, other new investors that are not currently Limited Partners may subscribe to purchase as many of the available Offered Interests as are desired by such subscriber. The General Partner may accept or reject, in whole or in part, any such subscriptions in its sole and absolute discretion. Continuing Partners and other investors who desire to purchase such Offered Interests must deliver (i) a completed ORANGE Investor Questionnaire if one was not previously delivered by the Continuing Partner in the First or Second Rounds and (ii) a GOLD Subscription Agreement, duly executed by or on behalf of such Continuing Partner or investor, on or before the time and date specified above. Full payment of the purchase price for Offered Interests subscribed for in the Third Round shall be due at that time as well. See "The Offering - How to Invest."

Proceeds from the sale of Offered Interests will initially be placed in an interest bearing escrow account pending satisfaction of the following conditions:

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000951

(1)  the receipt by the Partnership of the requisite consent for each of the matters which are the subject of the Consent Solicitation on or prior to the Consent Solicitation Expiration Date (see "The Consent Solicitation");

(2)  the receipt and acceptance by the Partnership of Subscription Agreements for the purchase of at least ▮▮▮▮▮ in Offered Interests and receipt of the proceeds for the sale and purchase of such Offered Interests or, in the discretion of the General Partner, the receipt by the Partnership of one or more irrevocable and unconditional commitments, guarantees, letters of credit or other financial instruments (in form and substance acceptable to the General Partner and the Council) to fund the purchase of Offered Interests totaling the difference ▮▮▮▮ ▮▮▮▮▮ and the amount of gross proceeds received by the Partnership from the subscription or sale of Offered Interests prior thereto; and .

(3)  the expiration of the First Round of the Offering.

Upon the satisfaction of such conditions, the funds held in escrow (including interest earned thereon) will be released to an account controlled by the General Partner or the Partnership to be used as described in this Memorandum. See "The Offering - Use of Proceeds." The proceeds from any subscriptions for Offered Interests thereafter received by the Partnership will be placed into the same or similar account. In the event and to the extent that an equity commitment, guarantee, letter of credit or other financial instrument is received and accepted by the General Partner and the Council, the provider of such instrument will not receive Offered Interests unless and until the Partnership draws upon such instrument and receives cash therefrom in the amount of the purchase price for such Offered Interests plus interest from the date of the relevant instrument through the date of the draw at the greater of (i) the prime rate of interest announced by the Wall Street Journal on the date that the instrument is provided (or the next succeeding business day if such date is a Saturday or Sunday or a national holiday) or (ii) eight percent (8%) per year.

In the event that each of the above conditions is not satisfied on or before the Offering Expiration Date, the Offering will be terminated and proceeds received from subscriptions for the Offered Interests will be returned to the subscribers in full, together with interest earned thereon and without deduction for expenses. In the event that the Offering is consummated and proceeds from the sale of some or all of the Offered Interests are placed into an account not directly controlled by the Partnership (as determined by the Proxy Holders in the exercise of their fiduciary responsibilities and as permitted by the Revised Consent Agreement with the Council) and the General Partner subsequently elects not to use such funds for the Business or the Enterprise, then such funds shall be returned to all purchasers of the Offered Interests on a pro rata basis according to the Offered Interests purchased by each such purchaser relative to the Offered Interests purchased by all such purchasers.

This Memorandum constitutes the private placement memorandum for the Offering as well as notice to holders of Class A Interests of the Offering as required by the Partnership Agreement.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

35

## Dilution

The Offered Interests will dilute the Class A Interests such that, after giving effect to the transactions contemplated by the Offering, holders of the Class A Interests will possess a ▆ % Percentage Interest in the Partnership for each ▆ contributed for their Class A Interests. In the Prior Offering, purchasers of the Class A Interests received a ▆ % Percentage Interest in the Partnership for each $▆ contributed. Current Partners holding the Class A Interests collectively possess a 38.72% Percentage Interest in the Partnership as of the date of this Memorandum. Assuming that no Current Partners accept the Rescission Offer, Current Partners holding the Class A Interests will collectively possess a Percentage Interest of 33.91% following completion of the Offering, resulting in direct and immediate dilution of about 12%. Following completion of the Offering and assuming all of the Offered Interests are purchased, all Limited Partners will collectively possess a Percentage Interest of approximately 70% and the General Partner will possess a "carried" Percentage Interest of approximately 30%. In the event that the Offering is completed and less than all of the Offered Interests are sold, then the Limited Partners will collectively possess a proportionately smaller Percentage Interest and the General Partner will possess a proportionately larger "carried" Percentage Interest. As additional Offered Interests or Limited Partnership Interests, as the case may be, are sold, the Percentage Interest allocable to such additional Offered Interest or Limited Partnership Interest would reduce the "carried" Percentage Interest of the General Partner.

It is important to note that the General Partner's interest in the Partnership is a "carried" or "residual" interest. Until the Limited Partners receive cash distributions from the Partnership in the aggregate amount of their capital contributions, Limited Partners will receive 99% of the cash distributions from the Partnership with the General Partner receiving only 1% of such distributions. Thereafter, cash distributions will be made in proportion to each Partner's Percentage Interest (i.e., 70% to the Limited Partners and 30% to the General Partner assuming full subscription under the Offering). See "Certain Agreements - Partnership Agreement."

The increase in the General Partner's "carried" interest relates to several factors, including the following:

(i) to compensate the General Partner and the Proxy Holders in part for the significant time and effort dedicated by them attending to the business and affairs of the Enterprise (including, but not limited to, (a) renegotiating certain agreements with the Council (see "Certain Agreements"), (b) locating, investigating and negotiating with manufacturers and tableters for the Drug, and (c) effecting the removal of ▆ from management of the Enterprise);

(ii) to recognize the positive aspects of the Revised Consent Agreement and Revised License Agreement negotiated by the Proxy Holders on behalf of the Enterprise (see "Certain Agreements"); and

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000953

(iii) to indirectly compensate MedApproach for the ▮▮▮▮ that it expended to acquire a 75% interest in the General Partner from ▮▮▮▮ as part of the efforts to remove him from the management of the Enterprise.

See "Business - History of the Enterprise," "Certain Relationships and Transactions - Removal," "Certain Agreements - Revised License Agreement" and "Certain Agreements - Revised Consent Agreement."

By approving the Offering under the Consent Solicitation, Continuing Partners would be consenting to the dilutive effects described above. See "The Consent Solicitation."

## Plan of Distribution

The Offered Interests will be sold on a "best efforts" basis directly by the Partnership. Neither the Partnership nor the General Partner will receive commissions or other compensation for sales of Offered Interests made in the Offering. Unless waived by the General Partner, only investors who meet certain suitability standards are eligible to purchase the Offered Interests. See "The Offering - Investor Suitability Standards."

## Investor Suitability Standards

In order to enable the Partnership to confirm its compliance with federal and state securities laws, investors will be required to supply certain information required in the ORANGE Investor Questionnaire, a copy of which is attached hereto as Exhibit E. The information provided by investors will be maintained as confidential to the fullest extent reasonably possible.

Investment in the Offered Interests involves a high degree of risk and may not be appropriate for certain investors. See "Risk Factors." The fact that a prospective investor is already an existing Limited Partner of the Partnership does not necessarily mean that an investment in the Partnership is a suitable investment for him, her or it. The investment will have limited liquidity, there will not be any public market for the Interests, and the sale or transfer of the interests is severely restricted. Investment in the Partnership may be viewed as highly speculative, is suitable only for persons of adequate financial means who have no need for liquidity with respect to this investment and who are capable of appreciating the risks involved and, at worst, of losing all or a significant portion of their investment. See "Risk Factors - Risks Relating to the Offering."

Unless waived by the General Partner, the Offered Interests will be offered and sold only to "accredited investors" as that term is defined by the Securities Act. "Accredited investor" is defined to include the following:

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

37

(a) Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(b) Any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his or her purchase exceeds $1,000,000;

(c) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years, or joint income with that person's spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the current year;

(d) Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a financially sophisticated person;

(e) Any organization described in Section 501(c)(3) of the Internal Revenue Code not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(f) Any bank as defined in section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934; any insurance company as defined in section 2(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), if the investment decision is made by a plan fiduciary, as defined in section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000, or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors; or

(g) Any entity in which all of the equity owners are accredited investors.

The above restrictions conform to regulations promulgated under the Securities Act. In addition, all offers and sales must conform to all applicable state securities laws. In the event that the General Partner approves a subscription from a Continuing Partner who has failed to demonstrate qualifications as an accredited investor, the General Partner will require that such Continuing Partner either (i) has a

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000955

preexisting personal or business relationship with the Partnership or the General Partner, or (ii) by reason of such person's business or financial experience or the business or financial experience of their professional advisor(s) who are unaffiliated with and who are not compensated by the Partnership, the General Partner or any affiliate thereof or any selling agent of the Partnership, directly or indirectly, could be reasonably assumed to have the capacity to protect such person's own interests in connection with an investment in the Partnership.

Any investor having any question regarding suitability standards or any other aspect of the Offering should contact the General Partner.

The Offered Interests are being offered in reliance upon federal and state exemptions from registration. The Partnership will not be registered under the Investment Company Act of 1940 based upon an exemption from an issuer whose outstanding securities are beneficially owned by not more than 100 persons and which is not making and does not presently propose to make a public offering of its securities. Each investor will be required to satisfy the suitability standards referred to above (unless and to the extent waived by the General Partner) and to represent that the investor:

- Is investing in the Partnership for the investor's own account, for investment purposes only, and not with a view to distribute the Offered Interest to another person or entity;

- Is a sophisticated investor (or has a qualified purchaser representative) capable of evaluating the risks and merits of an investment in the Partnership; has had access to sufficient information needed to make an investment decision about the Partnership; and

- Can tolerate the high risk and illiquidity which is characteristic of limited partnership interests in general and this investment in particular.

Additional representations will be required as necessary to comply with all applicable securities laws. Additional suitability requirements or restrictions on investment may be applicable under the laws of certain states in which the Offered Interests may be offered.

Due to the level of risk, illiquidity, likelihood of UBTI, and numerous other investment restrictions which will be applicable to such investors, the Partnership may not be suitable for investors which are qualified pension, profit sharing or stock bonus plans, individual retirement accounts subject to ERISA. Such investors must comply with complex fiduciary and tax requirements imposed by the United States Department of Labor and the Internal Revenue Service.

Investors subject to ERISA should be certain that their plan or trust agreements allow for investment as a limited partner in a partnership. Investors subject to ERISA are required to furnish a copy of the plan's trust agreement to the General Partner with their subscription documents. However, the General Partner takes no responsibility for assuring that this investment complies with applicable law. ERISA plan trustees will also be required to represent that they have reviewed this Memorandum and that they have the authority to invest in the Offered Interests.

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

39

**THIS LIMITED DISCUSSION IS NOT INTENDED TO SUBSTITUTE FOR THE ADVICE OF INDEPENDENT, QUALIFIED LEGAL COUNSEL. PLAN FIDUCIARIES ARE URGED TO CONSULT THEIR LEGAL ADVISORS BEFORE INVESTING PLAN ASSETS IN THE OFFERED INTERESTS.**

The General Partner reserves the right, in its sole and absolute discretion, to refuse the participation of any investor (including Continuing Partners) who does not meet the definition of "accredited investor" under Regulation D of the Securities Act or when the General Partner otherwise decides would not be an appropriate investor in the Offered Interests.

### How to Invest

Investors who desire to purchase the Offered Interests must deliver a completed and executed ORANGE Investor Questionnaire and GOLD Subscription Agreement to the special legal counsel for the General Partner, Foley & Lardner, Attention: Joseph P. Hildebrandt, 150 East Gilman Street, Madison, Wisconsin 53703, prior to 5:00 p.m., Central daylight time (Central Standard Time in the case of the Third Round), on the First Round Expiration Date, the Second Round Expiration Date or the Offering Expiration Date, as the case may be. Subject to the provisions of applicable state securities laws, all subscriptions for Offered Interests shall be irrevocable and unconditional. Full payment of the purchase price for the Offered Interests subscribed for must be received on or prior to the time and dates specified above by wire transfer of immediately available funds or by certified check. Instructions for the electronic transfer of funds are included in the Subscription Agreement.

Funds provided by prospective investors will initially be deposited into an interest bearing escrow account established by the Partnership. Upon depositing the investment funds into the escrow account, the investment funds are deemed contributed to the capital of the Partnership and the investment funds become the property of the Partnership, subject to completion of the Offering. Thereafter, the investors will not have the right to withdraw all or any portion of the investment amount. Upon the satisfaction of certain stated conditions (see "The Offering - Terms of the Offering"), funds held in the escrow account may be released to an account controlled by the General Partner or the Partnership. See "The Offering - Use of Proceeds." In the event that such conditions are not satisfied on or before the Offering Expiration Date, the Offering will be terminated and the proceeds from subscriptions for the Offered Interests will be returned to the subscribers in full, together with interest earned thereon and without deduction for expenses. See "The Offering - Terms of the Offering" and "Risk Factors - Risks Relating to the Offering."

Notwithstanding the requirement that Offered Interests be purchased for cash, the General Partner may, in its sole and absolute discretion, permit holders of the outstanding Bridge Loans to convert amounts owed thereunder into Offered Interests at a conversion rate equal to ▮▮ % of Percentage Interest for each $▮▮▮▮ converted under the Offering. If and to the extent that the amount of the Bridge Loans to be converted exceeds the dollar amount of Offered Interests into which they may be converted, the excess may be converted in subsequent rounds of the Offering, if any, or will be satisfied in full from proceeds of the Offering. See "The Offering - Use of Proceeds." As of the date of this Memorandum,

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000957

the amount of principal and accrued but unpaid interest due with respect to the Bridge Loans totaled approximately $▒▒▒▒▒▒.  See "Certain Relationships and Transactions - Bridge Loans."  Holders of the Bridge Loans are under no obligation to convert the Bridge Loans into Offered Interests.

The General Partner strongly encourages all prospective investors to engage their own legal counsel to assist them in reviewing this Memorandum (including specifically the "Risk Factors" section) and the other documents and information relating to the Transactions.  The entity structure and relationships described in this Memorandum are complex, and an investment in the Partnership is highly speculative.  The attorneys for the General Partner and Proxy Holders do not represent the interests of the other Limited Partners or investors and do not have any duties or obligations to such persons.  For these reasons, the General Partner strongly recommends that all prospective investors engage separate legal counsel to adequately protect their interests in connection with their consideration of, and investment in, the Partnership.

## Use of Proceeds

The gross proceeds of the Offering to the Partnership will be up to a maximum of $▒▒▒▒▒ comprised of (i) $▒▒▒▒▒▒ relating to the sale and issuance of the Additional Interests and (ii) up to $▒▒▒▒▒▒ relating to the sale and issuance of the Replacing Interests.  The minimum proceeds of the Offering to the Partnership will be $▒▒▒▒▒.  The gross proceeds raised from the sale of the Offered Interests are expected to be used as follows:

| Description | Minimum Proceeds | Percentage |
|---|---|---|
| | (1) | (1) |
| Rescission Price | | |
| First Fixed Royalty Payment to the Council (2) | ▒▒▒ | ▒▒▒ |
| Reimbursement of Certain Expenses of the Council (3) | ▒▒▒ | ▒▒▒ |
| Manufacturing and Tabletting Scale-Up (4) | ▒▒▒ | ▒▒▒ |
| Satisfaction of Bridge Loans (5) | ▒▒▒ | |
| Fees to Related Parties (6) | | ▒▒▒ |
| Certain Professional Fees (7) | ▒▒▒ | ▒▒▒ |
| Costs and Expenses Relating to the Transactions (8) | ▒▒▒ | ▒▒▒ |
| Working Capital (9) | ▒▒▒ | ▒▒▒ |
| TOTAL | ▒▒▒ | ▒▒▒ |

(1)    *Rescission Price.*  A portion of the proceeds from the Offering will be used to pay the Rescission Price to the Rescinding Partners.  See "The Rescission Offer."  The amount and percentage

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be replicated or reproduced in any manner.  Violators may be subject to claims by The Danco Group for damages and other relief.  The information contained in this Memorandum is believed to be accurate as of the date hereof.  Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

of proceeds used for this purpose will depend on the dollar amount of Rescission Interest held by the Rescinding Partners and the amount raised in the Offering. If only the minimum of $███████ is raised in the Offering, then the amount allocated to pay the Rescission Price will constitute a greater percentage of the Offering proceeds than if the Partnership were successful in raising more than just the minimum amount of funding under the Offering. See "Risk Factors - Risks Relating to the Offering."

(2)    *First Fixed Royalty Payment to the Council.* The amount shown is expected to be used to pay the First Fixed Royalty to the Council under the Revised License Agreement. See "Certain Agreements - Revised License Agreement."

(3)    *Reimbursement of Certain Expenses of the Council.* Under the Revised Consent Agreement, the Partnership agreed to pay to the Council (i) the sum of ███████ for reimbursement of certain expenses (in addition to ██████ paid by the Partnership to the Council in February 1997), (ii) the sum of ██████ for reimbursement of legal fees incurred by it in connection with certain litigation involving the Enterprise and the Council, and (iii) interest on such amounts at the rate of 8% per year from the date of the Revised Consent Agreement (i.e., April 30, 1998) until paid (which interest totals approximately ██████ assuming that such amounts are paid in full within two business days after the Offering Expiration Date. See "Certain Agreements - Revised Consent Agreement" and "Legal Proceedings - Proceedings Commenced Against the Enterprise."

(4)    *Manufacturing and Tabletting Scale-Up.* The amount shown is expected to be used to pay the various bulk substance and tablet manufacturers as they prepare the laboratory, pilot, scale-up and capital upgrades necessary to produce the Drug in compliance with FDA and other governmental requirements. See "Business - Government Regulation" and "Business - Manufacturing and Tabletting."

(5)    *Satisfaction of Bridge Loans.* Since June 1997, the Partnership has received Bridge Loans from MedApproach (as hereinafter defined), ███████████, and a few other investors in the aggregate principal amount of $███████ The Bridge Loans bear interest at the rate of 20% per year. As of the date of this Memorandum, the total amount of principal and accrued but unpaid interest outstanding on the Bridge Loans is ██████ Assuming that no additional Bridge Loans are required and that the existing Bridge Loans are satisfied in full within 30 days after the Offering Expiration Date, the total amounts due under the Bridge loans would be ██████ comprising principal in the amount of ██████ and accrued but unpaid interest of ██████. See "Certain Relationships and Transactions - Bridge Loans." The Bridge Loans may be converted into Offered Interests under the Offering. To the extent that the Bridge Loans are not converted into Offered Interests, the Partnership expects to use such amount of proceeds from the sale of Additional Interests to satisfy in full the Partnership's obligations under the Bridge Loans. See "The Offering - How to Invest."

(6)    *Fees to Related Parties.* As provided for in the Partnership Agreement, the Partnership is obligated to pay to the General Partner a fee of $██████ per year for managing the business and affairs of the Enterprise. As of June 30, 1998, the accrued but unpaid fee to the General Partner is approximately $██████. In addition, as compensation for services rendered in the capacity as a Proxy Holder of the General Partner and a member of Danco's Board of Directors, ██████ and ██████

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000959

will receive certain compensation. See "Certain Relationships and Transactions - Payments to Certain Related Parties." As of June 30, 1998, the aggregate amounts of compensation due to ███████ and ███████ in this regard are approximately ███████ and ███████, respectively. As of June 30, 1998, ███████ is also owed approximately ███████ in reimbursable expenses.

(7)     *Certain Professional Fees.* The amount shown is expected to be used to pay certain legal and other professional fees at the Enterprise relating, in large part, to legal proceedings involving the Enterprise. See "Legal Proceedings."

(8)     *Costs and Expenses Relating to the Transactions.* The amount shown is expected to be used to pay the costs and expenses incurred by the Partnership relative to the Transactions. These costs include legal, accounting, printing, blue sky filings and miscellaneous expenses.

(9)     *Working Capital.* The amount shown is expected to be retained for working capital purposes. Among other purposes, these funds may be used to pay operating costs of the Enterprise, including (but not limited to) payroll, selling, general and administrative, rent and insurance costs and expenses and consulting fees. For more details regarding these expenses, see the projections attached hereto as Exhibit C.

The foregoing table represents the Partnership's best estimate of its anticipated expenditure of the subject proceeds based upon current circumstances, estimates and plans. It is expected that certain of the actual expenditures will vary somewhat from these estimates. See "Risk Factors - Risks Relating to the Offering."

**Standby Funding Commitments**

As required by the Revised Consent Agreement, MedApproach, L.P., a Tennessee limited partnership ("MedApproach"), which owns 75% of the outstanding stock of the General Partner and is a Limited Partner of the Partnership, an affiliate of MedApproach and  (collectively, the "Standby Investors") have delivered to the Council and the Partnership commitments (the "Funding Commitments") to provide equity funding to the Partnership to pay all or a portion of the Partnership's obligations (i) to the Council under the Revised Consent Agreement in the amount of approximately ███████ and (ii) to Rescinding Partners for the Rescission Price in connection with the rescission of their investment in the Partnership (and all costs associated with the Rescission Offer), up to an aggregate maximum of ███████ in equity funding. The obligations of the Standby Investors to provide equity funding under the Funding Commitments is reduced on a dollar-for-dollar basis by the amount of proceeds received under the Offering or otherwise that are used to pay all or a portion of the foregoing obligations. The Funding Commitments supersede and replace similar funding commitments provided by the Standby Investors under the original Consent and Agreement. The Funding Commitments terminate upon the earlier to occur of (a) the date upon which the Partnership has notified the Council that the Offering and the Rescission Offer will not be commenced, pursued or consummated as a result of (i) a material adverse change in the Business, condition (financial, regulatory or otherwise) or

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The Information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such Information.*

43

prospects with respect to the Enterprise or (2) the inaccuracy in any material respect of any of the Council's representations or warranties made under the Revised Consent Agreement or the Council has breached any of its material obligations under the Revised Consent Agreement or Revised License Agreement, or (b) the date on which the Partnership has received both (I) proceeds from or commitments, guarantees or other financial instruments acceptable to the Council for equity funding in an aggregate amount of [          ] and (II) all of the equity funding from the Standby Investors necessary to satisfy the Partnership's obligations to the Council as described above. It is not expected that the Standby Investors will receive any independent compensation for providing the Funding Commitments. Under the Funding Commitments, MedApproach and its affiliate are responsible for two-thirds of the obligations under clause (i) above and for the entire obligation under clause (ii) above, [          ] is only responsible for one-third of the obligations under clause (i) above, and has no responsibility for the obligation under clause (ii) above.

## THE CONSENT SOLICITATION

### Summary of the Consent Solicitation

The Consent Solicitation is being undertaken by the General Partner to obtain approval and/or ratification from the Continuing Partners for each of the following actions: (i) the Rescission Offer; (ii) the Offering; and (iii) the Amendment.

Consents received pursuant to the Consent Solicitation shall be effective on the Consent Effective Date, which is subsequent to the Rescission Expiration Date. Therefore, only Continuing Partners will be entitled to participate in the Consent Solicitation. A Continuing Partner desiring to give consent to the actions which are the subject of the Consent Solicitation must complete and deliver the GREEN Consent form (a copy of which is attached hereto as Exhibit G), duly executed by the Continuing Partner or his, her or its proxy, to Foley & Lardner, Attention: Joseph P. Hildebrandt, 150 East Gilman Street, Madison, Wisconsin 53703, prior to 5:00 p.m., Central daylight time, on September 9, 1998, the Consent Solicitation Expiration Date.

By executing and returning the Consent form, a Continuing Partner will be considered to have voted to approve and/or ratify such actions. In the event that a Continuing Partner fails to respond to the Consent Solicitation, such Continuing Partner will be deemed to withhold consent to all actions described in the Consent Solicitation. If a Continuing Partner has previously selected a proxy to represent his, her or its Limited Partnership Interest, then the Consent form may be completed and executed by either the Continuing Partner or the proxy so selected.

The Rescission Offer, Offering and the Amendment are conditioned upon receipt by the General Partner of the requisite consent from the Continuing Partners for the actions which are the subject of the Consent Solicitation. Notwithstanding the foregoing, the General Partner reserves the right, in its sole and absolute discretion, to waive such condition with respect to any such actions other than the Rescission Offer and the Offering.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

44

### The Rescission Offer

Pursuant to the Rescission Offer, the Partnership is providing Current Partners an opportunity for a limited time to rescind their purchase of the Rescission Interests in exchange for the Rescission Price. The Partnership and the General Partner are undertaking the Rescission Offer because the sale of Limited Partnership Interests in the Prior Offering may have violated certain federal and/or state securities laws. See "The Rescission Offer" for a detailed discussion of the Rescission Offer terms and the reasons for and effect of the Rescission Offer. ·

### The Offering

Under the Offering, the Partnership is seeking to raise up to a maximum of ▉ in the aggregate by offering (i) ▉ of Additional Interests and (ii) up to ▉ of Replacing Interests. The Offered Interests will be sold at an effective price of ▉ % of Percentage Interest for each ▉ contribution. See "The Offering - Terms of the Offering." Following the completion of the Offering, the Percentage Interest associated with the Class A Interests will be diluted such that the Percentage Interest of the Class A Interests will be ▉ for each ▉ contributed by the Continuing Partners for their Class A Interests. Such dilution will apply to all Continuing Partners, including those who withhold consent for the Offering. After giving effect to the transactions contemplated by the Offering and assuming that all of the Offered Interests are purchased thereunder, the Limited Partners will collectively possess a "carried" Percentage Interest of approximately 70% and the General Partner will possess a Percentage Interest of approximately 30%. See "The Offering - Dilution." By consenting to the Offering, Continuing Partners will be consenting to the dilution of their Class A Interests as described herein.

### The Amendment

As a result of threatened litigation involving the use of the name "NeoGen," the General Partner has changed the Partnership's name from NeoGen Investors, L.P. to Danco Investors Group, L.P. and Holdings' name from NeoGen Holdings, L.P. to Danco Holdings, L.P. However, in order to complete the name change, the Partnership Agreement must be amended. The Partnership Agreement provides that, except as otherwise provided therein, the Partnership Agreement may not be amended without the written agreement of all Partners. See "The Partnership Agreement - Amendments to the Partnership Agreement." In light of the potential difficulties in obtaining unanimous consent of the Partners when and as needed in order to amend the Partnership Agreement, the General Partner also desires to amend the Partnership Agreement at this time to permit amendments thereto in the future to be accomplished by the consent or approval of the General Partner and Limited Partners owning or holding at least two-thirds (2/3) of the outstanding Limited Partnership Interests in the Partnership at that time. Thus, the "Amendment" involves the name and voting changes described above.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000962

**Required Vote**

For each of the actions which are the subject of the Consent Solicitation other than the Amendment (including, without limitation, the Rescission Offer and the Offering), a majority-in-interest of the Continuing Partners must consent to or vote for such actions. In contrast, all Continuing Partners must consent to the Amendment. Because the Consent Solicitation will be effective on the Consent Effective Date, the Percentage Interest of the Continuing Partners subsequent to the transactions contemplated by the Rescission Offer but prior to the Offering will be used in determining whether the requisite consent is received. See "Risk Factors - Risks Relating to the Consent Solicitation."

The receipt by the General Partner of the requisite consent for the actions described in the Consent Solicitation is a condition to the Rescission Offer, the Offering and the Amendment. Nevertheless, the General Partner reserves the right to waive, in its sole and absolute discretion, such condition with respect to the Amendment. Furthermore, notwithstanding receipt by the General Partner of the requisite consent for any such action, the General Partner in its sole discretion may decide not to proceed with any or all of such actions.

**Indications of Intent to Consent**

The General Partner was informed that certain Limited Partners affiliated with or otherwise related to the General Partner representing approximately 33% of the outstanding Limited Partnership Interests (before giving effect to the transactions contemplated by the Rescission Offer) presently intend to reject the Rescission Offer and to vote FOR the actions described in the Consent Solicitation. See "The Rescission Offer - Indications of Interest to Reject Rescission Offer." Thus, assuming that no Rescission Interests are rescinded, approval from Continuing Partners holding only about an additional 18% of the other Limited Partnership Interests will be needed to approve and/or ratify such actions other than the Amendment (which will require the consent of all Continuing Partners to approve).

## LEGAL PROCEEDINGS

The Enterprise is involved in several material legal proceedings, many of which relate, directly or indirectly, to the actions of ▮▮▮▮▮▮▮▮, the founder and former controlling person of the Enterprise. The outcome of these actions could have a material effect on the Enterprise's business. These matters fall into three categories: (A) proceedings commenced against the Enterprise (i.e., matters in which the Enterprise is a defendant and counter-complainant); (B) proceedings commenced by the Enterprise (i.e., matters in which the Enterprise is a plaintiff and counter-defendant); and (C) matters in which certain other litigation and/or arbitration is threatened and/or anticipated.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000963

## Proceedings Commenced Against the Enterprise

███████████ v. ███████████ NeoGen Investors, L.P., et al., Superior Court for the State of California, Los Angeles County, Case No. SC044747. This action, brought by an investment company, concerned a potential equity investment in the Enterprise, specifically an agreement between Plaintiff and ████, assertedly acting on behalf of the Enterprise, for a 68-day lockup commencing in July 1996, during which the parties were assertedly to attempt to negotiate a further agreement for Plaintiff to acquire an equity interest in the Enterprise. No further agreement was concluded. The defendants included various Enterprise entities (including the Partnership) as well as ████ personally. Plaintiff sought up to a 26% equity interest in the Enterprise, as well as damages. A recent motion by the Enterprise for summary judgment was granted by the court and effectively dismissed Plaintiff's claim against the Enterprise.

The Enterprise has also asserted a cross-complaint alleging that Plaintiff and its principals made misrepresentations relating to Plaintiff's suitability as an investor in the Enterprise and filed an unwarranted lawsuit that has disrupted the Enterprise and caused damages.

Plaintiff has settled its claims against ████, who has refused to disclose the terms of that settlement to the Enterprise.

███████████ v. MedApproach, L.P., NeoGen Investors, L.P., et al., Superior Court of the State of California, San Diego County, Case No. 711599. This is an action by a former Enterprise vice president for money allegedly due on asserted contracts between Plaintiff and the Enterprise; performance of the asserted contracts is claimed to have been guaranteed by various other principals of the Enterprise. Plaintiff also asserts claims for invasion of privacy, slander, libel, intentional infliction of emotional distress, conspiracy and fraud against the Enterprise, its principals and the Council. Contract and employment claims total approximately $500,000 and, in addition, more than $1 million in compensatory and punitive damages are sought for the tort claims.

Management believes that these claims are without merit, and the Enterprise has asserted a cross-complaint against Plaintiff and ████ for breach of certain agreements and rescission of others. There can be no assurance that the Enterprise will be successful in defending this action.

Plaintiff also sued ████, who has settled with Plaintiff, but ████ has refused to reveal the terms of the settlement to the Enterprise.

███████████ v. NeoGen Investors, L.P., et al., Superior Court of the State of California, Los Angeles County, Case No. 8C-049056. Plaintiff, ████ counsel, claims that the Enterprise is obligated to pay Plaintiff $31,889.85 for legal services provided to ████. The Enterprise has denied liability to Plaintiff. Management believes that any liability that it may have to Plaintiff should be indemnified by ████, but there can be no assurance that the Enterprise would be successful in recovering any such amounts from ████ if required to do so.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

## Proceedings Commenced by the Enterprise

Danco Laboratories v. Gedeon Richter, Supreme Court of the State of New York, New York County, Index No. 602406/97. This is an action commenced by Danco against the Hungarian pharmaceutical manufacturer (the "Previous Manufacturer") that was to provide the Enterprise with the Drug in bulk substance for breach of its agreement to do so. The Previous Manufacturer claims that its obligations came to an end in 1996 when Danco failed to provide certain projections and forecasts assertedly required by the contract. · Danco believes it has a basis for making its claim and seeks substantial damages. There can be no assurance that Danco will be successful in prosecuting this action. A hearing for the Previous Manufacturer's motion to dismiss is scheduled for August 5, 1998.

## Certain Threatened or Anticipated Litigation and Arbitration

Arbitration Against ▇▇▇▇. Previously, the Enterprise had initiated an action against Mr. ▇▇▇ and several of the Enterprise's former employees for misrepresentation and other claims. The court ordered the claims dismissed and to be arbitrated. The Enterprise intends to commence an arbitration proceeding raising many of the same claims against ▇▇▇, primarily for alleged misrepresentations by ▇▇▇ and breaches of his duties to the Enterprise. Management believes it has a basis for requiring the arbitration and will be seeking a substantial award. The collectibility of any such award is uncertain.

Termination of Employment and Distribution Agreement. ▇▇▇▇, a former employee of the Enterprise, has asserted by letter a claim against the Enterprise for asserted breach of an employment agreement and for abrogation of an agreement to provide distribution rights for the Drug, assertedly given to an entity affiliated with ▇▇▇. The Enterprise disputes ▇▇▇ assertions.

Fee Disputes. Two law firms have asserted claims against the Enterprise for legal services allegedly performed for the Enterprise while it was controlled by ▇▇▇. The law firm of White & Case claims fees of approximately $285,000 and the law firm of Cooley Godward LLP claims fees of approximately $180,000. The Enterprise disputes these legal fees.

## MANAGEMENT

### The Partnership

The Partnership is a limited partnership formed under the laws of the State of California. The General Partner will have the sole responsibility for the management of the Partnership and all powers necessary to conduct its business and affairs. The Limited Partners generally have no right to take part in the control or conduct of Partnership business and will have no right or authority to bind the Partnership. Moreover, the Limited Partners have no authority to remove the General Partner.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000965

However, under the Partnership Agreement, the General Partner must obtain the written consent of a majority-in-interest of the Limited Partners in order to undertake certain actions on behalf of the Partnership, such as acting in contravention of the Partnership Agreement, admitting a new general partner, changing the nature of the Partnership's business, selling, exchanging, mortgaging or disposing of substantially all of the Partnership's assets, consenting to any action as the general partner of Holdings that requires the consent of the Partnership as a limited partner, and acting inconsistent with the Expenditure Plan. Amendments to the Partnership Agreement require consent of all of the Limited Partners. See "Certain Agreements - Partnership Agreement."

The duties, rights, authority and restrictions on the authority of the General Partner are generally set forth in Section 15 of the Partnership Agreement. A copy of the Partnership Agreement is attached hereto as Exhibit A. See also "Certain Agreements - Partnership Agreement."

### The General Partner

The General Partner of the Partnership is N.D. Management, Inc., a Cayman Islands corporation. The ownership and control of the General Partner are described below.

MedApproach holds 75% of the General Partner's outstanding capital stock. MedApproach is a Tennessee limited partnership formed in 1995 for the purpose of investing in the Partnership. Mr. Daniel, one of the Proxy Holders, is a representative of MedApproach. The remaining 25% of the General Partner's capital stock is held by ███████. Pursuant to an Irrevocable Proxy and Power of Attorney, dated February 5, 1997, MedApproach, ███████████ granted to Messrs. Daniel and ███████████ (collectively, the "Proxy Holders") proxies to vote their respective interests in the General Partner. Accordingly, the General Partner is in effect managed by or under the direction of the Proxy Holders. The Proxy Holders will act by majority decision, except that any of the following actions will require either (i) unanimous approval by the Proxy Holders or (ii) both approval of a majority of the Proxy Holders and approval of a majority-in-interest of the Limited Partners:

- the establishment of a relationship with a financial institution;

- a change in the number or the identity of the Proxy Holders, provided however, that Mr. Daniel shall not be removed as a Proxy Holder without the consent of MedApproach;

- the admission of additional limited partners to the Partnership or the raising of additional capital other than (x) as contemplated under the Partnership Agreement, (y) as otherwise contemplated in the ███ Agreement (as hereinafter defined) or (z) from any of the Proxy Holders; and

- the formation of a domestic limited liability company into which Holdings and Danco may be merged, as contemplated in the ███ Agreement.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprised or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

See "Management - Executive Officers, Key Personnel and Directors" for biographical information relating to each of the Proxy Holders.

It is important to note that ▮▮▮ is prohibited from being involved in the management of the Enterprise pursuant to a Standstill Agreement (as hereinafter defined) with the Council. See "Certain Transactions - ▮▮▮▮▮▮▮▮" for a brief description of the terms of the Standstill Agreement.

