UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

SHARON HAWKINS,

              Plaintiff,

        v.                   13 Civ. 5434 (ALC)

MEDAPPROACH HOLDINGS, INC.,
et al.,

              Defendants.

------------------------------x

                         New York, N.Y.
                         May 18, 2022
                         10:00 a.m.

Before:

                HON. ANDREW L. CARTER, JR.,

                         District Judge

                   APPEARANCES

WOLLMUTH MAHER & DEUTSCH LLP
     Attorneys for Plaintiff
BY:  R. SCOTT THOMPSON

GOODWIN PROCTER LLP
     Attorneys for Defendants
BY:  JEFFREY A. SIMES
     LINDSAY EATON HOYLE
     VIKTORS M. DINDZANS
     JESSICA VOGELE

1        (Trial resumed)

2             THE COURT:  We are going to continue with the case on

3    trial.  Check and make sure that counsel's microphones are

4    working at your desk.

5             MR. THOMPSON:  Hello.

6             MR. SIMES:  Is that working?  Yep.

7             THE COURT:  All right.  Let's continue with the case

8    on trial.  Let's have the next witness called.

9             MR. THOMPSON:  Thank you, your Honor.

10            For the record, Scott Thompson from Wollmuth Maher

11   Deutsch, on behalf of the plaintiffs.  The plaintiffs call

12   Sharon Hawkins.

13   SHARON HAWKINS,

14        the plaintiff, called as a witness on her own behalf,

15        having been duly sworn, testified as follows:

16            THE COURT:  Let's come a little closer.  I think the

17   microphone's not working.  Hopefully everyone will be able to

18   hear you.  I don't think it's on now.  Just try to keep your

19   voice up.  OK?

20            Go ahead, counsel.

21   CROSS-EXAMINATION

22   BY MS. HOYLE:

23   Q.  Good morning, Mrs. Hawkins.  You are the plaintiff in this

24   lawsuit, correct?

25   A.  Yes.

M5IHHawT                    S. Hawkins - Cross

1    Q.  And you were a partner of MedApproach, L.P., correct?

2    A.  Yes.

3    Q.  You acquired your ownership interest in MedApproach, L.P.,

4    from your husband, Gregory Hawkins, in July 1998, correct?

5    A.  Correct.

6    Q.  It was Mr. Hawkins, not you, who was involved in

7    discussions concerning the initial investment that your family

8    made in MedApproach, L.P., correct?

9    A.  Correct.

10   Q.  And it was Mr. Hawkins, not you, who was involved in

11   discussions concerning the launch of the mifepristone project

12   and the creation of MedApproach, L.P., correct?

13   A.  Yes.

14   Q.  For example, you have never personally communicated with

15   Joseph Pike, the original head of the mifepristone project,

16   correct?

17   A.  Correct.

18   Q.  You have never at any time met or communicated with Brian

19   Freeman, one of the prior proxyholders, correct?

20   A.  Correct.

21   Q.  And you have never at any time met or communicated with

22   Dr. Jeffrey Rush, another proxyholder, correct?

23   A.  Correct.

24   Q.  Can we agree that you have had no involvement in the

25   creation of documents concerning the governance of the

1    mifepristone project?

2    A.  Yes.

3    Q.  For example, you had no involvement in the creation of the

4    irrevocable proxy and power of attorney that we've heard about

5    during this lawsuit, correct?

6    A.  Correct.

7    Q.  You do not know who was involved in the creation of that

8    proxy, correct?

9    A.  Correct.

10   Q.  You were not involved in preparing documentation concerning

11   the August 1998 rescission offer, correct?

12   A.  Correct.

13   Q.  You were also not involved in the creation of the certain

14   compensation matters agreement of May 1998, correct?

15   A.  Correct.

16   Q.  You do not know who was involved in creation of the certain

17   compensation matters agreement, correct?

18   A.  Correct.

19   Q.  You also were not involved in the creation of the

20   indemnification agreement dated August 1, 1998, correct?

21   A.  Yes.

22   Q.  Meaning that you were not?

23   A.  Yes, that's correct.

24   Q.  All right.  And you do not know who was involved in the

25   creation of the indemnification agreement, correct?

M5IHHawT                    S. Hawkins - Cross

1   A.  Correct.

2   Q.  Is it fair to say that you were not involved in any of the

3   discussions concerning the mifepristone project during the time

4   that your husband, Gregory Hawkins, owned a partnership

5   interest in MedApproach?

6   A.  Correct.

7   Q.  Is it also fair to say that you have no firsthand knowledge

8   on how the proxyholders were compensated or how their

9   compensation was determined?

10  A.  That's right.

11  Q.  So any allegation in this case concerning whether

12  Mr. Daniel was paid in a manner consistent or inconsistent with

13  the parties' arrangements and agreements is not something that

14  you have firsthand knowledge about, correct?

