**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

SHARON HAWKINS, derivatively on behalf
of MEDAPPROACH, L.P., and individually,

                    Plaintiff,

v.

MEDAPPROACH HOLDINGS, INC., and
W. BRADLEY DANIEL,

                    Defendants,

      -and-

MEDAPPROACH, L.P.,

                    Nominal Defendant.

**Civil Action No. 1:13-cv-5434 (ALC)**
**ECF Case**

---

### PLAINTIFF'S POST-TRIAL BRIEF

---

**WOLLMUTH MAHER & DEUTSCH LLP**
R. Scott Thompson
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050

*Attorneys for Plaintiff Sharon Hawkins*

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................1

PROCEDURAL HISTORY ...................................................................................3

   I.    Background ...........................................................................................3

   II.   The Trial Record .................................................................................4

         A.  Initial Payments Were Made Pursuant to the Unconsummated Settlement ...........4

         B.  NDM Corporate Documents .......................................................6

         C.  Hourly Rate ...............................................................................8

         D.  Time Records ............................................................................9

         E.  Dr. Jeffrey Rush .......................................................................10

ARGUMENT ....................................................................................................12

   I.    Legal Standard – Entire Fairness .......................................................12

   II.   Defendants Have Failed to Satisfy the Entire Fairness Standard .....................16

         A.  Fair Process .............................................................................16

             1.  The Payments Were Initially Made In Error Based on an Unconsummated Settlement Agreement .............................................17

             2.  There Was No Fair Process After Mr. Daniel Decided He Would Not Return Payments Made In Error .........................................18

                (a)  The operative documents do not entitle Mr. Daniel to indemnification .............................................18

                (b)  The computation of an hourly rate was not the product of fair process ..............................................21

                (c)  Defendants' Recordkeeping does not reflect fair process .............23

                    (i)  Destruction of documents should raise a spoliation inference .............................................23

(ii) The records that exist were specifically created for litigation ..........................................................................24

(iii) The spreadsheets are inaccurate .......................................25

(d) Dr. Rush ............................................................................26

B.  Fair Price .............................................................................29

CONCLUSION ..............................................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford,*
    554 F. Supp. 2d 538 (D. Del. 2008) .................................................................. 13

*Alpert v. 28 Williams St. Corp.,*
    63 N.Y.2d 557 (1984) ......................................................................................... 14

*Auriga Capital Corp. v. Gatz Props., LLC,*
    40 A.3d 849 (Del. Ch. 2012) ..............................................................................14

*Beard Research, Inc. v. Kates,*
    8 A.3d 573 (Del. Ch. Apr. 23, 2010) .................................................................. 12

*Boxer v. Husky Oil Co.,*
    429 A.2d 995 (Del. Ch. 1981) ............................................................................ 12

*Cinerama, Inc. v. Technicolor, Inc.,*
    663 A.2d 1156 (Del. 1995) ................................................................................. 15

*Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.,*
    304 F.R.D. 178 (S.D.N.Y. 2014) ....................................................................... 24

*Dweck v. Nasser,*
    2012 WL 161590 (Del. Ch. Jan. 18, 2012) ........................................................ 13

*Emerald Partners v. Berlin,*
    787 A.2d 85 (Del. 2001) ..................................................................................... 14

*Feeley v. NHAOCG, LLC,*
    62 A.3d 649 (Del. Ch. 2012) .............................................................................. 12

*Fund I, LP v. Siemens First Capital Commercial Fin. LLC,*
    995 N.Y.S.2d 40 (1st Dept. 2014) ...................................................................... 14

*Gamco Asset Mgmt. Inc. v. iHeartMedia Inc.,*
    2016 WL 6892802 (Del. Ch. Nov. 23, 2016) .................................................... 14

*Gantler v. Stephens,*
    965 A.2d 695 (Del. 2009) ................................................................................... 12

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,*
    817 A.2d 160 (Del. 2002) ................................................................................... 13

*Guth v. Loft, Inc.*,
   5 A.2d 503 (23 Del. Ch. 1939)................................................................13

*In re Cellular Tel. P'ship Litig.*,
   2022 Del. Ch. LEXIS 56 (Del. Ch. Mar. 9, 2022) .................................. 15-16, 28

*In re Crimson Expl. Inc. Stockholder Litig.*,
   2014 WL 5449419 (Del. Ch. Oct. 24, 2014) ................................ 14-15

*In re Orchard Enters., Inc. S'holder Litig.*,
   88 A.3d 1 (Del. Ch. 2014) ............................................................. 14

*In re S. Peru Copper Corp. S'holder Derivative Litig.*,
   52 A.3d (Del. Ch. 2011) ............................................................... 15

*Kahn v. Tremont Corp.*,
   694 A.2d 422 (Del. 1997) ............................................................. 14

*Nebenzahl v. Miller*,
   1993 WL 488284 (Del. Ch. Nov. 8, 1993) ........................................... 13

*Nixon v. Blackwell*,
   626 A.2d 1366 (Del. 1993) ............................................................ 13

*Rabkin v. Olin Corp.*,
   1990 WL 47648 (Del. Ch. Apr. 17, 1990) ........................................... 15

*Reis v. Hazelett Strip-Casting Corp.*,
   28 A. 3d 442 (Del. Ch. 2011) ..................................... 16, 19, 20, 28

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
   306 F. 3d 99 (2d Cir. 2002) ...................................................... 23, 24

*TVI Corp. v. Gallagher*,
   2013 WL 5809271, (Del. Ch. Oct. 28, 2013) ....................................... 13

*US W., Inc. v. Time Warner Inc.*,
   1996 WL 307445, (Del. Ch. June 6, 2006)........................................13

*Weinberger v. UOP, Inc.*,
   457 A.2d 701 (Del. 1983) .......................................................... 14, 15

*Whitecap (U.S.) Fund I, LP v. Siemens First Capital Commercial Fin. LLC*,
   995 N.Y.S.2d 40, 46 (1st Dept. 2014) ............................................14

**<u>Statutes</u>**

8 Del. C. § 102 (b)(7)................................................................................................13

Plaintiff Sharon Hawkins ("Hawkins" or "Plaintiff") respectfully submits this Post-trial Brief in support of the claim made in Count VIII of the Third Amended Complaint ("TAC" ECF No. 194).

## PRELIMINARY STATEMENT

Plaintiff is the beneficial owner of approximately 66% of the shares of N.D. Management, Inc. ("NDM"). In Count VIII of the TAC, Plaintiff alleged that Mr. Daniel caused NDM to make payments to him and to Angelia Van Vranken[1] in 2016 and 2017 for "consulting" fees and as "contract labor" without providing incremental value to NDM. Because these payments were self-interested transactions – calculated, proposed, and approved by Mr. Daniel -- they are subject to "entire fairness" review under Delaware law. Under Delaware law, Defendants have the burden of proving that the process by which the transactions were approved was fair to the shareholders of NDM, and that the terms of the payments were fair. Defendants have not met that standard. The record shows that there was no attempt to satisfy the entire fairness standard, and that the terms of the payments were not fair to the shareholders of NDM as a result.