## The Enterprise

The Business of the Enterprise, which shall be operated by Danco, will be managed by a Board of Directors consisting of seven members, including at least three women and a designee of the Council (if the Council so requests). Members of the Board shall also include Messrs. Daniel and ▮▮▮ and ▮▮▮, who are presently the only members of the Board of Directors and who will be the only members of the Board of Directors with voting or approval rights once it is expanded. See "Certain Agreements - Revised Consent Agreement." The day-to-day management of the Business shall be delegated to certain executive officers and key personnel of the Enterprise.

None of the executive officers or key personnel is currently employed pursuant to a written employment or consulting agreement. See "Risk Factors - Risks Relating to the Business." Nevertheless, the Enterprise intends to negotiate written employment or consulting agreements with its executive officers and key personnel setting forth their responsibilities, compensation and benefits. It is anticipated that such employment or consulting agreements will have a minimum term of two years. It is also anticipated that they will contain confidentiality requirements, a covenant not to compete in the United States during the term of their employment or engagement by the Enterprise and possibly for a minimum period of years thereafter, and such other provisions and restrictions as are deemed appropriate by the Board of Directors of Danco. In addition, the Enterprise intends to develop and implement employee benefit and incentive plans for the Enterprise's management, employees, consultants and/or others. The details of such plans have yet to be finalized.

From time to time, the Council and/or the Enterprise has engaged the services of certain consultants to assist in the commercialization of the Drug in the United States. Such consultants were generally presumed to have specialized knowledge about the Drug and/or the process for commercializing the Drug.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000967

### Executive Officers, Key Personnel and Directors

Management personnel, including directors, executive officers and key personnel of the Enterprise and their ages are as follows:

| Name | Age | Position |
|------|-----|----------|
| ▮▮▮▮▮▮ | ▮ | President and Chief Executive Officer |
| ▮▮▮▮▮▮ | ▮ | Vice President - Manufacturing |
| ▮▮▮▮▮ | ▮ | Controller |
| ▮▮▮▮▮ | ▮ | Director of Public Affairs |
| ▮▮▮▮▮ | ▮ | Director |
| ▮▮▮▮▮ | ▮ | Director |
| ▮▮▮▮▮ | ▮ | Director |



*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000968



**W. Bradley Daniel.** Mr. Daniel is a member of the Enterprise's Board of Directors and a Proxy Holder of the General Partner. He is a co-founder, principal shareholder, and Vice President of Bio-Pharm Investments, Inc., an investment advisor with respect to investments primarily in biotech and pharmaceutical companies. Bio-Pharm is the general partner of MedApproach and Mr. Daniel has primary responsibility for Bio-Pharm's management of MedApproach. Mr. Daniel graduated from Belmont University in Nashville, Tennessee, with a Bachelor's degree in Business Administration.



*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000969

## Executive Compensation

The following table sets forth all cash compensation to be paid to each of the Enterprise's executive officers, on an annualized basis, during the calendar year ending on December 31, 1998, and to all executive officers as a group:



| Name | Position | Annual Compensation |
|---|---|---|
| | President and Chief Executive Officer | |
| | Vice President - Manufacturing | |
| | | |

## Advisory Board

In order to obtain useful input and advice as to matters of importance to the Enterprise and its Business, the Enterprise is in the process of establishing an Advisory Board comprised of a small group of advisors that are experts in various fields. The Advisory Board shall work with management personnel to assist the Enterprise in its decision-making and strategic direction. It is expected that members of the Advisory Board will include experts in chemistry, patents, pharmaceutical contracts and FDA compliance as well as advocates for women's issues.

## Indemnification

The General Partner is accountable to the Partnership and the Limited Partners as a fiduciary and, consequently, is required to exercise good faith and integrity in all of its dealings with respect to the Partnership affairs. This is a developing and changing area of the law, and prospective investors who have questions concerning the duties of the General Partner should consult with their own legal counsel. Prospective investors should be aware that the Partnership Agreement provides that the General Partner is not liable to the Partnership or the Limited Partners and is to be indemnified by the Partnership for any act or omission not amounting to fraud or gross negligence and performed in good faith by the General Partner. See "Certain Agreements - Partnership Agreement." Therefore, purchasers of the Offered Interests and existing Limited Partners may have a more limited right of action against the General Partner than they would have absent such provisions.

Pursuant to the ▮▮ Agreement (as hereinafter defined), the Enterprise has agreed to indemnify and hold harmless, to the maximum extent not prohibited by law, each of the Proxy Holders, MedApproach and their affiliates, owners, partners, agents and employees from and against any loss, cost, damage, judgments, settlements, liability or expense resulting from any claims or threatened claims,

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000970

whether or not resulting in commencement of legal proceedings, including reasonable attorneys fees and costs of investigation, arising out or relating to the ███ Agreement or the transactions contemplated therein.

The ███ Agreement and a separate indemnification agreement recently entered into further provide that, to the fullest extent permitted by law, the Proxy Holders shall not be liable to the Enterprise, its limited partners, the General Partner or its shareholders for monetary damages for their actions as Proxy Holders, except for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law or for any transaction from which the Proxy Holder derived an improper personal benefit.

Moreover, directors and officers of Danco, which operates the Business of the Enterprise, shall be indemnified in such capacity to the fullest extent permitted by applicable law. The Enterprise is presently seeking to obtain directors and officers liability insurance coverage for Danco's directors and officers.

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth information concerning the Limited Partnership Interests owned or controlled as of the date of this Memorandum, by (i) each person or entity known to the General Partner or the Partnership to own (of record or beneficially) or control 5% or more of the Percentage Interests or outstanding Limited Partnership Interests, (ii) each of the Proxy Holders, and (iii) all Proxy Holders, directors and executive officers of the Enterprise as a group. Except as set forth below, the Partnership believes that each Limited Partner listed below has sole voting and investment power with respect to his, her or its Limited Partnership Interests.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000971



| Name | Partnership Percentage Interest | Percentage of Outstanding Limited Partnership Interests |
|---|---|---|
| N.D. Management, Inc. (1) | 61.29% | — |
| ███████████ | ███ | ███ |
| W. Bradley Daniel (3) for MedApproach, L.P. | ███ | ███ |
| ███ ███ | ███ | ███ |
| ███ ███ ███ | ███ | ███ |
| All Proxy Holders, directors and executive officers as a group (consisting of 3 persons, that is, Mr. Daniel, ███, as Proxy Holders and representatives of investing entities) (6) | ███ | ███ |

(1)    N.D. Management, Inc. is the General Partner of the Partnership. After giving effect to the sale of all Class B Interests under the Offering, the General Partner will possess a Percentage Interest of 30% and the Limited Partners will collectively possess a Percentage Interest of 70%. See "The Offering - Dilution."

(2)    ███ controls a Limited Partner that is a limited liability company possessing a Percentage Interest of ███%, representing ███% of the outstanding Limited Partnership Interests. He is one of three Proxy Holders that possess voting control over all of the outstanding stock of the General Partner, which possesses a Percentage Interest in the Partnership of 61.29%.

(3)    Mr. Daniel is a representative of MedApproach, a Limited Partner that possesses a Percentage Interest of 5.80%, representing 14.98% of the outstanding Limited Partnership Interests. In addition, MedApproach possesses 75% of the outstanding stock of the General Partner, which possesses a Percentage Interest in the Partnership of 61.29%. See "Management - The General Partner" and "Certain Relationships and Transactions." Mr. Daniel is also one of three Proxy Holders that possess voting control over all of the outstanding stock of the General Partner, which possesses a Percentage Interest in the Partnership of about 61.29%.

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000972

(4)     One investor appears to control two Limited Partners that are limited liability companies and that collectively possess a Percentage Interest of 2.90%, representing 7.49% of the outstanding Limited Partnership Interests.

(5)     ███████ controls two Limited Partners that are trusts and that collectively possess a Percentage Interest of ███%, representing ███% of the outstanding Limited Partnership Interests. He is one of three Proxy Holders that possess voting control over all of the outstanding stock of the General Partner, which possesses a Percentage Interest in the Partnership of 61.29%.

(6)     In addition to the Percentage Interest shown above, the Proxy Holders possess voting control over all of the outstanding stock of the General Partner, which possesses a Percentage Interest in the Partnership of 61.29%.

## BUSINESS

### General Description of the Business

The Enterprise is a group of companies organized to commercialize the Drug, which is a synthetic steroid developed by a group of scientists in order to effect non-surgical termination of pregnancies. Since its development, the Drug has been used for the AF Indication in China, France, the U.K. and Sweden. According to clinical tests, the Drug is approximately 92% up to 97% effective in the termination of pregnancies less than seven weeks LMP (after the beginning of the woman's last menstrual period) when used in conjunction with a prostaglandin (such as misoprostol). The Drug is also considered to be potentially effective for certain Other Indications, such as emergency contraception, cervical ripening, breast cancer, Cushings' disease, endometriosis and meningioma. The Enterprise has an exclusive license and right to manufacture, market and distribute the Drug in the United States. Opportunities to market the Drug in certain other countries may also exist. See "Certain Agreements - Revised License Agreement."

The mission of the Enterprise can be summarized as follows:

- Establish itself as a leader in the women's reproductive health field through the manufacturing, marketing and distribution of the Drug for the AF Indication in the United States.

- Market and distribute the Drug for the AF Indication in selected countries outside of the United States.

- Research, develop and market the Drug for Other Indications, specifically cervical ripening to facilitate birthing and assist in surgical termination of pregnancies, and other areas of potential interest, such as emergency contraception.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000973

- Utilize the Drug as an operational, marketing and financial base to establish a women's healthcare company dedicated to seeking out and making available to women new medications for diseases that specifically impact women.

Each year on a worldwide basis, up to 50 million women voluntarily terminate their pregnancies. Only a relatively small fraction of this number are able to access the relatively safe environment of a modern medical facility for this purpose. As a result of the conditions under which many pregnancies are terminated, approximately 70,000 women die each year, and many more suffer from infection, hemorrhaging and permanent sterilization. Even in countries where pregnancy termination is safe and legal such as the United States, women have essentially only one option: an invasive surgical procedure that carries with it the potential for emotional distress and surgical complications, such as infection and perforation.

Women in the United States experience approximately 6.6 million pregnancies each year, involving approximately 11% of women of reproductive age. Over half of these pregnancies are unintended, contributing to a reported rate of 1.5 million surgical pregnancy terminations per year. In fact, legally induced pregnancy termination is the most frequently performed gynecological procedure in the United States. While the currently available technology is safe and effective, the introduction of the Drug as a medical alternative is expected to have a dramatic and immediate impact. An acceptability study conducted of clinical trial participants in the United States shows that the overwhelming majority of women who chose the Drug would choose it again (91%) and would recommend it to others (96%).

In addition to the significant market potential in the United States, an opportunity for the Drug may exist in developing countries of the world. In many of these countries, unsafe surgical termination procedures are part of everyday life, and the provision of the Drug could have a substantial impact on the health of women. For example, in the former Soviet Union, the official reported statistics indicate that between 7 and 8 million pregnancy terminations were performed each year, with the average woman having over 10 terminations during her child bearing years. Management of the Enterprise believes that, even for just the AF Indication, the Drug has a significant potential market in such countries. The Enterprise has already received inquiries from interested parties in one or more of these countries, including Russia. See "Risk Factors - Risks Relating to the Business."

In the future, the Enterprise may also pursue other women's health products, not involving the use of the Drug, such as other products for emergency contraception. However, the Enterprise has no definitive plans to do so at this time. In the event that the Enterprise does decide to pursue such other products, it would likely require significant additional debt or equity financing. It is likely that the Enterprise would face similar government regulation of such other products as it currently faces with the Drug. In addition, the emergency contraception industry is highly competitive. Therefore, there can be no assurance that the Enterprise would be successful in any such pursuits. See "Risk Factors - Risks Relating to the Business."

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000974

## History of the Enterprise

In 1994, after substantial pressure from the Clinton Administration, the United States patent rights to the Drug were donated to the Council by the Donor. The Council engages in a variety of biomedical and social research activities designed to advance reproductive health options and rights on a global basis. In the context of carrying out the commercialization of the Drug, the Council was approached by several people who expressed interest in such a project, including ▮▮▮▮▮, who was affiliated with a company with which the Council had worked from time to time on other previous projects. ▮▮▮▮▮. a Delaware not-for-profit corporation, was established to be the licensee of an exclusive license to manufacture, market and distribute the Drug in the United States granted by the Council pursuant to the License Agreement. ▮▮▮▮▮, in turn, entered into Sublicenses with various entities within the Enterprise.

The Partnership was established as the investment vehicle for the Enterprise. The certificate of limited partnership of the Partnership was filed with the California Secretary of State on March 11, 1996. The Partnership's assets consist principally of a limited partnership interest representing a 99% interest in Holdings (the remaining 1% being held by the General Partner) and 100% of the outstanding stock of Pharmaceuticals.

Holdings was formed on September 13, 1995 for the purpose of investing in, and to serve as the holding company for, the equity of Danco. Holdings owns 100% of the outstanding stock of Danco. Danco currently holds a Sublicense to manufacture, market and distribute the Drug in the United States for the AF Indication.

Pharmaceuticals currently holds a Sublicense to manufacture, market and distribute the Drug in the United States for Other Indications. The Partnership does not presently have a business plan for the funding of Pharmaceuticals. See "Risk Factors - Risks Relating to the Business."

A diagram of the current organizational structure of the Enterprise can be found at "Memorandum Summary - Enterprise Organizational Chart."

In order to fund the Business, the Partnership (under the control of ▮▮▮▮▮ sold ▮▮▮▮▮ of Class A Interests in the Prior Offering. But see "The Rescission Offer - Background." The funds were received by the Partnership between about November 1995 and February 1997. Such funds were used by the Partnership primarily to pay license and royalty fees to the Council of approximately ▮▮▮▮▮. See "Rescission Offer - Reasons for Rescission Offer" and "Certain Relationships and Transactions - ▮▮▮▮▮"

In 1996, the Council learned certain unfavorable information about ▮▮▮▮▮, of which it was unaware when he had been selected from those interested in commercializing the Drug. In May 1996, ▮▮▮▮▮ had pled guilty to misdemeanor forgery charges in North Carolina arising out of a 1985 transaction in which he was involved. He was also disbarred from the practice of law in the State of North Carolina. None of these events were previously disclosed in the offering materials for the Prior

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000975

Offering or in any other materials distributed to prospective investors in the Enterprise or to the Council. For more details, see "Certain Relationships and Transactions - ████████." In addition, ████ may have caused the Partnership to violate certain federal and/or state securities laws in connection with the Prior Offering as a result of the potential misuse of Partnership funds, the inappropriate payment of fees and commissions, and the offering of Limited Partnership Interests to non-accredited investors, potentially subjecting the Partnership to civil liability under such securities laws. See "The Rescission Offer - Reasons for Rescission Offer."

In November 1996, the Council and ████ initiated litigation against ████ seeking to remove him from his management role with respect to the Enterprise and its Business, divest him of his ownership interest in the Enterprise and certain other relief. That litigation culminated in the ████ Agreement (as hereinafter defined), pursuant to which ████ transferred 75% of his stock in the General Partner to MedApproach (an existing Limited Partner), granted an irrevocable proxy to vote his remaining 25% interest in the General Partner to the Proxy Holders, and agreed to have no further involvement in the Business of the Enterprise. See "Certain Relationships and Transactions - ████." Concurrently with the consummation of the transactions contemplated by the ████ Agreement, the Council, ████ and certain of the Enterprise entities entered into the Consent and Agreement, setting forth certain terms to govern the future relationship of the parties, including an obligation for the Partnership to undertake the Rescission Offer (subject to certain conditions such as the absence of a material adverse change).

On February 28, 1997, while the Partnership was preparing to undertake the Transactions, the Previous Manufacturer expressed its intention to unilaterally terminate the Manufacturing Agreement dated May 15, 1996, that it had entered into with Danco. The General Partner and the Council entered into negotiations with the Previous Manufacturer to dissuade it from terminating such Manufacturing Agreement. However, the Previous Manufacturer ended those negotiations on May 7, 1997 and Danco subsequently filed suit against the Previous Manufacturer for breach of contract. See "Business - Manufacturing and Tabletting" and "Legal Proceedings - Proceedings Commenced by the Enterprise." The Partnership thereafter asserted that a material adverse change had occurred with respect to the Enterprise and its Business and affairs and, as a result, the Partnership did not undertake the Rescission Offer under the Consent and Agreement.

After taking control of the Enterprise, the Proxy Holders concluded that much needed to be accomplished in order to complete the critical infrastructure of the Business. For instance, they believed that appropriate key personnel had to be retained, multiple manufacturing sources had to be identified and secured, tabletters had to be identified and secured, additional progress had to be made regarding FDA approval, experienced distributors had to be identified and secured and a detailed business plan had to be finalized. Accordingly, since taking control, the Proxy Holders and key personnel of the Enterprise brought in by the Proxy Holders have been finalizing the Enterprise's business plan, working primarily on identifying and negotiating with bulk substance manufacturers and tabletters, securing final FDA approval for the manufacture, marketing and distribution of the Drug in the United States for the AF Indication, creating infrastructure, establishing relationships with certain women's advocacy groups and providers, and renegotiating more favorable terms in the Consent and Agreement and License Agreement

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000976

with the Council. As a result of such efforts, the Enterprise has engaged a new bulk substance manufacturer and has ongoing discussions with alternative manufacturing sources, is negotiating with several tabletters, has negotiated and executed the more favorable Revised Consent Agreement and Revised License Agreement, and is working on development of provider training and public education campaigns with certain women's advocacy groups. See "Business - Manufacturing and Tabletting" and "Certain Agreements." However, the significant time required to assemble the critical infrastructure for the Business, and in particular the time required to search for and secure new manufacturers, coupled with the attention required by certain legal proceedings (see "Legal Proceedings"), have caused significant delays in the introduction of the Drug into the United States market and placed greater pressures on the Enterprise's funding requirements.

## The Drug

The Drug was developed in France by a team of scientists as a means of interrupting pregnancy in its early stages without the woman undergoing surgery. The Drug is a potent antiprogestin which has the effect of blocking progesterone, a naturally-produced hormone that prepares the lining of the uterus for a fertilized egg and helps maintain pregnancy. Without progesterone, the lining of the uterus softens, breaks down, and bleeding begins.

The Drug alone is not sufficiently effective in terminating pregnancy. A prostaglandin is also required to cause the uterus to contract, helping to expel the embryo. Prostaglandins are substances naturally made by the lining of the womb during menstruation that cause contractions of the uterus. The prostaglandin used in France and proposed to be used in the United States is misoprostol, a drug already approved in the United States for certain other indications. Sweden and the U.K. primarily use a different prostaglandin, gemeprost, a vaginal suppository, which is not approved by the FDA for marketing in the United States.

In the United States, the regimen for the AF Indication will likely consist of the following: three tablets, each of which contains 200 milligrams of the Drug, followed two days later (unless the pregnancy has terminated by that time) by two tablets, each containing 200 micrograms of misoprostol. According to clinical tests separately conducted by the Council and the Donor, the Drug together with misoprostol is approximately 92% to 95% effective in the termination of pregnancies less than seven weeks LMP. Other studies have reported efficacy of up to 97%.

The Drug is approved and marketed for the AF Indication in France (1988), the U.K. (1991), and Sweden (1992), where it has been provided to over 300,000 women. It is also produced and marketed in China.

The Enterprise, together with the Council, has its initial efforts focused upon gaining approval from the FDA to use the Drug with misoprostol for the AF Indication in the United States during the first 49 days of pregnancy LMP. This is identical to the approved protocol in France. The regimen's safety and efficacy was established from two pivotal French trials involving 1,681 women. The data from those

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000977

trials was filed with the FDA as part of the NDA in March 1996, leading to an "Approvable Letter" for the Drug from the FDA in September 1996. Pregnancy termination occurred in 95.5% of the 1,681 women in the pivotal trials. In approximately half of the cases, pregnancy terminated within four hours after taking misoprostol. Three-quarters of women had pregnancy termination within 24 hours after taking misoprostol.

The data from the pivotal trials was supplemented with safety and efficacy data from a clinical study of 2,121 women undertaken in the United States by the Council. The United States study examined the effectiveness of the Drug followed by oral misoprostol for three groups of women: 859 women through 49 days LMP, 722 women 50-56 days LMP, and 540 women 57-63 days LMP. The results of this study were published in the prestigious New England Journal of Medicine in April 1998. They have also been filed with the FDA. These results show efficacy rates that are clinically no different than the French studies for pregnancies less than 49 days LMP (92% pregnancy termination). In approximately half of all cases of women less than 49 days LMP, pregnancy terminated within four hours after taking misoprostol. Approximately two-thirds of women in the study terminated their pregnancies within 24 hours after taking misoprostol. However, efficacy rates did decrease significantly at gestational ages greater than 49 days LMP.

The Drug itself appears to have few side effects; most of the side effects experienced by women taking the regimen are due to the prostaglandin. As an expected consequence of using the Drug for the AF Indication, vaginal bleeding occurs in almost all women. The most common side effect of the regimen in both the pivotal clinical trials and the United States trials was abdominal pain, including cramping. Other common side effects were nausea, vomiting and diarrhea. Serious side effects were rare.

Overall, the regimen was well tolerated by women in the United States trials. Results of the acceptability of the regimen were published in the July/August issue of Archives of Family Medicine. The overwhelming majority of women indicated they would recommend the regimen to others (96%), would choose it again (91%), and found it satisfactory (88%). Even the majority of women for whom the method failed indicated that they would try it again (70%) and/or recommend it to others (85%). The primary reason women chose the Drug over a surgical termination of pregnancy was to avoid surgery—they did not have to undergo an invasive surgical procedure. Many women also found the Drug regimen to be more natural than a surgical termination—similar to a miscarriage.

The development of the Drug, particularly its use for the AF Indication, has been very controversial; religious and advocacy groups protest the use of the Drug for perceived religious, moral and human rights reasons. It is possible that challenges or other actions may influence or prevent final FDA approval or cause legislation to be proposed or enacted which would limit or prohibit the use of the Drug for some or all potential applications. In addition, the ability of the Enterprise to successfully manufacture, market and sell the Drug may be adversely affected by protests, demonstrations or boycotts. See "Risk Factors - Risks Relating to the Business."

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000978

Aside from the AF Indication, the Drug has been researched for a variety of Other Indications including emergency contraception, cervical ripening, endometriosis, breast cancer, Cushings' disease, meningioma, and glioma. The Enterprise is investigating the opportunity to further study the Drug in these areas, but for the near to mid-term, is most interested in emergency contraception and cervical ripening (to assist in labor induction and surgical terminations). It is unclear at this time whether any of these Other Indications will ever come to market or provide a profitable opportunity. See "Risk Factors - Risks Relating to the Business."

### Patents

The Council is currently the registered holder of two United States patents for the Drug, U.S. Patent No. 4,386,085 and U.S. Patent No. 4,447,424, whose United States filing dates were January 8, 1982 and June 10, 1982, respectively, and issue dates were May 31, 1983 and May 8, 1984, respectively. The second patent was filed as a continuation in part of the application for the first patent.

Under present United States patent law, the term of a patent expires 17 years from the issue date of the patent. The legislation enacted to implement the most recent General Agreement on Tariffs and Trade ("GATT") provides that patents in force on June 8, 1995 will have a term of (a) 17 years from the issue date or (b) 20 years from the first United States filing date, whichever is greater. For the purposes of calculation, a patent filed as a continuation in part of an earlier patent has the filing date of the earlier patent. An existing patent which was issued less than three years after the first United States filing date is extended automatically by this new provision.

The first United States patent expires on May 31, 2000, which is 17 years from issue date. The patent has been extended under the GATT provision effective June 8, 1995 because it was issued less than three years after the first United States filing date. The new patent expiration date is January 8, 2002. The second United States patent expires on May 8, 2001, 17 years from the issue date. Under the GATT provision, the patent expires on January 8, 2002, which is 20 years from the first United States filing date, January 8, 1982. The new patent expiration date applies for the same reason as the first patent.

Patent counsel for the Enterprise has advised it that, under the Waxman-Hatch Act, the Council can request an extension of the patents for an additional two years to January 8, 2004, and possibly for as many as five years to January 8, 2007. The extension of these patents is vitally important for the Business of the Enterprise. The Enterprise has been informed that the Council intends to apply for the full five-year extension once the Drug has received final FDA approval for the AF Indication. However, there can be no assurance that any such extension request will be granted. See "Risk Factors - Risks Relating to the Business."

The Enterprise's right to manufacture, market and distribute the Drug derives from the Revised License Agreement entered into with the Council. For more details about the Revised License Agreement, see "Certain Agreements - Revised License Agreement."

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000979

The exclusive patent rights to manufacture, sell and distribute the Drug in the United States were obtained by the Council from the Donor. The patent transfer is subject to strict confidentiality on the part of the Council and its designees (such as the Enterprise) which, among other things, prohibits them from disclosing certain information. The distribution, dispensation and use of the Drug are subject to certain stated requirements and labeling of containers for the Drug must reflect certain relevant procedures. As a designee of the Council, the Enterprise is also subject to significant indemnification and insurance requirements. Importantly, the Council and the Enterprise are required to withdraw the Drug from the United States market for all purposes and to cease all activities in connection with the Drug immediately upon the occurrence of certain events, including a breach by the Council or its designees (such as the Enterprise) of their confidentiality requirements. Neither the Enterprise nor the Council necessarily has control over some of the withdrawal events. Accordingly, there is a risk that the Council's right to the United States patents for the Drug may be revoked in the future upon the occurrence of any such events. See "Risk Factors - Risks Relating to the Business."

In addition, the Council has received assurances from the Donor that it would have opportunities to be a candidate to distribute the Drug in certain countries outside the United States. In light of agreements made between the Council and the Enterprise in the Revised Consent Agreement (see "Certain Agreements - Revised Consent Agreement"), the Enterprise believes that opportunities for the distribution and sale of the Drug by the Enterprise in such countries may exist. However, there can be no assurance that the Enterprise will be able to capitalize on any such opportunities in the event that any of them materialize or that the Enterprise will have the financial resources to even pursue them. See "Risk Factors - Risks Relating to the Business."

Recently, the Council and the Enterprise learned that the Donor transferred (subject to certain opportunities reserved for the Council) all of its other patent rights involving the Drug outside the United States to a company controlled by its former President. It is suspected that the patent rights were transferred by the Donor in response to threatened boycotts by certain pro-life groups of other drug products sold by the Donor and/or its affiliates. The Enterprise has no reason to believe that the rights granted by the Donor to the Council for the United States patents will be adversely affected by such transfer. However, the intentions and strategy of the Donor's former President as to the commercialization of the Drug is unclear at this time and there can be no assurance that he will not seek to revoke the rights granted by the Donor to the Council for countries outside of the United States or otherwise adversely affect such rights. See "Risk Factors - Risks Relating to the Business."

The United States patent rights for use of the Drug, or sale of the Drug for use, in conjunction with misoprostol for the AF Indication are held by a foreign pharmaceutical company other than the Donor, referred to herein as the "XYZ Company." However, pursuant to a letter agreement (the "XYZ Agreement"), XYZ Company agreed not to institute or join in any legal proceedings against the Council or the Enterprise for infringement by them of the patents of XYZ Company so long as such infringement consists solely of the use of the Drug, or sale of the Drug for use, in conjunction with misoprostol for the AF Indication in the United States. Strict confidentiality of the XYZ Agreement is a condition to the agreements contained therein. The XYZ Agreement can be revoked by XYZ Company if (i) there is a material breach thereof by the Council or the Enterprise or (ii) there is a significant change of ownership

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

or control of the Council and/or Danco or either of them becomes insolvent or enters into liquidation or receivership. Several of the revocation events are not under the control of the Enterprise or the Council. XYZ Company has already consented to the transactions that were consummated under the ███ Agreement. See "Certain Relationships and Transactions - ██████████." Management believes that further consent from XYZ Company is not required under the XYZ Agreement in order to consummate any of the Transactions. However, see "Risk Factors - Risks Relating to the Business."

## Governmental Regulation

The Drug is a drug subject to extensive regulation in the United States by the FDA and by other federal, state and local authorities. The FDA regulates the research, development, clinical studies, manufacturing, processing, packaging, labeling, distribution, promotion and post-market surveillance of drugs and medical devices in the United States. Preclinical and clinical trials of drugs must be conducted in conformity with all applicable FDA regulations, including, with respect to preclinical trials, the FDA's Good Laboratory Practice regulations. In addition, state and local permits may be required under regulations relating to clinical activities.

Under the Federal Food, Drug and Cosmetic Act, data relating to drugs such as the Drug is subject to stringent FDA review to ensure that the drug is safe and effective before commencement of marketing, sales and distribution for clinical use in the United States. A company producing such a drug must subject its product to clinical trials, and thereafter submit to the FDA an application supported by extensive data, including clinical trial data, to prove the safety and effectiveness of the product. As part of the FDA application, the drug maker must submit a full description of the drug and its components, a full description of the methods, facilities and controls used for manufacturing, and proposed labeling.

At this stage, the FDA issues either an approval letter or approvable letter of the drug in question. When the FDA sends an approval letter, the subject drug is considered approved as of the date of the letter. Approval is subject to the FDA review of the final printed labeling before the drug can be marketed. Rarely, if ever, do drug sponsors receive an approval letter for an original NDA without first receiving an FDA request for some type of modification of the application in its originally submitted form. In many cases, an approvable letter precedes the approval letter. According to the FDA's Staff Manual Guide, "[t]he FDA will send the applicant an approvable letter if the application substantially meets the requirements for marketing approval and the agency believes that it can approve the application if specific additional information or material is submitted or specific conditions are agreed to by the applicant."

The Council filed its original Investigational New Drug ("IND") application with the FDA to utilize the Drug alone for the AF Indication in 1983. In the Spring of 1994, the Council amended its IND under which it conducted its research on the Drug with 2,100 new clinical trial patients. This study was completed in August 1995. The results obtained mirror experience in Europe where data on over 300,000 women has been obtained. Due to the extensive library of data available on the medication, and clinical results affirming those in France, the NDA was submitted in March 1996.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000981

On September 18, 1996, the FDA issued an Approvable Letter indicating that the Drug was approvable for the AF Indication in the United States, subject to certain additional tasks being accomplished before commercial sales may be commenced, such as the following:

- Approval of the manufacturer. The form of the Drug used in the clinical trials submitted to the FDA was manufactured by the Donor, which donated its rights to the Drug in the United States to the Council. Before the Enterprise can sell and distribute the Drug in the United States, the FDA must determine that the form of the Drug made by the Enterprise's manufacturer is bioequivalent to the form of the Drug made by the Donor.

- As part of obtaining final FDA approval, certain manufacturing information on the content of the chemistry, manufacturing and controls must be filed with the FDA. The Enterprise is responsible for supplying this information to the FDA, which it expects to receive from its new manufacturers and tabletters.

- The bulk substance manufacturer and the tabletter must each be inspected by the FDA.

- Bioequivalency and stability of the tabletted Drug must be established.

The Enterprise (along with its bulk substance manufacturer and tabletter) will need to demonstrate the ability to manufacture the Drug according to FDA standards. Further, the Enterprise must demonstrate that they have the systems required to track all transactions, respond to all inquiries in a timely manner, and account for all activity within the distribution chain.

Once final approval is obtained, the Enterprise will be required to register with the FDA and to submit drug listing information for products in commercial distribution, and its manufacturers will be subject to periodic reinspection by the FDA for compliance with current Good Manufacturing Practice regulations with respect to manufacturing, testing, distribution, storage and control activities (the "cGMP regulations"). Labeling and promotional activities are also regulated by the FDA. The Enterprise will be required to provide periodic reports containing safety and effectiveness information.

If the FDA believes that the Enterprise is not in compliance with applicable laws and regulations, the FDA can take one or more of the following actions: withdraw previously approved applications; require notification to users regarding newly-found, unreasonable risks; request corrective advertisements, formal recalls or temporary marketing suspension; refuse to review or clear applications to market any of the Enterprise's future products in the United States or to allow the Enterprise to enter into government supply contracts; or institute legal proceedings to detain or seize products, enjoin future violations or assess criminal penalties against the Enterprise, its officers or employees. Civil penalties for Food, Drug and Cosmetic Act violations may be assessed by the FDA in lieu of or in addition to instituting legal action. Any such action by the FDA could result in disruption of the Business for an indeterminate period of time. Various states in which the Enterprise's products may be sold in the future may impose additional regulatory requirements.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

Various meetings have been held with the FDA to ensure that the project was on track and that the Council was in compliance with all the requirements of the FDA. Most recently, a meeting was held on March 16, 1998, at which time the Enterprise informed the FDA of its manufacturing strategy and the associated regulatory approach that it expects to follow. However, see "Risk Factors - Risks Relating to the Business."

*Bulk Substance Manufacturing Strategy.* Arrangements with new bulk substance manufacturers are focused on ensuring that all efforts are geared towards support of a fast track regulatory strategy. Management plans to document all laboratory work and to define the process in a Technology Transfer Document, which will act as the blueprint for the manufacture of the Drug in bulk substance in the first pilot batches of approximately 5 kilograms each. The Technology Transfer Document will be made available to the FDA as appropriate to ensure that the FDA is comfortable with the chemistry and process being used. Once three 5 kilogram batches have been consistently produced, these validation batches will form the basis of the Chemistry, Manufacturing and Controls (the "CMC") section of the NDA which, together with three months accelerated stability data on those batches, will be filed with the FDA. Real time stability on these validation batches will continue even after filing of the CMC, so that approximately six months real time stability data should be available when the entire NDA will be ready for approval. The 5 kilogram batch size will then be scaled up to commercial batch sizes of 20 to 30 kilograms each and this manufacturing change will be filed as a supplement to the NDA.

The Enterprise is hopeful that the FDA will schedule its site visit of the bulk substance plant whenever that site is ready, and not wait until the entire NDA has been completed. Additionally, management believes that if Factory A follows the process of the Donor as closely as possible, then the FDA will consider Factory A merely as a site change, so that bioequivalence and other studies would not be required. The Enterprise plans to follow this strategy with slight adjustments for each additional manufacturer that is engaged to produce the Drug in bulk substance.

In 1995 and 1996, various agreements had been entered into between the Council, Danco and the Previous Manufacturer. This Previous Manufacturer had a reputation for producing products requiring complicated steroid chemistry and was also purported to be in compliance with the cGMP regulations. As such, the Previous Manufacturer appeared to be very appropriate to manufacture the Drug in bulk substance, and the Donor agreed to transfer the production technology directly to it, although it is unclear whether or not the Previous Manufacturer accepted such transfer. The Previous Manufacturer actually produced pilot batches (4x4.5kg) in March 1996. The Enterprise's consultants had some concerns about the stability testing and other matters related to these batches, but the Previous Manufacturer was required to produce a Drug Master File (the "DMF") based on its experience with these batches. Despite numerous requests for the DMF, which the Previous Manufacturer repeatedly said would be filed imminently, this had not been completed by February 28, 1997, when the Previous Manufacturer purported to unilaterally terminate its contract with Danco. Currently, the Previous Manufacturer is the defendant in a lawsuit for damages, which has been brought by Danco. See "Legal Proceedings - Proceedings Commenced by the Enterprise." The impact of losing a manufacturer who had already completed the laboratory work and who had produced the pilot batches of bulk substance was to set the project back eighteen months to two years from its original timetable depending upon the time needed

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The Information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000983

to find a new manufacturer, enter into an agreement, complete the laboratory work and produce the pilot batches of the Drug in bulk substance. See "Business - Manufacturing and Tabletting."

*Tabletting Strategy.* The Enterprise's strategy with respect to tabletters is to formulate, tablet and package the three 5 kilogram validation batches from the bulk substance manufacturer as validation tablet batches. These validation batches will form the basis of the CMC section, which will be filed together with three-month accelerated stability data. The Enterprise will continue to monitor real time stability and.file this data in a supplement to the NDA to extend the shelf life of the tabletted product.

The Enterprise believes that it has developed a strategy that will help it be successful in obtaining final approval from the FDA to manufacture and sell the Drug in the United States for the AF Indication. However, there can be no assurance that it will be successful in obtaining such approval or obtaining it in a timely manner, even with the assistance of the Council. Moreover, as detailed above, the Enterprise will rely on certain third parties to produce and tablet the Drug. Accordingly, the Enterprise will be susceptible to the failures of these third parties to perform obligations under contracts with the Enterprise. See "Risk Factors - Risks Relating to the Business."