15  A.  Not firsthand knowledge, no.

16  Q.  Is it fair to say that you relied on your husband, Gregory

17  Hawkins, with respect to the allegations that had been made in

18  this case on that subject matter?

19  A.  Yes.

20  Q.  You testified that Mr. Hawkins transferred the MedApproach

21  interest to you in July 1998, correct?

22  A.  Yes.

23  Q.  Can we agree that after Mr. Hawkins transferred the

24  partnership interest to you in July 1998, he continued to

25  manage the investment on your behalf?

1    A.   That is correct.

2    Q.   Since becoming an owner of the MedApproach interest in

3    July 1998, you have not attended any board meetings or other

4    business meetings in relation to MedApproach or the

5    mifepristone project, correct?

6    A.   That's correct.  I didn't know of any board meetings.

7    Q.   You have not discussed the business of MedApproach or the

8    marketing and selling of mifepristone with anyone other than

9    Mr. Hawkins, correct?

10   A.   That's correct.

11           MS. HOYLE:  Thank you.  No further questions.

12           THE COURT:  OK.  Any redirect?

13           MR. THOMPSON:  No, your Honor.

14           THE COURT:  Witness is excused.  Let's have the next

15   witness called.

16           I've been informed the microphone at the podium is

17   also not working at this point.  So probably easier for you to

18   use the microphone at your desk.

19           Let's have the next witness called.

20           (Witness excused)

21           MR. THOMPSON:  Thank you, your Honor.  The plaintiff

22   calls Gregory Hawkins.

23   GREGORY HAWKINS,

24       called as a witness by the Plaintiff,

25       having been duly sworn, testified as follows:

1          MR. SIMES:  Your Honor, may we approach to provide the

2    binders for the Court and the witness?

3          THE COURT:  Yes.

4          MR. SIMES:  Thank you.

5          May I proceed, your Honor?

6          THE COURT:  Yes.

7          MR. SIMES:  Thank you, your Honor.

8    CROSS-EXAMINATION

9    BY MR. SIMES:

10   Q.  Good morning, Mr. Hawkins.

11   A.  Good morning.

12   Q.  You have a Ph.D. in financial economics, is that correct?

13   A.  Yes.

14   Q.  And you have that degree from the Sloan School at MIT, is

15   that right?

16   A.  Yes.

17   Q.  You've worked at financial institutions such as Salomon

18   Brothers and Citigroup, correct?

19   A.  Yes.

20   Q.  You were one of the founders of a hedge fund called

21   Long-Term Capital Management, correct?

22   A.  Yes.

23   Q.  And among your partners in that endeavor were at least two

24   Nobel Prize winners, correct?

25   A.  Yes.

M5IHHawT                    G. HAWKINS - Cross

1    Q.  You consider yourself a sophisticated investor, is that

2    correct?

3    A.  Yes.

4    Q.  You personally reviewed the transaction documents prior to

5    your investment in MedApproach, correct?

6    A.  Which documents?

7    Q.  The documents that you signed and reviewed to become a

8    partner of MedApproach?

9    A.  Yes.

10   Q.  And you didn't rely on an outside adviser to counsel you

11   with respect to that investment, correct?

12   A.  Say that again.  I'm having trouble.

13   Q.  You did not rely on an outside adviser to counsel you with

14   respect to your investment in MedApproach, correct?

15   A.  Well, I relied on lawyers that MedApproach had hired.

16   Q.  Beyond the lawyers, you didn't bring in, for example, an

17   investment adviser or a financial adviser to advise you on that

18   transaction?

19   A.  No.

20   Q.  In the early days of the mifepristone project in the 1996

21   to 1998 time frame, you also personally reviewed a number of

22   the documents that governed the relationships among the

23   investors in the mifepristone project, correct?

24   A.  I believe I saw most of them, yes.

25   Q.  For example, you reviewed the irrevocable proxy and power

M5IHHawT                    G. Hawkins - Cross

1   of attorney of February 1997, correct?

2   A.  Yes.

3   Q.  And in fact, you approved of the proxy and the proxy

4   structure, correct?

5   A.  As a short-term solution, yes.

6   Q.  And you approved of Mr. Daniel, Mr. Freeman, and Dr. Rush

7   becoming the proxyholders for the venture, correct?

8   A.  Yes.

9   Q.  And there was discussion early on about the prospect that

10  you would be a proxyholder, correct?

11  A.  Say that -- I'm sorry.  Having trouble hearing you.

12  Q.  I'm sorry.  I'm a little tall for the microphone.

13          THE COURT:  You could be seated.

14          MR. SIMES:  I'll be seated.  I'll be seated.

15          THE COURT:  Actually, hold on.  We have AV here trying

16  to fix the microphones.

17          (Recess)

18          THE COURT:  Let's continue.  All the microphones are

19  live now.

20          MR. SIMES:  OK.  Thank you.

21  BY MR. SIMES:

22  Q.  I think, is that audible?  Can you hear me OK?

23  A.  Yes.

24  Q.  Terrific.

25          I think where we left off, I was asking whether at the

1    time of the creation of the proxy there was discussion that you

2    yourself might become a proxyholder?