There was literally no process undertaken when the first several payments were made. The first payments to Mr. Daniel were made in reliance on a proposed settlement agreement that was in dispute, was never consummated, and was ultimately found by this Court to be unenforceable.[2] When this Court held that the settlement agreement was unenforceable, Mr. Daniel did not return

---

[1] This Court dismissed that part of Count VIII relating to payments to Ms. Van Vranken based on Defendants' representations that Ms. Van Vranken was simply an employee of NDM. ECF 232 (Defendants' Memorandum of Law in Support of Motion for Summary Judgment) page 19 fn. 26. In fact, at trial Defendants testified that Ms. Van Vranken is a member of its Board of Directors. Transcript of Proceedings April 27, 2022 (ECF 314) ("Trial Tr. 1") 114:1-10. This contradicted Ms. Van Vranken's deposition testimony, in which she testified that Mr. Daniel and Dr. Jeffrey Rush were the members of NDM's Board. Trial Tr. 1 115:10-20. Although this Court applied the business judgment rule when evaluating the payments to Ms. Van Vranken, because she is an officer and member of the Board of Directors of NDM payments to Ms. Van Vranken should have been evaluated according to the entire fairness doctrine.

[2] ECF 158.

the payments; instead, he and Ms. Van Vranken came up with a different justification for the payments. Relying on an agreement that gave Mr. Daniel no right to be paid on a per diem basis for any work performed on behalf of NDM (because, instead, he was paid a significant annual fee for all of his day-to-day work for NDM), Mr. Daniel and Ms. Van Vranken agreed that Mr. Daniel should be paid at an hourly rate for every hour that he worked for NDM. They calculated that Mr. Daniel had worked approximately 1,000 hours on NDM issues since 2013, a calculation that was based on records that were apparently destroyed in 2018.[3] Because Mr. Daniel is not entitled to be compensated at a per diem rate under the parties' agreements, Mr. Daniel and Ms. Van Vranken extrapolated an hourly rate from a per diem rate by which another person was compensated, and then applied an inflation adjustment to that rate with literally no documentary basis whatsoever. These carefully manufactured calculations resulted in an amount owed to Mr. Daniel that was slightly in excess of the amount he had been paid pursuant to the invalid settlement proposal.

There is no record of any independent review of any of these machinations. NDM has one non-inside Director, Dr. Jeffrey Rush. He testified that the primary information he was given about the payments to Mr. Daniel was Mr. Daniel's assurance that Mr. Daniel was entitled to the payments. Dr. Rush testified that he was not given any documents to review, and that NDM did not engage any third party to assist in reviewing the payments. In light of this damning testimony, it is no surprise Defendants failed to call Dr. Rush as a witness at trial.

The process used by Defendants to approve the payments to Mr. Daniel was run entirely by self-interested people, Mr. Daniel and Ms. Van Vranken. No third party was involved in any meaningful way. The documents upon which Defendants rely to justify the payments do not support them, and the math used by Defendants is transparently result-oriented. Defendants have

---

[3] The calculation includes more than 100 hours of time spent on matters other than this lawsuit, even though Mr. Daniel only claims to be indemnified for time spent on this lawsuit.

utterly failed to bear their burden of showing that the payments were the result of a fair process, or that the amount of the payments is consistent with what would have been obtained through an arms-length transaction. Plaintiff respectfully requests that this Court enter judgment in her favor as to Count VIII.

## PROCEDURAL HISTORY

This case has a lengthy and somewhat complicated procedural history, much of which is irrelevant to the single claim that remains. The relevant procedural history and trial evidence is summarized below.

### I.     Background

Plaintiff brought suit against Defendants to obtain redress for a series of four separate self-interested transactions through which Defendant Daniel obtained benefits for himself at the expense of the stockholders of NDM and/or MedApproach L.P. This Court dismissed three of the four sets of claims against Mr. Daniel, holding that they were either barred by an applicable statute of limitation or that Plaintiff lacked standing. The remaining claim is set forth in Count VIII of the TAC. In that claim, Plaintiff alleges that Mr. Daniel caused NDM to make payments to him (totaling $431,817.52) (the "Payments") and to Angelia Van Vranken ($162,000) in 2016 and 2017 for "consulting" fees and as "contract labor" without providing value.

In Count VIII, Plaintiff expressly seeks damages on behalf of MedApproach L.P. as the primary remedy for Mr. Daniel's breach of his fiduciary duties. The first demand for relief made in Count VIII is for "[a]n award of damages in an amount sufficient to compensate MedApproach and N.D. Management for the damage they suffered as a result of the conduct described in this

Count." TAC at 41. Plaintiff's second demand for relief is for an order directing Mr. Daniel to repay amounts wrongfully taken from NDM. *Id.*

This Court held a bench trial on April 27 and May 18, 2022, during which it heard the testimony of four witnesses: Mr. Daniel, Ms. Van Vranken, Plaintiff Sharon Hawkins, and Ms. Hawkins' husband Gregory Hawkins. In addition, excerpts of the deposition testimony of Dr. Rush were made a part of the record.

## II.     The Trial Record

Defendants argue that Mr. Daniel is entitled to the Payments according to the express terms of NDM corporate documents. They argue that the hourly rate of $550 by which Mr. Daniel was compensated was the product of a calculation supported by express terms of NDM corporate documents as well, and they claim that they simply applied that hourly rate to the number of hours recorded by Mr. Daniel to arrive at the total amount he was owed for his time spent addressing this lawsuit from 2013 through 2017. The record does not support these claims.

### A.  Initial Payments Were Made Pursuant to the Unconsummated Settlement

Payments were made in the amounts of $75,000 and $19,312.50 to Mr. Daniel on April 13, 2016.[4] Ms. Van Vranken testified at trial that the payments were made based on Defendants' belief that Mr. Daniel was entitled to those amounts under a draft settlement agreement proposed in February 2016.[5] In 2018, during her deposition, Ms. Van Vranken had denied that the payments were made based upon the proposed settlement agreement.[6]

Ms. Van Vranken testified that the draft settlement agreement directed that Mr. Daniel be paid $75,000 immediately and that he was to receive quarterly payments totaling $75,000 per year

---

[4]     JX 21 page 11.
[5]     Trial Tr. 1 124:6-9.
[6]     Trial Tr. 1 124:18-25.

after that.[7]  The proposed settlement agreement contemplated a payment of $75,000 per year to Mr. Daniel beginning with 2015, but there was no provision for any "immediate" payment or for quarterly payments.[8]  Asked why Mr. Daniel had received a quarterly payment of $19,312.50 (rather than $18,750, which would have been one quarter of $75,000), Ms. Van Vranken testified that the proposed settlement agreement "called for an inflation adjustment on that base rate".[9]  In fact, the proposed settlement agreement did not call for any inflation adjustment on the contemplated $75,000 annual payments.[10]

Payments to Mr. Daniel based on the proposed settlement agreement  began on April 13, 2016 and continued until Defendants say they became aware that Mrs. Hawkins had not agreed to the proposed settlement agreement, which Mr. Daniel testified was some time after he had dismissed a lawsuit pending in Tennessee in reliance on the proposed settlement agreement.[11]  In fact, Defendants were informed on April 11, 2016 that there were issues left to be negotiated in the proposed settlement agreement,[12] and the payments were made notwithstanding that knowledge.[13]

Ms. Van Vranken testified that the amounts paid to Mr. Daniel in April 2016 had nothing to do with his claim for indemnification under the indemnification agreement.[14]  The payments were based entirely upon the disputed settlement agreement that was ultimately declared

---

[7]      Trial Tr. 1 126:22-127:9.
[8]      DX 18, page 2.
[9]      Trial Tr. 1 127:10-18.
[10]      DX 18, page 2
[11]      Trial Tr. 1 86:25-87:19.
[12]      ECF 144 Ex. A; ECF 140 (Defendants' Memorandum of Law in Support of Motion to Enforce Settlement dated March 6, 2017), page 5 (acknowledging receipt of correspondence concerning disagreement on April 26, 2016).
[13]      Moreover, the Tennessee lawsuit was dismissed pursuant to a separate settlement agreement (ECF 150 (Report and Recommendation dated January 9, 2018) at 6-7, and it was not dismissed until  October 11, 2016, long after Defendants knew that Mrs. Hawkins was not in agreement with the terms of the proposed settlement agreement. *See* ECF 140 page 6.
[14]      Trial Tr. 1 136:16-19.

unenforceable by this Court.[15]   The payments were not returned to NDM after this Court declared the proposed settlement agreement unenforceable.   In short, the Payments were initially made without any process whatsoever other than an incorrect determination that Mr. Daniel was entitled to money under a proposed settlement agreement.