## Manufacturing and Tabletting

*Bulk Substance Manufacturing.* Following the unilateral purported termination of the Manufacturing Agreement by the Previous Manufacturer, the recent focus of the Enterprise has been on bringing in a new management team and locating a replacement manufacturer as rapidly as possible. The ideal manufacturer would be one that had a facility that was in compliance with all FDA requirements and also had extensive experience in steroid chemistry. Well-established pharmaceutical manufacturers with a background in steroids would be obvious first choices. However, it was established very early on that none of these large pharmaceutical companies had interest in manufacturing this product, primarily because of its small volume and revenues relative to their existing products and because of any political fallout on their entire business due to potential protests and boycotts by certain religious and advocacy groups. Therefore, the Enterprise focused its efforts on finding a facility that was experienced in steroid chemistry, but not yet in compliance with FDA requirements. Of these, the Enterprise concentrated on those that it believed, with management's assistance, had a high probability of becoming compliant within an accelerated timeframe.

The Enterprise entered into a manufacturing agreement in November 1997 with a foreign manufacturer that is affiliated with a U.S.-based steroid chemistry laboratory to define the chemistry process in laboratory scale, develop a Technology Transfer Document and implement pilot scale and commercial production in its offshore facility ("Factory A"). The laboratory work is being finalized. The offshore facility is in the process of being upgraded and renovated to meet both the Drug's process needs and the FDA cGMP compliance requirements. With help from the Enterprise's management team and that of a major United States pharmaceutical company that has separately contracted the New Manufacturer to produce pharmaceutical grade intermediates (in separate equipment), Factory A has embarked on a program to prepare and implement full documentation and validation required for FDA

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

approval. The Enterprise has seen significant progress at the offshore site and expects that the first three validation batches will be completed by the end of the fourth quarter of 1998, and the CMC Section filed with the FDA in January 1999, with an FDA site inspection to follow in the first quarter of 1999. Three high-quality, laboratory scale batches have already been made.

Given its experience with the Previous Manufacturer, the Enterprise has decided that it is prudent to work with at least two bulk substance manufacturers to prevent being left without a source of supply due to inability of the other manufacturer to supply for any reason. On July 16, 1998, the Enterprise entered into an agreement with an additional supplier ("Factory B") which has substantial experience producing prescription drugs for women but is not now in compliance with the FDA requirements. However, Factory B appears to be rapidly moving towards compliance. With additional help from the Enterprise focusing on Drug process specific issues and adding expertise to the ongoing cGMP regulations upgrade program, Factory B may be a viable bulk substance supplier with similar timing as Factory A.

In addition, the Enterprise has identified another potential supplier ("Factory C") who is willing to renovate its facility and carry out the necessary upgrades to be in compliance with the requirements of the FDA. Similar to Factory A, Factory C will have to develop the process in the laboratory first, but its production will occur on the same site. Discussions with Factory C are ongoing.

Furthermore, as the Enterprise develops the Other Indications for the Drug, it may wish to utilize a manufacturer that will not be producing the Drug for the AF Indication. As a result, management has established a relationship with another manufacturer ("Factory D") which is currently FDA-approved and which is willing to produce the Drug for Other Indications, but not for the AF Indication. The Enterprise may contract with this Factory D as appropriate based on the development timeline of the Other Indications.

*Tabletting.* Similar to its strategy with regard to bulk substance manufacturers, the Enterprise intends to engage one or two qualified tabletters to formulate the bulk substance into tablets and package it in strip packs of three tablets each. The Enterprise is currently negotiating with an offshore tabletter who is both willing and able to supply the Enterprise's tablet needs for the United States market and elsewhere. This facility is not FDA-approved at this time but it is independently working toward that goal and plans to have the facility available by the fall of 1998. It is expected to be ready to manufacture tablets of the Drug in the fourth quarter of 1998 and place them on accelerated stability. Under those circumstances, the Enterprise could file the CMC section together with the accelerated stability data early in 1999 and seek inspection of the tabletting facility by the end of the first quarter.

Management has also had discussions with several other tabletters in the United States, some of whom are FDA-approved and others of whom are not. In addition, some factories require the Enterprise to establish a separate facility within its larger facility, but these have a substantial capital cost, require manpower and in some cases could be inappropriate for the small volumes needed. A future opportunity is provided by Factory B above, which is developing a new state-of-the-art tabletting facility, but which will only be ready some time in 2000. All these options are being examined so that the Enterprise can select those which can provide a quality product at a reasonable cost and in the timeframe required.

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000985

## Marketing and Distribution

Due to the likely restrictions on the distribution of the Drug product to be imposed by the FDA, given the primary use of the Drug for the AF Indication, and given the high concentration of pregnancy terminations in clinics (approximately 70%), the Enterprise does not anticipate utilizing a pharmaceutical sales force to promote the Drug product. Instead, the Enterprise plans to primarily focus on the training of providers who will carry the training materials, messages and experiences back with them to their clinics, hospitals or private practices, and on extensive public education programs to educate women about the availability of the Drug product. For those providers who are unable to attend group training sessions, the Enterprise plans to provide home learning kits which should serve a similar purpose. It is also contemplated that the Enterprise will work with specific women's interest groups who are very supportive of the product in order to successfully reach both the providers and women of reproductive age. In addition, a promotional campaign through the mail will be developed to reach the various constituents.

The Enterprise and its management (with assistance from the Council) have been building relationships with key women's advocacy groups and professional organizations in the field of reproductive health and rights. These groups have focused much of their efforts on making the Drug available to American women. This objective continues to be a priority for them. By utilizing these groups' longstanding expertise in reproductive health and rights, management is gaining a wealth of knowledge and assistance, particularly in the areas of provider training and public education. Working hand-in-hand with the women's advocacy groups will provide management with invaluable assistance on how to most effectively reach both providers and women in need of the Drug. Strong partnerships between the Enterprise and these groups are anticipated in order to meet the primary objective of making the Drug available to women planning to terminate their pregnancies.

*Marketing Objective.*

- Launch product as rapidly as possible, achieving market penetration for termination of pregnancy in the first 49 days LMP, in clinics, of 10%, 45% and 55% in the first, third and fifth years of marketing, respectively and 6%, 40% and 44% respectively among non-clinic providers (OB/GYN offices, hospitals, etc.), giving an aggregate market penetration among all providers of 9%, 44% and 52%, respectively.

- This is estimated to result in sales of approximately $6.6 million, $34.9 million and $41.7 million for the first, third and fifth years, respectively.

*Marketing Strategy.*

- Ensure that all key providers are identified (including key nursing staff) and that as many as possible are fully trained in use of the Drug ahead of launch.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000986

- Build interest and awareness among potential patient groups through public information and education programs and direct mail activities.

*Promotional Objective.*

- Position the product as a scientific breakthrough in women's reproductive health allowing women to choose an FDA-approved medical, non-invasive and more natural option to terminate their pregnancy, avoiding any aspect of surgery.

*Promotional Strategy.*

- Utilize extensive provider training at key meetings (NAF, PPFA, etc.), supplemented by "at home" training curricula to ensure that providers are fully equipped and trained to both offer and deliver the product as the first choice for women seeking termination of pregnancy in the first 49 days LMP.

- Complement training with extensive public education programs.

- Utilize extensive network of opinion leaders to spread key messages.

- Provide promotional material to known providers as well as potential providers through an aggressive direct mail campaign.

*Key Marketing Messages.*

- Believed to be a breakthrough product.

- First FDA-approved medical product to terminate pregnancy.

- The Drug provides women with a scientifically tested and proven medical option to surgical termination of pregnancy.

- Non-invasive treatment with oral tablets; avoiding any aspect of surgery.

- A more natural method to terminate pregnancy; similar to a miscarriage.

- Product regimen allows women themselves to take control of their own pregnancy termination.

- Large-scale clinical trials show from 92% to 97% efficacy during the first 49 days LMP.

- Extensive safety profile has been established.

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may he subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000987

- Experience in more than 300,000 women in France, the U.K. and Sweden.

- Generally well tolerated.

The foregoing marketing and promotional objectives, strategies and messages are included merely to describe the current anticipated marketing approach to be utilized by the Enterprise in promoting the Drug in the ordinary course of the Business and should not be relied upon by Current Partners and prospective Investors as being factual assertions or forecasts.

*Distribution.* The Drug will be distributed under very tight controls so that each tablet can be accounted for at all times. This is a requirement of both the Council and the FDA. · In order to comply, the Enterprise intends to· distribute the Drug through one or two appointed· distributors·who·will·be responsible for setting up individual accounts for·providers and making collections, ensuring patient consent forms are obtained and implemented (without violating patient confidentiality) and tying the serial number on them to the serial number on each pack of three tablets, handling all account queries (customer service) and establishing and maintaining a toll-free number which branches to the Enterprise for medical advice and assistance. This product will not be made available through pharmacists, but shipped directly to providers from the distributors. While management does not have any quotations in hand at this time, it expects distribution costs to be in the range of 3-6% of sales with the higher percentages applicable in the early years when accounts are being set up and queries are at their highest level. Distribution costs are expected to range from approximately $650,000 per year in the early years to $1,400,000 per year thereafter.

## Competition

The Drug has potential application in a number of fertility-regulation markets. As such, it is believed to transcend traditional boundaries between contraception and pregnancy termination. It becomes easier and more accurate to think in terms of a continuum of reproductive health options, with the Drug having differing degrees of potential and actual competitors along the continuum.

*Standard Surgical Pregnancy Termination.* Since the overwhelming majority of pregnancy terminations currently performed are surgical procedures using electric vacuum aspiration, the Drug will be competing primarily with these procedures. However, many physicians are unwilling to perform a surgical termination prior to 6 or 7 weeks LMP (because of increased risk to the patient and increased difficulty for the physician)—the timeframe for which the Drug is expected to be approved. Management believes that surgical procedures using electric vacuum aspiration, therefore, are not directly competitive with the Drug in the very early weeks post LMP. One of the primary advantages of the Drug is the possibility for early termination of pregnancy compared to a standard surgical procedure. Another advantage is for those women who want to avoid any aspect of surgery: the majority of women who have chosen the Drug indicate that they did so in order to avoid surgery. Many women also feel that medical termination of pregnancy is more natural—they perceive the use of the Drug as equivalent to experiencing

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000988

a miscarriage. Some women also like the increased sense of control the Drug gives them in terminating their pregnancy.

*Surgical Pregnancy Termination with MVA.* There is a lesser-known surgical procedure that is a potential direct competitor to the Drug for early pregnancy termination: manual vacuum aspiration ("MVA"). This is essentially a surgical procedure using a hand-held manual syringe rather than an electric vacuum pump. MVA has been in use in the United States and in developing countries for approximately two decades. Due to advances in technology such as highly sensitive pregnancy tests and vaginal ultrasounds, physicians can now perform surgical pregnancy terminations very early in pregnancy with MVA equipment. There has been a recent surge of interest in MVA in part because of medical pregnancy termination. MVA can be used as an effective, easy backup solution in those few percent of cases where medical termination fails. Many leading clinicians feel that while MVA is a good option for women to have, it is not a substitute for the Drug. As mentioned above, most doctors are not comfortable performing early surgical terminations, even with vaginal ultrasound and MVA equipment, prior to 6 or 7 weeks LMP. As is also mentioned above, most women who choose medical pregnancy termination do so to avoid some aspect of surgery; MVA is still an invasive surgical procedure.

*Medical Pregnancy Termination.* Additionally, there are alternative medical methods of early pregnancy termination that are direct competitors to the Drug. Currently, some physicians are using the drug methotrexate, off-label (i.e., without FDA approval), to perform medical pregnancy terminations during the first 7 weeks of pregnancy. Originally approved for use in treating certain forms of cancer and arthritis and now off-patent, methotrexate has been used off-label (i.e., without FDA approval) since the 1980's to terminate ectopic (tubal) pregnancies. Several studies in the 1990's have indicated that methotrexate is effective in terminating early uterine pregnancies. However, many leading clinicians feel that the Drug is a superior product and is preferable to methotrexate, in part because the Drug's action is usually quicker and more predictable. The Drug and methotrexate may have comparable efficacy, but the Drug's time course is better, which should positively impact acceptability by women. Methotrexate takes approximately 4 weeks to achieve success rates that the Drug reaches in one week. Methotrexate also appears to have a more severe side effect profile than the Drug and is known to cause fetal malformations in those cases where the pregnancy termination is not successful and the pregnancy continues.

There is current ongoing research on two other medical methods of early pregnancy termination: tamoxifen followed by misoprostol and misoprostol by itself. Both tamoxifen and misoprostol are being used off-label for the AF indication. There has only been one pilot study on tamoxifen (an anti-cancer agent) in combination with misoprostol. Researchers found that administering 4 days of tamoxifen to soften the cervix followed by misoprostol resulted in greater than 90% successful pregnancy terminations in a small number of women. Research on misoprostol in early termination of pregnancy shows efficacy ranging from 50% to 95%. Most of the research has involved vaginal use of misoprostol with very complex regimens that are not practical for wide usage. Further research on misoprostol, including pilot studies of different oral regimens with women less than 6 weeks LMP, is being proposed by others. Management believes that both tamoxifen with misoprostol and misoprostol alone need substantially more clinical research before either can emerge as a serious competitor to the Drug.

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

H00000989

CONFIDENTIAL

*Contraception and Emergency Contraception Uses.* The Drug could potentially have utility as a daily oral contraceptive as well. However, it would face considerable challenge from current oral contraceptive brands which also have a very low price. It could also potentially be used as a once-a-month contraceptive. There are currently no such once-a-month drugs approved in the United States. While contraceptive use is scientifically feasible for the Drug, it is not a high priority nor does the Enterprise believe that it has a high probability of success.

·In contrast, preliminary clinical studies have shown the Drug to be an effective emergency contraceptive. Emergency contraception, also known as the "morning after pill," is a way of preventing pregnancy following unprotected sexual intercourse. The most common method reduces the risk of pregnancy by approximately 75%; it involves taking two double doses of regular oral contraceptive pills within 72 hours of having unprotected sex (the "Yuzpe regimen"). However, a significant number of women using the Yuzpe regimen experience ill effects, such as nausea and/or vomiting. The FDA has published a notice in the Federal Register concluding that the use of certain oral contraceptives for emergency contraception is safe and effective; this notice represents a strong FDA endorsement of this off-label use. However, no major pharmaceutical manufacturer of oral contraceptives has expressed any interest in relabelling their product to include this usage. Currently, there remains a low level of awareness among women and providers as to emergency contraception's existence. There could potentially be a substantial market for the Drug as an emergency contraceptive, which in previous small clinical studies has tended to be more effective and cause fewer side effects than the current emergency contraception regimen. Large scale clinical trials will be necessary to resolve dose and efficacy issues to the satisfaction of the FDA. Competitive pricing will also be a challenge for this Other Indication.

*Competitive Entities.* The Enterprise is aware that the Drug has been manufactured in small quantities in the United States for Abortion Rights Mobilization ("ARM"), a New York based organization headed by Lawrence Lader, the abortion rights activist. ARM has stated that it is conducting trials of the Drug for the AF Indication involving women in 11 cities across the United States until the Drug can be supplied on a regular basis by the Enterprise. ARM apparently produced initially very small quantities of the Drug in laboratories set up by its affiliate, ARM Research Council, but subsequently closed that facility and found a laboratory in the United States willing to produce additional small quantities for it. ARM has not revealed the name of the United States manufacturer to the Council or the Enterprise. Lader claims that his purpose in producing the Drug is to make it available to American women and that his efforts are purely temporary—a stopgap measure until the Enterprise makes the Drug commercially available.

A New Jersey start-up company, Gynetics, Inc., is planning on introducing a dedicated emergency contraception product utilizing the Yuzpe regimen into the United States market sometime in 1998. According to press reports, Gynetics expects to receive FDA approval for its emergency contraception product during the summer of 1998. Gynetics is proceeding with plans to undertake an initial public offering of its securities in the near future, attempting to raise $5-10 million.

The pharmaceutical industry is subject to rapid and substantial technological change. Competition from pharmaceutical companies, biotechnology companies and universities is intense and expected to

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000990

increase. Many of these have significantly greater resources than the Enterprise. There can be no assurance that developments by others will not render the Enterprise's product or technology non-competitive. See "Risk Factors - Risks Relating to the Business."

### Employees

The directors, executive officers and key personnel of the Enterprise are discussed under "Management." Currently, the Enterprise has no other employees.

### Properties

The Enterprise is currently subleasing office space in New York City on a month-to-month basis. Annual rent for such office space is approximately ▓▓▓▓▓. The Enterprise is also reimbursing an affiliate of W. Bradley Daniel and an affiliate of ▓▓▓▓▓, two of the Proxy Holders, for the cost of using certain additional office space. See "Certain Relationships and Transactions - Use of Office Space from Certain Related Parties." Each of those are on a month-to-month basis as well. Except as described above, the Enterprise neither owns nor leases any real property.

## CERTAIN RELATIONSHIPS AND TRANSACTIONS

### Pike Removal

▓▓▓▓▓ was the founder of the Enterprise and, prior to February 1997, he controlled the management of the Enterprise as well. He was selected by the Council from various interested parties to commercialize the Drug in the United States as he was affiliated with a company with which the Council had worked from time to time on previous projects. However, as the consequence of circumstances described below and elsewhere in this Memorandum, Mr. ▓▓▓ has been removed from his management role with respect to the Enterprise and divested of a substantial portion of his interest in the Enterprise. See also "The Rescission Offer - Reasons for Rescission Offer."

*License Resignation; Forgery Conviction.* In 1985, Mr. ▓▓▓ was an attorney licensed to practice law in the State of North Carolina. In May 1985, Mr. ▓▓▓, in the capacity of agent, entered into a purchase and sale contract pursuant to which he agreed to purchase real property in North Carolina for two investors.

Apparently, a dispute arose between the investors and ▓▓▓▓▓ relating to the transaction and the two investors filed litigation proceedings against ▓▓▓▓▓ and his former law firm. In an affidavit to the North Carolina State Bar Council, dated July 1, 1993, ▓▓▓▓▓ stated that (i) he "contracted for the sale of the Property at a purchase price of $954,072.63 but represented the price to the two investors as $1.4 million", (ii) he represented he "was contributing money towards said purchase price when, in fact, he did not make a monetary contribution towards said purchase price" and (iii) he "provided

Strictly Confidential Proprietary Information

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Donca Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Donca Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

documentation to the investors indicating that he made a monetary contribution towards the purchase price of the Property when in fact such a monetary contribution had not been made." Following such affidavit, on July 9, 1993, the North Carolina State Bar Council entered an order of disbarment stating that "the facts admitted in the affidavit are grounds for discipline pursuant to N.C.G.S. Section 84-28(b) in that ▆▆▆▆ engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 1.2(c) of the Rules of Professional Conduct." ▆▆▆▆ voluntarily resigned his license to practice law in North Carolina and "retired" from the New York State Bar.

It is believed that the investors and ▆▆▆▆ and his former law firm entered into a settlement agreement, pursuant to which ▆▆▆▆ and the law firm agreed to pay to the two investors a substantial sum of money in return for a release of such claims.

On May 30, 1996, during the Prior Offering, ▆▆▆▆ pled guilty to misdemeanor forgery charges based on his conduct in connection with the transaction described above. ▆▆▆▆ received a two-year suspended sentence and was placed on probation for eighteen months. He was also ordered to pay a $300 fine and to perform 200 hours of community service within nine months.

The Proxy Holders are not aware that any of the events mentioned in the preceding five paragraphs were disclosed by ▆▆▆▆ in the Prior Offering Memorandum or any other materials distributed to the Council in connection with his selection to commercialize the Drug in the United States, or to prospective investors in connection with the Prior Offering.

*Removal Proceedings.* On November 6, 1996, the Council and ▆▆▆▆ filed a complaint against ▆▆▆▆ in New York State Court, which action was later removed to the United States District Court, Southern District of New York, which alleged that ▆▆▆▆ fraudulently concealed crucial facts bearing directly on his character and fitness for a leading role in the project to introduce the Drug in the United States. The complaint sought ▆▆▆▆ removal from his management role with respect to the Business, divestiture of his ownership interest in the Enterprise and certain other relief. Thereafter, ▆▆▆▆. ▆▆▆▆ disclosed to Limited Partners the circumstances surrounding the above-described transaction in Investor Update No. 4 dated November 22, 1996.

▆▆▆▆ then convened a special meeting of the Limited Partners to discuss the status of the litigation commenced by the Council and ▆▆▆▆ against him (the "Council Litigation") and arrange for the transfer of his controlling interest in the General Partner. The meeting was held on December 11, 1996 in San Diego, California, with most of the Limited Partners in attendance or otherwise represented through proxies or by telephonic conference. A quorum of Partners was present and/or represented at the meeting. At the meeting, certain representatives of the Limited Partners (the "LP Representatives"), including ▆▆▆▆, W. Bradley Daniel, ▆▆▆▆ volunteered to discuss with ▆▆▆▆ the terms and conditions under which he would turn over management responsibilities for, and transfer at least a majority of his ownership interest in, the Enterprise to a person or persons mutually agreeable to ▆▆▆▆, the Limited Partners, the Council and

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

75

Following the December 11, 1996 meeting, the LP Representatives, particularly Messrs. ███ and Daniel and ███████, engaged in extended discussions with ██ ██ and representatives of the Council and ██████, and participated in settlement conferences before the Magistrate of the District Court to whom the Council Litigation had been assigned.

On January 24, 1997, the LP Representatives sent a Memorandum to the Limited Partners to discuss the status of their negotiations and solicit consent to the transfer of interests in, and change in control of, the Enterprise. Under the agreement negotiated at that point between ██ ██ and the LP Representatives, the LP Representatives and any other Limited Partners who chose to invest (collectively, the "Participating Investors") would purchase from ██████ 75% of the equity interests in the General Partner. In the January 24, 1997 Memorandum, all Limited Partners were offered the opportunity to become Participating Investors by responding on or before January 31, 1997, provided that the interests and the purchase price would be allocated among the Participating Investors in proportion to the relative amounts of each Participating Investor's then-current cash investment in the Partnership.

Subsequent to the January 24, 1997 Memorandum, the LP Representatives determined that it was impractical, for logistical and timing reasons, to attempt to involve all of the Limited Partners in the purchase of equity interests from ██████. Accordingly, on January 31, 1997, the LP Representatives sent a Memorandum to the Limited Partners to update the Limited Partners on the revised form of agreement with █████ (the "██████"). The terms of the ███████ are discussed below. Through the January 31, 1997 Memorandum, the LP Representatives solicited the consent of the Limited Partners to: (i) the transfer of interests in, and change in control of, the General Partner; (ii) the transfer of voting control of the General Partner to the Proxy Holders; (iii) enter into, on behalf of the Partnership, the ████ Agreement and the Consent and Agreement with the Council and Advances. A majority-in-interest of the Limited Partners consented to such matters.

████ Agreement. Pursuant to the ████████, ████████ (i) transferred 75% of the outstanding stock of the General Partner to MedApproach; (ii) delivered an irrevocable proxy pursuant to which voting power over the remaining 25% of the outstanding stock of the General Partner was granted to the Proxy Holders; and (iii) resigned from any and all of his positions as an officer or director of the General Partner and its related entities.

In exchange for the above, ████ was given a ████████ cash loan by MedApproach at an interest rate of ████ per year, which was to have been repaid by being set-off against ████ share of the available Partnership profits attributable to the General Partner. A portion of the loan ████ was retained by MedApproach to pay for certain claims, including those resulting from the breach of the ████ Agreement or the Standstill Agreement (as hereinafter defined) and any inaccuracy of the representations and warranties made by ████ in the ████████, to the extent that such claims exceed ████ in the aggregate. MedApproach and the Proxy Holders have asserted claims against ████ for breach of the ████████ and, therefore, never released the retained funds to him. ████ was also to be engaged as a consultant by one or more of the Participating Investors pursuant to a consulting agreement (the "Consulting Agreement") for a term of 5 years for compensation of ████

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000993

per year, subject to annual adjustments determined by increases in the consumer price index. The costs incurred pursuant to the Consulting Agreement were to be reimbursed by the Enterprise.

t provided that the Partnership would indemnify and hold harmless ▮▮▮ for any liabilities and costs resulting from litigation or arbitration deriving from his role as the principal of the General Partner prior to the date of the ▮▮▮ t, unless and to the extent ▮▮▮ is adjudicated to have acted in a grossly negligent manner, to have breached his fiduciary duty to the Limited Partners or to have failed to properly account for any assets of the Enterprise. Such indemnification does not cover any losses, damages or expenses in excess of ▮▮▮ relating to Mr. ▮▮▮ breach of the ▮▮▮ or the Standstill Agreement.

The ▮▮▮ also contained a covenant not to compete from ▮▮▮ in favor of the Enterprise and MedApproach. Until the later of 3 years after the expiration or other termination of the Consulting Agreement or 5 years from the date of the ▮▮▮, ▮▮▮ prohibited from, directly or indirectly, engaging in any business or enterprise competitive with the Business and which relates to the development, manufacturing, marketing or distribution of any drug for the AF Indication. ▮▮▮ existing involvement in certain enterprises that manufacture and/or sell intra-uterine devices and vaginal rings was agreed not to violate this covenant not to compete.

Under the ▮▮▮ Agreement, MedApproach and certain of the other Participating Investors (▮▮▮) agreed to purchase, in proportion to their relative interests in the Partnership, any Limited Partnership Interests necessary to fund the transactions contemplated by the Rescission Offer. In addition, MedApproach and such other Participating Investors agreed to contribute, pro rata according to their Limited Partnership Interests in the Partnership, the amount of the additional ▮▮▮ that the Partnership is trying to raise by the sale of Additional Interests in the Offering, to the extent that the Additional Interests are not purchased by the other Limited Partners. The obligations of such Participating Investors to contribute additional capital to the Partnership may be allocated among them in any other manner as is agreed to by such Participating Investors.

Pursuant to the ▮▮▮, the Enterprise agreed to issue to ▮▮▮ warrants to purchase an additional ▮▮▮ interest in the Partnership. The exercise price of such warrants is to be based on an Enterprise valuation of ▮▮▮ and such warrants shall have a maturity of 10 years. ▮▮▮ assigned a portion of his interest in such warrants to an entity controlled by ▮▮▮. See "Certain Relationships and Transactions - Financial Advisory Services Agreements."

The ▮▮▮ Agreement contained numerous other executory provisions (i.e., covenants and obligations to be performed after the date of execution of the Agreement) regarding the economic rights and future performance of ▮▮▮, MedApproach and the Partnership. The ▮▮▮ Agreement also contained various representations and warranties by ▮▮▮ as to certain factual matters.

On February 12, 1997, following the execution of the ▮▮▮ Agreement, the parties to the Council Litigation filed a Stipulation of Dismissal pursuant to which they dismissed the action with prejudice. ▮▮▮ executed a release that released and discharged the Council, ▮▮▮ and their respective

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000994

officers, directors, trustees, employees, members, shareholders, agents, representatives, attorneys and other related persons from claims and other actions: (i) arising from their conduct alleged therein; and (ii) arising out of related to their efforts in connection with ████ ████ removal as contemplated in the ████ Agreement. Likewise, the Council and ████ executed a release that released and discharged ████ and all of his employees, agents, representatives, attorneys and other related persons from claims and other actions: (i) arising from their conduct alleged therein; (ii) arising out of or related to ████ efforts to maintain his role in the Partnership and its affiliates; and (iii) certain other matters.

After giving effect to the transactions contemplated by the ████ Agreement, ████ continues to hold a 25% interest in the General Partner and a Limited Partnership Interest in the Partnership equal to his ████ investment in the Partnership. Neither of those ownership interests carry any management rights.

*Alleged Breach of ████ Agreement.* Subsequent to the execution of the ████ Agreement, the Proxy Holders and MedApproach believe that ████ breached several of his material obligations under the ████ and that one or more of the representations made by ████ in the ████ are inaccurate. For instance, the Proxy Holders believe that ████ has failed to use his best efforts to assist them in certain matters affecting the Business and the Enterprise (as required by the ████ ) and has conducted himself in such a way as to "materially frustrate the Project." Other misrepresentations and breaches of the ████ are also believed or suspected to have occurred.

The ████ Agreement provided that, in the event of a material breach or violation by ████ of the Consulting Agreement or any other agreement with the Participating Investors, or if ████ were to materially frustrate the Business or the ████ Agreement, including a material breach of his representations and warranties thereunder, among other remedies: (i) ████ would be personally liable to repay the ████ loan referenced above; (ii) MedApproach would have the option to declare the loan immediately due and payable; (iii) the payments under the Consulting Agreement would be immediately terminated; and (iv) ████ would not be entitled to indemnification by the Enterprise.

As a result of such alleged violations of the ████ Agreement and other reasons, MedApproach accelerated the due date for the ████ loan provided under the ████ Agreement and sought repayment from ████ personally. Moreover, MedApproach and the other interested Participating Investors have taken the position that their obligations under the ████ Agreement to purchase the Offered Interests (to the extent that they are not purchased by the other Limited Partners) was voided as the result of ████ alleged breaches, as is the obligation for the Participating Investors to engage ████ under the Consulting Agreement.

In order to enforce the positions taken, MedApproach and the Enterprise filed a lawsuit against ████ , alleging breach of the ████ Agreement. The lawsuit was later dismissed by the court. One of the reasons for dismissal related to the fact that the ████ Agreement required disputes relating thereto to be settled by arbitration. MedApproach and the Enterprise intend to submit such matters to arbitration. See "Legal Proceedings – Other Threatened or Anticipated Litigation and Arbitration."

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Donco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Donco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000995

*Standstill Agreement*. In connection with the removal of ▮ from his management role with respect to the Enterprise, ▮ executed a letter agreement on February 5, 1997 in favor of the Council and the Partnership (the "Standstill Agreement") which prohibited his further involvement in the Business and the Enterprise. The Standstill Agreement provides that ▮ is prohibited from (i) the direct or indirect acquisition of any additional interest in the Enterprise without the prior written consent of the Council, (ii) representing to the public as having any affiliation with the Enterprise, (iii) using the names "Neogen," "Danco" or "▮" or (iv) making any public statement concerning his involvement with the Business or the Enterprise or any statement regarding the ▮ Agreement.

On June 16, 1998, the Council's legal counsel sent a letter to ▮ in which the Council alleged that ▮ violated the terms of the Standstill Agreement as a result of remarks attributed to him in an article published in the April 30, 1998 edition of the San Diego Union Tribune. The Council considered such remarks to be disparaging to the Council and an improper public statement relating to his involvement with the Enterprise. The Council also suggested that ▮ involvement in certain litigation violates the terms of the Standstill Agreement.

Financial Advisory Services Agreements Between ▮ and Certain Parties

In November 1996, ▮ engaged a company controlled by ▮ as a financial advisor in connection with various transactions. ▮ agreed to compensate ▮ with (i) a ▮ fee payable out of ▮ gross cash flow from the Enterprise; and (ii) of anything received by ▮ and his affiliated entities relating to the Business or the Enterprise (with item (i) credited against item (ii)) when and as received by ▮ (other than the ▮ per year anticipated as management fee). In connection with the execution of the Consent and Agreement, ▮ initiated a revision of this arrangement. In satisfaction of ▮ compensation obligations to ▮ noted above and his obligations to pay ▮ out-of-pocket and legal expenses under the arrangement, ▮ was paid ▮ from the proceeds of the loan made by MedApproach to ▮ under the ▮ Agreement and ▮ assigned to ▮ his right to purchase a ▮ Percentage Interest in the Partnership under a warrant entitling the holder to purchase a ▮ Percentage Interest. The engagement of ▮ was an alternative to requests by the Council and ▮ for ▮ to serve as a trustee for ▮ interests in the Enterprise in a manner that was acceptable to the Council and the Partners. The engagement of ▮ and the primary terms of it were disclosed to Partners at a meeting held in December 1996. ▮ has since assigned its remaining rights under its engagement agreement (including its interest in the warrant) to MedApproach in exchange for certain agreements.

In October 1996, ▮ engaged ▮ as a financial advisor in connection with various transactions. ▮ agreed to compensate ▮ for such services by paying ▮ a portion of the profits and distributions allocable to ▮ from the Partnership and related entities regarding the Business. Following the execution of the original Consent and Agreement by the Enterprise and the Council and prompted by concerns of the Council, ▮ initiated a revision of this arrangement. As revised, ▮ is entitled to receive ▮ % of any profits or distributions received by ▮ and his affiliated entities as a result of ▮ residual interest in the General Partner. ▮



*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL   H00000996

has since assigned his right to any such fees, commissions or other compensation to MedApproach in exchange for certain agreements.

## Prior Offering Commissions to Related Parties

The Partnership, by letter dated March 28, 1996, agreed to pay to ▮ a commission on the funds raised as a result of his contacts or efforts in connection with the Prior Offering, on the condition that a minimum of ▮ was raised. The Partnership purportedly raised a total of ▮ in the Prior Offering and paid ▮ a commission of ▮ in connection with raising a portion of such Prior Offering proceeds. In addition, the following persons affiliated with or related to ▮ received commissions in connection with the Prior Offering: ▮, a co-owner of the Limited Partner entity controlled by ▮ in the amount of ▮; and ▮ and ▮, brothers of ▮, in amounts of ▮ and ▮, respectively. The payment of some or all of these commissions may have resulted in a violation by the Partnership of certain state securities laws. See "The Rescission Offer - Reasons for the Rescission Offer."

## Payments to Certain Related Parties

For services provided with respect to the Business and affairs of the Enterprise, the General Partner and certain of the Proxy Holders will receive significant compensation. As contemplated by the Partnership Agreement, the General Partner will be paid an annual management fee of ▮. As compensation for services rendered in the capacity as a Proxy Holder of the General Partner and a member of Danco's Board of Directors, each of ▮ and ▮ will receive a ▮ annual retainer plus a ▮ per diem for ▮ and a ▮ per diem for ▮, subject to a maximum of ▮ per year per individual after the Offering and the Rescission Offer are successfully completed, unless otherwise agreed by the Proxy Holders. As to ▮, such compensation began accruing as of December 11, 1996 and as to ▮, such compensation began accruing as of February 12, 1997. As of June 30, 1998, the amounts due by the Partnership to ▮. ▮ and ▮ in this regard are approximately ▮ and ▮ respectively. As of June 30, 1998, substantial out-of-pocket expenses amounting to approximately ▮ are also due to ▮. See "The Offering - Use of Proceeds."

Each of the General Partner and the Proxy Holders have agreed to use commercially reasonable efforts to cause the Partnership to compensate Messrs. ▮ and Daniel, at customary market rates, for such additional special services as they may provide to the Partnership from time to time in connection with such matters as public offerings, mergers, sales of assets, acquisitions of products and/or assets, other business combinations and the raising of capital.

The Partnership has also agreed to reimburse each of the Proxy Holders for the actual out-of-pocket expenses incurred by them in their capacities as Proxy Holders or in any other management capacity in connection with the business of the Partnership.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000997

**Payments Relating to Legal Proceedings and Other Disputes**

The General Partner has engaged ▮▮▮ to provide oversight and litigation management services to the General Partner, the Partnership and certain of their affiliates, including Danco, in connection with certain legal proceedings involving such parties (other than in connection with lawsuits formerly pending against ▮▮▮). See "Legal Proceedings." As compensation for providing such services, the General Partner has agreed to compensate ▮▮▮ in an amount equal to ▮▮ of the aggregate recoveries (net of direct litigation expenses) from such legal proceedings in excess of ▮▮. In addition, ▮▮▮ has agreed to advance certain out-of-pocket expenses incurred by the Enterprise's legal counsel that is handling certain legal proceedings for the Enterprise. In exchange, ▮▮▮ will receive a return of such advances out of any recoveries in such legal proceedings as well as a small percentage of the contingent fee payable to such legal counsel related thereto.

Pursuant to a separate agreement, in the event that the amount of the General Partner's obligations to ▮▮ under the ▮▮▮ is reduced as a result of litigation, arbitration, settlement or other negotiated agreement, and/or in the event any other recovery is obtained against ▮▮▮ in respect of the claims set forth in the lawsuits formerly pending against ▮▮▮, the aggregate amount of such reduction and recovery inuring to the benefit of the General Partner shall be paid to MedApproach, Mr. Daniel and ▮▮▮.

**Bridge Loans**

On April 25, 1997, MedApproach and an affiliate of ▮▮▮ loaned to the Partnership (for an aggregate of ▮▮) at an interest rate of ▮▮ per annum, which loans were to mature on or before August 25, 1997. On June 10, 1997, MedApproach loaned to the Partnership an additional ▮▮ at an interest rate of ▮▮ per annum, which loan was to mature on or before December 31, 1997. The loans were used to fund the operations of the Enterprise and certain ongoing litigation involving Enterprise entities.