3    A.  Yes.

4    Q.  And you did not become a proxyholder in part because of

5    concerns about anonymity in light of the controversial nature

6    of the product, correct?

7    A.  Yes.

8    Q.  In addition to agreeing to the proxy and the proxy

9    structure, you also agreed that Mr. Daniel and the other

10   proxyholders should become board members of the board of

11   directors of ND Management, correct?

12   A.  I don't remember that.

13   Q.  Let's have a look at Exhibit DX 14 in your binder, please.

14   A.  OK.

15   Q.  Do you say, sir, that this is a February 4, 1997, letter re

16   financial commitments in respect to NeoGen project?

17   A.  Yes.

18   Q.  If you look at the last two pages of the document, do you

19   see that there is a fax cover sheet bearing the name Sharon

20   Hawkins, and then on the final page, a signature page, in which

21   the blank for Gregory D. Hawkins is filled in.  Do you see

22   that?

23   A.  Yes.

24   Q.  That signature on that page is, in fact, your signature,

25   correct?

1   A.  Yes.

2   Q.  And you agreed to this February 4, 1997, letter on or about

3   February 4, 1997, correct?

4   A.  Yes.

5   Q.  And if you look at the second page of the document, the

6   final paragraph after paragraph No. 3, do you see that it says:

7   "This letter also confirms that MedApproach, W. Bradley Daniel,

8   in his capacity as a proxyholder as defined in the agreement,

9   Freeman, and Rush agree to take all actions and to enter into

10  all agreements, proxies, or other documents as reasonably

11  necessary to maintain Messrs. Daniel, Rush, and Freeman as

12  members of the board of ND Management, Inc., a Cayman Islands

13  corporation, or any successor thereto."

14          Do you see that provision I just read?

15  A.  Yes.

16  Q.  And that was something you agreed to, correct?

17  A.  Yes.

18  Q.  You also reviewed and agreed to the certain compensation

19  matters agreement of May 1998, correct?

20  A.  Correct.

21  Q.  You approved that document, is that right?

22  A.  Correct.

23  Q.  And the same is true of the August 5, 1998, rescission

24  offer memorandum.  That's also a document that you reviewed and

25  approved, correct?

1   A.  I think so.

2   Q.  Well, let's have -- just for good housekeeping, could you

3   please turn to Exhibit DX 29 in your binder.

4   A.  OK.

5   Q.  Now, you recognize this to be the rescission offer

6   memoranda of August 5, 1998, is that right?

7   A.  It looks like it.

8   Q.  And looking at the document, does that refresh any

9   recollection as to whether you approved this document?

10  A.  I'm sure I read it.

11  Q.  OK.  You also reviewed the August 1, 1998, indemnification

12  agreement, correct?

13  A.  Which one?

14  Q.  August 1, 1998, indemnification agreement.

15  A.  I've got no idea what you're talking about.

16  Q.  Let's look at DX 22, please.

17  A.  OK.

18  Q.  You reviewed this agreement at the time it was created,

19  right?

20  A.  It looks -- it looks familiar.

21  Q.  You reviewed it at the time it was created, correct?

22  A.  Probably.  I don't remember specifically.

23  Q.  You ultimately agreed to this document, isn't that right?

24  A.  I might have.  I don't remember the document.

25  Q.  Do you recall, sir, giving a deposition in this case on

M5IHHawT                    G. Hawkins - Cross

1   September 13, 2018?

2   A.  2000 when?

3   Q.  2018.

4   A.  I gave a deposition then, yes.

5           MR. SIMES:  Could we please pull the September 13,

6   2018, deposition transcript and provide a copy to counsel.

7           MR. DINDZANS:  Your Honor, may I approach?

8           THE COURT:  Yes.

9   Q.  Referring you to page 218 of the transcript, and I'll start

10  with lines 2 to 4, isn't it --

11          THE COURT:  Hold on.

12  A.  Wait a minute.  Wait a minute.

13  Q.  Sorry.

14  A.  OK.

15  Q.  I'm sorry.  Referring to page 218, lines 10 to 14, isn't it

16  true that you were asked the question and gave the following

17  answer:

18  "Q.  "Do you know whether you ultimately agreed to the

19  indemnification agreement that I put before you?

20  "A.  I think the answer to that is yes."

21          You gave that answer to that question, correct?

22  A.  Yes, I said I think the answer is yes, even though I don't

23  remember the document specifically.

24  Q.  You, in fact, authorized that document, isn't that right?

25  A.  Say that again.

M5IHHawT                    G. Hawkins - Cross

1    Q.  You authorized the indemnification agreement, isn't that

2    correct?

3    A.  I know I authorized some indemnifications.  I don't -- like

4    I said, I don't remember this one specifically.

5    Q.  OK.  You were also deposed in the Delaware lawsuit between

6    the parties, correct?