### B.  NDM Corporate Documents

The Payments were initially made in partial fulfillment of concessions proposed under an unconsummated agreement.   They had "nothing at all to do" with any claim by Mr. Daniel to a right to indemnity for time spent on litigation.[16]   After the proposed settlement was found to be unenforceable, Defendants changed the rationale for the payments, decided that Mr. Daniel was entitled to the same payments according to NDM corporate documents.

Mr. Daniel claims that he is entitled to indemnification under the terms of an indemnification agreement dated August 1, 1998 (the "Indemnification Agreement") (DX 22), and that the Payments were all made in accordance with that Agreement.   As a prerequisite to receiving indemnification under DX 22, an indemnified party is required to submit a written demand for indemnification "as soon as practicable" after the occurrence of "an event triggering indemnification rights."[17]   There is no evidence that Mr. Daniel ever made any such written demand, let alone as soon as practicable after he believed he was entitled to indemnity for time spent attending to this lawsuit.

The Indemnification Agreement provides that a Proxy Holder is entitled to indemnification for time spent dealing with certain kinds of claims "at the per diem rates set forth in that certain agreement dated May ___, 1998 . . .,"[18]   which is a reference to a document called the Certain

---

15      ECF 158
16      Trial Tr. 1 136:16-19.
17      DX 22 ¶ 4.
18      *Id.* ¶ 2

Compensation Matters Agreement, a letter agreement dated May 31, 1998 (JX 5).  In JX 5, Mr. Daniel was assigned a management fee payable by Danco Laboratories, Inc. to NDM.  The management fee was originally set at $300,000 per year but has risen over time to in excess of $500,000 per year.[19]  The two other Proxy Holders – Brian Freeman and Dr. Jeffrey Rush – were compensated differently.  They each received annual fees of $50,000, but were to receive additional compensation at the rates of $3,000 and $2,500 per day up to a maximum of $250,000.[20] In other words, they could receive the same amount of compensation as Mr. Daniel if they were called upon to spend time on NDM matters beyond what was expected in 1998.  The reason for the difference was spelled out in the Certain Compensation Matters Agreement:  Mr. Daniel was responsible for "routine management services" provided to NDM on a day-to-day basis.  Mr. Daniel testified that such services were not a full-time job.[21]  Unless they earned certain incentive payments, none of the Proxy Holders was entitled to more than $300,000 per year from NDM.

Mr. Daniel participated in the negotiation of the Certain Compensation Matters Agreement, which took approximately a year.[22]  He signed it on behalf of three entities including himself, and at the time he signed it he believed it was fair to all three.[23]  Under the Certain Compensation Matters Agreement, Mr. Daniel is not entitled to compensation at a per diem rate under any circumstance.[24]

Mr. Daniel testified that he "spent a significant amount of time" with others drafting the Indemnification Agreement[25],and that it took a "significant amount of negotiating and discussion

---

[19]   *See* Trial Tr. 1 7:13-18.
[20]   JX 5 ¶ 2.
[21]   Trial Tr. 1 88:10-12.
[22]   Trial Tr. 1 13:21-14:2.
[23]   Trial Tr. 14:12-15; 15:2-5.
[24]   *See* JX 5.
[25]   Trial Tr. 1 58:16-22.

and meeting about it."[26]   He testified that he himself (along with others) "came up with" the language in the Indemnification Agreement that based reimbursement for time on the per diem rates in the Certain Compensation Matters Agreement.[27]   He had the opportunity to suggest revisions and does not recall any revisions he suggested that were rejected.[28] He signed it on behalf of several entities and believed it was fair when he signed it.[29]

### C.  Hourly Rate

The Payments were based on a rate of $550 per hour.  This rate was derived by taking the per diem rate specified for Brian Freeman in the Certain Compensation Matters Agreement, dividing that per diem rate by 8 hours, taking the resulting quotient ($375 per hour) and increasing it by an inflation factor, apparently through 2013.[30]

Mr. Daniel testified that no one raised any question about using Mr. Freeman's per diem rate as if it was a rate applicable to Mr. Daniel, that no one suggested computing an hourly rate based upon the management fee assigned to Mr. Daniel in the Certain Compensation Matters Agreement, and that no one suggested any other alternative to compute an hourly rate because "[w]e had an agreement in place that was very specific."[31]

Ms.  Van Vranken testified that the proposed settlement agreement provided that the Payments should be increased by an inflation factor, but the words of the proposed settlement agreement do not support that statement.[32]  After being shown the proposed settlement agreement at trial, Ms. Van Vranken claimed that in fact the inflation increase was authorized by the

---

[26]     Trial Tr. 1 64:6-10.
[27]     Trial Tr. 1 66:20-67:3.
[28]     Trial Tr. 1 64:18-24.
[29]     Trial Tr. 1 58:23-59:2.
[30]     DX 3 (Declaration of Angelia Van Vranken dated April 18, 2022) ¶ 41.   There is no intelligible explanation for why the inflation factor was not applied after 2013.
[31]     Trial Tr. 1 87:21-89:3.
[32]     Trial Tr. 1 129:20-131:6.

"partnership agreement", which – according to Ms. Van Vranken – provides for "an annual CPI increase" to "whatever someone's base compensation was."[33]   The Limited Partnership Agreement of Neogen Investors L.P. (DX 20) provides that the management fee payable by Danco Laboratories to NDM shall be increased annually by a factor based on the consumer price index (CPI), but it does not provide for CPI increases to any other payment to be made by either Danco or NDM.[34]

### D. Time Records

Mr. Daniel testified that he kept track of the time he spent addressing matters relating to this lawsuit from the moment he was served with a complaint in August 2013.[35]  He testified that he recorded only time relating to the lawsuit.[36]  According to Mr. Daniel, the time records made exhibits in this case (JX 7-12) do not include "non-lawsuit items."[37]  Ms. Van Vranken testified at trial that when she reviewed Mr. Daniel's timesheets for accuracy, she understood that he was only to be reimbursed for time spent on this case.[38]  This testimony conflicts with testimony she gave in 2018.  When Ms. Van Vranken testified in deposition in 2018, she testified that she understood that the Payments were meant to compensate Mr. Daniel for his "work and time in managing the affairs of N.D. Management and Danco."[39]

Mr. Daniel testified that he made contemporaneous notes that he gave to Ms. Van Vranken or other employees, but he does not know when he gave the notes to others.[40]  He knows that no

---

[33]   Trial Tr. 1 130:23-131:12.
[34]   *See* DX 20 at Section 15(d).
[35]   Trial Tr. 1 35:1-9.
[36]   Trial Tr. 1 35:25-36:15.
[37]   Trial Tr. 1 79:19-22.
[38]   Trial Tr. 1 148:18-149:1.
[39]   Trial Tr. 1 150:9-21.
[40]   Trial Tr. 1 37:5-20.

one has been able to find any of the handwritten notes.[41]  The records provided in this case are Quickbooks spreadsheets that were prepared between August and November 2018.[42]