On June 30, 1997, the General Partner sent a Memorandum to the Limited Partners asking the Limited Partners to ratify the April 25, 1997 and June 10, 1997 loans to the Partnership (collectively, the "Interim Financing"), calling upon the Limited Partners to loan a minimum of ▮▮ and a maximum of ▮▮ to the Partnership (the "Bridge Loans"), and asking the Limited Partners to consent to the Partnership's borrowing under the Bridge Loans. The Bridge Loans were necessary to fund the continuing operations of the Enterprise, including the ongoing litigation involving Enterprise entities, and to pay off the Interim Financing. The Bridge Loans are evidenced by promissory notes of Danco, which notes bear interest at a rate of ▮▮ per annum. A majority-in-interest of the Limited Partners approved the Bridge Loans up to an amount of ▮▮. Since then, the partnership has received Bridge Loans in the aggregate amount of ▮▮, of which ▮▮ was related to the refinancing of the Interim Financing. The Bridge Loans have been provided by MedApproach, ▮▮ ▮▮, one other Limited Partner, and an outside source. The Bridge Loans are expected

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

to be paid in full out of the net proceeds from the sale of the Offered Interests under the Offering. If permitted by the General Partner, any or all of the Bridge Loans may be converted into Offered Interests under the Offering. See "The Offering - Use of Proceeds." As of the date of this Memorandum, the total amount due with respect to the Bridge Loans (including accrued but unpaid interest) is ████████

## Use of Office Space from Certain Related Parties

The Enterprise has agreed to reimburse W. Bradley Daniel or one of his affiliates and ████ or one of his affiliates for the cost of using certain office space. The reimbursable amount for each is currently ████ per year and is expected to increase at the rate of ██ per year.

## CERTAIN AGREEMENTS

The following summaries of certain agreements do not purport to be complete descriptions of such agreements and are qualified in their entirety by reference to the provisions of such agreements. Capitalized terms which are used but not defined have the meanings ascribed to them in the respective agreement to which such summary relates. References to section numbers contained in these summaries are references to the relevant sections of the respective agreement to which the subject matter relates.

## Partnership Agreement

The Partnership was organized in 1996 under the California Revised Limited Partnership Act, pursuant to the Partnership Agreement. The Partnership was formed as an investment vehicle to fund the Business of the Enterprise. See "Business - History of the Enterprise." The following is a summary of the Partnership Agreement, a copy of which is attached hereto as Exhibit A.

*Investment Objective.* The investment objective of the Partnership is to achieve returns on the Partnership's investment primarily through income and/or capital appreciation derived from its 99% limited partnership interest in Holdings. The Partnership was formed with the goal of raising ████ from the offering of limited partner interests in the Partnership. In the Prior Offering, the Partnership raised ████████. The Partnership is attempting to raise the remaining ████ in the Offering. (§ 6).

*Term.* The initial term of the Partnership is until December 31, 2045, unless earlier terminated pursuant to the Partnership Agreement, or continued by a vote of a majority-in-interest of the Limited Partners. See "Dissolution and Liquidation" in this section below. (§ 7).

*Limitations on Limited Partners Liability.* A Limited Partner, as such, is not personally liable for any of the losses or obligations of the Partnership. No Limited Partner will be subject to assessment or will otherwise be required to make any cash contribution to the Partnership beyond that indicated in

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00000999

his or her Subscription Agreement. However, a Limited Partner who has received a distribution from the Partnership may in some circumstances be liable to the Partnership for a sum not in excess of such amounts received from the Partnership necessary to discharge Partnership liabilities to creditors whose claims arose before the date of the distribution. (§ 8).

*Management.* The General Partner has the sole and exclusive authority to control and manage the day-to-day business activities of the Partnership, and no Limited Partner shall have any right to participate in the management or control of such business activities. See "Management." The General Partner has certain limitations on its authority, including admitting any person or entity as a general partner, changing the nature of the Partnership's business, or taking such other actions as would make it impossible to carry on the ordinary business operations of the Partnership. For a description of the limitations on financing activities, see "Financing Activities" below. Limited Partners do not have the right to remove the General Partner. The General Partner is entitled to reimbursement for all out-of-pocket expenses incurred in furthering the business and affairs of the Partnership. (§ 15(f)).

The General Partner is not obligated to devote full time to the affairs of the Partnership. (§ 15(d)). Neither the General Partner nor the Limited Partners are prohibited from engaging in any other business or enterprise, whether or not competitive with the Partnership; provided, however, the General Partner may not engage in any business or activity in competition with the Partnership that relates to the development, manufacturing, marketing or distribution of any drug to be used for the AF Indication. Moreover, the General Partner must use reasonable care to see that the Partnership receives the benefit of any potential business opportunity related to the development, manufacturing, marketing or distribution of the Drug. (§ 17).

*Distributions.* The General Partner shall distribute, in its sole and absolute discretion, but in no event less than annually, Available Cash from Operations, as defined in the Partnership Agreement. "Available Cash from Operations" means all cash receipts of the Partnership from operations, proceeds from loans or the distribution of assets which the General Partner does not expect to use, in its sole and absolute discretion, for operation of the Partnership, the furtherance of the Business, payment of expenses and the creation of reserves. Available Cash from Operations shall be distributed first, 99% to the Limited Partners in proportion to their capital contributions, and 1% to the General Partner, until each Limited Partner has received the return of his or her outstanding capital contribution, and second to the Limited Partners and General Partner in accordance with their Percentage Interests in the Partnership. (§ 13).

*Percentage Interests.* Each Limited Partner making a capital contribution in the Prior Offering received a Percentage Interest in the Partnership equal to ▮▮▮▮ for each ▮▮▮▮▮ contributed. The Prior Offering raised ▮▮▮▮▮▮▮ and, accordingly, holders of the Class A Interests currently possess an aggregate Percentage Interest of 38.72%. (§ 9).

The General Partner's initial Percentage Interest in the Partnership was determined by calculating the difference between 100% and the Percentage Interests acquired by the Class A Limited Partners. Currently, the General Partner holds a 61.28% Percentage Interest in the Partnership. In exchange for

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

its interest in the Partnership, the General Partner made an initial contribution by transferring its entire right, title, and interest in Pharmaceuticals to the Partnership. The General Partner's initial capital account was credited with an agreed valuation of ███ for the contribution. This agreed valuation was determined by the General Partner and is not supported by an appraisal or by independent valuation of any kind.

Pursuant to the Partnership Agreement, the General Partner has the authority to secure additional capital through admission of additional Limited Partners, provided such admission does not reduce the Percentage Interests associated with the Class A Interests without consent of a majority-in-interest of the holders thereof. See "Financing Activities" in this section below. (§ 9).

*Financing Activities.* The General Partner may admit additional limited partners to the Partnership, in its sole discretion, by issuing Class B Interests in exchange for additional capital contributions, provided that the admission of additional Limited Partners shall not affect the Percentage Interests associated with the Class A Interests, except to the extent holders of a majority-in-interest of the Class A Interests consent to such reduction. It is important to note that the Offered Interests under the Offering will dilute the Percentage Interests applicable to the Class A Interests such that, after completion of the Offering, the holders of the Class A Interests will have a Percentage Interest equal to ███ for each ███ contributed by them in the Prior Offering. See "The Offering - Dilution." Approval for such dilution is being sought under the Consent Solicitation. See "The Consent Solicitation." Holders of Class B Interests shall be entitled to share in distributions of Available Cash from Operations in the same manner as the holders of Class A Interests. (§ 23(a)).

Prior to issuing any Class B Interests, the General Partner must deliver a written notice to the holders of the Class A Interests setting forth the amount of interests to be sold and the terms of such sale. Holders of the Class A Interests shall have the option to purchase all or any part of the interests to be sold at the lesser of (i) the proposed purchase price for each percentage interest as set forth in the offer notice, or (ii) the price paid by the holders of the Class A Interests in the Prior Offering. Any portion of the offered interests not purchased by the holders of the Class A Interests may be offered by the Partnership to other investors on the terms and conditions set forth in the offer notice. (§ 23(b)). See "The Consent Solicitation."

In addition, the General Partner may, subject to the consent of a majority-in-interest of the Limited Partners, cause Danco or Holdings to sell equity interests to investors. Prior to any sale of such interests, the General Partner must deliver a written notice to the Limited Partners setting forth the amount of interests to be sold and the terms thereof. If a majority-in-interest of Limited Partners consent to the sale of such interests, the Limited Partners shall have the option to purchase all or any part of the offered interests. Any interests which the Limited Partners do not elect to purchase may be sold to other investors on terms and conditions not materially more favorable than those set forth in the offer notice. (§ 15(g)).

The General Partner may also, in its sole discretion, cause the Partnership to borrow additional funds as are necessary from time to time in the operation of the Business from any person or entity,

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

84

including the General Partner itself or any affiliate; provided however that the General Partner first deliver written notice to the Limited Partners of the amount and terms of the financing. The Limited Partners shall have the option to fund all or any part of the proposed financing on the same terms as set forth in the notice. (§ 14)

The General Partner may, subject to the consent of a majority-in-interest of Limited Partners, cause Holdings and Danco to borrow funds from Partners of the Partnership, or their affiliates. Prior to such financing, the General Partner shall deliver a written notice to the Limited Partners stating the terms of such financing. If a majority-in-interest consent, the Limited Partners have the option to fund any or all of the proposed financing on the same terms and conditions set forth in the notice. Any portion of the financing which the Limited Partners do not elect to provide may be offered to lenders on terms and conditions set forth in the offer notice. (§ 15(h)).

*Fiscal Year.* The Partnership's fiscal year ends on December 31.

*Meetings.* The General Partner is required to call at least one meeting of the Partners each year. A majority-in-interest of the Limited Partners may also call or convene Partnership meetings. (§ 22). Limited Partners may vote at a meeting in person or by proxy. (§ 16).

*Transferability of Partnership Interests.* No Limited Partner may sell, assign, pledge, gift, mortgage, hypothecate, alienate or subject to any encumbrance any part of the Limited Partner's interest in the Partnership without the prior written consent of the General Partner, which consent may be withheld in the General Partner's sole discretion. (§ 24(a)). Notwithstanding the foregoing, any Partner may transfer his or her interest to the Partnership, to an existing Partner of the Partnership or to a trust for the benefit of such partner's spouse or lineal descendant. (§ 24(g)). Resale of partnership interests is also restricted pursuant to applicable federal and state securities laws.

*Capital Accounts.* A separate capital account shall be maintained on the books of the Partnership for each partner strictly in accordance with the provisions of Code Sections 704(b) and 704(c) and the Treasury Regulations promulgated thereunder. The capital account shall be credited with the Partner's contributions and with his, her or its allocable share of taxable income. The capital account shall be debited with the Partner's allocable share of taxable loss and with the amount of all distributions to the Partner. Upon termination and liquidation of the Partnership, the final distribution to each Partner shall be made according to the balance of his, her or its capital account. (§ 11).

*Dissolution and Liquidation.* The Partnership may be dissolved prior to the end of its initial term by (i) the liquidation, dissolution, bankruptcy or insolvency of the General Partner, unless, within sixty (60) days of such event, a majority-in-interest of the Limited Partners select a new general partner and elect to continue the Partnership, (ii) the sale or transfer of substantially all of the assets of the Partnership, or (iii) the written agreement of the General Partner and a majority-in-interest of the Limited Partners to dissolve and terminate the Partnership. (§ 26).

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

Upon dissolution of the Partnership, its assets will (as soon as practicable after an event causing early dissolution or at the end of the term of the Partnership) be liquidated and, after payment of the Partnership's debts and expenses, the Partnership will distribute to each Partner an amount from the remaining net assets of the Partnership proportional to his, her or its capital account balance and will thereafter distribute all remaining assets according to Percentage Interests in the Partnership. Distributions will be made to the Limited Partners as soon as practicable after the date of dissolution and such distributions will, in the sole discretion of the General Partner, be either in cash or in kind. (§ 26).

*Exculpation and Indemnity.* The General Partner shall not be liable in damages or otherwise to the Partnership or to any Partner of the Partnership, and the Partnership shall indemnify and hold harmless the General Partner and its principals from any loss or damage incurred by reason of any act or omission performed or omitted by the General Partner in good faith on behalf of the Partnership and in a manner reasonably believed by the General Partner to be within the scope of the authority granted to the General Partner by the Partnership Agreement and/or is in the best interests of the Partnership; provided that (i) the General Partner was not guilty of gross negligence or willful misconduct with respect to such acts or omissions, and (ii) the satisfaction of any indemnification shall be from and limited to Partnership assets and no Limited Partner shall have any personal liability on account thereof. The indemnification shall include the payment of reasonable attorneys' fees and other expenses incurred in settling or defending any claims, threatened action, or finally adjudicated legal proceedings. (§ 27).

*Amendments to the Partnership Agreement.* Currently, the Partnership Agreement may be modified or amended only by the written consent of all of the Partners of the Partnership; provided, however, that the General Partner is empowered to make amendments to the Partnership Agreement to reflect the admission of additional Limited Partners. (§ 41). Under the Consent Solicitation, it is proposed that the Partnership Agreement be amended to permit further amendments by agreement of the General Partner and Limited Partners owning or holding at least two-thirds of the outstanding Limited Partnership Interests. See "The Consent Solicitation."

Nevertheless, certain actions may be taken by the General Partner in contravention of the Partnership Agreement with the consent of a majority-in-interest of the Limited Partners. (§ 15(b)(i)). For instance, it is not clear under the Partnership Agreement that the General Partner has the complete authority by itself to undertake and consummate the Rescission Offer. Although the Partnership Agreement gives the General Partner authority to permit a Partner to withdraw capital from the Partnership, there is a provision in the Partnership Agreement that prohibits the paying of interest on a Partner's capital contribution. In addition, as indicated above, there is a provision in the Partnership Agreement that provides holders of the Class A Interests not only a right of first refusal to purchase their pro rata share of the Offered Interests under the Offering but also the right to purchase such share at the lower of the price offered by the Partnership or the price paid by such holders for their Class A Interests. While the Offering gives Continuing Partners the right to purchase their pro rata share of the Offered Interests, the price of such Offered Interests is greater than the price at which the Continuing Partners purchased their Class A Interests. The General Partner believes that, notwithstanding these express provisions in the Partnership Agreement, it can cause the Partnership to consummate the Rescission Offer and Offering under the terms described in this Memorandum by obtaining the consent of a majority-in-

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001003

interest of the Continuing Partners under the Consent Solicitation. However, there can be no assurances that the General Partner's authority in this regard will not be questioned.

THE FOREGOING SUMMARY OF THE PARTNERSHIP AGREEMENT DOES NOT PURPORT TO BE COMPLETE AND EACH CURRENT PARTNER AND PROSPECTIVE INVESTOR SHOULD READ THE PARTNERSHIP AGREEMENT IN ITS ENTIRETY.

## Holdings Limited Partnership

Holdings was organized in 1996 as a Cayman Islands limited partnership. The general partner of Holdings is the General Partner and its limited partner is the Partnership. Holdings owns 100% of the outstanding stock of Danco. The following is a brief summary of the important provisions contained in the Amended and Restated Limited Partnership Agreement of Holdings dated as of December 28, 1995 (the "Holdings Partnership Agreement").

*Purpose.* Holdings was organized to develop, manufacture, market and distribute the Drug in the United States and appropriate other countries for the AF Indication. It has organized Danco to further that purpose.

*Term.* The initial term of Holdings is until December 31, 2045, unless earlier terminated under the Holdings Limited Partnership, or continued by a vote of the General Partner and a majority-in-interest of Holdings' limited partners.

*Financing Activities.* The General Partner has the authority to borrow the necessary capital in the name of Holdings or Danco to operate the Business. However, if the General Partner desires to obtain financing from any partner of Holdings or any affiliate of a partner, the General Partner must obtain the prior consent of the Partnership.

*Management.* The General Partner has the sole and exclusive authority to control and manage the day-to-day business and activities of Holdings, and no limited partner of Holdings shall have any right to participate in the management or control of such business activities. The General Partner has certain limitations on its management authority. For instance, the General Partner is prohibited from taking the following actions without the written consent of the Partnership: act in contravention of the Holdings Partnership Agreement; admit a person or entity as a general or limited partner of Holdings; change the nature of Holdings' business; sell, exchange, lease, mortgage or grant a security interest in all or substantially all of the assets of Holdings other than in the ordinary course of its business; sell, exchange, mortgage, pledge or otherwise transfer equity interests in Danco; or cause Holdings or Danco to act inconsistent with the Expenditure Plan, as defined in the Partnership Agreement. In addition, the General Partner may only use related or affiliated persons or entities to perform certain management or operational duties to Holdings and Danco if the transaction or arrangement is disclosed to Limited Partners of the Partnership and the terms of which are commercially reasonable.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

*Transferability of Partnership Interests.* There are similar restrictions on transfer as contained in the Partnership Agreement. See "Certain Agreements - Partnership Agreement."

*Dissolution and Liquidation.* Holdings may be dissolved prior to the end of its initial term by (i) the liquidation, dissolution, bankruptcy or insolvency of the General Partner, unless limited partners of Holdings owning or holding in the aggregate 66.7% of the percentage interests in Holdings select a new general partner and elect to continue Holdings, (ii) the sale or transfer of all or substantially all of the assets of Holdings, (iii) the written agreement of the General Partner and a majority-in-interest of Holdings' limited partners, or (iv) completion of the initial term of Holdings.

*Amendments.* The Holdings Partnership Agreement may be modified or amended only by the written consent of all of the partners of Holdings, which presently include the General Partner and the Partnership.

## Revised Consent Agreement

In connection with the removal of ▮▮▮▮ from the management of the Enterprise, the Council, ▮▮▮▮s, the Partnership, the General Partner and Holdings entered into the Consent and Agreement. See "Business - History of the Enterprise." Under its terms, the Council consented to the transfer by ▮▮ of 75% of the outstanding stock of the General Partner to MedApproach, to the transfer of voting and certain other rights relating to ▮▮▮▮ remaining 25% beneficial interest in the General Partner to the Proxy Holders and to control of the General Partner being vested in the Proxy Holders (the "▮▮ Transaction"). Since the date of the Consent and Agreement, ▮▮▮▮ has dissolved in accordance with the terms of the Consent and Agreement, XYZ Company has consented to the ▮▮ Transaction, Danco has initiated legal proceedings against the Previous Manufacturer, and the Partnership has asserted that a material adverse change occurred with respect to the Enterprise and its Business and affairs. Under the Consent and Agreement, a material adverse change alleviated the Partnership from the obligation to undertake the Rescission Offer and the Offering. In light of these circumstances and other developments and information that has become known to the parties since execution of the Consent and Agreement, the parties amended and restated the Consent and Agreement in its entirety by entering into a Revised Consent and Agreement (the "Revised Consent Agreement"). A summary of the principal terms of the Revised Consent Agreement is set forth below.

*Waiver.* Under the terms of the Revised Consent Agreement, the Council waived (i) any prior default under the License Agreement or under any other agreement to which it or its affiliates were a party, arising out of any prior performance or failure to perform and (ii) any of the consequences of such default. The Council did not waive the requirements to maintain insurance or the requirements that govern the marketing, sale or distribution of the Drug, as provided in the License Agreement. (§ 1).

*Mutual Releases.* The Council on behalf of itself and (to the maximum extent effective) each of its agents, employees, representatives, partners, officers, trustees, directors, affiliates, subsidiaries, predecessors, successors and assigns (the "Council Releasors") released all Claims which they had, have

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001005

or may have against the Enterprise, and each of its agents, employees, representatives, partners, shareholders, officers, trustees, directors, affiliates, subsidiaries, predecessors, successors, heirs, personnel representatives and assigns (the "Enterprises Releasees") (which does not include ████, members of his family, and their respective affiliates, except for the Enterprise) on or by reason of any matter, cause, event, transaction, or thing whatsoever from the beginning of the world through the date of the Revised Consent Agreement, provided that the Council Releasors did not release or discharge the obligations of the Partnership or Danco under the Revised Consent Agreement. The Enterprise, on behalf of itself and (to the maximum extent effective) each of its agents, employees, representatives, partners, shareholders, officers, trustees, directors, affiliates, subsidiaries, predecessors, successors and assigns (the "Enterprise Releasors") released all claims which they had against the Council and each of its agents, employees, representatives, partners, officers, trustees, directors, affiliates, subsidiaries, predecessors, successors, heirs, personnel representatives and assigns (the "Council Releasees") on or by reason of any matter, cause, event, transaction or thing whatsoever from the beginning of the world through the date of the Revised Consent Agreement, provided that the Enterprise Releasors did not release or discharge the obligations of the Council under the Revised Consent Agreement.  (§ 2).

*Reimbursement and Assurance of Minimum Funding.* In connection with the execution of the Consent and Agreement in February 1997, the Partnership paid ████ to the Council as reimbursement for certain expenses incurred in connection with the ████ Litigation, the Council Litigation and otherwise in connection with their disputes with ████, including the removal of ████. ████ from the management of the Enterprise. The Partnership has also agreed to pay to the Council within 10 business days after the Closing Date as full reimbursement for all expenses, (i) an additional sum of ████, and (ii) the amount owed to the law firm of Skadden, Arps, Slate, Meagher & Flom (but not to exceed ████) for services rendered in connection with the ████ Litigation from the date of the Consent and Agreement to the date of the Revised Consent Agreement, plus interest at the rate of 8% per annum on the unpaid portion of such amount from the date of the Revised Consent Agreement and until the date such payment is made. (§ 3) See "The Offering - Use of Proceeds." The Partnership is (except in certain circumstances) obligated to make this expense reimbursement to the Council even if the Rescission Offer or the Offering is not commenced or consummated. If the Closing Date has not occurred by December 31, 1998 (in the absence of either a breach or misrepresentation by the Council, or a material adverse change in the business, condition (financial, regulatory or otherwise) or prospects with respect to the Business that would affect the Enterprise prior to the Closing Date), then the Partnership is, nonetheless, required to make the payment on January 4, 1999. (§ 3).

The Partnership has delivered to the Council evidence demonstrating that the Partnership has received irrevocable commitments for the delivery on the Closing Date of equity funding aggregating not less than ████. (§ 4). See "The Offering - Standby Funding Commitments."

*Assignment of Claims and Enforcement of Rights.* The Council has assigned to the Partnership all Claims which the Council has, had or may have against certain parties, including ████ ████, the Previous Manufacturer, certain consultants and others (collectively, the "Assigned Subjects") on or by reason of any matter, cause, event, transaction or thing relating to the Business from the beginning of the world through the date of the Revised Consent Agreement, provided that the Partnership shall not

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprised or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

pursue any litigation involving the Assigned Subjects until certain conditions (as set forth below) are satisfied.

If the Enterprise believes in good faith that the Donor or its former President has breached any of its or his obligations under, or attempts to terminate the Donor Agreements, the Council will pursue an action against such party in the name of and for the benefit of the Enterprise. If the Enterprise believes in good faith that XYZ Company has breached any of its obligations under the XYZ Agreement, the Council will meet with the Enterprise and if the Council acting reasonably in furtherance of the project agrees that there has been a breach by XYZ Company, it will pursue all such Claims either on its own behalf or in the name of and for the benefit of the Enterprise. The Enterprise will control any such actions and all monies, properties or other economic benefits received by the Council in connection therewith shall be promptly turned over to the Enterprise. The Enterprise shall indemnify the Council against the cost, expense and risk of such litigation (with certain exceptions). Prior to pursuing Claims against an Assigned Subject, the Donor, its former President or XYZ Company, the Enterprise, must satisfy the following conditions: (i) deliver to the Council a notice of claims to be asserted, (ii) be available for a period of 45 days (15 days in the case of the Previous Manufacturer) from the date of such notice to negotiate such Claims, and (iii) to the extent negotiation is unsuccessful, mediate for 45 days, although such mediation is not required for Claims against the Previous Manufacturer. The time periods may be shortened or eliminated if compliance with such negotiation efforts (x) would risk causing the Enterprise irreparable harm, (y) is inappropriate because the parties to the dispute all have stated in writing that negotiation or mediation is futile or (z) would allow the applicable statute of limitations for such Claim to expire (§§ 6(b)-(f)).

*Governance of the Enterprise.* The Revised Consent Agreement requires that the Licensee have a Board of Directors consisting of seven members, including at least three women and a designee of the Council, if the Council so requests. The Board of Directors shall include Messrs. Daniel and ▮▮▮▮▮▮▮▮▮▮ (unless they are unwilling or unable to serve) who are the only members of the Board of Directors with voting or other approval rights. (§ 8(b)). The Partnership is required to submit to the Council the names of the proposed candidates for the Board of Directors as well as the list of the persons proposed to be appointed to the Advisory Board by September 30, 1998. Admission to the Board of Directors is subject to approval of the Council. The selection of the chief executive officer for the Business is also subject to approval of the Council, which has already approved the selection of ▮▮▮ as the Enterprise's chief executive officer. (§ 8(b)).

*Requirement for Rescission Offer and Offering.* The Partnership and the General Partner are required to prepare and circulate to all Limited Partners a disclosure statement describing the issues which arose in connection with the Prior Offering as well as describing the terms of the Revised Consent Agreement, the Revised License Agreement, and the additional financing contemplated thereby (i.e. this Memorandum). In this disclosure document, the Partnership is required to offer rescission to all Current Partners in compliance with applicable federal and state law and require that the decision of such investors be made at the earliest possible date. See "The Rescission Offer." The Partnership is also required to seek additional capital contributions of at least ▮▮▮▮▮ See "The Offering." (§ 9(a)). The closing of the Rescission Offer must occur within 40 days after circulation of the disclosure materials

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001007

and the closing of the Offering must occur within 180 days after circulation of the disclosure materials (subject to a discretionary 60-day extension in each case). (§ 9(b)).

The Rescission Offer and the Offering are not required to be commenced, pursued, made or consummated if (x) after the date of the execution of the Revised Consent Agreement, there is (or the Proxy Holders first become aware of information relating to facts or circumstances in existence prior to the date of the Revised Consent Agreement disclosing that there is) a material adverse change in the business, condition (financial, regulatory or otherwise) or prospects with respect to the Business that would affect the Enterprise prior to the Closing Date, or (y) any of the Council's representations and warranties made under the Revised License Agreement is untrue in any material respect as of the date of the Revised Consent Agreement or the Closing Date, or the Council has breached any of its material obligations under the Revised Consent Agreement or License Agreement. (§ 9(c)). In the event of the existence or occurrence of the circumstances described in the foregoing clauses (x) and (y), the Partnership shall have the option to terminate the Revised Consent Agreement, to surrender the License Agreement, or both, without releasing any claims arising after giving effect to the Revised Consent Agreement and prior to the date of such surrender, in addition to any other available remedies. (§ 9(c)).

*Revised License Agreement.* The Revised Consent Agreement also provides that on and as of the Closing Date, the Revised License Agreement shall become effective. Certain terms of the Revised License Agreement are summarized under "Certain Agreements - Revised License Agreement." (§ 11).

*Rights Outside the United States.* The Revised Consent Agreement provides that the Council shall consult with the Enterprise in preference to other commercial entities in making the Drug for the AF Indication available in countries outside the United States. The Council shall use commercially reasonable efforts, and shall cooperate with the Enterprise to obtain expanded rights from the Donor as to countries other than the United States, with such expanded rights to be licensed to the Enterprise under the Revised License Agreement. (§ 12).

*Additional Products.* Beginning after the Enterprise shall have introduced the Drug for the AF Indication in the United States and shall have made the first two fixed royalty payments required under the Revised License Agreement and shall otherwise be in compliance in all material respects with the terms of the Revised Consent Agreement and the Revised License Agreement, at the request of the Enterprise made not more than once in any calendar year or otherwise as the parties may mutually agree, will be given the opportunity to bid on inventions under study by the Council, though the Council reserves the right to reject any such bid for any reason or no reason at all.

*Right of First Offer/Refusal for Other Medical Products.* The Enterprise has a right of first offer and a right of first refusal for a limited time to discuss and negotiate a possible license, sublicense, agreement or other arrangement relating to any inventions, proprietary rights or products which are owned or controlled by the Council and are used for medical pregnancy termination, as long as the Revised License Agreement is in full force and effect and the Enterprise is in compliance in all material respects with the terms thereof. The Council will use good faith efforts during such period to reach an agreement with the Enterprise regarding any such competitive product. The Enterprise shall have the

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

right to sublicense or otherwise transfer to any third party, subject to approval by the Council, which approval shall not be unreasonably withheld. The Council will also use reasonable efforts to keep the Enterprise informed of developments relating to such products which come to the attention of the corporate offices of the Council.

*Business Plan and Budget.* On or before September 30, 1998, the General Partner or the Partnership must deliver to the Council for its information (not approval) a business plan and budget for the Enterprise for the five-year period beginning January 1, 1998.

*Representations and Warranties.* The Council made certain representations and warranties to the Enterprise in the Revised Consent Agreement, including, without limitation, representations relating to the accuracy and completeness of information provided to the Enterprise, its authority to enter into the Revised Consent Agreement, rights of the Council to United States patents for the Drug, and the status of FDA approval. In return, the Enterprise made certain representations to the Council regarding its ownership structure, authority to enter into the Revised Consent Agreement, and the accuracy of information provided to the Council.

*Indemnification.* The Partnership agreed to indemnify the Council and its Affiliates and other related persons from any claims, suits, losses, liabilities, judgments, damages and expenses (the "Losses") incurred by or asserted against such parties from and after the date of the Revised Consent Agreement, arising in any manner out of (i) any complaint, claim or action arising from ▌▌▌ participation in the ownership of the Partnership and its Affiliates, his involvement in the Business, or his transfer of the controlling interests in the General Partner, (ii) the breach of the Revised Consent Agreement by the Partnership, (iii) the solicitation of equity or debt financing for the Partnership or its Affiliates, or (iv) the Rescission Offer and the Offering.

The Partnership is not required to provide indemnity against Losses to the extent such Losses (i) relate to or arise out of such indemnitee's willful misconduct, gross negligence or breach of its representations, warranties or obligations under the Revised Consent Agreement or under the Revised License Agreement, (ii) arise in connection with a claim as to which the indemnitee is adjudged liable or arise out of information provided by or on behalf of the Council specifically for inclusion in the Rescission Offer, the Offering or other solicitation for funding of the Business, (iii) arise in connection with any claim by former employees (or their Affiliates) of any of the Enterprise entities, or (iv) arise in connection with the ▌▌▌ Litigation. (§ 17).

*Dispute Resolution.* Disputes under the Restated Consent Agreement are required to be resolved by binding arbitration. (§ 19(f)).

Revised License Agreement

The Revised Consent Agreement provides that upon the closing of the Transactions (the "Closing Date"), the License Agreement granted by the Council to Advances and the Sublicenses granted by

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001009

████ to each of Danco and Pharmaceuticals will be amended and restated in their entirety by the Amended and Restated License and Distribution Agreement dated April 30, 1998 (the "Revised License Agreement") between Council, as licensor, and the Partnership and Danco, as licensee (the "Licensee"). The principal terms of the Revised License Agreement are described below.

*Representations and Warranties.* Each of the Council and the Partnership and Danco make certain representations and warranties to each other similar to those contained in the Revised Consent Agreement.

*Fixed Royalties.* For use of the Drug for the AF Indication, the Licensee shall pay to the Council fixed royalties (the "Fixed Royalties") as follows" ████ within 90 days after the first date (the "Approval Date") when both (x) the FDA has approved the NDA and (y) the Licensee is a party to a Processing Agreement with a Supplier capable (consistent with FDA requirements) of producing the Drug in a dosage form in commercial quantities for sale within the Territory, and sufficient quantities of the Drug are available to Licensee to allow commercial marketing consistent with the Licensee's then current business plan (the "First Fixed Royalty Payment Date"), (ii) ████ on the first anniversary of the First Fixed Royalty Payment Date, (iii) ████ on the second anniversary of the First Fixed Royalty Payment Date, and (iv) ████ on the third anniversary of the First Fixed Royalty Payment Date. (§ 6.1(a)). This schedule was calculated based on an aggregate ████ fixed royalty payment on the First Fixed Royalty Payment Date together with interest on the deferred payments at 8%. The Enterprise has previously paid to the Council royalty payments totaling ████ out of the proceeds from the Prior Offering.

For use of the Drug for Other Indications, the Licensee shall pay to the Council, ████ within 90 days after the FDA approves a new drug application for the manufacture, marketing and distribution of the Drug for each of the first four other Indications (other than new drug applications for orphan drugs), up to a total of ████. (§ 6.1(b)).

The Partnership or the Licensee is required to establish an escrow account for the payment of the Fixed Royalties to the Council (the "Escrow Account"). An amount equal to the first fixed royalty payment is required to be deposited into the Escrow Account by January 15, 1999. Thereafter, all subsequent royalty payments are required to be deposited into the Escrow Account 90 days before the payment date of such Fixed Royalty. Interest earned on funds in the Escrow Account is for the account of, and to be released to, the Licensee. (§ 6.1(a)).

*Fluctuating Royalties.* The Licensee shall pay to the Council "Fluctuating Royalties" of (i) ████ of Net Sales Revenues of the Drug for the AF Indication and (ii) ████ of Net Sales Revenues of the Drug for Other Indications. (§ 6.2). Fluctuating Royalties are payable for the term of the Revised License Agreement (rather than the life of any particular patent). Fluctuating Royalties are payable quarterly.

The Licensee is entitled to credit against (and thereby reduce) payments of the Fluctuating Royalties a total amount equal to ████ of the sum of the following: (i) the Fixed Royalties paid to the

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001010

Council: (ii) up to ███████ in expenses reimbursed to the Council as contemplated by the Revised Consent Agreement; (iii) actual legal fees and expenses incurred by the Enterprise in connection with the KCC Litigation (See "Legal Proceedings - Proceedings Commenced Against the Enterprise"); (iv) insurance premiums paid by Danco to obtain the insurance required by the Revised License Agreement, in the maximum aggregate amount of ███████; and (v) certain amounts paid to or on behalf of the Council pursuant to the Revised Consent Agreement. (§ 6.4(a)).

The Licensee is entitled to use the total amount of the credit to the extent of (i) 75% of any single payment of Fluctuating Royalties for amounts credited under subparagraph (v) in the immediately preceding paragraphs or (ii) 50% of any single payment of Fluctuating Royalties during the first 5 years following the Introduction Date for amounts credited under subparagraphs (i) through (iv) in the immediately preceding paragraph, and thereafter, 25% of any single such payment. Subject to these limitations, to the extent an available credit is not fully used to reduce payment of Fluctuating Royalties in any year, the unused credit may be carried forward to subsequent years. (§ 6.4(b)). The credit amount shall be reduced, dollar-for-dollar, by an amount equal to (a) 25% of the aggregate sum of the net recoveries in the ███████ Litigation and the ███████ Suit by the Enterprise in excess of ███████ and less than $ ███████ (b) 40% of net recoveries in the ███████ Litigation and the ███████ Suits in excess of ███████ (§ 6.4(c)).

The Licensee is authorized (but not required), on behalf of the Council, to renegotiate an agreement (the "UVW Agreement") entered into by "UVW Company" and the Council, pursuant to which the Council has agreed, upon execution of the Revised License Agreement, to pay, or cause to be paid, to UVW Company a royalty at the rate ███████ of Net Sales Revenue. To the extent the Licensee is successful in reducing or eliminating the royalty paid to UVW Company by the Council under the UVW Agreement, the Licensee will receive an equivalent reduction in the royalty rate it is required to make under the Revised License Agreement. (§ 6.2).

*Liquidity Requirements.* Under the Revised License Agreement, the Licensee is obligated to maintain cash and cash equivalents of at least (i) $500,000 throughout the period from the Closing Date to the date on which the first commercial sale of the Drug for the AF Indication has been made (the "Introduction Date"), (ii) $1,000,000, throughout the period from the Introduction Date to the first anniversary of the Introduction Date, and (iii) $2,000,000, from the first anniversary of the Introduction Date and at all times thereafter. Irrevocable standby letters of credit or personal guarantees reasonably acceptable to the Council may also be used to satisfy this liquidity requirement on a dollar-for-dollar basis. (§ 2.2(b)).