7    A.  Say that again.

8    Q.  You were deposed in the Delaware lawsuit between the

9    parties, correct?

10   A.  Yes.

11   Q.  And you recall you were asked questions about the

12   indemnification agreement in that lawsuit as well, in that

13   deposition, right?

14   A.  I'm sure I was.

15           MR. SIMES:  Could we please pull the Delaware

16   transcript dated August 12, 2021.

17           And if we may approach, your Honor?

18           THE COURT:  Yes.

19           THE WITNESS:  Thank you.

20   Q.  I'll direct your attention to page 318, please.

21   A.  318.  OK.

22   Q.  Directing your attention to line 21 on page 318, isn't it

23   true you were asked the following questions and gave the

24   following answers:

25   "Q.  You understand that NDM has certain obligations to

1   indemnify proxyholders, other members of management, in

2   connection with lawsuits like the ones you had with Mr. Daniel,

3   correct?

4   "A.  I disagree with that.

5   "Q.  OK.  You disagree with it, but you understand there is an

6   indemnification --

7   "A.  Yes.

8   "Q.  -- agreement which you authorized?

9   "A.  Yes."

10          You gave those answers to those questions, correct?

11  A.  Yes, I did, but which --

12  Q.  You did, in fact --

13  A.  Could I ask which indemnification agreement?

14  Q.  The indemnification agreement with respect to lawsuits like

15  the one you had with Mr. Daniel, you authorized that

16  indemnification agreement to that effect, correct?

17  A.  Could you say it again.

18  Q.  You authorized an --

19          THE COURT:  Just back up off the microphone.  Leaning

20  on the microphone, getting static.

21          Go ahead.

22  Q.  You authorized an indemnification agreement that would

23  indemnify with respect to lawsuits like the ones you had with

24  Mr. Daniel, correct?

25  A.  I authorized some indemnifications.  I don't recognize this

1    one.

2    Q.  Just to be clear for the record, DX 22, you don't know

3    whether you authorized that document or not?

4    A.  No recollection.

5    Q.  I take it that you have no reason to doubt that Mr. Daniel

6    and Mr. Freeman discussed that agreement, DX 22, with you prior

7    to the time it was signed?

8    A.  It was a long time ago.  I have no reason to believe they

9    didn't.

10   Q.  Before we get into the specifics of any of these

11   agreements, let me ask some general questions about your

12   involvement with the project.

13           You invested in MedApproach in approximately 1996, is

14   that right?

15   A.  Yes.

16   Q.  And you subsequently transferred your interest to

17   Mrs. Hawkins, correct?

18   A.  Yes.

19   Q.  And that transfer happened in July of 1998, right?

20   A.  Yes.

21   Q.  Since July of 1998, you have continued to manage the

22   investment on your wife's behalf, is that fair to say?

23   A.  Yes.

24   Q.  After the July 1998 transfer, you continued to be involved

25   for some years in the management of the mifepristone project,

1    correct?

2    A.   Involved in the management?  I wasn't a day-to-day person.

3    Q.   Well, you attended periodic meetings with the proxyholders

4    and others involved in running the project, correct?

5    A.   Yes.

6    Q.   And you did that for a number of years following the

7    July 1998 transfer, correct?

8    A.   Yes.

9    Q.   You would speak with Mr. Daniel quite frequently about the

10   project in the years following July 1998?

11   A.   Yes.

12   Q.   Mr. Daniel frequently consulted with you about questions of

13   strategy and management, correct?

14   A.   Yes.

15   Q.   Can we agree that although you had no formal title at the

16   project, for at least a decade or so you were an active

17   participant in many of the discussions concerning the project

18   and its direction?

19   A.   As long as you say "many" and not "all," yes.

20   Q.   OK.  And the discussions you were involved in concerning

21   the project sometimes addressed the question of compensation

22   for officers or employees of the project, correct?

23   A.   I don't remember.

24   Q.   You don't recall ever discussing compensation with any --

25   compensation of employees or officers of the project.  For

1    example, Dr. Karnovsky, Ms. Van Vranken, you don't recall being

2    involved in those discussions?

3    A.  I'm sure it was talked about.  I don't remember any

4    specifics at this date.

5    Q.  OK.  Do you recall -- let me withdraw that.

6            You were also involved in discussions about whether

7    the proxyholder should be compensated, correct?

8    A.  Yes, it was a certain compensation matters agreement.

9    Q.  You were involved in setting the amount of the so-called

10   proxy fee paid to the proxyholders, correct?

11   A.  Yes.

12   Q.  But you don't recall the substance of those particular

13   discussions, correct?

14   A.  The substance of what?

15   Q.  Of the particular discussions setting the proxy fee,

16   correct?