Mr. Daniel testified that he did not intend to include non-litigation time in the entries he made.[43]  Nevertheless, the Quickbooks spreadsheets include many entries that have no apparent connection to this lawsuit, totaling more than 100 hours.[44]  Mr. Daniel testified that the description in those entries does not matter because "the fact that it's in here is mentioning the litigation. Otherwise, I wouldn't have it in here."[45]  Ms. Van Vranken testified that she checked all of Mr. Daniel's entries for accuracy and did not find any questionable entries.[46]  When asked why she did not catch multiple entries that were not litigation-related, Ms. Van Vranken admitted that she did not "catch everything" that did not relate to the litigation.[47]

### E.  Dr. Jeffrey Rush

Dr. Jeffrey Rush was the only member of the NDM Board of Directors who did not receive special payments in 2016 and 2017; in other words, he was the only disinterested director.  Dr. Rush testified in deposition that, while he is a member of the NDM Board of Directors, he does not know who the other members are.[48]  He testified that he does not remember ever receiving any written communication concerning the business of NDM.[49]  He does not remember ever seeing

---

41   Trial Tr. 1 39:4-12.
42   *See* JX 7-12; PX 4 (Declaration of Jamie Pagano dated April 20, 2022) at ¶ 3, Ex. A; PX 6.
43   Trial Tr. 1 55:16-25.
44   JX 7 reflects an entry on April 9, 2013 for two hours.  The suit was not filed until August 2013, so there could not possibly have been an indemnification obligation at that point.  Other entries include: August 2 and 19, September 7 and 12, 2013 (JX 7); January 22 and 29, April 17, June 24 (partial), September 4 and 14, October 6/7 and 16, and November 20, 2014 (JX 8); February 9 and 11, March 9, 12, and 18, May 18, July 20, November 11, and December 18, 2015 (JX 9); January 12, March 5 and 8, May 11, 16, and 19, July 12, November 15 and December 15, 2016 (JX 10); January 17 and 24, February 23, March 3 (partial) and 10,  May 26, August 10, November 8 and 17, and December 5 and 6, 2017 (JX 11).  These entries total 109.5 hours.
45   Trial Tr. 1 52:1-4
46   Trial Tr. 1 147:20-25.
47   Trial Tr. 1 149:6-9.
48   PX 1 (Excerpts from Transcript of Deposition of Dr. Jeffrey Rush August 7, 2019 ("Rush Tr.")) 49:19-23.
49   Rush Tr. 101:19-102:2.

any minutes of a meeting of the Board of Directors of NDM.[50]  Dr. Rush testified that he did not learn of the existence of this lawsuit until approximately 2018, and that he has never read the complaint in this case in its entirety.[51]

Dr. Rush testified that he did not know of any documents he could review to determine what compensation Mr. Daniel receives from N.D. Management.[52]  When he was deposed in 2019, he did not remember that N.D. Management paid Mr. Daniel $75,000 in consulting fees and $152,000 in contract labor in 2016.[53]  He knew that Mr. Daniel received payments of some amount, and testified that Mr. Daniel told him that he kept a log of hours he had worked and was entitled to be compensated at the rate of $600 per hour, but that he did not ask to see the log of hours.[54]  He testified that Mr. Daniel told him that "as him operating the company at the ground level that they were entitled to that money based upon the documents . . ."[55]

Dr. Rush testified that he does not remember approving roughly $210,000 in payments to Mr. Daniel in 2017, and that he never received any documents explaining why Mr. Daniel received that money.[56]  He testified that he never reviewed any documents to determine whether the payments were appropriate and he never consulted any outside party to help him determine if they were appropriate.[57]  He testified that he did not recall the Board of NDM ever engaging an outside third party to advise it on a proposed course of action.[58]

---

[50]    Rush Tr. 49:11-13.
[51]    Rush Tr. 12:24-13:6.
[52]    Rush Tr. 77:14-21.
[53]    Rush Tr. 78:20-23.
[54]    Rush Tr. 80:21-81:25.
[55]    Rush Tr. 79:10-20.
[56]    Rush Tr. 82:21-25; 83:6-9.
[57]    Rush Tr. 83:15-20.
[58]    Rush Tr. 51:10-15.

Dr. Rush testified that Mr. Daniel never submitted a written request for indemnification to the N.D. Management Board pursuant to the Indemnification Agreement.[59]  He testified that someone provided him with a memo dated November 9, 2018 for him to sign, and that he signed it because Mr. Daniel told him that the documents supported indemnification.  He testified that he did not write the memo and that he does not know who gave it to him to sign.[60]

Both Mr. Daniel and Ms. Van Vranken submitted sworn statements that they discussed indemnification with Dr. Rush, and both listed specific dates on which those discussions took place. *See* DX 2 (Daniel) at ¶ 34; DX 3 (Van Vranken) at ¶ 31.  However, the time records provided in this case do not reflect any of those supposed discussions.[61]  Mr. Daniel testified that he tried to include all time that he spent on this lawsuit in his time entries[62] , and could not explain why none of the supposed discussions with Dr. Rush (of which he listed 15) did not appear in his time records other than that it was "another error on my part."[63]

**ARGUMENT**

I.     **Legal Standard – Entire Fairness**

Under Delaware law, there are two elements of a breach of fiduciary duty claim: existence of the duty, and breach.  *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. Apr. 23, 2010).  Fiduciary duty has two components: the duty of care and the duty of loyalty, which includes the duty to act in good faith.  *See Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).

---

[59]     Rush Tr. 85:17-20.
[60]     Rush Tr. 97:10-99:1.
[61]     *Compare* **LIST OF DATES**
[62]     Trial Tr. 1 35:10-11.
[63]     Trial Tr. 1 76:16-18.

A general partner owes duties to both the partnership and to the limited partners. *See Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012) ("General partners owe default fiduciary duties."); *see also Boxer v. Husky Oil Co.*, 429 A.2d 995, 997 (Del. Ch. 1981) ("it is clear that the general partner in a limited partnership owes fiduciary dut[ies] to the limited partners"). These duties include the "traditional fiduciary duties of loyalty and care." *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 170 (Del. 2002).

According to Delaware courts, "[a]t the core of the fiduciary duty is the notion of loyalty – the equitable requirement that, with respect to the property subject to the duty, a fiduciary always must act in a good faith effort to advance the interests of his beneficiary." *Dweck v. Nasser*, 2012 WL 161590, at *12 (Del. Ch. Jan. 18, 2012) (quoting *US W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *21 (Del. Ch. June 6, 2006)).  "[T]he Delaware Supreme Court's touchstone decision on the duty of loyalty, *Guth v. Loft,* states corporate officers and directors are not permitted to use their position of confidence to further their private interests . . . [t]he rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest." *TVI Corp. v. Gallagher*, 2013 WL 5809271, (Del. Ch. Oct. 28, 2013) at *14.