*License.* Pursuant to the Revised License Agreement, the Council grants the Licensee an exclusive license to make and have made, process, use, market, sell and distribute the Drug for the Indications (the AF Indication and Other Indications) in the United States (the initial Territory). Exclusivity is contingent on the Licensee making its first commercial sale within one year following the date on which all Registrations necessary for the sale of the Drug for use for an Indication has been issued, and after such commercial sale the Licensee has made continuing and reasonably diligent efforts to market and sell the Drug for such Indication. The License will be expanded to include any additional

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

94

CONFIDENTIAL

H00001011

rights with respect to additional applications of the Drug (i.e., in addition to current Indications) and/or expansion by the Council from the Donor subsequent to the date of the Revised License Agreement. The Council shall use commercially reasonably efforts, and shall cooperate with Danco, to obtain the right to use, market and sell the Drug for the Indications outside the initial Territory.

In order to secure performance and the license granted under the Revised License Agreement, the Council granted to the Licensee a security interest in the proprietary rights licensed to the Licensee thereunder.

*Developmental Efforts.* On a monthly basis after the date of the Revised License Agreement, the Licensee shall pay to the Council all costs incurred by the Council, that have been approved or requested by the Licensee, in connection with the development of the Drug for the AF Indication. In addition, the parties agreed to cooperate with each other to prepare and submit FDA materials relating to the Drug, and the manufacturing and tabletting of the Drug. The Licensee is also required to use its reasonably diligent efforts to introduce the Drug for commercial sale for the AF Indication in the United States.

*Distribution Requirements.* The Revised License Agreement provides very detailed requirements regarding the procedures for the sale and distribution of the Drug and confidentiality, including stringent limitations on sublicensing.

*Advisory Board.* The Revised License Agreement requires the Enterprise to establish an Advisory Board. For more information about the Advisory Board, see "Management - Advisory Board."

*Pricings.* The Licensee is required to comply with the requirements of Federal Medicaid and any comparable state laws and regulations to make the Drug for the AF Indication available to eligible women under the Medicaid program (including approval or pricing of the Drug for Medicaid-funded administration of the Drug for the AF Indication). The Licensee is also required to comply with federal Medicaid laws and regulations to make the Drug for Other Indications available to eligible persons under the Medicaid program. (§ 5.5). Other than this requirement to participate in Federal Medicaid (and comparable state law) programs and "compassionate use" of the Drug for Indications other than any of the licensed Indications, the Council has not placed on the Licensee any additional constraints on pricing of the Drug.

*Restrictions on Organization of the Enterprise.* Any unapproved Change of Control permits the Council to revoke the License. A "Change in Control" event is defined as any change in the equity ownership of the General Partner, the Partnership or the Licensee, or any arrangement as to voting or other management rights with respect to any of them, that results in less than 50.1% of all such rights with respect to the Licensee being owned or controlled, directly or indirectly, by either (i) the Proxy Holders or (ii) Messrs. Daniel and ▮▮▮▮. In the case of the death, permanent disability or resignation of either of Messrs. Daniel and ▮▮▮▮ (or their respective permitted successors) from such capacity, a change of control shall be deemed to have occurred only if and when an individual becomes a successor to either of Messrs. Daniel and ▮▮▮▮ who has not been approved by the Council, provided that in the event of the death, permanent disability or resignation of either of Messrs. Daniel or ▮▮▮▮, a

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001012

temporary successor may be designated without the prior approval of the Council and such designation shall not constitute a Change of Control so long as such successor may be replaced at any time and a permanent successor shall be designated and approved by the Council, which approval shall not be unreasonably withheld, within 120 days after such death, disability or resignation of either of Messrs. Daniel or [redacted] (§ 1).

From the date of the Revised License Agreement through the first anniversary of the Introduction Date, neither the Licensee nor the Partnership shall (i) enter into any merger or consolidation agreement with any other Person unless the Licensee or the Partnership is the surviving entity, (ii) sell, lease, transfer or otherwise dispose of all or substantially all of its respective business or assets, or (iii) sell, transfer, pledge or otherwise dispose of equity interests in the Licensee other than (x) interests representing not more than 49% of all the voting rights of the Licensee in connection with options or other employee incentive plans or (y) interests issued by the Licensee in connection with financing for the operations of the Licensee in the ordinary course of business. The Licensee may (but shall not be obligated to) reorganize (by conversion, merger or otherwise) into a corporation organized under the laws of a state of the United States so long as (i) no Change of Control occurs as a result thereof, and (ii) the corporate entity assumes the obligations of the Partnership or the Licensee (as the case may be) under the Revised License Agreement and the Revised Consent Agreement.

Prior to the date upon which the first Fixed Royalty payment is due, the General Partner, the Partnership, Holdings and Danco are prohibited from engaging in any private or public offering of securities or any other transaction which would, if consummated, result in a Change of Control. After such date, such entities or their Affiliates may engage in a private or public offering of securities under certain circumstances.

The Licensee shall not, and shall not permit any Sublicensee to, create, incur or suffer to exist any lien, pledge, security interest or encumbrance of any kind (other than the Sublicenses) on any of the licenses or rights granted by the Council to the Licensee pursuant to the Revised Consent Agreement, except in connection with obtaining financing (and the Licensee and such Sublicensees may enter into all related agreements in connection therewith) throughout the period from the date of the Revised License Agreement until the third anniversary of the Approval Date or arising by operation law.

_Indemnification and Insurance Maintenance Obligations._ The Licensee shall indemnify and hold harmless the Donor, its Affiliates and their respective shareholders, partners, members, managers, trustees, directors, officers, agents, consultants, counsel and employees from and against all Losses resulting from, relating to or arising out of the study, manufacture, processing, distribution, sale, use or handling of the Drug, by or on behalf of the Licensee or any Sublicensee or Supplier (except by or on behalf of the Council, the Donor or any of their respective Affiliates). (§ 7.1(a)).

The Licensee shall also indemnify and hold harmless the Council, its Affiliates and their respective shareholders, partners, members, managers, trustees, directors, officers, agents, consultants, counsel and employees from and against all Losses to the extent resulting from, relating to or arising out of (x) the Licensee's or any Supplier's or Sublicensee's gross negligence, recklessness or willful

_Strictly Confidential Proprietary Information_

_This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information._

CONFIDENTIAL

H00001013

misconduct in connection with the study, manufacture, processing, distribution, sale, use or handling of the Drug, (y) the breach or inaccuracy by the Licensee of any representation or warranty contained in the Revised License Agreement, or by a Sublicensee or Supplier in any Sublicense or Processing Agreement, or (z) failure of the Licensee to observe or perform any duty, covenant or obligation arising under the Revised License Agreement or such failure by a Sublicensee or Supplier under a Sublicense or Processing Agreement; provided, however, that the Licensee has no obligation to indemnify the Council or any of its Affiliates to the extent of Losses resulting from, relating to or arising out of facts or circumstances (x) for which the Licensee is entitled to be indemnified by the Council or (y) for which the Council is expressly not to be indemnified pursuant to the Revised Consent Agreement. (§ 7.1(a)).

Likewise, the Council shall indemnify and hold harmless the Licensee, its Affiliates and its respective shareholders, partners, members, managers, trustees, directors, officers, agents, consultants, counsel and employees from and against all Losses to the extent resulting from, relating to or arising out of (x) the gross negligence, recklessness or willful misconduct of the Council or its Affiliates in connection with the study, manufacture, processing, distribution, sale, use or handling of the Drug, (y) the Council's breach or inaccuracy of any representation or warranty contained in the Revised License Agreement, or (z) failure to observe or perform any duty, covenant or obligation arising under the Revised License Agreement. (§ 7.2).

The Licensee is required to maintain extensive product liability and other insurance coverage, which will be costly.

*Term and Early Termination of the Revised License.* The Revised License Agreement is subject to an initial term of 50 years, renewable thereafter upon the satisfaction of certain conditions. (§ 11).

The Revised License Agreement will be subject to early termination by the Council upon the occurrence of certain events (the "Events of Default"), including, among others, (i) the Licensee's breach or failure to perform any of its material duties or obligations pursuant to the Revised License Agreement, which are not cured within the prescribed time period, (ii) the Licensee's failure to pay the Fixed Royalties to the Council, (iii) the Licensee's failure to maintain product liability insurance as required by the Revised License Agreement, (iv) any Change of Control, (v) the Licensee's bankruptcy, insolvency or similar proceeding, whether voluntary or involuntary, or the Licensee's general assignment for the benefit of its creditors, (vi) the Licensee being prevented for any reason from performing any of its material obligations by any law, governmental or other action, which performance has not been resumed within 180 days (such time period to be extended so long as the Licensee is reasonably diligent in seeking to eliminate the impediment to its performance), (vii) the Licensee's dissolution or liquidation, except in a permitted reorganization, and (viii) the conviction of a felony or serious misdemeanor involving dishonesty or moral turpitude, of any member of the Licensee's Board of Directors or of any key management personnel, if such person's relationship with the Licensee is not forthwith terminated. (§ 11.3(a)).

*Guarantee.* The performance of the Licensee's obligations under the Revised License Agreement is guaranteed by the Partnership.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

*Dispute Resolution.* Any dispute under the Revised License Agreement shall be resolved by arbitration.

**Positive Aspects of Revised Consent Agreement and Revised License Agreement**

Set forth below is a brief description of some of the positive aspects that the General Partner and Proxy Holders were able to obtain when negotiating the Revised Consent Agreement and the Revised License Agreement.

   Royalties and Creditability.

   Fixed    –    Schedule of annual payments has been spread out over 4 payments versus 3 and are less front-end loaded, thus helping cash flow, even though the present value of the payments does not alter.

   New Schedule: ███████████████████████████████

   Old Schedule: ███████████████████.

   –    50% of Fixed Royalties (i.e. ████████) is creditable against Fluctuating Royalties resulting in less net Fixed Royalty payments to the Council.

   –    Previously ████████ for all future Fixed Royalty payments out of the ████████ to be raised through the Offering was required to be placed into escrow immediately upon closing of the Offering. Now, only ████████ goes into escrow on January 15, 1999 for the first Fixed Royalty payment (upon FDA approval) and each additional annual payment must be placed in escrow only 90 days before the due date for that particular payment. It is believed that this will improve the Enterprise's cash flow.

   Fluctuating    –    Total Fluctuating Royalty paid by the Enterprise is reduced back to the original flat ████ of Net Sales, reflecting the elimination of royalties due to ████████ and does not rise to ████████ (from the third anniversary of introduction), as per the prior agreement.

   –    Payments are now due 90 days after the end of each quarter versus 45 days, improving cash flow.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001015

- Up to 75% of Fluctuating Royalties are available for creditability for allowed amounts of combinations of Fixed Royalties and various legal fees, including legal fees for the ███ Suit, reducing the Enterprise's net cost.

- No royalties are now due in non-patent countries, reducing the Enterprise's future payment obligations.

- An additional royalty of ████████ of Net Sales potentially due to the Council if sales exceeded certain aggregate targets has been eliminated.

## Liquidity/Use of Funding Proceeds

Liquidity
Requirements
- The Partnership is now required to keep a minimum of $500,000 in the Business up until introduction of the Drug; $1,000,000 for the next year, and $2,000,000 thereafter. This compares favorably with the previous requirement of $500,000 up to introduction and $5,000,000 thereafter.

Net Tangible
Assets
- The Enterprise's obligation to maintain Net Tangible Assets of ████████ at all times has been removed.

Other
Indications
- Ability to separately fund the "Other Indications" without restrictions on change of ownership has been agreed.

Council
Expenses
- The Council's fees in the ████ Suit are over $███████, but the Enterprise's commitment to pay all fees has been capped at $████ plus interest from April 30, 1998 until the ████████ is paid.

## Creditability Against Fluctuating Royalties

50% of the following expenses are now allowed for creditability against 50% of Fluctuating Royalties in the first 5 years and 25% of Fluctuating Royalties thereafter:

- $████████ for legal expense obligations of the Council which were agreed for payment by the Enterprise in the February 1997 agreement. Creditable amount is therefore $████████

- $████████ in Fixed Royalty payments. Creditable amount is therefore $████████

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

- Approximately $█████ of legal expenses to the Enterprise for the █████ Suit. Creditable amount is therefore █████

- $█████ in insurance premiums. Creditable amount is therefore $█████

- Total available credits are approximately $█████ and they can be rolled.over against future royalty obligations if insufficient Royalties are available in any one year.

- Certain potential legal expenses to the Enterprise for indemnifying the Council or acting on claims it may have are additionally creditable in varying percentages for each type of event.

- Certain recoveries by the Enterprise from specific suits against third parties could reduce the creditability described above.

Council Claims Against Third Parties. Certain claims that the Council may have against third parties are now, in certain circumstances, assigned to the Enterprise.

Council Management "Control" Issues. Negotiations resulted in substantial removal of or reduction in various "controls" that the Council had placed on the Enterprise throughout the previous agreements. Examples of areas impacted include manufacturing, pricing, day-to-day conduct of the Business and related reports to the Council, Advisory Board composition and authority, destruction of outdated materials, etc.

Renegotiation Opportunity. If an event occurs which is reasonably viewed as having a major adverse effect on the Business and which is out of the Enterprise's control, the Council has agreed to renegotiate royalty payments going forward.


Agreement Regarding Directorship

In December 1996, while the Enterprise was under the control of █████ █████ from Columbia University Law School and the Enterprise's current President and Chief Executive Officer, █████, were asked to serve in the capacity as directors of the General Partner to study the project and documents related thereto, participate in director meetings, attend court hearings relating to certain legal proceedings, and show to the Council and the Limited Partners that the Enterprise was making progress in commercializing the Drug. To induce them to accept the invitation, the Enterprise stated in a letter that it would compensate them for acting in such capacity by providing each an opportunity to purchase █████ of Limited Partnership Interests and paying them a sign-up fee of █████. The letter stated that the proposal was subject to Limited Partner approval, but that the principals would use their best efforts to have it implemented. Indemnification of these individuals for

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001017

acting in the capacity of directors was also mentioned in the letter. ████████ accepted the invitation and served in that capacity for a limited duration. He is no longer a director of the General Partner. The agreement between ████████ and the Enterprise was never formalized nor was it approved by the Limited Partners, though the proposed engagement was noted at a meeting of the Limited Partners in November 1996. ████████ recently indicated a desire to purchase the Limited Partnership Interest offered to him in the letter. The Enterprise is in the process of resolving this matter. The proposal to ████████ was never accepted and was superseded by his employment with the Enterprise.

## FINANCIAL MATTERS

### Basis of Presentation

The Partnership is part of a group of entities organized to commercialize the Drug. For reporting purposes, the financial statements of all the entities of the Enterprise are consolidated and all significant intercompany transactions and balances have been eliminated. Accordingly, reference in this section to the Partnership's results or financial statements should be understood as a reference to the results and financial statements of the combined entities of the Enterprise.

The financial statements of the Enterprise have been prepared on the accounting basis used by the Partnership for federal income tax purposes, which is a comprehensive basis of accounting other than generally accepted accounting principles. However, management has elected to omit substantially all of the footnote disclosures ordinarily included in financial statements prepared on the income tax basis of accounting. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the Enterprise's assets, liabilities, equity, revenues and expenses. Accordingly, the financial statements are not designed for those who are not informed about such matters.

None of the Enterprise's financial statements have been audited or reviewed by an independent certified public accountant. To date, the Enterprise has been unsuccessful in obtaining an audit opinion with respect to its financial statements as a result of concerns about the accuracy and reliability of financial information compiled by ████████ and his employees prior to February 1997, when control of the Enterprise was transferred from ████████ to the Proxy Holders. See "Certain Relationships and Transactions - ████████ " and "Risk Factors - Risks Relating to the Business."

### Selected Financial Data

Attached hereto as Exhibit B are the unaudited financial statements of the Enterprise (comprised of a Statement of Assets, Liabilities and Partners' Equity, Statement of Revenues and Expenses and Statement of Cash Flows) for the year ended December 31, 1997, as well as the unaudited interim financial statements of the Enterprise for the six-month period ended on June 30, 1998. The selected financial data set forth below should be read in conjunction with such financial statements.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Donco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Donco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

101

|  | Year Ended<br>December 31, 1997 | Six-Months Ended<br>June 30, 1998 |
|---|---|---|

Statement of Revenues and Expenses:
Total Revenue
Operating Expenses
Operating Profit (Loss)
Other Income (Expense)
Amounts Capitalized as Start-Up Costs
Net Income (Loss)

Statement of Assets, Liabilities and
Partners' Equity:
Working Capital
Total Assets
Total Liabilities
Partners' Equity



### Selected Pro Forma Financial Data

Attached hereto as Exhibit C are pro forma financial statements (balance sheet, income statement and statement of cash flows) of the Enterprise for the years ending on December 31, 1998-2003. The projections were developed by Enterprise management based on their current understanding of the market and the expenses necessary to get the Drug to the market. They are based on certain assumptions which may or may not prove correct. None of the projections have been reviewed or approved by an independent source. They represent results that could be achieved at various levels of sales. Actual performance will likely vary from the projections. See "Certain Forward-Looking Statements" and "Risk Factors - Risks Relating to the Business."

The sales forecasts are based on an estimated 1,500,000 terminations per year, adjusted downwards for those performed in the first eight weeks given that the Drug, if approved by the FDA, will likely be approved for use in the first 49 LMP. Approximately 55% of the 1,500,000 pregnancy terminations performed each year in the United States are in the first eight weeks, and about 70% of those are performed in clinics. From this data, management has determined penetration rates for each market segment ranging from 10% in the first year to 55% in the fifth year for clinics, and from 6% in the first year to 44% in the fifth year for the non-clinic segments (i.e., OB/GYNS, hospitals, etc.). Overall, the Enterprise has projected an approximately 30% share of the total pregnancy termination market. This is approximately what has been reported as the market penetration for the Drug in France. These sales forecasts are substantially lower than those produced by ████████.

The selected pro forma financial data set forth below should be read in conjunction with such projections.

*Strictly Confidential Proprietary Information.*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001019

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| Clinics | | | | | | |
| procedures | --- | 60,000 | 175,000 | 260,000 | 320,000 | 320,000 |
| % of clinics in first 8 weeks | --- | 10% | 30% | 45% | 55% | 55% |
| Non-Clinics | | | | | | |
| procedures | --- | 15,000 | 60,000 | 100,000 | 110,000 | 110,000 |
| % of non-clinics in first 8 weeks | --- | 6% | 24% | 40% | 44% | 44% |
| Total | | | | | | |
| procedures | --- | 75,000 | 235,000 | 360,000 | 430,000 | 430,000 |
| % of total (1,500,000) | --- | 5% | 16% | 24% | 29% | 29% |

(expressed in millions)

Sales
Net Income (Loss)

The pro forma financial statements attached hereto as Exhibit C are significantly different from those distributed to Current Partners at the meeting of the Partnership's partners held on January 22, 1998. The differences are a result of several factors, including the substitution of more updated information in the place of estimates (related to the Revised Consent Agreement and Revised License Agreement as well as to the anticipated amount of manufacturing start-up costs) and an expected delay in the introduction of the Drug into the United States market from the first quarter of 1999 to the end of the second quarter or beginning of the third quarter of 1999 (thus, including only six months of projected sales during 1999 rather than a full twelve months of projected sales). More conservative sales and cost projections were also incorporated. Short-term sales and profitability projections were affected most by the changes. However, long-term sales and profitability is projected to be higher. For example, the projections distributed to Partners at the January 22 meeting projected a combined total net income of approximately [redacted] over the 7-year period. The latest projections show a combined total net income of approximately [redacted] over the same period of time, though it should be noted that there are some differences in the treatment of capitalized costs as between such projections.

The pro forma financial statements do not incorporate certain receipts or revenues that may or may not be experienced by the Enterprise in the future. These include, without limitation, the proceeds, if any, from certain litigation and/or arbitration proceedings, from the sale of the Drug for any Other Indication or in any country outside the United States, or from loans or grants. To date, the Enterprise has received no such receipts or revenues and there can be no assurance that it will be successful obtaining them in the future. In this regard, the Enterprise has sought financial assistance from a number of private foundations, a few of which have declined to provide such assistance and others of which there are proposals outstanding.

In the event that FDA approval is not obtained at all or within the estimated timeframe, or the Enterprise is unable to secure the necessary supply of the Drug in bulk or tablet form within the

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

contemplated timeframe, the results of the Business operations will likely be less favorable. There may be other circumstances that adversely affect such results as well. See "Risk Factors - Risks Relating to the Business."

In the event that the Enterprise is successful in obtaining quicker penetration into the United States market, the projected sales are expected by management to be more favorable. Set forth below are best case estimates of sales under those circumstances, which are 12% higher than total sales projected on Exhibit C attached hereto. However, the best case estimates of sales are predicated on significant progress relative to PDA approval and the securing of qualified bulk substance manufacturers, tabletters and distributors for the Drug. There can be no assurance that such progress will be made in a timeframe or in a manner that it will result in the best case estimates, nor can there be any assurances that if such progress is made within the contemplated timeframe that the estimated results will be achieved.

### Best Case Scenario

|  | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| **Clinics** | | | | | | |
| procedures | — | 115,000 | 200,000 | 250,000 | 320,000 | 320,000 |
| % of clinics in first 8 weeks | — | 20% | 35% | 50% | 55% | 55% |
| **Non-Clinics** | | | | | | |
| procedures | — | 37,000 | 85,000 | 110,000 | 120,000 | 125,000 |
| % of non-clinics in first 8 weeks | — | 15% | 35% | 45% | 50% | 50% |
| **Total** | | | | | | |
| procedures | — | 152,000 | 285,000 | 400,000 | 440,000 | 445,000 |
| % of total (1,500,000) | — | 10% | 19% | 27% | 29% | 30% |
| **Sales** | | | | | | |

## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

The following summary describes certain significant federal income tax consequences of owning a Limited Partnership Interest. The summary is not addressed to nonresident aliens or foreign corporations. The summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), the Treasury regulations promulgated thereunder, rulings of the Internal Revenue Service ("IRS"), and court decisions.

THIS SUMMARY IS NECESSARILY GENERAL, AND LIMITED PARTNERS ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX CONSEQUENCES OF PURCHASING AND HOLDING AN INTEREST IN THE PARTNERSHIP.

*Strictly Confidential Proprietary Information*
*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001021

*Status as a Partnership.* Pursuant to Treasury regulations, the Partnership should be treated as a partnership for federal income tax purposes, not as a corporation, and should not be characterized as a "publicly traded partnership." As a result, the Partnership itself should not be subject to federal income tax. Rather, Partners will be required to report on their federal income tax returns their allocable share of the Partnership's income, gains, losses, deductions and credits for the taxable year of the Partnership ending with or within the taxable year of the Partner, whether or not cash or other property is distributed to the Partner. As soon as practicable after the end of each taxable year, the Partnership will provide each Partner with a copy of Schedule K-1 to IRS Form 1065 (or any successor form) prepared by the Partnership's accountants, indicating the Partner's share of the Partnership's income, loss, gain, expense and other items relevant for federal income tax purposes.

The General Partner may, but will not be required to, make an election under Section 754 of the Code to adjust the basis of the Partnership's assets in the event of a distribution of money or property to a Partner or in the event of a transfer of a Limited Partnership Interest by sale or as a result of the death of a Partner.

*Investment Partnership.* The Partnership will not carry on the Business ascribed to the Enterprise in this Memorandum. Rather, the Business will be carried on through Danco and Pharmaceuticals, which will be funded by the Partnership (through Holdings, in the case of Danco). This structure will limit the tax benefits that might otherwise accrue to the investors if the Business were to be conducted by the Partnership. Such limitations include, but are not limited to, the following:

- As regular "C" corporations, Danco and Pharmaceuticals will be taxed on any profits derived from the Business. Any distributions of after-tax profits by the corporations to the Partnership (through Holdings, in the case of Danco) will be taxable to investors, resulting in a second level of tax. If the Business were conducted directly by the Partnership, any profits would be taxed only at the investor level. A similar detriment could occur if the corporations sell their assets or liquidate.

- Any net losses incurred by Danco and Pharmaceuticals can only be used to offset income of these corporations and will not pass-through to the investors.

- Expenditures incurred by the Partnership in connection with the Enterprise may be treated as if made by Danco or Pharmaceuticals from capital derived from the Partnership. Such characterization may eliminate or defer tax benefits that would otherwise accrue to investors from the Partnership. For example, start-up expenses and organizational expenses capitalized by the Partnership and deductible over a 60-month amortization period may be treated as those of Danco and Pharmaceuticals, which may not receive a current tax benefit from amortization.

- Similarly, fees paid to the General Partner, the Proxy Holders or the Council directly by the Partnership could be reclassified as payments on behalf of Danco or Pharmaceuticals or as capital expenditures associated with the Partnership's investment in Holdings.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001022

- Transactions between the Partnership and Danco or Pharmaceuticals may be closely scrutinized by the IRS under the arms-length standards of Section 482 of the Code and readjusted to the detriment of the Partnership. Loans by the Partnership or Holdings to Danco or Pharmaceuticals could be reclassified as equity and the interest deduction denied to the payors.

The Proxy Holders and Enterprise management are presently considering alternative structures that may be more favorable from a tax perspective. However, no definitive plans have been made in this regard.

*Syndication Fees.* Under § 709 of the Code, costs associated with raising capital for the Partnership are non-deductible and non-amortizable. Substantial amounts have and will be expended by the Partnership in connection with the Prior Offering, this Offering and the implementation of the Transactions. The Partnership will make a good faith determination of the amount of syndication costs, but this amount may be adjusted by the IRS.

*Royalties.* Any royalties paid by the Partnership directly to the Council are likely to be treated as made by Danco. The Revised License Agreement term of 50 years greatly exceeds the remaining life of the Patents. The IRS could argue that the ▮▮▮▮▮ of Fixed Royalties should be amortized by Danco over the term of the Revised License Agreement rather than over the lives of the Patents.

*Allocations of Partnership Taxable Income.* Generally, allocations of Partnership net profits and net losses for income tax purposes will be respected by the IRS under applicable Treasury regulations if they meet the "substantial economic effect" test, or are made in accordance with the "partners' interest in the partnership" test. The Partnership believes that the allocations in the Partnership Agreement will satisfy the "substantial economic effects" test or the "partners' interest in the partnership" test.

*Tax-Exempt Investors.* Tax-exempt entities must pay federal income tax on their UBTI. UBTI includes income from a partnership which carries on a trade or business unrelated to the exempt purpose of the tax-exempt partner. Generally, dividends, interest, and capital gains from the sale of securities are excluded from the definition of UBTI, unless they constitute "unrelated debt-financed income," whether derived directly or through a partnership in which the tax-exempt entity is a partner. Any gain or income earned from "debt financed" property, including securities held for investment, is treated as UBTI.

*Foreign Investors.* Federal income tax considerations for investors who are not United States citizens or residents are complex. Foreign investors considering an investment in the Partnership should consult their own tax advisors.

*State and Local Taxes.* In addition to the federal income tax aspects described above, investors should consider potential state and local tax consequences of an investment in the Partnership. Prospective investors are advised to consult their own tax advisors to determine the state or local tax consequences of an investment in the Partnership.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001023

*Possible Federal Income Tax Audits.* In the event of an IRS audit the federal income tax treatment of Partnership items will generally be determined in a unified Partnership audit, rather than in separate audits of the individual Partners. Partnership audits will generally be handled by the General Partner as the "Tax Matters Partner" of the Partnership. The Tax Matters Partner will keep the Limited Partners informed of any Partnership level inquiry, examination or proceeding. Given the lack of certainty as to the use of the proceeds from the Initial Offering, it is possible that there will be adjustments if the 1996 and 1997 returns of the Partnership are audited.

A separate statute of limitations will apply with respect to Partnership items. The Tax Matters Partner has the authority to extend the statute of limitations on behalf of the Partnership and, accordingly, any extension will be binding on all Partners. An audit of the Partnership's federal income tax returns may result in an audit of the partners' individual federal income returns, which could give rise to adjustments to items unrelated to the Partnership.

*Status as a Tax Shelter.* This investment is not intended to generate tax losses or credits, and will not be registered as a "Tax Shelter" under the applicable provisions of the Code.

THE FOREGOING DISCUSSION IS BASED UPON EXISTING INTERPRETATIONS OF LAW AND REGULATIONS WHICH ARE SUBJECT TO CHANGE. INVESTORS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF AN INVESTMENT IN THE PARTNERSHIP.

## LEGAL MATTERS

The General Partner (through ▮▮▮▮ previously engaged the law firm of Seltzer, Caplan, Wilkins & McMahon of San Diego, California, to represent it in connection with the formation of the Partnership and with the Prior Offering. From about July, 1996 until February 1997, the law firm of Cooley Godward LLP of San Diego, California, was engaged by the General Partner (through ▮▮▮▮ ▮▮▮▮ from in matters relating to the Transactions. In February 1997, following the removal of ▮▮▮▮ from management of the Enterprise, the law firm of Fried, Frank, Harris, Shriver & Jacobson of New York, New York, was engaged to represent the General Partner in connection with certain matters, including background work for the Transactions and negotiation of the Revised Content Agreement and Revised License Agreement. The General Partner has also engaged Michael Stern & Associates of Los Angeles, California, to represent the Enterprise in connection with certain proceedings. See "Legal Proceedings." The Enterprise's legal counsel for FDA and regulatory matters is currently with the Washington, D.C. office of Heller, Ehrman, White & McAuliffe. The Enterprise has also engaged the law firm of Friedman-Siegelbaum of Roseland, New Jersey and New York City from time to time for various matters. In December 1997, the Madison, Wisconsin and Washington, D.C. offices of Foley & Lardner were engaged as special counsel to the General Partner and the Proxy Holders in connection with the Transactions and this Memorandum. Foley & Lardner does not represent any Limited Partner in connection with the Transactions and all Limited Partners are strongly encouraged to engage their own legal counsel to represent their interests with respect to the Transactions and, if applicable, their review, completion and execution of the necessary documents related thereto.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001024

## ADDITIONAL INFORMATION

THERE ARE MANY DOCUMENTS WHICH ARE RELEVANT TO THE TRANSACTIONS DESCRIBED IN THIS MEMORANDUM AND TO THE RIGHTS AND OBLIGATIONS OF THE RESPECTIVE PARTIES. SUCH DOCUMENTS INCLUDE, BUT ARE NOT LIMITED TO, THE PARTNERSHIP AGREEMENT, REVISED CONSENT AGREEMENT, REVISED LICENSE AGREEMENT AND ▐▐▐▐ AGREEMENT. THE STATEMENTS CONTAINED IN THIS MEMORANDUM CONSTITUTE ONLY A SUMMARY OF CERTAIN PROVISIONS OF SUCH DOCUMENTS, DO NOT PURPORT TO BE A COMPLETE DESCRIPTION OF EVERY TERM AND CONDITION THEREOF, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH DOCUMENTS. AS WITH ANY SUMMARY, SOME DETAILS AND EXCEPTIONS HAVE BEEN OMITTED. IF ANY OF THE STATEMENTS IN THIS MEMORANDUM ARE IN CONFLICT WITH ANY OF THE TERMS OF ANY SUCH DOCUMENTS, THE TERMS OF SUCH DOCUMENTS WILL GOVERN. REFERENCE IS MADE TO THE ACTUAL DOCUMENTS FOR A COMPLETE UNDERSTANDING OF WHAT THEY CONTAIN.

EACH INVESTOR IS URGED TO REVIEW ALL SUCH DOCUMENTS. TO THE EXTENT THAT THEY ARE AVAILABLE TO THE PARTNERSHIP, COPIES OF ALL DOCUMENTS IN CONNECTION WITH THE TRANSACTIONS DESCRIBED IN THIS MEMORANDUM ARE AVAILABLE IN WHOLE OR IN PART FOR INSPECTION DURING NORMAL BUSINESS HOURS AT THE OFFICES OF FOLEY & LARDNER, 150 EAST GILMAN STREET, SUITE 500, MADISON, WISCONSIN 53703, BY LIMITED PARTNERS AND PROSPECTIVE INVESTORS THAT HAVE SIGNED AND DELIVERED A CONFIDENTIALITY AGREEMENT TO THE GENERAL PARTNER.

NO PERSON HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS OR GIVE ANY INFORMATION WITH RESPECT TO THE LIMITED PARTNERSHIP INTERESTS, AND NO OFFERING LITERATURE OR ADVERTISING IN WHATEVER FORM SHALL BE EMPLOYED IN THE RESCISSION OFFER, OFFERING OR CONSENT SOLICITATION EXCEPT FOR THIS MEMORANDUM AND ANY INFORMATION SUPPLIED IN WRITING BY THE GENERAL PARTNER AND IDENTIFIED IN WRITING AS A SUPPLEMENT TO THIS MEMORANDUM. ONLY THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS MEMORANDUM AND SUPPLEMENTS FURNISHED BY THE GENERAL PARTNER MAY BE RELIED UPON IN CONNECTION WITH THE RESCISSION OFFER, THE OFFERING OR THE CONSENT SOLICITATION.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001025

# GLOSSARY

"Additional Interests" means the [redacted] of additional Limited Partnership Interests offered by the Partnership under the Offering.



"AF Indication" means the medical termination of pregnancies.

"Amendment" means the amendment to the Partnership Agreement to (i) change the name of the Partnership from "NeoGen Investors, L.P." to "Danco Investors Group, L.P.," (ii) permit amendments to the Partnership Agreement in the future to be accomplished by the consent or approval of the General Partner and Limited Partners owning or holding at least two-thirds (2/3) of the outstanding Limited Partnership Interests in the Partnership at that time, and (iii) change the name of Holdings from "NeoGen Holdings, L.P." to "Danco Holdings, L.P."

"Approvable Letter" means the letter from the FDA to the Council indicating that the use of the Drug for the AF indication was approvable subject to the satisfaction of certain special conditions.

"ARM" means Abortion Rights Mobilization, a New York based organization.

[redacted] means a company controlled by [redacted].

"Bridge Loans" means certain loans made to the Partnership from time to time in the maximum of [redacted], a portion of which were used to refinance the Interim Financing.



"Business" means the manufacture, marketing and distribution of the Drug by the Enterprise.

"cGMP regulations" means the current Good Manufacturing Practice regulations of the FDA.

"Change of Control" means as defined in "Certain Agreements - Revised License Agreement."

"Class A Interests" means currently outstanding Limited Partnership Interests held by Continuing Partners.

"Class B Interests" means the Offered Interests purchased under the Offering.

"Closing Date" means the date upon which the Transactions are closed.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001026

"CMC" means the Chemistry, Manufacturing and Controls section of the NDA.

"Code" means the Internal Revenue Code of 1986, as amended.

"Consent and Agreement" means the Consent and Agreement dated February 12, 1997 entered into by ███████████, the Council, ███████████ and certain of the Enterprise entities.

"Consent Effective Date" means one day after the Consent Solicitation Expiration Date.

"Consent Solicitation" means the solicitation by the Partnership of consent from Continuing Partners for approval and/or ratification of the Rescission Offer, the Offering and the Amendment.

"Consent Solicitation Expiration Date" means September 9, 1998, or such later date if extended by the General Partner, the date upon which the Consent Solicitation expires.

"Continuing Partners" means Current Partners who do not accept the Rescission Offer.

"Council" means The Population Council, Inc., a New York not-for-profit corporation.

"Council Litigation" means the litigation commenced by the Council and ███████████ against ███████████, seeking his removal from his management role with respect to the business, divestiture of his ownership interest in the Enterprise and certain other relief.

"Council Releasors" and "Council Releasees" means, for purposes of the Revised Consent Agreement, the Council and its agents, employees, representatives, partners, officers, trustees, directors, affiliates, subsidiaries, predecessors, successors and assigns.

"Current Partners" means holders of the Rescission Interests.

"Danco" means Danco Laboratories, Inc., a Cayman Islands corporation.

"DMF" means the Drug Master File.

"Donor" means the French corporation that developed the Drug.

"Drug" means the drug mifepristone.

"Enterprise" means the group of companies called "The Danco Group" organized to commercialize the Drug.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001027

"Enterprise Releasees" and "Enterprise Releasors" means, for purposes of the Revised Consent Agreement, the Enterprise entities and each of their agents, employees, representatives, partners, shareholders, officers, trustees, directors, affiliates, subsidiaries, predecessors, successors, heirs, personal representatives and assigns.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Account" means the escrow account established by the Partnership or the Licensee for the payment of Fixed Royalties to the Council, as required by the Revised License Agreement.

"Events of Default" means certain events, the occurrence of which will subject the Revised License Agreement to early termination by the Council. A description of the Events of Default can be found in "Certain Agreements - Revised License Agreement."