17   A.  I'm still having trouble hearing you.

18   Q.  I'm sorry.  You don't recall -- can you hear me OK now?

19   A.  Recall what?

20   Q.  Can you hear me OK now?  Am I audible?

21   A.  That's good.

22   Q.  OK.  You don't recall the particular discussions regarding

23   the amount of the proxy fee?  You don't recall those

24   discussions, correct?

25   A.  No, but I agreed to it.

1    Q.  And after the proxy fee was established, you continued to

2    be involved in conversations from time to time about what the

3    proxyholders should be paid, correct?

4    A.  It was already set in paper, so yes.

5    Q.  And you recall that there were from time to time questions

6    about what Dr. Rush would be paid, correct?

7    A.  It was in the compensation agreement.

8    Q.  Let me ask you to turn to Exhibit DX 15, please.

9    A.  OK.

10   Q.  You see that this is a July 5, 2006, email from Mr. Daniel

11   to you, correct?

12   A.  Yes.

13   Q.  You have any reason to suppose that you did not receive

14   this email?

15   A.  I think I probably did.

16   Q.  Do you see on the bottom email Mr. Daniel is raising a

17   question to you about payments to Dr. Rush, the proxy fee to

18   Dr. Rush, and he references the idea that Dr. Rush reduced his

19   past proxy fees by approximately $383,940?  Do you see that?

20   A.  Yes.

21   Q.  And Mr. Daniel proposes a way to catch up Dr. Rush,

22   correct?

23   A.  Say that again.

24   Q.  Mr. Daniel then proposed a way to catch Dr. Rush up on his

25   proxy fees, correct?

1   A.  Yes.

2   Q.  And your response was we need to talk.  The total of all

3   moneys going to the proxyholders and related activities seems

4   to be getting large compared to other costs, correct?

5   A.  Where do you -- oh, there it is.  That's correct, we needed

6   to talk.

7   Q.  It's fair to say that in 2006, a decade after your initial

8   investment, you continued to be involved in discussions with

9   Mr. Daniel about compensation paid to the proxyholders,

10  correct?

11  A.  Yes.

12  Q.  Turning your attention back to DX 22, the indemnification

13  agreement, I notice, sir, that in your declaration in this

14  case, you've not referenced this document.  Did you not recall

15  this document at the time you prepared your testimony?

16  A.  No.  As I said earlier, I don't recognize it specifically.

17  Q.  It's fair to say you would not be able to shed light on any

18  discussions regarding the creation of this document?  You

19  simply do not recall any such conversations?

20  A.  No, I know there was indemnification.

21  Q.  And you would not have any ability to shed light on the

22  provisions of this agreement; in other words, you don't recall

23  discussing Section 1, Section 2, things of that nature,

24  correct?

25  A.  I don't remember.

M5IHHawT                    G. Hawkins - Cross

1    Q.  Now, Mr. Daniel testified that he and Mr. Freeman spoke to

2    you about this agreement, DX 22, and walked through its

3    provisions.  I take it you do not recall that conversation,

4    correct?

5    A.  No, I don't.  There was a lot going on at that time.

6    Q.  You have no reason to suppose that that conversation did

7    not happen, correct?

8    A.  Since I don't remember the conversation, I can't answer.

9    Q.  Would it be fair to say that you agreed with the general

10   concept of indemnity for the proxyholders, correct?

11   A.  Yes.

12   Q.  You understood that concern about lawsuits was significant

13   at the mifepristone project, correct?

14   A.  Yes.

15   Q.  The product was a controversial abortion drug, right?

16   A.  Yes.

17   Q.  And the proxy was created as a result of a lawsuit from

18   Population Council, the licensor of mifepristone, correct?

19   A.  Right.

20   Q.  And --

21   A.  The Population Council demanded it.

22   Q.  I'm sorry.  Can you repeat that.

23   A.  Pop. Co. demanded it at that time.

24   Q.  And one of the reasons behind the August 1998 rescission

25   offer was the concern that investors might sue if they felt

1    deceived by the failure of Mr. Pike to disclose his criminal

2    history, isn't that accurate?

3    A.  Yes.

4    Q.  And you understood that indemnity was being provided to the

5    proxyholders, including Mr. Daniel, to address the concern that

6    investors might sue, correct?

7    A.  Yes.

8    Q.  Now, I'm going to ask you to turn to JX 5, please, the

9    certain compensation matters agreement.

10   A.  OK.

11   Q.  Now, if we look at this document, sir, do you recognize the

12   first page to be a May 28, 1998, letter signed by you and

13   Mr. Daniel?

14   A.  I think it says May 31, but OK.

15   Q.  So the very first page, right, which would bear a Bates

16   number on the lower right-hand corner, MED00014072.  Are you

17   with me?

18            THE COURT:  JX 5.

19   A.  Oh, you're talking about the letter, yes.

20   Q.  Yes.  The very first page of the Exhibit JX 5 is a May 28,

21   1998, letter, correct?