To prove a breach of the duty of loyalty, a plaintiff must show that "the board was either interested in the transaction or lacked the independence to objectively consider whether the transaction was in the best interest of the corporation and its shareholders." *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 558 (D. Del. 2008).  A fiduciary is interested in a transaction when one who controls the operations of a company stands on both sides of a transaction or "expect[s] to derive any personal financial benefit from it . . . as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993); *Ad Hoc Comm. of Equity Holders of Tectonic*

*Network, Inc.*, 554 F. Supp. 2d at 558; *see also Nebenzahl v. Miller*, 1993 WL 488284, at *3 (Del. Ch. Nov. 8, 1993) (citation omitted) ("A breach of the duty of loyalty is established when the evidence demonstrates that a director was on both sides of the transaction. . . .").[64]

When there is a breach of the duty of loyalty, the self-interested transaction is subject to entire fairness review. *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997). Under Delaware law, when a self-dealing transaction by a corporate fiduciary is challenged, the burden shifts to the defendant to prove the "entire fairness" of the transaction. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983). If entire fairness applies, the defendant has the burden of establishing that the transaction was the product of fair process and that the company received fair value. *Id.* at 711; *see also Gamco Asset Mgmt. Inc. v. iHeartMedia Inc.*, 2016 WL 6892802, at *15 (Del. Ch. Nov. 23, 2016), aff'd, 172 A.3d 884 (Del. 2017) ("the entire fairness standard imposes upon the defendants 'the burden of proving that the transaction . . . was entirely fair to the minority.'"); *Emerald Partners v. Berlin*, 787 A.2d 85, 97 (Del. 2001) ("Once entire fairness is the applicable standard . . . the director defendants . . . bear the burden of proof."). *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 570 (1984) ("when there is an inherent conflict of interest, the burden shifts to the interested directors or shareholders to prove good faith and the entire fairness"); *Whitecap (U.S.) Fund I, LP v. Siemens First Capital Commercial Fin. LLC*, 995 N.Y.S.2d 40, 46 (1st Dept. 2014) ("[A] director is interested if she appears involved on both sides of a transaction or expects

---

[64] The duty of loyalty cannot be contracted away. 8 Del. C. § 102 (b)(7) ("[T]he certificate of incorporation may. . . [contain] a provision eliminating or limiting the personal liability. . . for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) [f]or any breach of the director's duty of loyalty to the corporation or its stockholders….). *See also Auriga Capital Corp. v. Gatz Props.*, LLC, 40 A.3d 849, 859 (Del. Ch. 2012) (Delaware statutory law "does not authorize exculpation for breaches of corporate directors' duty of loyalty"); *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 32 (Del. Ch. 2014) (exculpatory clauses may not eliminate duty of loyalty).

to receive a personal financial benefit from self-dealing beyond the benefit accruing to the corporation and its other stockholders.").

Fair dealing or fair process "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and stockholders were obtained." *Weinberger*, 457 A.2d at 711; *In re Crimson Expl. Inc. Stockholder Litig.,* 2014 WL 5449419, at *9 (Del. Ch. Oct. 24, 2014).  "The degree of procedural due care a board of directors exercises has been recognized as a continuing component of an entire fairness analysis." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1175 (Del. 1995).  Courts have found that an "arm's-length negotiation provides strong evidence that the transaction meets the test of fairness" in addition to the existence of a special committee, and the absence of these mechanisms may evince a lack of fairness. *See id.* at 1172; *Weinberger,*457 A.2d at 709 n. 7.

Even where a defendant has constituted a special committee of independent Directors to review a transaction, entire fairness may not be satisfied.  In order for a defendant to obtain a shift in the burden of proof to the plaintiff based on the use of an independent special committee when the board is controlled by a controlling shareholder who has an interest in the transaction, the special committee "must function in a manner which indicates that the controlling shareholder did not dictate the terms of the transaction and that the committee exercised real bargaining power at an arms-length[;] … the inquiry must focus on how the special committee actually negotiated the deal—was it well functioning—rather than just how the committee was set up."  *In re S. Peru Copper Corp. S'holder Derivative Litig*., 52 A.3d at 789-90; *see also Rabkin v. Olin Corp*., 1990 WL 47648, at *6 (Del. Ch. Apr. 17, 1990), aff'd, 586 A.2d 1202 (Del. 1990) ("The mere existence of an independent special committee . . . does not itself shift the burden.").

In all of these cases, the key was whether shareholders were given a voice, either directly or through the appointment of someone to represent their interests. Where the process is simply run by self-interested Directors with no procedural safeguards in place to protect the shareholders, it is unlikely that the process has been "fair". *See, e.g., In re Cellular Tel. P'ship Litig.,* 2022 Del. Ch. LEXIS 56, *52 (Del. Ch. Mar. 9, 2022) (failure to use a special committee or advocate for shareholders resulted in lack of fairness);  *Reis v. Hazelett Strip-Casting Corp.,* 28 A. 3d 442, 464-65 (Del. Ch. 2011) (same).

## II.   Defendants Have Failed to Satisfy the Entire Fairness Standard

Throughout this case, Defendants have refused to acknowledge that the Payments are subject to review under the "entire fairness" standard. Defendants argue that the Payments are authorized by an "Express Contract" and that entire fairness does not apply.[65] Defendants argue in the alternative that, if entire fairness does apply, the express terms of the governing documents authorize the Payments. The express terms of the relevant documents do not authorize the Payments; in fact, Defendants' reading of some of the documents is hard to follow. Moreover, the process by which the Payments were authorized and made was run entirely by self-interested members of NDM's Board of Directors, with no meaningful input from any third party – let alone someone charged with representing the interests of shareholders. Defendants have failed to meet their burden of proof under the entire fairness standard as to either fair process or fair price.

### A.  Fair Process

The record shows that there was essentially no process for approval of the Payments when they were first made because they were made pursuant to a proposed settlement that was still being negotiated when the Payments started. When Defendants learned that the proposed settlement was

---

[65]     Defendants' Pre-Trial Memorandum (ECF 299) at 13.

null and void, Mr. Daniel did not return the Payments, and there is no evidence that returning the Payments was considered.  Instead, Defendants – with the assistance of Ms. Van Vranken, a member of NDM's Board of Directors -- engaged in an after-the-fact exercise designed to justify the payments that had been made.  There is no record of any meaningful participation in that process by anyone other than self-interested parties, and the documents used as after-the-fact support for the Payments do not justify the Payments.  Not only have Defendants failed to carry their burden of proof as to fair process, the record makes it clear that there was no effort made at the time the Payments were made to engage in a fair process.

### 1. The Payments Were Initially Made In Error Based on an Unconsummated Settlement Agreement

Payments were made in the amounts of $75,000 and $19,312.50 to Mr. Daniel on April 13, 2016.[66]  Ms. Van Vranken testified at trial that the payments were made based on Defendants' belief that Mr. Daniel was entitled to those amounts under a draft settlement agreement proposed in February 2016.[67]  Ms. Van Vranken testified that the amounts paid to Mr. Daniel in April 2016 had nothing to do with any claim for indemnification under the Indemnification Agreement.[68]  The payments were based entirely upon a disputed settlement agreement declared unenforceable by this Court[69] pursuant to which Plaintiff received no benefit.

There is confusion in the record concerning the basis for the initial payments to Mr. Daniel, highlighting the lack of process.  In 2018, during her deposition, Ms. Van Vranken emphatically denied that the payments were made based upon the proposed settlement agreement.[70]  This conflict is significant.  In 2018 Defendants claimed the Payments were for indemnification from

---

[66]     JX 21 page 11.
[67]     Transcript of Proceedings April 27, 2022 ("Trial Tr. 1") 124:6-9.
[68]     Trial Tr. 1 136:16-19.
[69]     ECF 158
[70]     Trial Tr. 1 124:18-25.

the very beginning (even though they included non-indemnifiable amounts).  Today, however, they assert a different initial justification, which makes it highly unlikely that there was any process at all when the first of the Payments were made.

The proposed settlement was not a reasonable basis for making payments to Mr. Daniel. At the time the payments began on April 13, 2016, Defendants had been made aware of significant issues that remained to be resolved concerning the proposed settlement.[71]  Payments continued for more than a year despite Defendants' knowledge that Plaintiff did not agree to the proposed settlement.

The payments were not returned to NDM after this Court declared the proposed settlement agreement unenforceable in 2018.  In short, the Payments were initially made without any process whatsoever other than an incorrect determination that Mr. Daniel was entitled to money under a proposed settlement agreement, and were not returned when that basis was declared invalid as a matter of law.