"Factory A" means the foreign manufacturer that is affiliated with a U.S.-based steroid chemistry laboratory and that entered into a manufacturing agreement with the Enterprise to define the chemistry process in laboratory scale, develop a Technology Transfer Document and implement pilot scale and commercial production in its offshore facility of the Drug in bulk substance.

"Factory B" and "Factory C" mean additional source suppliers for the Drug in bulk substance.

"Factory D" means an FDA-approved drug manufacturer which is willing to produce the Drug in bulk substance for Other Indications, but not for the AF Indication.

"FDA" means the United States Food and Drug Administration.

"First Round" means the first round of the Offering involving an offering of the Additional Interests.

"First Round Expiration Date" means September 9, 1998, the date upon which the First Round of the Offering expires.

"Fixed Royalties" means the fixed royalties payable by the Licensee to the Council under the Revised License Agreement in connection with the sale of the Drug for the AF Indication.

"Fluctuating Royalties" means the variable royalties (based on net sales revenues) payable by the Licensee to the Council under the Revised License Agreement in connection with the sale of the Drug for the AF Indication and for the Other Indications.

"Funding Commitments" means commitments delivered by the Standby Investors to the Council and the Partnership to provide equity funding to the Partnership under certain circumstances to pay all or a portion of the Partnership's obligations (i) to the Council under the Revised Consent Agreement in an amount of approximately ███████ and (ii) to Rescinding Partners for the Rescission Price and to

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Dance Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Dance Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

111

cover all costs associated with the Resclsion Offer, up to a maximum of ▉▉▉▉▉ in equity funding, reduced by the amount of proceeds received under the Offering and used for the purposes described above.

"GATT" means the General Agreement on Tariffs and Trade.

"General Partner" means N.D. Management, Inc., a Cayman Islands corporation.

"Holdings" means Danco Holdings, L.P., a Cayman Islands limited partnership formerly known as NeoGen Holdings, L.P.

"IND" means the Investigational New Drug application filed by the Council with the FDA to utilize the Drug for the AF Indication in the United States.

"Interim Financing" means certain loans made to the Partnership by MedApproach and ▉▉▉▉ on April 25, 1997 and June 10, 1997.

"IRS" means the Internal Revenue Service.

"License Agreement" means the License and Distribution Agreement dated December 29, 1995 between the Council and ▉▉▉▉. The License Agreement will be superseded by the Revised License Agreement.

"Licensee" means, for purposes of the Revised License Agreement, Danco.

"LMP" means a period of time after the beginning of the woman's last menstrual period.

"LP Representatives" means the representatives of Limited Partners who volunteered to discuss with ▉▉▉▉▉▉ the terms and conditions under which he would turn over management responsibilities with respect to the business and the Enterprise, and includes ▉▉▉▉▉▉, W. Bradley Daniel,

"MedApproach" means MedApproach, L.P., a Tennessee limited partnership.

"Memorandum" means this Confidential Memorandum dated August 5, 1998 and the exhibits and attachments hereto.

"MVA" means manual vacuum aspiration, which is a surgical procedure for early pregnancy termination.

"NDA" means the New Drug Application submitted by the Council to the FDA for use of the Drug for the AF Indication in the United States.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001029

"Offered Interests" means the Additional Interests and the Replacing Interests.

"Offering" means the up to ▮▮▮▮▮ offering by the Partnership of the Offered Interests pursuant to this Memorandum.

"Offering Expiration Date" means November 27, 1998, or such later date if extended by the General Partner, the date upon which the Third Round of the Offering expires.

"Other Indications" means certain other possible medical applications for the Drug, such as emergency contraception, cervical ripening, breast cancer, Cushings' disease, endometriosis and meningioma.

"Participating Investors" means the LP representatives and any other Limited Partners who chose to participate in the ▮▮▮ Agreement.

"Partnership" means Danco Investors Group, L.P., a California limited partnership formerly known as NeoGen Investors, L.P.

"Partnership Agreement" means the Limited Partnership Agreement of the Partnership dated as of December 28, 1995.

"Pharmaceuticals" means Danco Pharmaceuticals, Inc., a Delaware corporation formerly known as NeoGen Pharmaceuticals, Inc.

"▮▮▮ Agreement" means the agreement between ▮▮▮▮▮▮ and certain other parties, pursuant to which, among other things, he (i) transferred 75% of the outstanding stock of the General Partner to MedApproach, (ii) delivered an irrevocable proxy pursuant to which voting power over the remaining 25% of the outstanding stock of the General Partner was granted to the Proxy Holders, and (iii) resigned from any and all of his positions as an officer or director of the General Partner and its related entities.

"▮▮▮ Claims" means any and all claims which the Rescinding Partners may now or hereafter have against ▮▮▮▮ and/or his family members or affiliates (other than the Enterprise) by reason of any matter, cause, event, transaction or thing relating to the Enterprise or the Business.

"Previous Manufacturer" means the Hungarian pharmaceutical manufacturer that was to provide the Enterprise with the Drug in bulk substance but which unilaterally terminated its agreement with Danco to do so.

"Prior Offering" means the offering of Limited Partnership Interests occurring between about November 1995 and February 1997, pursuant to which the Rescission Interests were purchased by the Current Partners.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001030

"Proxy Holders" means W. Bradley Daniel, ████████████████████████████████ For most purposes, including for eligibility to participate in benefit and incentive plans, the Proxy Holders will be considered as part of Enterprise management.

"Qualified Plans" means qualified pension, profit-sharing and stock bonus plans and individual retirement accounts.

"Replacing Interests" means up to ████████ of Limited Partnership Interests offering by the Partnership to replace Rescission Interests which will be repurchased to consummate the Rescission Offer.

"Rescinding Partners" means Current Partners who accept the Rescission Offer.

"Rescission Expiration Date" means September 9, 1998, the date upon which the Rescission Offer expires.

"Rescission Interests" means Limited Partnership Interests purchased in the Prior Offering for aggregate capital contributions of ████████.

"Rescission Offer" means the offering by the Partnership to Current Partners the right to rescind their purchases of the Rescission Interests pursuant to the terms set forth in this Memorandum.

"Rescission Price" means cash equal to the amount of consideration paid by Rescinding Partners for the Rescission Interests together with interest thereon from the date of purchase at the Statutory Rate.

"Revised Consent Agreement" means the Revised Consent and Agreement dated as of April 30, 1998, between the Council and the Enterprise, which supersedes the Consent and Agreement and which sets forth the agreements of the parties relative to certain developments.

"Revised License Agreement" means the Amended and Restated License and Distribution Agreement dated as of April 30, 1998, between the Council, Danco and the Partnership, which will supersede the License Agreement on the Closing Date and which, among other things, grants Licensee an exclusive license to make and have made, process, use, market, sell and distribute the Drug for the AF Indication and Other Indications in the United States.

"Second Round" means the second round of the Offering involving an offering of the Replacing Interests and any Additional Interests not purchased in the First Round.

"Second Round Expiration Date" means October 21, 1998, the date upon which the Second Round of the Offering expires.

"Securities Act" means the Securities Act of 1933, as amended.

"Standby Investors" means MedApproach, an affiliate of MedApproach and ████████████

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL

H00001031

"Standstill Agreement" means the letter agreement dated February 5, 1997 in favor of the Council and the Partnership which, among other things, prohibits any further involvement by ███████████ in the Business and the Enterprise.

"Statutory Rate" means, for purposes of the Rescission Offer, the applicable statutory rate of interest for the state in which the Rescinding Partner resides or has his, her or its principal place of business.

"Sublicense" means the sublicense agreement between Advances and various entities within the Enterprise, sublicensing to such entities the rights to manufacture, market and distribute the Drug in the United States.

"Third Round" means the third round of the Offering involving the offering of any Replacing Interests and Additional Interests not purchased in the First Round or Second Round of the Offering.

"Transactions" means the Rescission Offer, the Offering and the Consent Solicitation.

"UBTI" means unrelated business taxable income under the Code.

"U.K." means the United Kingdom.

"XYZ Agreement" means the letter agreement pursuant to which XYZ Company has agreed not to initiate or join in any legal proceedings against the Council or the Enterprise for infringement by them of patents of XYZ Company so long as such infringement consists solely of the use of the Drug, or sale of the Drug for use, in conjunction with misoprostol for the AF Indication in the United States.

"XYZ Company" means the foreign pharmaceutical company, other than the Donor, that holds the United States patent rights for the use of the Drug, or sale of the Drug for use, in conjunction with misoprostol for the AF Indication.

"Yuzpe regimen" means the method of preventing pregnancy by taking two double doses of regular oral contraceptive pills within 72 hours of having unprotected sex.

*Strictly Confidential Proprietary Information*

*This Memorandum is not to be shown or given to any person other than the recipient whose name appears on the cover page hereof and such person's professional advisors, and is not to be reprinted or reproduced in any manner. Violators may be subject to claims by The Danco Group for damages and other relief. The information contained in this Memorandum is believed to be accurate as of the date hereof. Neither The Danco Group nor its management shall be responsible for any opinions or conclusions drawn from such information.*

CONFIDENTIAL
H00001032

# LIMITED PARTNERSHIP AGREEMENT

CONFIDENTIAL

THE SECURITIES (LIMITED PARTNERSHIP INTERESTS) EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR REGISTERED OR QUALIFIED UNDER ANY SECURITIES OR BLUE SKY LAWS OF ANY STATE OR JURISDICTION. THE SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED UNTIL (i) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR THE APPLICABLE STATE SECURITIES OR BLUE SKY LAWS SHALL HAVE BECOME EFFECTIVE WITH REGARD TO THE PROPOSED TRANSFER, OR (ii) IN THE OPINION OF COUNSEL ACCEPTABLE TO THE GENERAL PARTNER, REGISTRATION OR QUALIFICATION UNDER THE SECURITIES ACT OR BLUE SKY LAWS IS NOT REQUIRED IN CONNECTION WITH THE PROPOSED TRANSFER.

LIMITED PARTNERSHIP AGREEMENT OF

NEOGEN INVESTORS, L.P.,

A California Limited Partnership


THIS LIMITED PARTNERSHIP AGREEMENT OF NEOGEN INVESTORS, L.P., a California limited partnership ("Agreement"), is made as of December 28, 1995 ("Effective Date"), among N.D. MANAGEMENT, INC., a Cayman Islands company, as general partner (hereinafter referred to as the "General Partner"), and each of the parties designated as limited partners on Exhibit "A" to this Agreement, as amended from time to time (hereinafter individually and collectively referred to as "Limited Partner(s)"), each of whom has executed and delivered to the General Partner a subscription agreement authorizing the General Partner to execute this Agreement and any amendments hereto on behalf of such person(s) as its or their attorneys-in-fact. The General Partner and the Limited Partners and any other general or limited partners admitted to this limited partnership in accordance with this Agreement sometimes hereinafter shall be referred to individually as a "Partner" and collectively as the "Partners." The Partners agree as follows:

1. RECITALS. The Partners are entering into this Agreement to form a limited partnership ("Partnership") for, among other things, the purpose of acquiring and holding for investment a limited partnership interest ("Neogen Holdings Interest") in NEOGEN HOLDINGS, L.P., a Cayman Islands limited partnership ("NeoGen Holdings").

2. FORMATION OF LIMITED PARTNERSHIP. By this Agreement the General Partner intends to form, and upon filing of the Certificate of Limited Partnership shall form, a California limited partnership pursuant to the provisions of Chapter 3, Title 2 of the California Corporations Code, commonly referred to as the California Revised Limited Partnership Act.

3. NAME OF LIMITED PARTNERSHIP. The name of the Partnership shall be NEOGEN INVESTORS, L.P., a California limited partnership.

4. **FILING OF CERTIFICATE OF LIMITED PARTNERSHIP.** The General Partner shall cause a Certificate of Limited Partnership to be prepared, executed by the General Partner, and filed in the office of the California Secretary of State in accordance with California Corporations Code section 15621.

5. **PRINCIPAL PLACE OF BUSINESS.** The principal place of business of the Partnership shall be One Capital Place, Shedden Road, Grand Cayman, Cayman Islands, British West Indies. The principal place of business of the Partnership may be changed to such other place or places as the General Partner hereafter shall determine from time to time.

6. **PURPOSE OF THE PARTNERSHIP.** The Partnership is organized for the purpose of acquiring and holding for investment the NeoGen Holdings Interest and to engage in any other lawful business permitted under this Agreement. NeoGen Holdings has been formed for the purpose of investing in, and will serve as a holding company for, Danco Laboratories, a Cayman Islands company ("Danco"), an entity which holds a license or licenses to develop, manufacture, market and distribute Mifepristone (the "Drug") in the United States as a medical abortifacient. The investment objective of the Partnership is to achieve returns on the Partnership's investment through income and/or capital appreciation derived from the NeoGen Holdings Interest. To accomplish the Partnership objectives, the Partnership shall become a limited partner in NeoGen Holdings by entering into that certain Amended and Restated Limited Partnership Agreement of NeoGen Holdings, L.P., a Cayman Islands Limited Partnership ("NeoGen Holdings Agreement"). Pursuant to the NeoGen Holdings Agreement, the Partnership shall contribute cash to fund the business of NeoGen Holdings. The Partnership has been formed with the goal of raising ▓▓▓▓▓▓ from the offering of limited partnership interests in the Partnership pursuant to that certain Private Placement Memorandum dated April 15, 1996 ("Offering"). The Partnership may subsequently raise additional capital (whether or not the Partnership raises ▓▓▓▓▓▓ from the Offering) in accordance with subparagraph 6.c below. Additionally, NeoGen Pharmaceuticals, a Delaware corporation ("NeoGen Pharmaceuticals"), will be a wholly-owned subsidiary of the Partnership. NeoGen Pharmaceuticals holds a license or licenses to develop, manufacture, market and distribute the Drug for certain currently identified non-abortifacient indications. The General Partner shall cause NeoGen Pharmaceuticals to be contributed to the Partnership in accordance with subparagraph 8.a. below. Nevertheless, all funds contributed to the Partnership shall be initially invested in NeoGen Holdings. The Partnership does not currently have a business plan for the funding of NeoGen Pharmaceuticals or for the development, manufacture, marketing and distribution of the Drug for indications other than as a medical abortifacient. The Partnership shall fund the business of NeoGen Pharmaceuticals at such time, and by such means, as the General Partner, in its sole and absolute discretion,

CONFIDENTIAL

H00001035

deems appropriate and in the best interests of the Partnership.
NeoGen Pharmaceuticals may, in the sole and absolute discretion of
the General Partner, be reorganized as a limited liability company.

7. **TERM OF THE PARTNERSHIP**. The Partnership shall commence
as of the date the Certificate of Limited Partnership is filed in
the Office of the Secretary of State and shall continue in
existence until December 31, 2045, unless terminated sooner
pursuant to any other provision of this Agreement, or continued by
a vote of the General Partner and a majority-in-interest of the
Limited Partners, based on the Limited Partners' respective
Percentage Interests (as defined below).

8. **CAPITAL CONTRIBUTIONS**. The Partners shall make the
following initial contributions to the capital of the Partnership:

a. **General Partner's Initial Contribution**. As its
initial capital contribution, the General Partner shall cause all
right, title and interest in Neogen Pharmaceuticals to be
contributed to the Partnership, which initial capital contribution
is agreed by the Partners to have a fair market value of ____.

b. **Limited Partners' Initial Contributions**. The
initial capital contributions of the Limited Partners shall be as
set forth opposite each Limited Partner's name on **Exhibit "A."**

c. **Additional Capital Contributions**. If the General
Partner determines in its sole and absolute discretion that
additional contributions to the capital of the Partnership are
necessary from time to time for the operation of the business of
the Partnership, the General Partner may, in its sole and absolute
discretion, admit additional limited partners to the Partnership
pursuant to paragraph 23 below who shall make additional
contributions.

d. **General Partner's Obligations**. The General Partner
shall have no obligation to provide funds to the Partnership, by
way of capital contributions, loans or otherwise, even if the
failure to do so could result in a default of the Partnership's
obligations.

e. **Limitation on Liabilities of Limited Partners**. In
no event shall the Limited Partners be liable for losses or
obligations of the Partnership in excess of the greater of their
respective (i) contributions to the capital of the Partnership or
(ii) distributions received from time to time pursuant to this
Agreement and which under applicable law the Limited Partner is
required to return to the Partnership.

CONFIDENTIAL                                                H00001036

**f.** __No Interest on Capital Contribution__. No Partner shall be paid interest on any capital contribution made by such Partner or on such Partner's Capital Account (as hereinafter defined).

**9.** __PERCENTAGE INTERESTS__. Each Limited Partner making a capital contribution on or before the date of the close of the Offering ("__Offering Termination Date__") as described in that certain Private Placement Memorandum dated April 15, 1996 shall receive an ownership interest in the Partnership (expressed as a percentage interest in the Partnership) ("__Percentage Interest__") equal to ▮▮▮% for each ▮▮▮▮▮ contributed (Limited Partners who have made capital contributions on or before the Offering Termination Date shall sometimes hereafter be referred to as "__Class A Limited Partners__"). Accordingly, to the extent ▮▮▮▮▮ is contributed to the capital of the Partnership by Class A Limited Partners, the Class A Limited Partners shall, in the aggregate, have a ▮▮▮▮ Percentage Interest in the Partnership. Likewise, to the extent ▮▮▮▮▮▮ is contributed to the capital of the Partnership by Class A Limited Partners, the Class A Limited Partners shall, in the aggregate, have a ▮▮▮▮ Percentage Interest in the Partnership. The balance of the Percentage Interests in the Partnership shall be allocated to the General Partner. Subsequent to the Offering Termination Date, the General Partner shall have the authority, pursuant to paragraph 23 below, to secure additional capital through the admission of additional limited partners to the Partnership; provided, however, such additional capitalization efforts shall not result in a reduction of the Percentage Interests assigned to the Class A Limited Partners except as specifically set forth in paragraph 23.

**10.** __WITHDRAWAL OF CAPITAL__. No Partner may withdraw capital from the Partnership or from such Partner's Capital Account (as hereinafter defined) without the prior written consent of the General Partner.

**11.** __CAPITAL ACCOUNTS__.

**a.** __Establishment of Capital Accounts__. A separate capital account shall be maintained for each Partner (a "__Capital Account__") strictly in accordance with the rules set forth in Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

**b.** __Adjustment to Capital Accounts__. Subject to subparagraph 11.a., a Partner's Capital Account from time to time:
(i) shall be increased by:

(A) the amount of money contributed by such Partner to the Partnership;

CONFIDENTIAL

H00001037

(B) the fair market value of property contributed by such Partner to the Partnership (net of liabilities secured by such property that the Partnership is considered to assume or take subject to under Section 752 of the Internal Revenue Code, as amended ("Code"); and

(C) the Profit (as defined in Exhibit "B") allocated to such Partner and other items of income and gain specially allocated to such Partner; and

(ii) shall be decreased by:

(A) the amount of money distributed to such Partner;

(B) the fair market value of property distributed to such Partner by the Partnership (net of liabilities secured by the distributed property that such Partner is considered to assume or take subject to under Code Section 752;

c. Single Capital Account for Multiple Interests. If a Partner is both a General Partner and a Limited Partner of the Partnership, a single Capital Account shall be maintained for that Partner.

d. Treatment of Loans or Advances. If any Partner shall loan or advance any funds to the Partnership, the amount of any such loan or advance shall not enlarge that Partner's capital account, but shall be a debt due from the Partnership to that Partner to be repaid upon such terms and conditions, bearing interest at such rates and secured by such assets of the Partnership and in such manner as the General Partner shall determine in its sole and absolute discretion.

e. Transfer of Partnership Interest. In the event all or a portion of an interest in the Partnership is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the capital account of the transferor to the extent it relates to the transferred interest.

12. ALLOCATION OF PROFITS AND LOSSES. All allocations of profit, loss, income, gain, credits and deductions of the Partnership shall be made in accordance with the terms and provisions of Exhibit "B".

13. CASH DISTRIBUTIONS.

a. Distributions of Available Cash From Operations. The General Partner shall distribute, in its sole and absolute discretion, but in no event less than annually, "Available Cash from Operations." As used herein, "Available Cash from Operations" shall mean all cash receipts of the Partnership from operations,

CONFIDENTIAL                                                                    H00001038

loan proceeds or the disposition of any assets that the General Partner does not expect to use, in its sole and absolute discretion, for (i) the operation of the Partnership, (ii) the furtherance of the business of the Partnership, (iii) the payment of all expenses, including any Reimbursable Expenses (as defined in subparagraph 15.f below), then due, or (iv) the creation of a reasonable reserve for expenses and anticipated obligations of the Partnership. Available Cash from Operations shall be distributed by the General Partner as follows (except upon dissolution of the Partnership, in which event, available funds shall be utilized or distributed according to the priorities set forth in subparagraph 26.b below):

(i)   First, ninety-nine percent (99%) to the Limited Partners in proportion to and to the extent of their respective Adjusted Capital Contributions (as defined below), and one percent (1%) to the General Partner, until each Limited Partner has received an amount equal to its Adjusted Capital Contributions;

(ii)   Second, to the Partners in accordance with their respective Percentage Interests.

b.   **Adjusted Capital Contributions**.  As used herein, "Adjusted Capital Contributions" means the aggregate amount of capital contributions made by a Partner to the Partnership pursuant to paragraph 8 above, reduced, but not below zero, by all prior distributions to the Partners of Available Cash from Operations.

14.  **AUTHORITY TO BORROW**.  If the General Partner determines that additional funds are necessary from time to time for the operation of the business of the Partnership, the General Partner may, at its sole and absolute discretion, borrow the necessary capital in the name of the Partnership from any person or entity deemed appropriate by the General Partner, including, without limitation, the General Partner itself or any Affiliate (as defined in subparagraph 15.e below) provided, however, that (i) such financing is consistent with the Expenditure Plan (as defined in subparagraph 19.g below) and (ii) the General Partner shall first deliver a written notice to the Limited Partners of the amount, terms and conditions of the financing sought pursuant to this paragraph 14 ("Notice of Financing").  The Limited Partners shall have the option, which option must be exercised within fifteen (15) days after the Notice of Financing is delivered, to fund all or any part of the proposed financing on the same terms and conditions as set forth in the Notice of Financing.  If more than one Limited Partner elects to provide financing and the amount of financing to be so provided exceeds the amount of financing set forth in the Notice of Financing, unless agreed otherwise by such Limited Partners, each Limited Partner electing to provide financing hereunder shall have the right to participate in the financing in the proportion that such Limited Partner's Percentage Interest bears to the Percentage Interests of all Limited Partners electing

CONFIDENTIAL

H00001039

to participate in the financing. Any portion of the financing covered by the Notice of Financing which the Limited Partners do not elect to fund pursuant to this paragraph 14 may be offered by the General Partner to lenders, upon terms and conditions not materially more favorable to such lenders than those set forth in the Notice of Financing; provided, however, that such financing must be consummated within one hundred eighty (180) days after the Notice of Financing is delivered to the Limited Partners. All loans pursuant to this paragraph 14 shall be on commercially reasonable terms and conditions as available in the market at that time.

15. <u>MANAGEMENT OF THE PARTNERSHIP</u>.

a. <u>Authority of General Partner</u>. Except as otherwise provided in this Agreement, the General Partner shall have the sole and exclusive authority to control and manage the day-to-day business affairs and activities of the Partnership, and no Limited Partner shall have any right to participate in the management or control of the business affairs and activities of the Partnership. The General Partner shall have all rights, power and authority of partners in a partnership without limited partners and as otherwise generally conferred by law or necessary, advisable or consistent with accomplishing the purpose of the Partnership, whether or not such rights are specifically mentioned in this Agreement. Without limiting the foregoing, the General Partner shall have the authority:

(i)    To manage and control the operation and business affairs of the Partnership and, except as expressly provided herein, to make all decisions regarding the operation and business affairs of the Partnership;

(ii)    To contribute and/or lend funds to Neogen Holdings as the General Partner deems appropriate in its sole and absolute discretion;

(iii)    To exercise all rights, powers, privileges and other incidents of ownership of the NeoGen Holdings Interest.

(iv)    To acquire, own, lease, sublease, manage, hold, deal in, control or dispose of any interests or rights in personality and any interests or rights in real property;

(v)    To make, execute, assign, acknowledge, file and deliver on behalf of the Partnership any and all agreements, contracts and other documents or instruments and take such other steps as the General Partner, in its sole discretion, determines to be necessary to effectuate the purposes of the Partnership;

CONFIDENTIAL                                                    H00001040

(vi)  To borrow money in such amounts, on such terms and conditions, and at such rates as the General Partner deems appropriate for any Partnership purpose and, as security therefore, encumber all or any part of the Partnership assets;

(vii)  To invest Partnership funds in debt or equity securities or other obligations of other issuers, including, but not limited to, securities or other obligations of other partnerships;

(viii) To employ and engage suitable agents, employees, advisers, consultants and counsel who may be Affiliates, as defined in subparagraph 15.e below (including, without limitation, any investment adviser, accountant, attorney, corporate fiduciary, bank or other reputable financial institution) for the General Partner to carry out any activities which the General Partner deems is necessary, advisable or consistent with accomplishing the purpose of the Partnership;

(ix)  To purchase and maintain, in its sole and absolute discretion and at the expense of the Partnership, liability, indemnity and any other insurance, including errors and omissions insurance, sufficient to protect the Partnership, the General Partner and any other person from those liabilities and hazards which may be insured against in the conduct and management of the Partnership's business;

(x)  To compromise, arbitrate or otherwise adjust claims in favor of or against the Partnership, and to commence or defend litigation with respect to the Partnership or the assets of the Partnership, as the General Partner, in its sole and absolute discretion, deems to be in the best interest of the Partnership;

(xi)  To qualify the Partnership to do business in another state, territory, dependency or foreign country;

(xii)  To admit any additional Limited Partners pursuant to paragraph 23 below; and

(xiii) To make all Partnership decisions and elections for accounting and income tax purposes, including but not limited to the selection of the accounting method or methods to be used by the Partnership for Partnership accounting and income tax purposes, the selection of depreciation methods and useful lives for Partnership property and the making of any election for income tax purposes under Section 754 or any other appropriate provisions of the Internal Revenue Code of 1986, or any successor federal income tax statute.

The expression of any power or authority of the General Partner in this Agreement shall not limit or exclude any other power or authority which is not specifically or expressly set forth

CONFIDENTIAL

H00001041

in this Agreement. The foregoing authority may be relied upon by any person or entity which may conduct business with the Partnership.

b.  **Limitations on General Partner's Authority**. Notwithstanding subparagraph a. to the contrary, the General Partner shall not undertake any of the following without the written consent of a majority-in-interest of the Limited Partners:

(i)   Take any action in contravention of this Agreement;

(ii)  Assign the Partnership assets for the benefit of creditors;

(iii) Possess Partnership assets other than for a Partnership purpose;

(iv)  Admit a person or entity as a General Partner;

(v)   Change the nature of the Partnership's business;

(vi)  Sell, exchange, lease, mortgage, pledge, or grant a security interest in all or a substantial part of the assets of the Partnership other than in the ordinary course of its business;

(vii) Dispose of the goodwill of the Partnership's business;

(viii) Undertake any act in which would make it impossible to carry on the ordinary business affairs and operations of the Partnership;

(ix)  Consent to any actions by the general partner of Neogen Holdings which require the consent by the Partnership under any of the provisions of the NeoGen Holdings Agreement, including, without limitation, the taking of any action to amend the NeoGen Holdings Agreement; or

(x)   Undertake any act or cause the Partnership to undertake any act that is inconsistent with the Expenditure Plan (as defined in subparagraph 19.g below).

c.  **Limitation on Limited Partners' Authority**. Limited Partners shall not be entitled to vote on or approve any Partnership actions except as expressly set forth herein or pursuant to those specific rights conferred by law which, under law, cannot be superseded by agreement between the parties. Without limiting the generality of the foregoing sentence, it is

CONFIDENTIAL

H00001042

expressly agreed that the Limited Partners shall not have the right to remove the General Partner as the general partner of the Partnership.

   d. <u>Management Responsibilities</u>. The General Partner (or its designee) shall devote such time and energies to the business of the Partnership as are necessary to provide for the orderly administration of the business affairs of the Partnership. The General Partner (or its designee) is not obligated to devote full time to the affairs of the Partnership. The General Partner shall not be entitled to any management fee in connection with its management of the Partnership. Notwithstanding the foregoing, the Limited Partners understand that Danco shall be contracting directly with the General Partner or an Affiliate (as defined in subparagraph e. below) to assist Danco in the management and operation of the development, manufacturing, marketing and distribution of Mifepristone, and that the General Partner (or an Affiliate) shall be receiving a fee directly from Danco for such assistance ("<u>Management Fee</u>"). The Management Fee shall initially equal ▮▮▮▮▮ per year. The Management Fee shall be adjusted on the first anniversary of the date of this Agreement and on each anniversary date thereafter ("<u>Adjustment Dates</u>") to reflect increases in the Consumer Price Index for all Urban Consumers (the "<u>Index</u>") published by the United States Department of Labor for Los Angeles, "All Items" (1982-84 = 100 base). At each Adjustment Date, the Management Fee for the immediately preceding year shall be increased in the amount of any percentage increase in the Index last published before the Adjustment Date as compared with the Index published for the same calendar month of the preceding year. The Management Fee thereby payable for the year succeeding each Adjustment Date shall be the Management Fee for the immediately preceding year ("<u>Last Year's Management Fee</u>") plus the product of (i) Last Year's Management Fee and (ii) the percentage increase in the Index during the preceding year (as determined above). If the format or components of the Index are materially changed during the term of this Agreement, the General Partner shall substitute an index which is published by the Bureau of Labor Statistics or similar agency and which is most nearly equivalent to the Index in effect on the date of this Agreement. In no event shall the Management Fee be adjusted to reflect decreases in the Index. Except as set forth above, the Management Fee may not be otherwise increased until the date all Class A Limited Partners have received distributions in an amount equal to their respective Adjusted Capital Contributions pursuant to paragraph 13 above ("<u>Investment Return Date</u>"). On or after the Investment Return Date, the Management Fee may be increased from time to time (in excess of the cost of living adjustments referenced above) as reasonably determined by the General Partner subject to the approval of a majority-in-interest of the Limited Partners. Neither the Partnership nor the Limited Partners shall have any right, title or interest in the Management Fee.

CONFIDENTIAL

H00001043

e.   **Affiliates**.  The Partners hereby acknowledge and agree that the General Partner may use related or affiliated persons or entities ("**Affiliate**"), in the sole and absolute discretion of the General Partner, to perform certain management or operational duties in connection with the management of the Partnership; provided, however, that any transaction between the Partnership and any such Affiliate shall be disclosed to the Limited Partners and shall be on commercially reasonable terms and conditions.

f.   **General Partner's Reimbursable Expenses**.  Expenses of the Partnership shall be billed to and paid by the Partnership. In addition, the General Partner shall receive from the Partnership reimbursement for all actual out-of-pocket expenses incurred in furthering the Partnership's business, including, but not limited to, organizational expenses of the Partnership (including expenses of the Offering and the formation of the Partnership both before and after the Effective Date), maintenance of Partnership books and records, reporting to and corresponding with the Partners, preparing the Budget and the reports required under paragraph 19, legal, accounting and general bookkeeping services ("**Reimbursable Expenses**").   The Partnership shall not reimburse the General Partner for office space or employee costs associated with the operation of the Partnership.  Notwithstanding the foregoing, (i) organizational expenses of the Partnership which constitute Reimbursable Expenses hereunder and (ii) costs of developing the Venture (as defined in the NeoGen Holdings Agreement) and expenses relating to the formation of NeoGen Holdings, both of which constitute Reimbursable Expenses under the NeoGen Holdings Agreement, as of the Effective Date equal approximately ▮▮▮▮ and, as of April 1, 1996, shall not exceed ▮▮▮▮▮.

g.   **Downstream Equity Sales**.  The Partners acknowledge that N.D. Management, Inc., as general partner of NeoGen Holdings, may from time to time, subject to the consent of a majority-in-interest of the Limited Partners pursuant to subparagraph 15.b(ix), cause NeoGen Holdings and/or Danco to sell equity interests ("**Equity Interests**") to investors, including, without limitation, Partners and their respective Affiliates.  Prior to the sale of any Equity Interests, the General Partner shall first deliver a written notice to the Limited Partners setting forth the amount of Equity Interests to be sold at such time and the proposed purchase price for such Equity Interests ("**Notice and Offer to Sell**").  If a majority-in-interest of the Limited Partners consent to the proposed sale of the Equity Interests reflected in the Notice and Offer to Sell, the Limited Partners shall have the option, which option must be exercised within fifteen (15) days after the Notice and Offer to Sell is delivered, to purchase all or any part of the Equity Interests to be sold upon the same terms and conditions set forth in the Notice and Offer to Sell.  Any Equity Interests available under the Notice and Offer to Sell which the Limited Partners do not elect to purchase pursuant to this subparagraph

CONFIDENTIAL

H00001044

15.g, may be offered to investors upon terms and conditions not materially more favorable to such investors than those set forth in the Notice and Offer to Sell; provided, however, that the sale of the Equity Interests available under the Notice and Offer to Sell must be consummated within one hundred and eighty (180) days after the Notice and Offer to Sell is delivered to the Limited Partners. If more than one Limited Partner elects to purchase the Equity Interests available under the Notice and Offer to Sell and the number of Equity Interests desired exceed the number of Equity Interests available under the Notice and Offer to Sell, unless agreed otherwise by the Limited Partners electing to purchase Equity Interests hereunder, each such purchasing Limited Partner shall have the right to purchase the available Equity Interests in the proportion that such Limited Partner's Percentage Interest bears to the Percentage Interests of all Limited Partners electing to purchase Equity Interests hereunder.

     h.   <u>Downstream Financing</u>. The Partners acknowledge that N.D. Management, Inc., as general partner of NeoGen Holdings, may from time to time, subject to the consent of a majority-in-interest of the Limited Partners pursuant to subparagraph 15.b(ix), cause NeoGen Holdings and/or Danco to borrow funds from Partners and/or their respective Affiliates ("<u>Affiliate Financing</u>"). Prior to entering into any Affiliate Financing, the General Partner shall deliver to the Limited Partners written notice of the material terms and conditions of such Affiliate Financing ("<u>Notice of Affiliate Financing</u>"). If a majority-in-interest of the Limited Partners consent to the Affiliate Financing, the Limited Partners shall have the option, which option must be exercised within fifteen (15) days after the Notice of Affiliate Financing is delivered, to fund all or any part of the proposed financing on the same terms and conditions as set forth in the Notice of Affiliate Financing. Any portion of the financing covered by the Notice of Affiliate Financing which the Limited Partners do not elect to fund pursuant to this subparagraph h., may be offered to lenders upon terms and conditions not materially more favorable than those terms and conditions set forth in the Notice of Affiliate Financing; provided, however, that such financing must be consummated within one hundred eighty (180) days after the Notice of Affiliate Financing is delivered to the Limited Partners. If more than one Limited Partner elects to provide the financing covered by the Notice of Affiliate Financing and the amount of financing to be so provided exceeds the amount of financing sought under the Notice of Affiliate Financing, unless agreed otherwise by such Limited Partners, each Limited Partner electing to provide financing hereunder shall have the right to participate in the financing in the proportion that such Limited Partner's Percentage Interest bears to the Percentage Interests of all Limited Partners electing to participate in the financing.

CONFIDENTIAL

H00001045

16.  **PROXIES**.  Any Limited Partner shall be entitled to select a proxy (which proxy may be the General Partner) ("**Proxy**") who shall be authorized to represent and act on behalf of such Limited Partner with respect to the business of the Partnership.  A Limited Partner may select a Proxy by delivering to the General Partner a notice ("**Proxy Notice**") setting forth that the Limited Partner is selecting a Proxy pursuant to this Agreement and the name, address, telephone number and facsimile number of the Proxy.  The receipt of a Proxy Notice by the General Partner shall constitute a designation by the Limited Partner sending the Proxy Notice to have all Notices (as defined in paragraph 28 below) delivered, mailed and/or transmitted by facsimile to the Proxy (and not the Limited Partner) pursuant to the information set forth in the Proxy Notice.  All information in the Proxy Notice relating to the Proxy shall be provided to the Limited Partners by the General Partner.   If a Limited Partner selects a Proxy, the other Partners shall be entitled to assume that the Proxy has full power and authority to do and perform each and every act and thing that the Limited Partner might or could do under this Agreement, including, without limitation, attend Partnership meetings and vote.  Any Partner who relies on and acts in accordance with the actions or instructions of the Proxy shall have no liability to the Limited Partner selecting the Proxy for doing so.