22   A.  Yes.

23   Q.  And that is your signature on the bottom of the document?

24   A.  Yes.

25   Q.  And you signed the letter to indicate that you were

1   agreeing to the attached certain compensation matters

2   agreement, correct?

3   A.  Yes.

4   Q.  Now, if we look at the third page of the document, this is

5   where the certain compensation matters agreement starts,

6   correct?

7   A.  Yes.

8   Q.  Now, you don't recall who drafted this document, is that

9   right?

10  A.  I couldn't tell you who drafted it.

11  Q.  Paragraph 1 of the certain compensation matters agreement

12  provides that:  In respect of routine management services

13  provided by Daniel to the general partner and for service as a

14  director/proxyholder, Daniel shall receive an annual fee to be

15  accrued as of February 12, 1997, equal to the $300,000 fee

16  payable to the general partner by Danco Laboratories, Inc., and

17  then it goes on.

18          Do you see that?

19  A.  Yes.

20  Q.  You were one of the parties that agreed to the $300,000

21  amount, correct?

22  A.  Yes.

23  Q.  You understood that that amount would increase with

24  inflation each year, correct?

25  A.  Yes.

M5IHHawT                    G. Hawkins - Cross

1    Q.  But fair to say that you don't recall specific discussions

2    that you had with the parties in negotiating this document?

3    A.  No, I don't remember specifics.

4    Q.  For example, you don't recall in paragraph 2 how the $3,000

5    per diem for Mr. Freeman was arrived at, correct?

6    A.  I'm thinking back.  As you said, there was a lot of

7    litigation we expected.  Freeman was the proxyholder, was the

8    lawyer.  He wanted a per diem, because he had such a small

9    proxy fee, to cover his uncertain time and costs.

10   Q.  And do you recall, were you involved in discussions with

11   Freeman with respect to the setting of that $3,000 amount?

12   A.  Probably.

13   Q.  You don't recall either way?

14   A.  Not directly, no.

15   Q.  With respect to the $300,000 that Mr. Daniel would receive

16   for routine management services, you understood at the time of

17   the agreement that there was other compensation to which

18   Mr. Daniel would be entitled or could be entitled for

19   management the project, isn't that right?

20   A.  I actually don't recall that.

21   Q.  Well, you knew, sir, that $300,000 was not all he was

22   getting paid, right?

23   A.  Well, at this time I thought it was.  That was a

24   significant amount of compensation.

25   Q.  Let's take a look at paragraph 3 of this document.  It

1    says, "Each of Freeman and Daniel shall participate in

2    management incentive plans and other benefit plans to be

3    determined at a future date."

4            Do you see that?

5    A.  Yes.

6    Q.  You agreed to that, right?

7    A.  Of course.  I believe incenting people to a job --

8    Q.  OK.  Let's look at --

9    A.  -- for performance.

10   Q.  I'm sorry.  I didn't mean to interrupt you.

11   A.  No, if performance is good, give them incentives.

12   Q.  OK.  In paragraph 5, let's have a look at that, you

13   understood paragraph 5 to provide that Mr. Daniel could be

14   compensated based on the results of a lawsuit against Mr. Pike,

15   correct?

16   A.  Yes.

17   Q.  Directing your attention to paragraph 6, you understood

18   that Mr. Daniel could acquire certain percentage interests in

19   Danco as set forth in this paragraph, correct?

20   A.  Yes, as an incentive.

21   Q.  OK.  In paragraph 8, you agreed that the undersigned shall

22   use commercially reasonable efforts to cause the partnership to

23   compensate Messrs. Freeman and Daniel at customary market rates

24   for such additional special services as they may provide to the

25   partnership from time to time in connection with such matters

G. Hawkins - Cross

1   as, and then there's a list.

2            Do you see that?

3   A.  Special services, yes.

4   Q.  And you agreed to all of those different types of

5   compensation, correct?

6   A.  Yes, they're all incentive based, except for the 300,000.

7   Q.  Now, you attended a settlement conference with Mr. Daniel

8   in Nashville, Tennessee, on February 2, 2016, correct?

9   A.  Yes.

10  Q.  And if we look at your declaration in this case, which is

11  Exhibit PX 2 in your binder, I'll direct your attention to

12  paragraph 30, please.

13  A.  OK.

14  Q.  In the third sentence you say:  "In February 2016, I agreed

15  to attend a meeting in Tennessee to discuss a global resolution

16  of both the remaining claim in the Tennessee case and the

17  claims in this case."

18           That's accurate, I take it, right?

19  A.  Yes.

20  Q.  And that Tennessee meeting was in Nashville, correct?

21  A.  Yes.

22  Q.  And you attended with counsel, is that right?

23  A.  Yes.

24  Q.  And you attended on behalf of Mrs. Hawkins, correct?

25  A.  Yes.

M5IHHawT                    G. Hawkins - Cross

1    Q.  It's fair to say that you made more progress than you had

2    anticipated during that settlement conference, correct?

3    A.  Yes.

4    Q.  And you agreed with Mr. Daniel in principle on several,

5    several points, correct?