## 2. There Was No Fair Process After Mr. Daniel Decided He Would Not Return Payments Made In Error

### (a) The operative documents do not entitle Mr. Daniel to indemnification

The Payments were initially made in partial fulfillment of concessions proposed under an unconsummated agreement.  They had "nothing at all to do" with any claim by Mr. Daniel to a right to indemnity for time spent on litigation.[72]  Nevertheless, when the settlement agreement was declared void, Mr. Daniel came up with a different justification for the Payments, based on unreasonable reading of NDM corporate documents.

---

[71]  *See, e.g.,* ECF 140 at 5.
[72]  Trial Tr. 1 136:16-19.

Mr. Daniel claims that he is entitled to indemnification under the terms of the Indemnification Agreement (DX 22), and that the Payments were all made in accordance with that Agreement.  However, it is undisputed that he never made written demand for indemnification as required under that agreement.[73]

The Indemnification Agreement provides that a Proxy Holder is entitled to indemnification for time spent dealing with certain kinds of claims "at the per diem rates set forth in that certain agreement dated May ___, 1998 . . .,"[74] referring to the Certain Compensation Matters Agreement (JX 5).  In JX 5, Mr. Daniel was assigned a management fee payable by Danco Laboratories, Inc. to NDM that was originally set at $300,000 per year but has risen over time to in excess of $500,000 per year.[75]   The management fee recognized that Mr. Daniel would be primarily responsible for all routine management functions of NDM, and he was therefore compensated at a relatively high annual rate. The two other Proxy Holders – Brian Freeman and Dr. Jeffrey Rush – were compensated differently.  They each received annual fees of $50,000, but were to receive additional compensation at the rates of $3,000 and $2,500 per day up to a maximum of $250,000 additional compensation (commencing after a planned rescission offer was completed).[76] Compensation (other than incentive compensation as set forth in JX 5) was capped for all three at $300,000.  Although Mr. Daniel had responsibility for the day-to-day affairs of NDM, he testified that such services were not a full-time job.[77]

Nothing in the Certain Compensation Matters Agreement entitled Mr. Daniel to extra compensation at a per diem rate.  While there were provisions for specific kinds of extra benefits

---

[73]     *See* DX 22 at ¶ 4.
[74]     *Id.* ¶ 2
[75]     *See* Trial Tr. 1 7:13-18.
[76]     JX 5 ¶ 2.
[77]     Trial Tr. 1 88:10-12.

and incentive compensation,[78] there is no provision entitling Mr. Daniel to additional hourly or daily compensation for attending to the affairs of NDM.  That is because, as Gregory Hawkins (a signatory to the Certain Compensation Matters Agreement) understood, Mr. Daniel was receiving $300,000 per year which was "a significant amount of compensation"[79], particularly for part-time work.  Mr. Hawkins testified that he understood that that was all Mr. Daniel was entitled to, other than certain incentive compensation provided for in the Agreement.[80] In fact, Mr. Daniel has been paid approximately $10.3 million in management fees since 1996.[81]

Mr. Daniel personally participated in drafting both the Indemnification Agreement and the Certain Compensation Matters Agreement.[82]  He had every opportunity to make sure that those documents clearly spelled out a right to be indemnified for time spent on lawsuits involving NDM if in fact such indemnification was intended.

The terms of the documents, which Mr. Daniel himself helped to draft, do not give him a right to indemnification.  The only right to indemnification for time spent on lawsuits is for Proxy Holders at the per diem rates specified in the Certain Compensation Matters Agreement.  Mr. Daniel is not entitled to compensation at a per diem rate under the plain terms of the Certain Compensation Matters Agreement, and he is therefore not entitled to any payments for time spent addressing claims other than the annual management fee he received – which he himself testified required only part of his time.

That is exactly as the compensation of the Proxy Holders was structured:  If either Mr. Freeman or Dr. Rush had to spend time addressing litigation, the Indemnification Agreement

---

[78]     JX 5 ¶¶ 3, 5. 6 and 8.
[79]     Transcript of Proceedings May 18, 2022 (Trial Tr. 2) 182:21-24.
[80]     *Id.*
[81]     Trial Tr. 1 8:21-9:6.
[82]     Trial Tr. 1 13:21-14:2; 57:11-58:17.

simply makes it clear that they were entitled to be paid for that time at their per diem rates.   No provision was made for Mr. Daniel because he received the full management fee – now more than $500,000 per year – to run the business affairs of NDM.

Mr. Daniel's tortured interpretation of the Certain Compensation Matters Agreement to claim a right to compensation that is not in that document highlights the lack of fair process for approval of the Payments.  Although Mr. Daniel testified that "we had an agreement in place that was very specific", that is not the case:  the agreements made no provision for any per diem rate for Mr. Daniel.   Nevertheless, despite this obvious problem, Mr. Daniel testified that before he started receiving the Payments, no one ever even raised the issue that there is no per diem rate for him in the Certain Compensation Matters Agreement.[83]   The record is devoid of competent evidence of any third party reviewing – or even being asked to review – the documents upon which Mr. Daniel created his after-the-fact justification for the Payments.  It is inconceivable that a person fulfilling fiduciary duties to the shareholders of NDM would not have recognized the obvious problem with Mr. Daniel's proposal for compensation.   But no one questioned Mr. Daniel's interpretation.  That bespeaks a lack of fair process.

**(b)     The computation of an hourly rate was not the product of fair process**

When deciding upon an hourly rate at which he would be compensated, Mr. Daniel rejected the most obvious basis: his compensation under the Certain Compensation Matters Agreement. Had he computed an hourly rate using his own compensation, that rate should have started at $150 per hour and risen to a high of $250 per hour.  Compensation at those rates would have resulted in Mr. Daniel having been overpaid by as much as $250,000.  Mr. Daniel therefore chose to create a rate based on the per diem rate of Brian Freeman, which was the highest hourly rate computable

---

[83]        Trial Tr. 1 87:21-88:3.

under the Certain Compensation Matters Agreement.  Tellingly – at least as far as fair process is concerned – no one suggested that he consider some rate other than Mr. Freeman's per diem rate.[84]

Compounding this unfair process, Mr. Daniel applied an increase to the derived hourly rate that lacks any basis in any document.  Dividing Mr. Freeman's per diem by 8 hours resulted in an hourly rate of $375.  If that rate had been used, Mr. Daniel still would have been overpaid by approximately $60,000.  So the rate was simply increased by an inflation factor, to $550 per hour. Ms. Van Vranken attempted to justify this by testifying, under oath, that it was required under the terms of the proposed settlement agreement, but that is clearly not true.[85]  She then claimed that the inflation adjustment was required under the Danco Limited Partnership Agreement which, according to Ms. Van Vranken, required cost of living increases to "whatever someone's base compensation was."[86]  That is also clearly not true.  The only inflation adjustment discussed in the Danco Limited Partnership Agreement expressly relates only to the annual management fee to be paid by Danco Laboratories to NDM; there is literally no reference to anything relating to compensation of individuals in that document.[87]

Application of an inflation factor to compute an hourly rate for Mr. Daniel is simply not justified under the terms of any of the documents relating to the Payments.  Nor is there any record of any review by a disinterested third-party.[88]  Not even Dr. Rush, the only disinterested member of the NDM Board of Directors, was given information concerning the rate or the inflation factor.[89]

---

[84]     Trial Tr. 1 88:17-89:3.
[85]     *See* DX 18.
[86]     Trial Tr. 131:7-12.
[87]     *See*  DX 20 Section 15(d).
[88]     In her sworn statement, Ms. Van Vranken asserts that the rate was approved by NDM's accountants (DX 3 at ¶ 43), but that statement is inadmissible hearsay and is plainly unreliable in light of the complete absence of any documentation reflecting any consultation with accountants on the subject.  If in fact accountants had been consulted, there would be a paper trail, as records would have to have been transmitted to and from the accountants in order for them to review the documents.
[89]     *See* Rush Tr. 82:21-83:20 ("Q: In 2017, did you review any documents to help you understand whether the payments were appropriate? A: No.")