17.  **COMPETITION**.  No provision of this Agreement shall be interpreted or construed to prevent any Partner (or principal or Affiliate of any Partner) from engaging in any other business or enterprise, including, without limitation, any business or enterprise competitive with the Partnership, including, without limitation, ownership and participation as a director, officer, partner, employee, consultant, agent or in any other individual or representative capacity in any commercial biotechnology venture; provided, however, that the General Partner (and any principal of the General Partner) shall not engage in any business or enterprise competitive with the Partnership which relates to the development, manufacturing, marketing or distribution of any drug as a medical abortifacient  The provisions contained in this paragraph 17 (and paragraph 18 below) shall survive and be binding upon the General Partner in the event the General Partner withdraws from the Partnership and the General Partner shall impose in written agreements the provisions hereof on its principals and such provisions shall survive their ceasing for any reason to be the principals of the General Partner.

18.  **BUSINESS OPPORTUNITY**.  No Partner (or principal or Affiliate of any Partner) shall be required to offer to the other Partners of the Partnership the opportunity to participate in any other business, including, without limitation, any business related to or competitive with the Partnership, except that the General Partner (and any principal of the General Partner) shall use reasonable care to see that the Partnership receives the benefit

CONFIDENTIAL

H00001046

of any potential business opportunity related to the development, manufacturing, marketing or distribution of the Drug.

19. FISCAL MATTERS.

a. Partnership Documents. The General Partner shall keep at the principal place of business of the Partnership, or any other location deemed appropriate by the General Partner in its sole and absolute discretion, the following Partnership documents which the Limited Partners shall have the right to audit and review at any reasonable time during business hours (provided, however, that any expenses for such audit or review shall be borne by the Limited Partner causing such audit or review to be conducted):

(i) A copy of the Certificate of Partnership and all Certificates of Amendment thereto;

(ii) Copies of the Partnership's federal, state and local tax or information returns and reports, if any, for the four most recent taxable years;

(iii) Copies of this Agreement and all amendments thereto;

(iv) Financial statements of the Partnership for the six most recent fiscal years which shall include, but shall not be limited to, income statements, balance sheets and statements of changes in financial position;

(v) The Partnership's books and records for at least the three most recent fiscal years, which books and records shall include all budgets and reports required to be provided to the Partnership pursuant to the NeoGen Holdings Agreement;

(vi) A current list of the full name and last known business address of each Partner (or such Partner's Proxy) together with the Adjusted Capital Contribution, Capital Account balance and Percentage Interest of each Partner; and

(vii) Financial statements of the General Partner for the most recent fiscal year, which shall include, but shall not be limited to, income statements, balance sheets and statements of changes in financial position.

b. Tax Returns. The General Partner also shall deliver to the Partners within seventy-five (75) days after the end of each fiscal year, including any partial first fiscal year, (or sooner if any information is necessary for the Partners to complete their federal and state income tax or information returns) a copy of the Partnership's federal, state and local income tax or information returns for the year.

CONFIDENTIAL

H00001047

c.  Accounting Period.  Subject to such approval of the Internal Revenue Service as may be required, the accounting year of the Partnership shall be on a calendar-year basis ("Accounting Period").

d.  Budget.  On or before the commencement of each fiscal year, the General Partner shall deliver to each Limited Partner an operating budget ("Budget"), setting forth in reasonable detail the estimated operating expenses of the Partnership for such fiscal year. The budget is for informational purposes only and may be revised at any time by the General Partner in its sole and absolute discretion.

e.  Annual Reports.  Within one hundred twenty (120) days after the end of each fiscal year, the General Partner shall cause to be delivered to each Partner who was a Partner at any time during such fiscal year, an annual report containing the following:

(i)  Financial statements of the Partnership, including, without limitation, a balance sheet as of the end of the Partnership's fiscal year and statements of income, Partners' equity and changes in financial position, for such fiscal year, which shall be prepared in accordance with generally accepted accounting principles consistently applied and shall be accompanied by a report containing an opinion of a firm of independent certified public accountants; and

(ii)  A statement of cash flow for the period covered by the annual report.

f.  Quarterly Reports.  Within forty five (45) days after the end of each fiscal quarter, the General Partner shall cause to be delivered to each Partner who was a Partner at any time during the three months then ended, a quarterly report containing an unaudited balance sheet as of the end of such three-month period and statements of income and cash flow for such period and a general description of the activities of the Partnership during the period covered by the quarterly report with a statement reporting any material deviations from the Budget with a general and brief discussion of the reason for each such material deviation.

g.  Expenditure Plan.  Each Limited Partner acknowledges that it has received and reviewed that certain Estimated Use of Proceeds of Offering dated March 1, 1996 ("Expenditure Plan").

20.  TAX MATTERS PARTNER.

a.  General Partner's Duties as Tax Matters Partner. The General Partner shall act as the "Tax Matters Partner" of the Partnership pursuant to Internal Revenue Code Section 6231 and the Treasury Regulations promulgated thereunder.  The Tax Matters Partner shall file the Partnership tax returns, which shall be

CONFIDENTIAL

H00001048

prepared by an independent certified public accountant. The Tax Matters Partner may select any accounting firm suitable to the Tax Matters Partner to perform such special audits or accounting as the Tax Matters Partner, in its sole discretion, determines necessary to insure that the Partnership complies with all applicable tax laws and that the Partners are fully informed of the financial status of the Partnership. Each Partner hereby consents to such designation and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices or such other locations as are designated by the Tax Matters Partner such documents as the Tax Matters Partner may deem necessary or appropriate to evidence such consent.

b. <u>Indemnification of Tax Matters Partner</u>. The Partnership shall indemnify and reimburse the Tax Matters Partner for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with any tax audit or judicial review proceeding with respect to the tax liability of the Partners and the payment of all such expenses shall be made before the distribution of cash to the Partners.

21. <u>BANK ACCOUNTS</u>. The Partnership shall maintain accounts at financial institutions determined by the General Partner. All funds, revenues, receipts and income of the Partnership, except for items regularly maintained as petty cash, shall be deposited in said accounts in the name of the Partnership, and all expenses and disbursements shall be made by checks drawn on said accounts. Partnership checks may be executed only by the General Partner or its designated agent or agents.

22. <u>PARTNERSHIP MEETINGS</u>.

a. <u>Call of Meetings</u>. Meetings of the Partners shall be held at the principal place of business of the Partnership at the call and pursuant to the written request of the General Partner or, a majority-in-interest of the Limited Partners. Except as specifically provided herein, the Limited Partners shall not have the right to call or convene meetings of the Partnership. The General Partner shall call at least one meeting of the Partners each year, but does not otherwise intend to hold additional meetings of the Partners.

b. <u>Conduct of Meetings</u>. Except as otherwise stated herein, meetings of the Partnership shall be governed by the provisions of California Corporations Code Section 15637 as it may be amended from time to time.

23. <u>ADDITIONAL PARTNERS</u>.

a. <u>Admission of Additional Partners</u>. The General Partner shall have the sole and absolute authority to admit additional limited partners to the Partnership and to assign

CONFIDENTIAL

H00001049

interests in the Partnership in connection therewith. Notwithstanding the foregoing, if the General Partner seeks to admit additional limited partners subsequent to the Offering Termination Date, interests in the Partnership assigned to such new limited partners (hereafter sometimes referred to as "Class B Limited Partners") in exchange for additional capital contributions shall solely result in a reduction of the General Partner's Percentage Interest. In no event shall the admission of additional limited partners after the Offering Termination Date affect the Percentage Interests assigned to the Class A Limited Partners (provided, however, a Class A Limited Partner may also be a Class B Limited Partner), except to the extent a majority-in-interest of the Class A Limited Partners consent to such reduction in the Percentage Interests of Class A Limited Partners. If an additional limited partner is admitted to the Partnership, (i) the General Partner shall have the authority to amend this Agreement to reflect the admission of such additional limited partner; and (ii) such additional limited partner shall execute an amendment to this Agreement in which such additional limited partner agrees to be bound by all the provisions and conditions hereof. Each additional limited partner also shall perform those acts appropriate to amend other documents deemed appropriate by the General Partner. Unless otherwise agreed to by a Class B Limited Partner, once admitted to the Partnership, Class B Limited Partners shall share in distributions of Available Cash From Operations as Limited Partners pursuant to paragraph 13 above.

b.  Right of First Refusal.  Notwithstanding anything in subparagraph a. to the contrary, if the General Partner desires to admit Class B Limited Partners, the General Partner shall first deliver a written notice to the Class A Limited Partners setting forth the amount of Percentage Interests to be sold by the Partnership to Class B Limited Partners at such time and the proposed purchase price for such Percentage Interests ("Offer to Sell"). The Class A Limited Partners shall have the option, which option must be exercised within thirty (30) days after the Offer to Sell is delivered, to purchase all or any part of the Percentage Interests which the Partnership proposes to sell as set forth in the Offer to Sell at the lesser of (i) the proposed purchase price for each Percentage Interest as set forth in the Offer to Sell or (ii) the price paid by the Class A Limited Partners for each Percentage Interest pursuant to paragraph 9 above. If more than one Class A Limited Partner elects to purchase the Percentage Interests covered by the Offer to Sell and the number of Percentage Interests desired exceed the number of Percentage Interests available under the Offer to Sell, unless agreed otherwise by the purchasing Class A Limited Partners, each such purchasing Class A Limited Partner shall have the right to purchase from the Partnership in the proportion that such purchasing Partner's Percentage Interest bears to all such purchasing Partners' Percentage Interests. Any portion of the Percentage Interests covered by the Offer to Sell which are not purchased by the Class

CONFIDENTIAL

H00001050

A Limited Partners may be offered by the Partnership to investors upon terms and conditions not materially more favorable to such investors than the terms and conditions set forth in the Offer to Sell; provided, however, that the sale of such Percentage Interests must be consummated within one hundred eighty (180) days after the Offer to Sell is delivered to the Limited Partners.

24. **RESTRICTION AGAINST TRANSFER.**

a. _Consent Required_. No Limited Partner shall Transfer (as defined herein) any part of its interest in the Partnership, or any legal or beneficial right or interest therein, whether voluntarily or by operation of law, without the prior written consent of the General Partner, which consent may be withheld in the General Partner's sole and absolute discretion. Notwithstanding the foregoing, no Partner may Transfer its interests in the profits, losses or capital of the Partnership so as to cause a termination of the Partnership for income tax purposes pursuant to Section 708 of the Code, considering all previous Transfers (but without considering any possible future Transfers not previously disclosed to the other Partners).

b. _Transferee's Obligations_. Any permitted or approved transferee to whom an interest in the Partnership may be Transferred shall take such interest subject to all the terms and conditions of this Agreement and shall so agree in writing before such transferee shall be entitled to exercise or obtain any of the rights so transferred. The transferee also shall perform those acts necessary to amend the Certificate of Partnership and any other documents deemed reasonably appropriate by the General Partner.

c. _"Transfer" Defined_. The Transfer of an interest in the Partnership shall mean the alienation, sale, assignment, pledge, gift, mortgage, hypothecation, encumbrance, subjection to a security interest or other disposition or encumbrance of all or any part of an existing interest in the Partnership, whether voluntary or involuntary, a conveyance arising by reason of the death, insanity or incompetence of a Partner, by bankruptcy of a Partner, by operation of law, or by the transfer of greater than fifty percent (50%) of the stock, partnership or other equity interest of a Partner that is a corporation or an entity other than an individual.

d. _Status of Transferee_. Any permitted transferee of a Partnership interest may become a "substituted limited partner," as such status is discussed in Section 15674(b) of the California Corporations Code by:

(i) Electing to become such a substituted limited partner by delivering a written notice of such election to the General Partner;

CONFIDENTIAL

H00001051

        (ii)    Obtaining the consent of the General Partner to admission to the Partnership which consent may be withheld in the General Partner's sole and absolute discretion;

        (iii)  Executing and acknowledging such other instruments as the General Partner reasonably may request to effect the admission of such transferee as a substituted limited partner, including, but not limited to, the written acceptance and adoption by such person of the provisions of this Agreement; and

        (iv)    Paying a Transfer fee to the Partnership which is sufficient to cover all reasonable expenses connected with such Transfer and the admission of such person as a substituted limited partner, including, but not limited to, any attorney's fees incurred in connection therewith.

Neither the Partnership nor any Partner shall be required to recognize as a partner the transferee of any Partnership interest not made in accordance with the terms and conditions of this Agreement, nor shall such transferee receive from the Partnership any distributions to which the assignor of such Partnership interest would have been entitled but for such sale or transfer.

    e.    <u>Permitted Transfers</u>:  The provisions of this Agreement relating to the restrictions against Transfer of a Partnership interest shall not apply to the following Transfers (as long as such Transfers comply with the relevant federal and state securities laws):

        (i)   Any Partner may Transfer all or any part of its Partnership interest to the Partnership or to an existing Partner of the Partnership; and

        (ii) Any individual Partner may Transfer all or any part of his Partnership interest to a trust for the benefit of such Partner or the spouse or lineal descent of such Partner.

If any Partnership interest is transferred pursuant to subparagraphs (i) and (ii) above, the transferee of such Partnership interest shall own such Partnership interest subject to all of the provisions of this Agreement and shall agree to be bound by this Agreement and shall make no other Transfers other than as permitted under this Agreement.

    f.    <u>Capital Account of Transferee</u>.  Upon any permitted Transfer of any Partner's Partnership interest pursuant to this paragraph 24, the Capital Account and Adjusted Capital Contributions of the transferring Partner that is attributable to the transferred Partnership interest shall carry over to and be assumed by the transferee Partner.

CONFIDENTIAL

H00001052

## 25. TERMINATING EVENTS.

a. The liquidation, dissolution, bankruptcy, or insolvency of the General Partner ("Terminating Event") shall cause the dissolution and termination of the Partnership, unless within 60 days of such Terminating Event, a majority-in-interest of the Limited Partners select a new general partner and elect to continue the Partnership. If the General Partner suffers a Terminating Event and the remaining Partners determine to elect a new general partner and continue the Partnership, the interest of the General Partner in the Partnership thereafter shall be deemed to be that of a limited partner.

b. The liquidation, dissolution, bankruptcy, insolvency, death or incapacity of a Limited Partner shall not terminate or dissolve the Partnership, and the personal representative or successor-in-interest to such Limited Partner shall have all the rights and privileges of a transferee and may become a substituted limited partner upon meeting the requirements of subparagraph 24.d above. No Limited Partner may withdraw from the Partnership without the prior written consent of the General Partner, which consent may be granted or withheld in the sole and absolute discretion of the General Partner.

## 26. DISSOLUTION.

a. Events Resulting in Dissolution: This Partnership shall dissolve and terminate upon any one of the following events:

(i) The sale or transfer of all or substantially all of the assets of the Partnership;

(ii) By written agreement of the General Partner and a majority-in-interest of the Limited Partners;

(iii) Upon the events described in subparagraph 25.a; or

(iv) Upon completion of the term of the Partnership or as otherwise provided herein.

b. Procedure Upon Dissolution: Upon dissolution of the Partnership, its assets promptly shall be liquidated and the proceeds therefrom shall be distributed in the following order (provided, however, that if the General Partner so agrees, a Partner may elect to accept assets, or an undivided interest in assets, in lieu of any cash distribution to which it may be entitled as hereinafter set forth, if the value of such assets to be so distributed is determined by the General Partner):

CONFIDENTIAL

H00001053

(i)     First, to pay the expenses of liquidation and the debts of the Partnership other than those owed to the Partners, in the order provided by law;

(ii)    Second, to the Partners for expenses they have incurred on behalf of the Partnership for which they have not been reimbursed;

(iii)   Third, to each Partner in the ratio that the debt of the Partnership owing to such Partner bears to the total amount of debt of the Partnership owing to all Partners until such debts owing to the Partners have been repaid in full;

(iv)    Fourth, to the Partners by the end of the Partnership fiscal year, or within ninety (90) days of liquidation, all remaining cash or assets in kind, pro rata in accordance with their respective positive Capital Account balances, as determined after taking into consideration all Capital Account adjustments for that Partnership fiscal year (other than those made necessary due to transactions required by this subparagraph 26.b.(iv)) until all Partners' Capital Accounts equal zero; and

(v)     Fifth, to all Partners pursuant to their respective Percentage Interests.

c.    <u>Sharing of Profit and Loss During Winding Up</u>:  The Partners shall continue to share Profit and Loss during the winding up period in the same ratio as such Profit and Loss are shared prior to dissolution.  Upon any dissolution of the Partnership under this Agreement or applicable law, except as otherwise provided in this Agreement, the continuing operation of the Partnership's business shall be confined to those activities reasonably necessary to wind up the Partnership's affairs, discharge its obligations and preserve and distribute its assets. Upon such dissolution, the assets of the Partnership shall be distributed as quickly as possible consistent with good business practices in the context of circumstances surrounding the dissolution.

d.    <u>Certificate of Dissolution</u>:     Promptly upon dissolution, a Certificate of Dissolution and a "Cancellation of Certificate of Limited Partnership" shall be filed in the Office of the Secretary of State pursuant to Section 15623 of the California Corporations Code.

27.  <u>INDEMNITY OF GENERAL PARTNER</u>.  The General Partner shall not be liable in damages or otherwise to the Partnership or to any Partner, and the Partnership shall indemnify, defend and hold harmless the General Partner and its principals from any loss or damage incurred by reason of any act or omission performed or omitted by the General Partner in good faith on behalf of the Partnership and in a manner reasonably believed by the General

CONFIDENTIAL

H00001054

Partner to be within the scope of the authority granted to the General Partner and/or in the best interests of the Partnership; provided that (i) the General Partner was not guilty of gross negligence or willful misconduct with respect to such acts or omissions, and (ii) the satisfaction of any indemnification shall be from and limited to Partnership assets and no Limited Partner shall have any personal liability on account thereof. This indemnification shall include the payment of reasonable attorneys' fees and other expenses incurred in settling or defending any claims, threatened action or finally adjudicated legal proceedings.

28. NOTICES. Every notice, demand, request, consent, approval or other communication (collectively, "Notice") which the General Partner is required or desires to give or make or communicate upon or to the other Partners, or the Limited Partners are required or desire to give or make or communicate to the General Partner, shall be in writing and shall be given or made or communicated by personally delivering the same or by mailing the same by registered or certified mail, first class postage and fees prepaid, return receipt requested, to the address set forth opposite the relevant Partner's name in Exhibit "A" or at such other address or addresses as any party hereto may designate from time to time and at any time by notice given as herein provided. In addition, Notice may be communicated hereunder by facsimile, by transmitting the same to the facsimile number set forth opposite the relevant Partner's name in Exhibit "A" or at such other facsimile number(s) as any party hereto may designate from time to time and at any time by notice given as herein provided. All Notices so sent shall be deemed to have been delivered, effective, made or communicated, as the case may be, at the time that the same shall have been personally delivered or deposited, registered or certified, properly addressed, as aforesaid, postage and fees prepaid, return receipt requested, in the United States mail, or, if Notice was given pursuant to facsimile, at the time receipt of the same is acknowledged.

29. BINDING ON ASSIGNEES. Subject to the restrictions on transfer contained herein, this Agreement is binding upon and inures to the benefit of the successors-in-interest, assigns, and transferees of the Partners.

30. CAPTIONS. The captions in this Agreement are solely for the convenience of the Partners and should not be construed as part of this Agreement or used in the interpretation hereof.

31. GOVERNING LAW AND VENUE. All questions with respect to the construction of this Agreement and the rights and liabilities of the Partners shall be governed by the laws of the State of California. For the purposes of venue and jurisdiction, this Agreement shall be deemed made and performable in the City of San Diego, State of California.

CONFIDENTIAL

H00001055

32. **TIME OF THE ESSENCE**. With regard to the performance by the Partners of their obligations under this Agreement, time is expressly made of the essence.

33. **FURTHER ASSURANCES**. Each Partner shall perform any further acts and execute and deliver any documents which reasonably may be necessary to carry out the provisions of this Agreement.

34. **ENTIRE AGREEMENT**. This Agreement, the Private Placement Memorandum dated April 15, 1996, the Offeree Questionnaire completed by each Limited Partner, the Confidentiality Agreement signed by each Limited Partner, the Acknowledgement signed by each Limited Partner, and the Subscription Agreement signed by each Limited Partner (collectively, "Partnership Documents") memorialize and constitute the final, complete and exclusive expression and statement of the agreement and understanding between the parties in the Partnership Documents. The Partnership Documents supersede and replace all prior negotiations and proposed agreements whether written or unwritten as to the subject matter contained in the Partnership Documents. Each party acknowledges that no other party, or any agent or attorney of any other party, has made any promise, representation or warranty, express or implied, as to the subject matter contained herein, which is not expressly contained in the Partnership Documents.

35. **ATTORNEYS' FEES**. If litigation is commenced or counsel is consulted to interpret or enforce any of the provisions hereof, to recover indemnification hereunder or to obtain declaratory relief in connection with any of the provisions hereof, the prevailing party or parties shall be entitled to recover reasonable attorneys' fees. If this Agreement is asserted in any litigation or other legal action as a defense to any liability, claim, demand, action, cause of action or right asserted in such litigation, the prevailing party shall be entitled to recovery of reasonable attorneys' fees, whether or not such litigation or other legal action proceeds to judgment.

36. **LEGENDS**.

### ALL PARTNERS

THE SECURITIES (LIMITED PARTNERSHIP INTERESTS) EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR REGISTERED OR QUALIFIED UNDER ANY SECURITIES OR BLUE SKY LAWS OF ANY STATE OR JURISDICTION. THE SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED UNTIL (i) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR THE APPLICABLE STATE SECURITIES OR BLUE SKY LAWS SHALL HAVE BECOME EFFECTIVE WITH REGARD TO THE PROPOSED TRANSFER, OR (ii) IN THE OPINION OF COUNSEL ACCEPTABLE TO THE

CONFIDENTIAL

GENERAL PARTNER, REGISTRATION OR QUALIFICATION UNDER THE SECURITIES ACT OR BLUE SKY LAWS IS NOT REQUIRED IN CONNECTION WITH THE PROPOSED TRANSFER.

THE LIMITED PARTNERSHIP INTERESTS HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS AGREEMENT OR THE PARTNERSHIP DOCUMENTS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE LIMITED PARTNERSHIP INTERESTS MAY NOT BE RESOLD, WHETHER REGISTERED OR EXEMPT FROM REGISTRATION, WITHOUT THE PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER OF THE PARTNERSHIP.

### CALIFORNIA RESIDENTS ONLY

THE SALE OF THE LIMITED PARTNERSHIP INTERESTS HAVE NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE LIMITED PARTNERSHIP INTERESTS OR THE PAYMENT OR A RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS PROHIBITED UNLESS EXEMPTED FROM QUALIFICATION BY SECTION 25100, 25102, OR 25105 OF THE CALIFORNIA CORPORATION CODE. THE RIGHTS OF ALL PARTIES TO SUBSCRIBE FOR THE LIMITED PARTNERSHIP INTERESTS ARE EXPRESSLY CONDITIONED UPON THE GENERAL PARTNER DETERMINING THAT AN EXEMPTION IS AVAILABLE.

### CONNECTICUT RESIDENTS ONLY

THE LIMITED PARTNERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR SECTION 36-485 OF THE SECURITIES AND BUSINESS INVESTMENTS LAW OF CONNECTICUT AND THEREFORE CANNOT BE RESOLD UNLESS REGISTERED UNDER THE SECURITIES ACT OF 1933 AND THE SECURITIES AND BUSINESS INVESTMENTS LAW OF CONNECTICUT OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

### IDAHO RESIDENTS ONLY

THE LIMITED PARTNERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE IDAHO SECURITIES ACT AND CANNOT BE RESOLD UNLESS REGISTERED UNDER THE SECURITIES ACT OF 1933 AND THE IDAHO SECURITIES ACT OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

CONFIDENTIAL

H00001057

### ILLINOIS RESIDENTS ONLY

THE LIMITED PARTNERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE ILLINOIS SECURITIES LAW OF 1953 AND CANNOT BE RESOLD UNLESS REGISTERED UNDER THE SECURITIES ACT OF 1933 AND THE ILLINOIS SECURITIES LAW OF 1953 OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

### MASSACHUSETTS RESIDENTS ONLY

THE LIMITED PARTNERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE MASSACHUSETTS UNIFORM SECURITIES ACT AND CANNOT BE RESOLD UNLESS REGISTERED UNDER THE SECURITIES ACT OF 1933 AND THE MASSACHUSETTS UNIFORM SECURITIES ACT OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

### NEVADA RESIDENTS ONLY

THE LIMITED PARTNERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE NEVADA BLUE SKY LAW AND CANNOT BE RESOLD UNLESS REGISTERED UNDER THE SECURITIES ACT OF 1933 AND THE NEVADA BLUE SKY LAW OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

### NEW YORK RESIDENTS ONLY

THE LIMITED PARTNERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE NEW YORK BLUE SKY LAW AND CANNOT BE RESOLD UNLESS REGISTERED UNDER THE SECURITIES ACT OF 1933 AND THE NEW YORK BLUE SKY LAW OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

### TENNESSEE RESIDENTS ONLY

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES

CONFIDENTIAL

H00001058

LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

### WASHINGTON RESIDENTS ONLY

THE LIMITED PARTNERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND THE LIMITED PARTNERSHIP INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF WASHINGTON CHAPTER 21.20 RCW, AND CANNOT BE RESOLD UNLESS REGISTERED UNDER THE SECURITIES ACT OF 1933 AND THE SECURITIES ACT OF WASHINGTON CHAPTER 21.20 RCW OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

37. REPRESENTATIONS OF LIMITED PARTNERS. Each Limited Partner hereby represents, warrants, covenants and acknowledges to the General Partner as follows:

a. Each Limited Partner has read, understands, and agrees to be bound by the provisions of this Agreement, and has been advised by the General Partner to seek and obtain the advice of independent legal counsel of its choice regarding all legal issues pertaining to the purchase of its interest in the Partnership, including, without limitation, the federal income tax consequences of a purchase of the interest in the Partnership and the application of any state or federal securities laws to an investment in the Partnership. Each Limited Partner understands that Seltzer Caplan Wilkins & McMahon ("SCWM") represents and has represented only the General Partner and its principal(s) in connection with the formation of the Partnership and the private placement offering of the interests in the Partnership. SCWM has not, does not, and will not represent the interests of any Limited Partner in connection with the formation of the Partnership, the investment decision of each Limited Partner to invest in the Partnership, or any other matter at any time. Each Limited Partner acknowledges and represents that: (i) it has been advised by the General Partner to engage separate legal counsel to represent its interests in connection with this transaction, (ii) SCWM has not undertaken any and has no duty or obligation of any kind to any Limited Partner, (iii) SCWM has not endorsed or recommended the investment in the Partnership, and (iv) in making its investment decision, each Limited Partner has not in any way relied on the involvement of SCWM in this transaction or upon any information or material furnished or provided by SCWM. In addition, each Limited Partner understands that SCWM may represent the Partnership itself from time to time subsequent to its formation, and consents to any such representation of the Partnership by SCWM. Each Limited Partner agrees that by continuing to represent the General Partner or by representing the Partnership itself from time to time, SCWM will not be deemed to have undertaken representation of any Limited

CONFIDENTIAL

H00001059

Partner or to have assumed any duty or obligation of any kind to any Limited Partner. Each Limited Partner will at all times continue to engage and consult with their own separate legal counsel, if any, in connection with matters and affairs relating to the Partnership. If SCWM represents the Partnership on various matters from time to time, and if conflicts of interest or other controversies develop between the General Partner and any one or more Limited Partners, SCWM may withdraw as counsel to the Partnership and thereafter continue to represent the General Partner or its principals on matters relating to the Partnership and its business and affairs, including matters directly adverse to any one or more Limited Partners; provided, however, that SCWM shall not represent the General Partner or its principals in matters which are directly adverse to the Partnership.

b. Each Limited Partner further understands that the General Partner is relying upon the representations, warranties, covenants and acknowledgements made by him or her in this paragraph 37 of this Agreement, and each Limited Partner agrees to protect, defend, indemnify and hold harmless the General Partner and its shareholders, directors and officers with respect to any damages, losses, liabilities, claims or expenses (including the reasonable cost of investigating and defending against claims therefore and related reasonable attorneys' fees) incurred by them as a result of the inaccuracy of any representation or warranty or the breach of any covenant contained herein.

c. Each Limited Partner has a pre-existing personal or business relationship with the General Partner and its principals, and he or she became aware of the opportunity to acquire an interest in the Partnership as a result of such relationship with the General Partner and not through any advertisement or public solicitation of any kind supplied by the General Partner.

38. INVALID PROVISIONS. If any provision of this Agreement is held to be invalid, void or illegal, it shall be deemed severable from the remainder of the Agreement and shall in no way affect or invalidate any other provision hereof. If any provision hereof is held or deemed to be invalid due to its scope or breadth, that provision shall be deemed valid to the extent of the scope or breadth permitted by law.

39. DISCLOSURE. Except (i) as and to the extent required by law or this Agreement or (ii) pursuant to the prior written consent of the General Partner, no Limited Partner shall (and each Limited Partner shall direct its Representatives not to), directly or indirectly, make any public comment, statement or communication with respect to, or otherwise disclose or permit the disclosure of: (i) any aspect of the Partnership, including, without limitation, any of the terms, conditions or other aspects of this Agreement or the NeoGen Holdings Agreement, (ii) the identity of any of the Partners, (iii) that certain License and Distribution Agreement

CONFIDENTIAL                                                        H00001060

dated as of December 29, 1995 between the Population Council, Inc. and Advances in Health Technology, Inc., and (iv) any information provided by the General Partner either before or after the Effective Date regarding the Drug and/or any other transactions relating hereto or thereto (collectively, the "Confidential Matters"). If a Partner is required by law (and not otherwise required by this Agreement) to make any such disclosure, it shall first provide to the General Partner the content of the proposed disclosure, the reasons that such disclosure is required by law, and the time and place that the disclosure will be made. As used herein, "Representatives" means any shareholder, director, officer, employee, partner, affiliate, consultant, accountant, attorney or any other agent or representative of a Partner, including, without limitation, the Proxy, or any Representative of a Representative.

40. CONFIDENTIALITY. Except as and to the extent required by law, the Limited Partners shall not disclose or use (and each Limited Partner shall direct its Representatives not to disclose or use) at any time or in any manner any information with respect to any aspect of the Confidential Matters; provided that this prohibition does not include information which such Limited Partner can demonstrate (i) is generally available to or known by the public other than as a result of improper disclosure by such Limited Partner or (ii) is obtained by such Limited Partner from a source other than the General Partner or the Partnership, provided that such source was not bound by a duty of confidentiality to the Partnership or another party with respect to such information. In addition, to protect the anonymity of the Limited Partners, no Limited Partner will have the right to know the identity of any other Limited Partner who selects a Proxy pursuant to paragraph 16 above. With respect to those Limited Partners selecting a Proxy ("Anonymous Limited Partner(s)"), the Exhibit "A" to this Agreement distributed to the Limited Partners shall include only the name, address and facsimile number of their respective Proxies and not any information indicating the identity of the Anonymous Limited Partners. The Limited Partners will not have the right to review or inspect any records of the Partnership which contain or may reveal the identity of Anonymous Limited Partners. Specifically, and without limitation, the provisions of sections 15615, 15634, and 15635 of the California Corporations Code are not applicable to this Partnership and are waived by the Limited Partners to the extent such provisions relate to any right of Limited Partners to obtain information regarding the identity of Anonymous Limited Partners or to review records of the Partnership which include the identity of Anonymous Limited Partners or contain information relating to the identity of Anonymous Limited Partners.

41. AMENDMENTS. Except as otherwise provided herein, this Agreement may be amended only by a writing executed pursuant to the written consent of all of the Partners.

CONFIDENTIAL

H00001061

42.  COUNTERPARTS.  This Agreement may be executed in one or more counterparts and as executed shall constitute one and the same agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signature to the original or the same counterpart.

43.  EXHIBITS.  All Exhibits to this Agreement are incorporated herein by this reference.

GENERAL PARTNER:

N.D. MANAGEMENT, INC.,
a Cayman Islands company

By:_____

Its:_____

LIMITED PARTNERS:

N.D. MANAGEMENT, INC.,
a Cayman Islands company,
as attorney-in-fact for each
party designated as a limited
partner on Exhibit "A".

By:_____

Its:_____

CONFIDENTIAL

H00001062

EXHIBIT "B"


ALLOCATION OF PROFIT, LOSS
AND OTHER ITEMS AMONG THE PARTNERS


1.1 **Definitions.** As used in the Agreement and this Exhibit "B," the following terms shall have the following meaning:

(a) The "_Economic Risk of Loss_," with respect to any Partner or Partners, shall be determined pursuant to Sections 1.704-2(i) and 1.752-2 of the Treasury Regulations.

(b) "_Depreciation_" means for each fiscal year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such fiscal year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such fiscal year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such fiscal year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such fiscal year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

(c) "_Gross Asset Value_" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset.

(ii) The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner, as of the following times: (a) the acquisition of an additional interest by any new or existing Partner in exchange for more than a *de minimis* Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a *de minimis* amount of Property as consideration for an interest; and (c) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g): provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

1

H00001063

(iii) The Gross Asset Value of any Partnership asset distributed to any Partner shall be adjusted to equal to the gross fair market value of such asset on the date of distribution.

(iv) The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining capital accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this paragraph 1.1(c)(iv) to the extent the General Partner determines that an adjustment pursuant to Section 1.1(c)(ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph 1.1(c)(iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph 1.1(c)(i), paragraph 1.1(c)(ii), or paragraph 1.1(c)(iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(d) "Nonrecourse Deductions" in any year means the Partnership deductions that are characterized as "nonrecourse deductions" under Sections 1.704-2(b)(1) and 1.704-2(c) of the Treasury Regulations.

(e) "Nonrecourse Liabilities" means liabilities of the Partnership treated as "nonrecourse liabilities" under Section 1.704-2(b)(3) of the Treasury Regulations.

(f) "Partner Nonrecourse Debt" means liabilities of the Partnership which are treated as "partner nonrecourse debt" under Section 1.704-2(b)(4) of the Treasury Regulations.

(g) "Partner Nonrecourse Deductions" in any year means the Partnership deductions that are characterized as "partner non-recourse deductions" under Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

(h) "Partnership Minimum Gain" with respect to any Partnership year means the "partnership minimum gain" computed strictly in accordance with the principles of Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations.

(i) "Profits" and "Losses" for each fiscal year shall be an amount equal to the Partnership's taxable income or loss for such fiscal year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

2

(i)        Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this paragraph 1.1(i) shall be added to such taxable income or loss;

(ii)   .   Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.1(i), shall be subtracted from such taxable income or loss;

(iii)        In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to paragraph 1.1(c)(ii) or Section 1.1(c)(iii) hereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)        Gain   or   loss   resulting   from   any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(v)        In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with paragraph 1.1(b) hereof;

(vi)        To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining capital accounts as a result of a distribution other than in liquidation of a Partner's interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii)        Notwithstanding any other provisions of this Section 1.1(i) any items which are specially allocated pursuant to paragraph 1.2 or paragraph 1.3 hereof shall not be taken into account in computing Profits or Losses.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to paragraphs 1.2 and 1.3 hereof shall be determined by applying rules analogous to those set forth in paragraphs 1.1(i)(i) through 1.1(i)(vi).

3

CONFIDENTIAL

1.2  <u>Allocation of the Profit and Loss of the Partnership</u>.
Partnership Profit and Loss shall be allocated among the Partners
in the order of priority set forth below:

(a)  <u>Minimum Gain Chargeback</u>:

(i)       If there is a net decrease in the
Partnership Minimum Gain during a Partnership taxable year, each
Partner shall be allocated items of income and gain in accordance
with Section 1.704-2(f) of the Treasury Regulations and its
requirements for a "minimum gain chargeback."

(ii)       Subject to Paragraph 1.2(a)(i) above, the
Partnership shall allocate to each Partner income and gain for that
taxable year (and, if necessary, subsequent taxable years) in
proportion to, and to the extent of, an amount equal to the
Partner's share of the net decrease in Partnership Minimum Gain
determined in accordance with Section 1.704-2(g)(2) of the Treasury
Regulations.