6    A.  Say that again.

7    Q.  You agreed with Mr. Daniel in principle on several points,

8    correct?

9    A.  Several, but not all.

10   Q.  And the one you didn't agree on was the issue of voting

11   versus nonvoting shares for a restructured ND Management,

12   correct?

13   A.  Right.  It was a governance matter.

14   Q.  At that February 2016 settlement conference, the parties

15   wrote down on a piece of paper the terms they were trying to

16   agree to in principle, correct?

17   A.  Yes.

18   Q.  Let me ask you to look at DX 18, please, in your binder.

19   A.  OK.

20   Q.  You recognize this to be the term sheet that the parties

21   marked up at the February 2, 2016, settlement conference

22   referenced in your declaration, correct?

23   A.  Yes.

24   Q.  And for clarity of the record, do you agree that what the

25   parties did was take an earlier September 2014 letter that I

M5IHHawT                     G. Hawkins - Cross

1    had sent to Mr. Thompson and apply handwriting to it in the

2    February 2016 conference?

3    A.   Yes.

4    Q.   So the printed matter comes from 2014.  The handwriting

5    comes from 2016.  That's what you recall, right?

6    A.   Yes.

7    Q.   And your initials appear on the bottom of each page second

8    from the left, is that right?

9    A.   Yes.

10   Q.   Now, you initialed the term sheet to indicate your general

11   agreement in principle to the terms in the term sheet, correct?

12   A.   Yes, but I think I'm missing something here.

13   Q.   What do you think you're missing?

14   A.   The part that should have said "subject to further

15   negotiation."  I don't see that.

16   Q.   I think you're looking -- I think you're referring, sir, to

17   the written portion following item 1(b) on the first page where

18   in parentheses it says "subject to attorney review and

19   discussion," correct?

20   A.   Yes.  Sorry I missed that, yes.

21   Q.   So that was the item you understood to be subject to

22   attorney review and discussion?

23   A.   One of them, yes.

24          MR. SIMES:  Now, your Honor, at this point I would

25   offer DX 18.  I understand that there has been an objection

 1   about it, and I'd be happy to address that.

 2          THE COURT:  Any objection?

 3          MR. THOMPSON:  Yeah.  Yes, your Honor, yes.  This is a

 4   draft of a settlement agreement that was ultimately determined

 5   not to be valid, and so it --

 6          THE COURT:  Hold on.  Hold hon.  Hold on.  Hold on.

 7   Hold on.  Let's just go in the robing room away from the

 8   witness as we discuss this.

 9          MR. THOMPSON:  I'm sorry.

10          THE COURT:  Have the court reporter come back in the

11   robing room.

12          (In the robing room)

13          THE COURT:  Let me hear your objection again.

14          MR. THOMPSON:  It has no probative value, your Honor,

15   because to the extent that there are -- that his initials

16   indicate any kind of an admission, right, that would make it

17   admissible, it's all conditional on terms that were never

18   agreed to, and therefore, any -- it has no probative value

19   because you can't use it to show agreement because there was a

20   *quid pro quo*, and the *quid* never came to be, and therefore

21   there is no *quo*.

22          THE COURT:  I guess I'm not fully -- it sounds as if,

23   and I don't want to mischaracterize your objection, is that

24   your objection is this seems to go more to the weight than the

25   admissibility of this.  It's certainly not dispositive.  I

M5IHHawT                    G. Hawkins - Cross

1    don't think it's not probative.  Certainly, he can bring out --

2    you can bring out the fact that -- I don't know at this point

3    if the defense is trying to say this is an admission.  It

4    certainly seems as if this may be relevant.  He hasn't gotten

5    there yet in terms of an admission, but it seems like the

6    objection goes to the weight and not the admissibility of it.

7              MR. THOMPSON:  It's a 403.  It is, your Honor, yes.

8    And so it's a bench trial.  I understand.

9              THE COURT:  All right.  I'll overrule the objection.

10   I'll allow it.

11             (In open court)

12             THE COURT:  Objection's overruled.

13             Go ahead.

14             MR. SIMES:  Thank you.  Your Honor, I had offered

15   DX 18 for admission into evidence.

16             THE COURT:  It's admitted.

17             (Defendant's Exhibit 18 received in evidence)

18             MR. SIMES:  Thank you.

19   BY MR. SIMES:

20   Q.  Mr. Hawkins, I want to clarify a few items from your

21   declaration in this case, which is Exhibit PX 2.  Can I refer

22   you to paragraph 26 of your declaration, please.

23   A.  OK.

24   Q.  In paragraph 26 you state in the second sentence, "Dr. Rush

25   and Mr. Freeman were each entitled to an annual payment of

M5IHHawT                      G. Hawkins - Cross

1    $50,000 plus a per diem of $2,000 for time spent working on NDM

2    business."