There was, in short, no meaningful process involving anyone other than self-interested Directors used to compute the rate at which Mr. Daniel was to be indemnified.

### (c)     Defendants' Recordkeeping does not reflect fair process

Defendants' extremely aggressive interpretation of NDM's corporate documents – without any independent third-party review – bespeaks a lack of fair process.  In addition, Defendants' record-keeping reflects a lack of fair process as well.

Defendants' after-the-fact justification for the Payments depends entirely in the first instance upon the accuracy of the records they used to support the Payments.  Those records are incomplete and inaccurate, and those issues themselves demonstrate a lack of fair process.

Mr. Daniel testified that, beginning in August 2013, he made notes whenever he spent time on this lawsuit.[90]  He testified that he gave the notes to others, but could not recall when.[91]  He testified that he did not record time spent on non-litigation matters.[92]  Although he instructed others to preserve the notes,  the notes cannot be found.[93]  The only records that exist are Quickbooks spreadsheets that, according to their metadata, were created between August and November 2018.[94]  These records – which appear to have been created as part of the after-the-fact attempt to justify the Payments – evince a lack of fair process.

### (i)     Destruction of documents should raise a spoliation inference

It is undisputed that the source documents identified by Defendants as the basis for the Payments cannot be found.  It is also undisputed that they were created during the pendency of this lawsuit.  Without the source documents, Plaintiffs' ability to test Defendants' calculation of

---

[90]     Trial Tr. 1 34:14-25.
[91]     Trial Tr. 1 36:25-37:20.
[92]     Trial Tr. 1 35:12-17; 55:16-25.
[93]     Trial Tr. 138:21-39:12.
[94]     PX 4 (Declaration of Jamie Pagano dated April 20, 2022) at ¶ 3 and Ex. A; PX 6.

the Payments is severely impaired.  In other words, there can be no serious dispute that the documents existed or that they are relevant. The only question remaining is whether the Defendants were negligent in destroying the documents.  *See, e.g., Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F. 3d 99, 107-08 (2d Cir. 2002).  The documents must have existed (if they ever existed) in August 2018, when the Quickbooks summaries were prepared, but they were gone within months even though Defendants knew they related to claims in this case.  Where the destroying party knew that the documents related to claims in a litigation but failed to take appropriate steps to preserve them, a spoliation inference should be applied.  *See, e.g., Id.; Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.,* 304 F.R.D. 178, 184 (S.D.N.Y. 2014) (inference applies where destruction of relevant evidence is grossly negligent; purpose of spoliation doctrine is to place the risk arising out of loss of evidence on the party who created the risk).

### (ii)      The records that exist were specifically created for litigation

Defendants admit that their current justification for the Payments was not their original justification for the Payments.[95]  They only decided to use indemnification as a justification for the Payments some time after Mr. Daniel had started receiving money.  Although Mr. Daniel testified that that change took place after he learned of Plaintiff's rejection of the February 2016 settlement proposal, which he placed in late 2016, that testimony is incorrect.  Defendants have admitted they knew of Plaintiff's position on settlement in April 2013.[96]  Moreover, although Mr. Daniel has created a fiction that he only learned of Plaintiff's position after he dismissed a lawsuit in Tennessee (which dismissal, according to Mr. Daniel's fictionalized account, was done in

---

[95]      *E.g.,* Trial Tr. 1 136:16-19 (at time of first payments to Mr. Daniel in 2013, amounts paid "had nothing to do" with Mr. Daniel's claim for indemnification).

[96]      *See, e.g.,* ECF 140 (Defendants' Memorandum of Law in Support of Motion to Enforce Settlement dated March 6, 2017), page 5.

fulfillment of the February 2016 proposed settlement of this case)[97], the record thoroughly debunks that story.  Dismissal of the Tennessee lawsuit took place in October 2016 pursuant to a separate settlement agreement[98]; as noted, Defendants were made aware of the dispute concerning the proposed settlement of this case as early as April 2016.

The spreadsheets purporting to show time spent by Mr. Daniel on this lawsuit were created between August and November 2018, in part after Plaintiff filed the Third Amended Complaint challenging the validity of the Payments.[99]  They are part of Defendants' after-the-fact attempt to justify payments improperly made to Mr. Daniel in reliance on the proposed settlement agreement, and were created for this litigation.  Their accuracy cannot be tested due to Defendants' destruction of the source documents, and they would be suspect in any event.  They are not contemporaneous records, and are filled with inaccuracies and questionable time entries.  They should not be accepted as any part of a "fair process" defense.

### (iii)    The spreadsheets are inaccurate

Mr. Daniel testified that he did not include non-litigation time when he recorded time for which he was to claim indemnification.[100]  That testimony makes the spreadsheets highly suspect. As set forth above, there are dozens of entries totaling more than 100 hours the descriptions of which reflect activity not related to this case.[101]  When questioned what in these entries reflects indemnifiable activity, Mr. Daniel testified that even if the description did not refer to indemnifiable activity, "the fact that it's in here is mentioning the litigation.  Otherwise, I wouldn't

---

[97]     Trial Tr. 1 86:25-87:19.
[98]     ECF 150 (Report and Recommendation dated January 9, 2018) at 6-7; ECF 140 page 6 (dismissal of Tennessee lawsuit).

[99]     JX 4 at ¶3 and Ex. A; ECF 191 (Third Amended Complaint filed October 5, 2018)
[100]    Trial Tr. 1 55:4-6.
[101]    *See* above, fn.41.

have it in here."[102]  But since he did not intend to record non-lawsuit-related activity in the first place, his explanation makes no sense.

The presence of so many non-litigation-related entries also calls into question the process by which the Payments were approved.  Ms. Van Vranken testified that she was the quality control person for Mr. Daniel's time, but she had no explanation for why there were so many non-litigation-related charges listed other than that "I didn't catch everything."[103]

The reason she "didn't catch everything" is because she believed when she reviewed the time entries that Mr. Daniel was entitled to be paid for all of his time spent on NDM matters.  She testified in 2018 that she understood the Payments to Mr. Daniel were "for his work and time in managing the affairs of ND Management and Danco,"[104] which is a much more credible reason for the presence of the non-litigation-related entries on the spreadsheets than that she simply missed some three dozen incorrect entries.  Of course, if that was her understanding in 2018, there could not possibly have been a "fair process" for approval of the payments, since not even Defendants argue that Mr. Daniel was entitled to be paid supplemental hourly payments managing the day-to-day affairs of NDM.  Mr. Daniel receives more than $500,000 each year to manage the affairs of NDM.  A process that resulted in supplemental payments to Mr. Daniel for time spent on non-litigation matters concerning NDM would be unfair even by Defendants' current definitions.  Yet that is what happened here.

**(d)    Dr. Rush**

Dr. Rush is the only independent Director of NDM, and the only Director who did not receive payments for "consulting" or "contract labor" in 2016 and 2017. If Defendants intended to

---

[102]        Trial Tr. 1 52:1-4.
[103]        Trial Tr. 1 149:6-9.
[104]        Trial Tr. 1 149:21-150:21.

engage in a fair process for approval of the Payments, Dr. Rush should have been deeply involved. The record shows that he was only involved after the fact.  Dr. Rush testified that he did not learn of the existence of this lawsuit until approximately 2018.[105]  That testimony means that he was not consulted at the time the Payments were made in 2016.