(b)  <u>Partner Minimum Gain Chargeback</u>:

(i)       If there is a net decrease in the minimum
gain attributable to a Partner Nonrecourse Debt of the Partnership
during a Partnership taxable year, each Partner with a share of the
minimum gain attributable to the Partner Nonrecourse Debt at the
beginning of the taxable year shall be allocated income and gain
for the year (and, if necessary, subsequent years) in accordance
with Section 1.704-2(i)(4) of the Treasury Regulations.

(ii)       Subject to Paragraph 1.2(b)(i) above, each
such Partner shall be allocated income and gain for that taxable
year (and, if necessary, subsequent years) in proportion to, and
to the extent of, an amount equal to the Partner's share of the net
decrease in minimum gain attributable to the Partner Nonrecourse
Debt determined in a manner consistent with Section 1.704-2(g)(2)
of the Treasury Regulations.

(c)  <u>Qualified Income Offset</u>.

(i)       Any Limited Partner who unexpectedly
receives an adjustment, allocation or distribution described in
subparagraphs (4), (5) or (6) of Section 1.704-1(b)(2)(ii)(d) of
the Treasury Regulations, which adjustment, allocation or
distribution creates or increases a deficit balance in that Limited
Partner's Capital Account in excess of such Limited Partner's share
of Partnership Minimum Gain, shall be allocated items of "book"
income and gain in an amount and manner sufficient to eliminate or
to reduce, as quickly as possible, the excess deficit balance in
that Partner's Capital Account so created or increased.

(ii)       Allocations under this Paragraph 1.2(c)
shall comprise a pro rata portion of each item of Partnership
income (including gross income) and gain for the year.  For
purposes of this Paragraph 1.2(c), Capital Accounts shall be

4

CONFIDENTIAL

adjusted hypothetically as provided for in Sections 1.704-1(b)(2)(ii)(d) and 1.704-1(b)(4)(iv)(e) of the Treasury Regulations. The Partners intend that the provision set forth in this paragraph 1.2(c) shall constitute a "qualified income offset" as described in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations. Such section of the Treasury Regulations shall control in the case of any conflict between that section of the Treasury Regulations and this Paragraph 1.2(c).

(d) Allocation of Loss. Except as otherwise specifically provided in this Agreement, all Loss shall be allocated among the Partners according to their respective Percentage Interests. Notwithstanding the preceding sentences, any Partner Non-recourse Deductions shall be allocated among the Partners as required by Section 1.704-2(i) of the Treasury Regulations in accordance with the manner in which the Partner or Partners bear the Economic Risk of Loss for the Partner Non-recourse Debt corresponding to the Partner Non-recourse Deductions.

(e) Allocation of Profit. Except as otherwise provided in this Agreement, Profit shall be allocated among the Partners as follows:

(i) First, to the extent any one or more of the Partners have Capital Account balances which are less than their Adjusted Capital Contributions ("Deficit Partners"), the Partnership shall allocate Profit to the Deficit Partners pro rata according to their respective deficits until each Deficit Partner's Capital Account balance (after the Profit allocated under this paragraph 1.2(e)(i) is reflected in each Partner's Capital Account) is equal to such Partner's Adjusted Capital Contributions.

(ii) Second, to the Partners in proportion to and only to the extent of the amount of Available Cash from Operations distributed to them under this Agreement for the current and all prior Partnership fiscal years reduced by all prior allocations of Profit under this Paragraph 1.2(e)(ii).

(iii) Thereafter, to the Partners in accordance with their respective Percentage Interests.

1.3 Code Section 704(c) Allocation. If at any time a Partner contributes property to the Partnership, then profit and loss with respect to such contributed property shall be allocated (solely for income tax purposes and not for the purpose of the Partnership's Books of Account) between the Partners in accordance with Section 704(c) of the Code so as to take into account any variation to the Partnership between the adjusted basis of such contributed property for federal income tax purposes and the fair market value of such contributed property at the time of the contribution. If at any time the General partner revalues the book value of Partnership property on the Partnership's Books to more accurately reflect the fair market value of such property, then profit and loss with respect to such revalued property shall be allocated (solely for income tax purposes and not for the purpose of the Partnership's

5

H00001067

Books of Account) between the Partners in accordance with the principles of Section 704(c) of the Code so as to take into account any variation to the Partnership between the adjusted basis of such revalued property for federal income tax purposes and the book value of such revalued property.

1.4 Curative Allocations. The allocations set forth in Paragraphs 1.2(a), 1.2(b) and 1.2(c) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Paragraph 1.4. Therefore, notwithstanding any other provision of this Agreement (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of the Agreement and all Partnership items were allocated pursuant to paragraphs 1.2(d) and 1.2(e). In exercising its discretion under this paragraph 1.4, the General Partner shall take into account future Regulatory Allocations that, although not yet made, are likely to offset other Regulatory Allocations previously made.

1.5 Tax Allocation Not Described in this Exhibit. Any Partnership income, gain, loss or deduction for federal and state income tax purposes (which is not included within the allocations of Profit or Loss as provided herein) shall be allocated in the same manner as Profit and Loss is allocated pursuant to Sections 1.2 and 1.3 above.

1.6 Allocation Between Assignor and Assignee. The portion of the income, gain, losses, credits, and deductions of the Partnership for any fiscal year of the Partnership during which a partnership interest is assigned by a Partner (or by an assignee or successor in interest to a Partner), that is allocable with respect to such partnership interest shall be apportioned between the assignor and the assignee of the partnership interest on the basis of the interim closing of the books method provided by the applicable Treasury Regulations under Section 706 of the Code.

1.7 Express Consent to Allocations. The allocations which are to be made pursuant to this Agreement, including allocations of distributions, are expressly consented to by each Partner as a condition of becoming a Partner.

CONFIDENTIAL                                                    H00001068

FINANCIAL STATEMENTS

CONFIDENTIAL

NEOGEN INVESTORS, L.P.
(A CALIFORNIA LIMITED PARTNERSHIP)

NASHVILLE, TENNESSEE

FINANCIAL STATEMENTS
AND
ACCOUNTANTS' REPORT

DECEMBER 31, 1997

CONFIDENTIAL

H00001070



**KRAFTCPAs**

Kraft Bros., Esstman
Patton & Harrell, PLLC
Certified Public Accountants

Member BKR International

## ACCOUNTANTS' REPORT

Partners
Neogen Investors, L.P.
Nashville, Tennessee

We have compiled the accompanying statements of assets, liabilities and partners' equity (income tax basis) of Neogen Investors, L.P. (limited partnership) as of December 31, 1997 and December 31, 1996, and the related statements of revenues and expenses (income tax basis) and cash flows (income tax basis) for (1) the three-month period and year ended December 31, 1997, and (2) the two-month period ended February 28, 1997, and the two-month period ended April 30, 1997, and the eight-month period and year ended December 31, 1997, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. The financial statements have been prepared on the accounting basis used by Neogen Investors, L.P. for federal income tax purposes, which is a comprehensive basis of accounting other than generally accepted accounting principles.

A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any other form of assurance on them.

Management has elected to omit substantially all of the disclosures ordinarily included in financial statements prepared on the income tax basis of accounting. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the Company's assets, liabilities, partners' equity, revenues and expenses. Accordingly, these financial statements are not designed for those who are not informed about such matters.

*Kraft Bros., Cootman, Patton & Harrell, PLLC*

Nashville, Tennessee
January 16, 1998

- 1 -

1200 Parkway Towers
404 James Robertson Parkway
Nashville, TN 37219-1548
(615) 242-7351 • FAX 255-1740

CONFIDENTIAL

H00001071

NEOGEN INVESTORS, L.P.
(A CALIFORNIA LIMITED PARTNERSHIP)

STATEMENTS OF ASSETS, LIABILITIES, AND PARTNERS' EQUITY
(INCOME TAX BASIS)

DECEMBER 31, 1997 AND DECEMBER 31, 1996

(UNAUDITED - SEE ACCOUNTANTS' REPORT)

|  | DECEMBER 31, 1997 | DECEMBER 31, 1996 |
|---|---|---|

ASSETS



CURRENT ASSETS
  Cash in banks
  Capital contribution receivable
  Legal retainer
  Prepaid payroll taxes
  TOTAL CURRENT ASSETS

EQUIPMENT
  Office equipment
  Less accumulated depreciation
  TOTAL EQUIPMENT - NET

OTHER ASSETS
  Due from Danco Laboratories
  Due from Jeffrey Rush
  Due from ND Management
  Due from Neogen Holding
  Due from Neogen Industries
  Investment in Neogen Pharmaceuticals
  Start-up costs
  TOTAL OTHER ASSETS

TOTAL ASSETS

CONFIDENTIAL

H00001072

## NEOGEN INVESTORS, L.P.
### (A CALIFORNIA LIMITED PARTNERSHIP)

### STATEMENTS OF ASSETS, LIABILITIES, AND PARTNERS' EQUITY
### (INCOME TAX BASIS)

### DECEMBER 31, 1997 AND DECEMBER 31, 1996

### (UNAUDITED - SEE ACCOUNTANTS' REPORT)

|  | DECEMBER 31, 1997 | DECEMBER 31, 1996 |
|--|--|--|

### *LIABILITIES AND PARTNERS' EQUITY*

**CURRENT LIABILITIES**
Accrued interest payable
Accounts payable
Bridge financing
TOTAL CURRENT LIABILITIES

**LONG-TERM DEBT**
Due to Neogen Holdings
TOTAL LONG-TERM DEBT

**PARTNERS' EQUITY**
Partners' equity
Net income (loss) for period
TOTAL PARTNERS' EQUITY

TOTAL LIABILITIES AND PARTNERS' EQUITY



- 3 -

CONFIDENTIAL

H00001073

NEOGEN INVESTORS, L.P.
(A CALIFORNIA LIMITED PARTNERSHIP)

STATEMENTS OF REVENUES AND EXPENSES
(INCOME TAX BASIS)

FOR THE TWO-MONTH PERIOD ENDED FEBRUARY 28, 1997, AND THE TWO-MONTH PERIOD
ENDED APRIL 30, 1997, AND THE EIGHT-MONTH PERIOD AND YEAR ENDED DECEMBER 31, 1997

(UNAUDITED - SEE ACCOUNTANTS' REPORT)



| | FOR THE TWO-MONTH PERIOD ENDED FEBRUARY 28, 1997 | FOR THE TWO-MONTH PERIOD ENDED APRIL 30, 1997 | FOR THE EIGHT-MONTH PERIOD ENDED DECEMBER 31, 1997 | FOR THE YEAR ENDED DECEMBER 31, 1997 |
|---|---|---|---|---|
| **REVENUE** | | | | |
| TOTAL REVENUE | | | | |
| | | | | |
| **OPERATING EXPENSES** | | | | |
| Bank service charges | | | | |
| Consulting | | | | |
| Contract labor | | | | |
| Depreciation | | | | |
| Drug manufacturing expense | | | | |
| General partner and proxy holder fees | | | | |
| Insurance | | | | |
| Interest | | | | |
| Legal and accounting | | | | |
| Licenses | | | | |
| Marketing | | | | |
| Miscellaneous | | | | |
| Office supplies | | | | |
| Office support | | | | |
| Payroll processing fees | | | | |
| Pilot batch | | | | |
| Postage and courier | | | | |
| Rent - equipment | | | | |
| Rent - office | | | | |
| Research | | | | |
| Taxes - payroll | | | | |
| Taxes - other | | | | |
| Telephone | | | | |
| Travel and entertainment | | | | |
| Wages | | | | |
| TOTAL OPERATING EXPENSES | | | | |
| | | | | |
| EXCESS OF EXPENSES OVER REVENUES FROM OPERATIONS | | | | |
| | | | | |
| **OTHER INCOME** | | | | |
| Other income | | | | |
| Interest income | | | | |
| TOTAL OTHER INCOME | | | | |
| | | | | |
| AMOUNT CAPITALIZED AS START-UP COSTS | | | | |
| | | | | |
| EXCESS OF REVENUE OVER EXPENSES | | | | |

-4-

CONFIDENTIAL

H00001074

NEOGEN INVESTORS, L.P.
(A CALIFORNIA LIMITED PARTNERSHIP)

STATEMENTS OF REVENUES AND EXPENSES
(INCOME TAX BASIS)

FOR THE THREE-MONTH PERIOD AND YEAR ENDED DECEMBER 31, 1997

(UNAUDITED - SEE ACCOUNTANTS' REPORT)



|  | FOR THE THREE-MONTH PERIOD ENDED DECEMBER 31, 1997 | FOR THE YEAR ENDED DECEMBER 31, 1997 |
|---|---|---|
| **REVENUE** | | |
| TOTAL REVENUE | | |
| | | |
| **OPERATING EXPENSES** | | |
| Bank service charges | | |
| Consulting | | |
| Contract labor | | |
| Depreciation | | |
| Drug manufacturing expense | | |
| General partner and proxy holder fees | | |
| Insurance | | |
| Interest | | |
| Legal and accounting | | |
| Licenses | | |
| Marketing | | |
| Miscellaneous | | |
| Office supplies | | |
| Office support | | |
| Payroll processing fees | | |
| Pilot batch | | |
| Postage and courier | | |
| Rent - equipment | | |
| Rent - office | | |
| Research | | |
| Taxes - payroll | | |
| Taxes - other | | |
| Telephone | | |
| Travel and entertainment | | |
| Wages | | |
| TOTAL OPERATING EXPENSES | | |
| | | |
| **EXCESS OF EXPENSES OVER REVENUES FROM OPERATIONS** | | |
| | | |
| **OTHER INCOME** | | |
| Other income | | |
| Interest income | | |
| TOTAL OTHER INCOME | | |
| | | |
| **AMOUNT CAPITALIZED AS START-UP COSTS** | | |
| | | |
| **EXCESS OF REVENUE OVER EXPENSES** | | |

- 5 -

CONFIDENTIAL

H00001075

NEOGEN INVESTORS, L.P.
(A CALIFORNIA LIMITED PARTNERSHIP)

STATEMENTS OF CASH FLOWS
(INCOME TAX BASIS)

FOR THE TWO-MONTH PERIOD ENDED FEBRUARY 28, 1997, AND THE TWO-MONTH PERIOD
ENDED APRIL 30, 1997, AND THE EIGHT-MONTH PERIOD AND YEAR ENDED DECEMBER 31, 1997

(UNAUDITED - SEE ACCOUNTANTS' REPORT)

| | FOR THE TWO-MONTH PERIOD ENDED FEBRUARY 28, 1997 | FOR THE TWO-MONTH PERIOD ENDED APRIL 30, 1997 | FOR THE EIGHT-MONTH PERIOD ENDED DECEMBER 31, 1997 | FOR THE YEAR ENDED DECEMBER 31, 1997 |
|---|---|---|---|---|
| **OPERATING ACTIVITIES** | | | | |
| Excess of revenues over expenses for the period | | | | |
| Adjustments to reconcile excess of revenues over expenses to net cash provided by (used in) operating activities: | | | | |
| Depreciation | | | | |
| (Increase) decrease in refund receivable | | | | |
| (Increase) decrease in capital contribution receivable | | | | |
| (Increase) decrease in legal retainer | | | | |
| (Increase) decrease in prepaid payroll tax | | | | |
| Increase (decrease) in accounts payable | | | | |
| Increase (decrease) in accrued interest payable | | | | |
| TOTAL ADJUSTMENTS | | | | |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | | | | |
| **INVESTING ACTIVITIES** | | | | |
| Increase in due from Danco Laboratories | | | | |
| Decrease in due from Neogen Industries | | | | |
| Decrease in due from Jeffrey Rush | | | | |
| Purchase of office equipment | | | | |
| Increase in start-up costs | | | | |
| NET CASH USED IN INVESTING ACTIVITIES | | | | |
| **FINANCING ACTIVITIES** | | | | |
| Increase in bridge financing loans | | | | |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | | | | |
| NET INCREASE (DECREASE) IN CASH | | | | |
| **BALANCE - BEGINNING OF PERIOD** | | | | |
| **BALANCE - END OF PERIOD** | | | | |

-6-

CONFIDENTIAL

H00001076

NEOGEN INVESTORS, L.P.
(A CALIFORNIA LIMITED PARTNERSHIP)

STATEMENTS OF CASH FLOWS
(INCOME TAX BASIS)

FOR THE THREE-MONTH PERIOD AND YEAR ENDED DECEMBER 31, 1997

(UNAUDITED - SEE ACCOUNTANTS' REPORT)

|  | FOR THE THREE-MONTH PERIOD ENDED DECEMBER 31, 1997 | FOR THE YEAR ENDED DECEMBER 31, 1997 |
|---|---|---|
| **OPERATING ACTIVITIES** | | |
| Excess of revenues over expenses for the period | | |
| Adjustments to reconcile excess of revenues over expenses to net cash provided by (used in) operating activities: | | |
| Depreciation | | |
| (Increase) decrease in refund receivable | | |
| (Increase) decrease in capital contribution receivable | | |
| (Increase) decrease in legal retainer | | |
| (Increase) decrease in prepaid payroll tax | | |
| Increase (decrease) in accounts payable | | |
| Increase (decrease) in accrued interest payable | | |
| TOTAL ADJUSTMENTS | | |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | | |
| **INVESTING ACTIVITIES** | | |
| Increase in due from Danco Laboratories | | |
| Decrease in due from Neogen Industries | | |
| Decrease in due from Jeffrey Rush | | |
| Purchase of office equipment | | |
| Increase in start-up costs | | |
| NET CASH USED IN INVESTING ACTIVITIES | | |
| **FINANCING ACTIVITIES** | | |
| Increase in bridge financing loans | | |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | | |
| NET INCREASE (DECREASE) IN CASH | | |
| BALANCE - BEGINNING OF PERIOD | | |
| BALANCE - END OF PERIOD | | |

- 7 -

CONFIDENTIAL

NEOGEN INVESTORS, L.P.
(A CALIFORNIA LIMITED PARTNERSHIP)

SELECTED INFORMATION ACCOMPANYING FINANCIAL STATEMENTS
SUBSTANTIALLY ALL DISCLOSURES REQUIRED BY THE
INCOME TAX BASIS OF ACCOUNTING ARE NOT INCLUDED

DECEMBER 31, 1997

(UNAUDITED - SEE ACCOUNTANTS' REPORT)

As of December 31, 1997, amounts loaned to related parties and disbursed as start-up costs for the development of the manufacture of the drug are as follows:

Due from Danco Laboratories
Due from ND Management
Due from Neogen Holding
Due from Neogen Industries
Start-up costs



The value of these loans are not known at present time, as the underlying entities do not have sufficient funds currently available to repay Neogen Investors, L.P. (the Company). The value of the start-up costs is also not currently known at present time.

CONFIDENTIAL

H00001078

DANCO INVESTORS GROUP, L.P.
(FORMERLY NEOGEN INVESTORS, L.P.
(A CALIFORNIA LIMITED PARTNERSHIP)

NASHVILLE, TENNESSEE

FINANCIAL STATEMENTS
AND
ACCOUNTANTS' REPORT

JUNE 30, 1998

CONFIDENTIAL



# KRAFTCPAs

Kraft Bros., Eastman
Patton & Harrell, PLLC
Certified Public Accountants

Member BKR International

## ACCOUNTANTS' REPORT

Partners
Danco Investors Group, L.P.
Nashville, Tennessee

We have compiled the accompanying statement of assets, liabilities and partners' equity (income tax basis) of Danco Investors Group, L.P. (formerly Neogen Investors, L.P.) (limited partnership) as of June 30, 1998 and the related statement of revenues and expenses (income tax basis) and cash flows (income tax basis) for the three-month and six-month periods ended June 30, 1998, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. The financial statements have been prepared on the accounting basis used by Neogen Investors, L.P. for federal income tax purposes, which is a comprehensive basis of accounting other than generally accepted accounting principles.

A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any other form of assurance on them.

Management has elected to omit substantially all of the disclosures ordinarily included in financial statements prepared on the income tax basis of accounting. If the omitted disclosures were included in the financial statements, they might influence the user's conclusions about the Company's assets, liabilities, partners' equity, revenues and expenses. Accordingly, these financial statements are not designed for those who are not informed about such matters.

*Kraft Bros., Eastman, Patton & Harrell, PLLC*

Nashville, Tennessee
July 21, 1998

- 1 -

1200 Parkway Towers
404 James Robertson Parkway
Nashville, TN 37219-1598
(615) 242-7351 • FAX 256-1052
Also in Columbia, Tennessee

CONFIDENTIAL

DANCO INVESTORS GROUP, L.P.
(FORMERLY NEOGEN INVESTORS, L.P.)
(A CALIFORNIA LIMITED PARTNERSHIP)

STATEMENT OF ASSETS, LIABILITIES, AND PARTNERS' EQUITY
(INCOME TAX BASIS)

JUNE 30, 1998

(UNAUDITED - SEE ACCOUNTANTS' REPORT)

JUNE 30,
1998

## ASSETS



CURRENT ASSETS
    Cash in banks
    TOTAL CURRENT ASSETS

EQUIPMENT
    Office equipment
    TOTAL EQUIPMENT - NET

OTHER ASSETS
    Due from Danco Laboratories
    Due from Danco Pharmaceuticals
    Due from ND Management
    Investment in Danco Holdings
    Start-up costs
    Organizational costs
    Total cost
    Less accumulated amortization of organizational costs
    TOTAL OTHER ASSETS

TOTAL ASSETS

CONFIDENTIAL

H00001081

DANCO INVESTORS GROUP, L.P.
(FORMERLY NEOGEN INVESTORS, L.P.)
(A CALIFORNIA LIMITED PARTNERSHIP)

STATEMENT OF ASSETS, LIABILITIES, AND PARTNERS' EQUITY (CONTINUED)
(INCOME TAX BASIS)

JUNE 30, 1998

(UNAUDITED - SEE ACCOUNTANTS' REPORT)

JUNE 30,
1998

LIABILITIES AND PARTNERS' EQUITY

CURRENT LIABILITIES
    Accounts payable
    Accrued interest payable
    Bridge financing
    TOTAL CURRENT LIABILITIES

PARTNERS' EQUITY
    Partners' equity
    Net income (loss) for period
    TOTAL PARTNERS' EQUITY

TOTAL LIABILITIES AND PARTNERS' EQUITY



- 3 -

CONFIDENTIAL

DANCO INVESTORS GROUP, L.P.
(FORMERLY NEOGEN INVESTORS, L.P.)
(A CALIFORNIA LIMITED PARTNERSHIP)

STATEMENT OF REVENUES AND EXPENSES
(INCOME TAX BASIS)

FOR THE THREE-MONTH AND SIX-MONTH PERIODS ENDED JUNE 30, 1998

(UNAUDITED - SEE ACCOUNTANTS' REPORT)

|  | FOR THE THREE-MONTH PERIOD ENDED JUNE 30, 1998 | FOR THE SIX-MONTH PERIOD ENDED JUNE 30, 1998 |
|---|---|---|

**REVENUE**
TOTAL REVENUE

**OPERATING EXPENSES**
Advertising
Amortization
Bank service charges
Consulting
Contract labor
General partner and proxy holder fees
Insurance
Interest
Legal and accounting
Licenses and permits
Office supplies
Office support
Payroll processing fees
Pilot batch
Postage and courier
Product testing
Rent - equipment
Rent - office
Research
Security
Settlement
Supplies
Taxes - payroll
Taxes - other
Telephone
Travel and entertainment
Wages
Write-off expenses advanced to Neogen Industries
TOTAL OPERATING EXPENSES

EXCESS OF EXPENSES OVER REVENUES
FROM OPERATIONS

**OTHER INCOME**
Interest income
TOTAL OTHER INCOME

AMOUNT CAPITALIZED AS START-UP
COSTS

EXCESS OF REVENUE OVER EXPENSES



- 4 -

CONFIDENTIAL

H00001083

STATEMENT OF CASH FLOWS
(INCOME TAX BASIS)

FOR THE THREE-MONTH AND SIX-MONTH PERIODS ENDED JUNE 30, 1998

(UNAUDITED - SEE ACCOUNTANTS' REPORT)

| | FOR THE THREE-MONTH PERIOD ENDED JUNE 30, 1998 | FOR THE SIX-MONTH PERIOD ENDED JUNE 30, 1998 |
|---|---|---|
| **OPERATING ACTIVITIES** | | |
| Excess of expenses over revenues for the period | | |
| | | |
| Adjustments to reconcile excess of revenues over expenses | | |
| to net cash provided by (used in) operating activities: | | |
| Amortization | | |
| (Increase) decrease in prepaid payroll tax | | |
| Increase (decrease) in accounts payable | | |
| Increase (decrease) in accrued interest payable | | |
| Increase (decrease) in accrued franchise tax | | |
| TOTAL ADJUSTMENTS | | |
| | | |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | | |
| | | |
| **INVESTING ACTIVITIES** | | |
| (Increase) decrease in due from Neogen Industries | | |
| (Increase) decrease in due from Danco Pharmaceuticals | | |
| (Increase) decrease in due from ND Management | | |
| Decrease in machinery and equipment | | |
| Purchase of office equipment | | |
| (Increase) decrease in start-up costs | | |
| NET CASH USED IN INVESTING ACTIVITIES | | |
| | | |
| **FINANCING ACTIVITIES** | | |
| Increase in bridge financing loan | | |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | | |
| | | |
| NET INCREASE (DECREASE) IN CASH | | |
| | | |
| BALANCE - BEGINNING OF PERIOD | | |
| | | |
| BALANCE - END OF PERIOD | | |

-5-

CONFIDENTIAL

DANCO INVESTORS GROUP, L.P.
(FORMERLY NEOGEN INVESTORS, L.P.)
(A CALIFORNIA LIMITED PARTNERSHIP)

SELECTED INFORMATION ACCOMPANYING FINANCIAL STATEMENTS
SUBSTANTIALLY ALL DISCLOSURES REQUIRED BY THE
INCOME TAX BASIS OF ACCOUNTING ARE NOT INCLUDED

JUNE 30, 1998

(UNAUDITED - SEE ACCOUNTANTS' REPORT)

As of June 30, 1998, amounts loaned to related parties and disbursed as start-up costs for the development of the manufacture of the drug are as follows:

Due from Danco Laboratories
Due from Danco Pharmaceuticals
Due from ND Management
Investment in Danco Holdings
Start-up costs
Organizational costs



The value of these loans are not known at present time, as the underlying entities do not have sufficient funds currently available to repay Danco Investors Group, L.P. (the Company). The value of the investment in Danco Holdings, start-up costs, and organizational costs are also not currently known at present time.

-6-

CONFIDENTIAL

H00001085

EXHIBIT C

PROJECTIONS

CONFIDENTIAL

This Financial Model is not an offer to sell or a solicitation to buy securities of the Partnership. Any offering of the Partnership's securities in the future will be made exclusively by a Confidential Memorandum and any Exhibits and Supplements thereto. The prospective financial data presented herein represents the combined financial activity of all entities to be funded and/or controlled by Danco Investors, L.P.

Danco Investors Group, L.P.
Pharmaceutical Products
Cash Flows Statement                    7/9/99

Year Number
Year

| Worksheet | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|

Cash Flow from Operations
Net Receipts

Gross Receipts
Collection Loss
Total Net Receipts

Royalties
Population Council-Legal Fees
Population Council-Fixed
Ira Net Sales Royalty
Royalty Credit

Total Royalties

Costs of Goods Sold
Bulk Manufacturing Costs
Ware, Distr & Order Entry Costs
Formuling/Tableting/Packaging Costs

Total Costs of Goods Sold

Gross Profit

Operating Expenses
Payroll
Selling
General & Administration
Occupancy Costs
Insurance
Legal
Consultants
Neogen 1-1-97 thru 2-28-97
Neogen 3-1-97 thru 4-1-97
Neogen 4/1/97-12/31/97
Neogen (A/P Carry Forward)
Pilot Batches & Scale Up
General Partnel/Proxy Fees and Expenses

Total Operating Expenses

Net Op. Inc. (exclusive of depreciation)

CONFIDENTIAL

Datca Investors Group, L.P.

Pharmaceutical Products

Cash Flows Statement

7/8/98

(Cont'd.)

| | Historical | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|

Year Number

Year

**OPERATING ACTIVITIES**

Pretax Income (Loss)-including depreciation and amortization expense

Adjustments to reconcile pre-tax income (loss)

to net cash provided by (used in) operating activities:

   *Depreciation & amortization*

   (Increase) Decrease in inventories

   (Increase) Decrease in receivables/retainers

   (Increase) Decrease in prepaid expenses

   Increase (Decrease) in accounts payable

   Increase (Decrease) in accrued expenses

   TOTAL ADJUSTMENTS

NET CASH PROVIDED BY OPERATING ACTIVITIES

**INVESTING ACTIVITIES**

(Increase) (decrease in loans and investment in related entities (includes $8,000,000 royalty to Pop. Co)

Purchase of equipment

Increase in start-up costs

NET CASH USED IN INVESTING ACTIVITIES

**FINANCING ACTIVITIES**

Increase (decrease) in bridge financing loans

Contributions to capital

NET PROVIDED BY FINANCING ACTIVITIES

NET INCREASE (DECREASE) IN CASH

BALANCE - BEGINNING OF PERIOD

BALANCE - END OF PERIOD

CONFIDENTIAL

H00001088

This Financial Model is not an offer to sell or a solicitation to buy securities of the Partnership. Any offering of the Partnership's securities in the future will be made exclusively by a Confidential Memorandum and any Exhibits and Supplements thereto. The prospective financial data presented herein represents the combined financial activity of all entities to be funded and/or contained by Danco Investors Group, L.P.

Danco Investors Group, L.P.
Pharmaceutical Products
Income Statement

2/9/99

| Year Number | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | Historical | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
| Cash Flow from Operations | | | | | | | | |
| Net Receipts | | | | | | | | |
| Gross Receipts | | | | | | | | |
| Collection Loss | | | | | | | | |
| Total Net Receipts | | | | | | | | |
| Royalties | | | | | | | | |
| Population Council-Legal Fees | | | | | | | | |
| Population Council-Fixed | | | | | | | | |
| 6% Net Sales Royalty | | | | | | | | |
| Royalty Credit | | | | | | | | |
| Total Royalties | | | | | | | | |
| Costs of Goods Sold | | | | | | | | |
| Direct Manufacturing Costs | | | | | | | | |
| Whse, Distr & Order Entry Costs | | | | | | | | |
| Packaging Costs | | | | | | | | |
| Total Costs of Goods Sold | | | | | | | | |
| Gross Profit | | | | | | | | |
| Operating Expenses, | | | | | | | | |
| Payroll | | | | | | | | |
| Selling | | | | | | | | |
| General & Administrative | | | | | | | | |
| Occupancy Costs | | | | | | | | |
| Insurance | | | | | | | | |
| Legal | | | | | | | | |
| Neogen 1-1-97 thru 2-28-97 | | | | | | | | |
| Neogen 3-1-97 thru 4-1-97 | | | | | | | | |
| Neogen 4-1-97 thru U21/97 | | | | | | | | |
| Neogen (A/P Carry Forward) | | | | | | | | |
| Depreciation & Amortization Expense | | | | | | | | |
| Consultants | | | | | | | | |
| Pilot Batches | | | | | | | | |
| General Partner and Proxy Fees | | | | | | | | |
| Total Operating Expenses | | | | | | | | |
| Operating Income (Loss) | | | | | | | | |
| Less: amount capitalized as start-up costs | | | | | | | | |
| Taxable Income (loss) | | | | | | | | |

H00001089

Danco Investors Group, L.P.
Pharmaceutical Products
Balance Sheet

This Financial Model is not an offer to sell or a solicitation to buy securities of the Partnership. Any offering of the Partnership's securities in the future will be made exclusively by a Confidential Memorandum and any Exhibits and Supplements thereto. The prospective financial data presented herein represents the combined financial activity of all entities to be funded and/or controlled by Danco Investors Group, L.P.

| 7/8/99 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|

**Assets**
  Current Assets
    Cash
    Accounts Receivable
    Inventory
    Prepaids

  Total Current Assets

  Property, Plant & Equipment
  Accumulated Depreciation
  Net PP&E

  Other Assets
    Loans to and Investment
      in related entities
    Start-up costs
    A/A start-up costs
    Total other assets

**Total Assets**

**Liabilities and Stockholders Equity**
  Current Liabilities
    Accounts Payable
    Notes payable
    Accrued expenses
    Total Current Liabilities

  Total Liabilities

  Partner capital
    Contributions
    Accumulated earnings
    Total partner capital
  Total Liabilities and Capital

difference

CONFIDENTIAL

H00001090

7/9/98

PAYROLL EXPENSE:
Salaries
Employee Benefits
TOTAL PAYROLL

SELLING :
Advertising (Buys)
PR Firm/Ad Agency
Promotion Material
Training
TOTAL SELLING

GENERAL AND ADMINISTRATIVE:
Accounting
Advisory Board
Bank Service Fees
Board of Directors (Mtg/T&E/Fee)
Dues & Subscription
Entertainment
Market Research
Office Supplies
Office Support
Postage & Delivery
Recruiting
Repairs
Taxes
Telephone
Travel

TOTAL G&A COSTS

OCCUPANCY COSTS:
Office/Facility Rent
TOTAL OCCUP. COSTS

INSURANCE EXPENSE:
Insurance : Donor
Insurance: Danco Corp
TOTAL INSURANCE

LEGAL EXPENSE:
Corporate
FDA-Regulatory
Patent
Rescission/Cap
Litigation
TOTAL LEGAL EXP.

CONSULTANTS

GENERAL AND PROXY FEES:
Fees and Expenses
TOTAL G.P. & PROXY

CONFIDENTIAL

Danco Investors Group, Inc.
Pharmaceutical Products
Disbursements Detail Statement
7/3/96

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Year Number | | | | | |
| Year | 1999 | 2000 | 2001 | 2002 | 2003 |

Disbursements
   Direct Manufacturing & Packaging Costs[1]
   Warehousing, Distribution & Order Entry Costs[2]

[1] Direct Manufacturing Costs
   Number of Non-Surgical Procedures/Doses
   Costs per Procedure or Dose

   Total Direct Manufacturing Costs
[2] Packaging and Tableting costs
   Number of Non-Surgical Procedures/Doses
   Costs per Procedure or Dose

   Annual Pregnancy Terminations
   55% in 1st 8 weeks
   70% of Clinics

   Sales in Clinics
   % of Total
   %of 1st 8 Weeks
   % of Clinics

   Sales OB/GYN, Hospitals, Other (Procedures)
   825,000-577,500=247,500 Manin
   Procedures
   % of Total (1.5 Million)
   % of 1st 8 Weeks (825,000)
   % of Non-Clinic 1st 8 Weeks (247,500)

   Total Sales (Procedures)
   # of Tablets (3 per procedure)
   Kilos
   Adjusted for Yield Loss(85%)

   Costs of Goods
   Active Ingredient(KG)
   Costs of Active per Tablet after Yield Loss
   Formulating, tableting, packaging

   Formulating/Tableting/Packaging Cost per Tablet is
   Active cost component per package
   Packaging cost component
   Total Costs (Packaged 3/ Pack)

   Pricing
   Private (70%)
   Government (30%)
   Av. Price (Pack of 3 Tablets)

     Total sale receipts



CONFIDENTIAL

H00001092

7/9/96

Inventory summary:
    ending tablets
    cost per tablet
    ending tablet inventory

    ending non-tablet inventory(kg)
    average cost per kg
    ending non-tablet inventory

  Total inventory



| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 | 2003 |

CONFIDENTIAL

### Danco Investors Group, L.P.
### Pharmaceutical Products
### Table of Assumptions

**Royalties**

| Start of Royalties | 1989 |
|---|---|
| Population Council | |
| Royalty % of Net Sales Revenue | |
| 90 days after Approval | |
| 1st Anniversary of Approval | |
| 2nd Anniversary | |
| 3rd Anniversary | |
| Additional Legal Fees | |



FOOTNOTE: The Company will be given credit for the legal fees incurred in the ▮▮▮▮ lawsuit. The credit will be reduced by any net recoveries against ▮▮▮▮▮▮ The dollar amount cannot be determined until the lawsuits are settled.

**Total Credits, excluding net recoveries on the ▮▮▮▮▮▮ lawsuits, equal ▮▮▮▮**

CONFIDENTIAL

**Depreciation Schedule**

| Assets | Cost | Life | Amount |
|--------|------|------|--------|



Distribution

| Yr 1 | Yr 2 | Yr 3 | Yr 4 | Yr 5 | Total |

7/8/98

CONFIDENTIAL

H00001096