3            Just want to make sure, sir, that's incorrect, right?

4    The $2,000 per diem rate that is in your declaration is not

5    accurate?

6    A.  I think Mr. Freeman was 3,000.

7    Q.  OK.  And we can look at JX 5, if you'd like to.  JX 5 on

8    the third page in the second paragraph refers to a 2,500 per

9    diem for Rush and a 3,000 per diem for Freeman, correct?

10   A.  Correct.

11   Q.  Just want to be sure, sir, when you say a 2,000 per diem,

12   it's just a mistake.  It's not a belief that they were only

13   entitled to 2,000?

14   A.  Yes, a mistake.

15   Q.  Directing your attention to paragraph 29 of your

16   declaration.

17   A.  OK.

18   Q.  Second to last sentence of this paragraph states:  "To be

19   clear as I can be, we have never wanted or sought to control

20   the operations of Danco or NDM."

21            That's also incorrect, is it not, sir?

22   A.  No, it's not -- it is correct.

23   Q.  In fact, earlier this year in March you made an offer to

24   purchase the NDM shares owned by MedApproach, is that not

25   correct?

1    A.  Yes.

2    Q.  And by saying "yes," you agree that you made that offer,

3    correct?

4    A.  Yes.

5    Q.  And in making that offer, that offer was only for the NDM

6    shares and no other assets owned by MedApproach, correct?  For

7    example, you did not make an offer to purchase the direct

8    interest that MedApproach holds in Danco, correct?

9    A.  I think that's right.

10   Q.  The only asset you were making an offer for for MedApproach

11   is the one that would have given you control over the project,

12   correct?

13   A.  Well, if there was liquidation, I was going to own it all

14   anyway.

15   Q.  Sir, my question was the asset that you sought to acquire

16   from MedApproach, the only asset you sought to acquire, was the

17   only one that would give you control, correct?

18   A.  I think that's incorrect.

19   Q.  You understood the NDM shares, whoever owned those NDM

20   shares, would control the project, correct?

21   A.  Yes.

22   Q.  And that is what you offered to buy and nothing else,

23   correct?

24   A.  That may be right, except I was going to own it all anyway,

25   so --

M5IHHawT                        G. Hawkins - Cross

1   Q.  I'm sorry.  I couldn't hear your answer.

2   A.  If there was liquidation, I would own it all anyway.

3   Q.  But you made a choice not to bid for any other asset other

4   than the NDM shares, correct?

5   A.  I think that's right.  There was no need.

6               MR. SIMES:  I have no further questions, your Honor.

7               THE COURT:  OK.  Any redirect?

8               MR. THOMPSON:  None, your Honor.

9               THE COURT:  OK.  The witness is excused.

10              THE WITNESS:  Really?

11              (Witness excused)

12              THE COURT:  Are there any other witnesses?  I believe

13  that is it, correct?

14              MR. THOMPSON:  That's it, your Honor, for plaintiff.

15              THE COURT:  All right.

16              MR. SIMES:  That's it, your Honor.

17              THE COURT:  Let's do this:  Let's set a schedule,

18  then, for posttrial submissions.

19              Yes, counsel?

20              MR. THOMPSON:  I'm sorry.  I was just standing while

21  you're speaking.

22              THE COURT:  So let's do that.  I think that makes the

23  most sense.

24              Or before we do that, are there any other motions or

25  anything from the parties?

1          MR. THOMPSON:  None for the plaintiff, your Honor.

2          MR. SIMES:  None for defendants, your Honor.

3          THE COURT:  So let's schedule posttrial submissions.

4     Let's have each side file their opening brief within one month.

5          When would that be, Tara?

6          THE DEPUTY CLERK:  That takes us to a little more than

7     one month, Judge.  That would be June the 20th.

8          THE COURT:  OK.  June 20.  And the other side can

9     respond to their opponent's opening brief three weeks later,

10    which would be when, Tara?

11         THE DEPUTY CLERK:  That would be July 11.

12         THE COURT:  All right.  Anything else from

13    plaintiff's counsel?

14         MR. THOMPSON:  Nothing from plaintiffs.

15         THE COURT:  Anything else from defense counsel?

16         MR. SIMES:  Your Honor, if there are any particular

17    aspects that would be useful to the Court in the briefing, we

18    would obviously invite that, but we're perfectly happy just to

19    simply brief generally.

20         THE COURT:  No, let's just have the briefs filed.

21    We're adjourned.  Thank you.

22         MR. SIMES:  Thank you, your Honor.

23         MR. THOMPSON:  Thank you, your Honor.

24         (Adjourned)

25

INDEX OF EXAMINATION

Examination  of:                              Page

SHARON HAWKINS

Cross By Ms. Hoyle . . . . . . . . . . . . . 160

GREGORY HAWKINS

Cross By Mr. Simes . . . . . . . . . . . . . 165

DEFENDANT EXHIBITS

Exhibit No.                                  Received

 18    . . . . . . . . . . . . . . . . . . . 188