Both Mr. Daniel and Ms. Van Vranken submitted sworn statements that they discussed indemnification with Dr. Rush, and both listed specific dates on which those discussions took place. *See* DX 2 (Daniel) at ¶ 34; DX 3 (Van Vranken) at ¶ 31.  However, the time records provided in this case do not reflect any discussions regarding indemnification prior to the time the Payments were made; in fact, most of the records do not reflect any discussions with Dr. Rush on the dates in question at all.[106]  Not only do the time records not support the testimony of Mr. Daniel and Ms. Van Vranken, but most of the dates identified by Mr. Daniel and Ms. Van Vranken predate 2018. Dr. Rush testified that he was unaware of this case prior to 2018, making it impossible that he discussed indemnification with anyone prior to that time.    Thus, Mr. Daniel's testimony is contradicted by the testimony of Dr. Rush, and also by Mr. Daniel's time records.  The same is true for Ms. Van Vranken's testimony.

The record makes it clear that there was no attempt to involve Dr. Rush or any other independent third party in the process of approving the Payments.    In 2019, Dr. Rush did not remember that N.D. Management paid Mr. Daniel $75,000 in consulting fees and $152,000 in contract labor in 2016.[107]  He knew that Mr. Daniel received payments of some amount, and testified that Mr. Daniel told him that he kept a log of hours he had worked and was entitled to be

---

[105]     Rush Tr. 12:24-13:6.
[106]     *Compare* JX 7 at 4, 7; JX 8 at 2, 14; JX 9 at 9; JX 10 at 12; JX 11 at 2, 11; JX 25 at 2; JX 26 at 2-3; JX 27 at 2.
[107]     Rush Tr. 78:20-23.

compensated at the rate of $600 per hour, but that he did not ask to see the log of hours.[108]   He

testified that Mr. Daniel told him that "as him operating the company at the ground level that they

were entitled to that money based upon the documents . . ."[109]

Dr. Rush testified that he does not remember approving roughly $210,000 in payments to

Mr. Daniel in 2017, and that he never received any documents explaining why Mr. Daniel

received that money.[110]   He testified that he never reviewed any documents to determine whether

the payments were appropriate and he never consulted any outside party to help him determine if

they were appropriate.[111]   He testified that the Board of NDM ever engaged an outside third

party to advise it on a proposed course of action.[112]

Thus, Dr. Rush gave sworn testimony that directly contradicts the testimony of the two

self-interested Directors of NDM, Mr. Daniel and Ms. Van Vranken.  As a Director of NDM, Dr.

Rush could have been called by Defendants as a witness at trial to explain this profound

discrepancy.  Defendants' failure to call Dr. Rush is an admission on their part that his story does

not corroborate theirs.  In evaluating whether Defendants have met their burden of proof to

demonstrate that the process employed by NDM was fair, the testimony of Dr. Rush, and his

absence at trial, should be significant factors.

Most importantly, Dr. Rush's testimony made it clear that there was no attempt made to

employ any procedural protections for the shareholders of NDM, or to engage an advocate for their

interests.  Under Delaware law, that is compelling evidence of a lack of fairness.  *E.g., In re*

*Cellular Tel. P'ship Litig.,* 2022 Del. Ch. LEXIS 56, *52 (Del. Ch. Mar. 9, 2022) (failure to use a

---

| | |
|---|---|
| 108 | Rush Tr. 80:21-81:25. |
| 109 | Rush Tr. 79:10-20. |
| 110 | Rush Tr. 82:21-25; 83:6-9. |
| 111 | Rush Tr. 83:15-20. |
| 112 | Rush Tr. 51:10-15. |

special committee or advocate for shareholders resulted in lack of fairness);  *Reis v. Hazelett Strip-Casting Corp.,* 28 A. 3d 442, 464-65 (Del. Ch. 2011) (same).

**B.  Fair Price**

The record shows that the shareholders of NDM received no value for the approximately $438,000 paid to Mr. Daniel in 2016 and 2017 (or the additional amount – estimated by Mr. Daniel as another $400,000 – since 2017[113]) for "consulting" and "contract labor".

First, Mr. Daniel is paid an amount in excess of $500,000 each year to manage the affairs of NDM.  He testified that it is not full-time work,[114] and the time records submitted in this case show a total of approximately 110 hours of time spent on NDM affairs by Mr. Daniel from 2013 through 2018.  By any standard, Mr. Daniel receives extraordinary annual compensation for tending to the affairs of NDM.  In light of this, he is not entitled to payment on a per diem basis for any work done on behalf of NDM – and that should be no surprise given the size of the annual management fee.

By contrast, the other proxy holders received only $50,000 annually, with the ability to earn an additional $250,000 at per diem rates if they were called upon to devote additional time to the affairs of NDM.  It should come as no surprise that the Indemnification Agreement made it clear that time spent by other Proxy Holders would be compensated at their per diem rates, because that was a primary basis of their compensation.

Taken together, the Indemnification Agreement (DX 20) and the Certain Compensation Matters Agreement (JX 5) gave Dr. Rush and Mr. Freeman the right to receive per diem compensation for time spent addressing lawsuits.  Those same documents do not give such a right to Mr. Daniel because he was overcompensated to begin with.  Even including the time he claims

---

[113]     Trial Tr. 1 33:19-34:9.
[114]     Trial Tr. 1 88:4-11.

to have spent on this lawsuit since 2013 (amounting to approximately 150 hours per year), Mr. Daniel is still extravagantly overcompensated for his work for NDM.  According to the documents upon which Mr. Daniel relies, he is not entitled to any compensation for time spent on this lawsuit and the $438,000 he received is not fair to the shareholders of NDM.

Second, the formula used to determine the amount paid to Mr. Daniel is grossly unfair to NDM's shareholders.  Mr. Daniel engineered the rate he was to receive in an after-the-fact calculation designed to justify the amount he received, not to come up with a "fair" amount.  He started with the highest possible hourly rate he could find (Mr. Freeman's per diem divided by 8 hours), with no third-party review and apparently no debate.  He could have derived a rate based upon his annual compensation, but that rate (approximately $150 per hour) would have left him owing money back to NDM.  NDM's shareholders had no voice in any of these machinations.

To make matters worse, Mr. Daniel applied a wholly unjustified inflation factor that lacks any support in any document.  If he had used just his cherry-picked rate, he would have still owed money back to NDM.  The solution:  increase the rate by an inflation factor applied through 2013 (but not thereafter).  Miraculously, the result was an amount that left NDM owing money to Mr. Daniel, and not the other way around.  Needless to say, the "price" charged by Mr. Daniel to NDM was grossly unfair, which is no surprise given that it was an after-the-fact calculation specifically designed to justify the amount paid.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment in her favor as to Count VIII and require Mr. Daniel to return to NDM the $431,817.52 he received in payments in 2016 and 2017, as well as any other payments he has received since then for time spent addressing this lawsuit.

Dated: June 20, 2022
       New York, New York

**WOLLMUTH MAHER & DEUTSCH LLP**

By:    */s/ R. Scott Thompson*

     R. Scott Thompson
     500 Fifth Avenue
     New York, New York 10110
     Phone: (212) 382-3300
     Fax: (212) 382-0050
     sthompson@WMD-LAW.com
     nrende@WMD-LAW.com

     *Attorneys for Plaintiff Sharon Hawkins*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 21, 2022 I caused to be served by electronic means via the Court's CM/ECF System a copy of the Memorandum of Law in Opposition to Defendants' Motion to Strike Plaintiff's Jury Demand on all counsel registered to receive electronic notices.

Dated: June 21, 2022                    **WOLLMUTH MAHER & DEUTSCH LLP**

By: <u>   *s/ R. Scott Thompson*          </u>
                                          R. Scott Thompson